## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

GEORGIA COALITION FOR THE
PEOPLES' AGENDA, INC., as an
organization; ASIAN AMERICANS
ADVANCING JUSTICE-ATLANTA,
INC., as an organization; GEORGIA
STATE CONFERENCE OF THE
NAACP, as an organization; NEW
GEORGIA PROJECT, INC., as an
organization; GEORGIA
ASSOCIATION OF LATINO
ELECTED OFFICIALS, INC., as an
organization; PROGEORGIA STATE
TABLE, INC., as an organization; THE
JOSEPH AND EVELYN LOWERY
INSTITUTE FOR JUSTICE AND
HUMAN RIGHTS, INC, as an
organization; and COMMON CAUSE,
as an organization;

       Plaintiffs,

v.

BRIAN KEMP, in his official capacity as
Secretary of State for the State of
Georgia,

       Defendant.

Civil Action
Case No. 1:18-cv-04727-ELR

**AMENDED COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF**

**Section 2 of the Voting Rights Act
of 1965 (52 U.S.C. § 10301);
Section 8 of the National Voter
Registration Act of 1993 (52
U.S.C. § 20507); First and
Fourteenth Amendments to the
United States Constitution**

## INTRODUCTION

1.     In 2017, Georgia Governor Nathan Deal signed into law House Bill 268, which codified a voter registration database "exact match" protocol that had been already shown to disproportionately and negatively impact the ability of voting-eligible African-American, Latino and Asian-American applicants to register to vote.

2.     The protocol codified by HB 268, and implemented by Georgia's Secretary of State, Defendant Brian Kemp, requires county registrars to enter information from a voter registration form into Georgia's statewide voter registration system known as "Enet." That information is then matched against records on file with the Georgia Department of Drivers Services (DDS) or Social Security Administration (SSA). If the information entered into "Enet" does not exactly match the applicant's identity data on file with DDS or SSA, the application is placed in "pending" status. HB 268 places the burden upon the applicant to then cure the no match result within 26 months. If this deadline is not met, or the application is cancelled, and the applicant must start the voter registration application process anew.

3.     Under this "exact match" protocol, the transposition of a single letter or number, deletion or addition of a hyphen or apostrophe, the accidental entry of

2

an extra character or space, and the use of a familiar name like "Tom" instead of "Thomas" will cause a no match result. HB 268 imposes no requirement upon county registrars to check whether the information from the registration form was accurately entered into the "Enet" system or to perform any other quality review to determine whether the no match result was caused by a common error before relegating the application to "pending" status and putting the burden on the applicant to cure the no match—even when the no match result was caused through no fault of the applicant.

4.     Applicants are also put into pending status if the DDS or SSA records flag the applicant as a potential non-citizen. United States citizens are routinely erroneously flagged as non-citizens because the system relies upon citizenship data in DDS records that are not automatically updated to reflect that an applicant has attained U.S. citizenship after having previously obtained a driver's license or state ID as a non-citizen. Plaintiff organizations have found that registrars often place such applicants in pending status and send notices demanding they provide proof of citizenship even when the applicants included their naturalization certificate with their initial registration.

5.     HB 268 contains no requirement that county registrars examine whether proof of citizenship documents were submitted with the registration before

3

placing a voter in pending status, despite this known issue caused by outdated DDS citizenship data. The result is an additional burden on citizens who already took affirmative steps to prove their citizenship status with their registration.

6.      HB 268's matching protocol holds voter registration applicants to a strict "exact match" standard, even though the matching protocol itself is not a model of strict accuracy and is prone to erroneous, inconsistent results that are often not the fault of the applicant. In fact, the SSA Help America Vote Verification ("HAVV") database is widely known to routinely produce false no match and inconsistent results. The error-prone nature of the SSA HAVV matching process was the subject of an evaluation report by the office of the SSA's Inspector General which found, among other things, that the "HAVV program provided the States with responses that may have prevented eligible individuals from registering to vote and allowed ineligible individuals to vote."

7.      HB 268 was introduced in 2017 on the heels of the settlement of a lawsuit filed the previous year, which challenged a substantially similar voter registration database matching protocol that had been implemented administratively by Defendant Kemp. HB 268 was a transparent effort by the Georgia General Assembly and Secretary of State's office to undermine reforms achieved by that settlement.  Governor Deal, the Georgia General Assembly, and

4

Defendant Kemp were all on notice that HB 268 would impose severe burdens on applicants' right to vote and have a severe discriminatory impact on African-American, Latino and Asian-American applicants.

8.     Since the enactment of HB 268, the voter registration verification process and its implementation by the Georgia Secretary of State's Office have continued to produce a high rate of erroneous "no-matches" that disproportionately impacts African-American, Latino and Asian-American applicants.

9.     A preliminary review of data produced by the Georgia Secretary of State's Office on July 4, 2018 indicates that approximately 51,111 voter registration applicants were in "pending" status for reasons related to the "exact match" protocol, i.e., the purported failure to verify against DDS or SSA identity or citizenship data. Approximately 80.15% of those pending applications were submitted by African-American, Latino and Asian-American applicants. Only 9.83% of the "pending" for failure to verify applications were submitted by applicants identifying as White.

10.     Because of the errors and limitations inherent in the "exact match" protocol, the 26-month cancellation requirement for "pending" applicants will undoubtedly result in the cancellation of pending applications that are facially complete and accurate before the 2020 Presidential election cycle.

5

11.    Unless the Court grants the relief requested herein by Plaintiffs, this protocol will continue to have a discriminatory impact on African-American, Latino and Asian-American applicants and will continue to impose severe burdens on voting-eligible Georgians' fundamental right to vote that are not justified by any rational or compelling state interest.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1343(a) because it seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Voting Rights Act and 28 U.S.C. § 1331, because it arises under the laws of the United States.

13.    This Court has jurisdiction to grant both declaratory and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202.

14.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

15.    Plaintiff THE GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC. ("GCPA") is a Georgia nonprofit corporation with its principal

place of business located in Atlanta, Georgia. The GCPA is a coalition of more than 30 organizations, which collectively have more than 5,000 individual members. The organization encourages voter registration and participation, particularly among Black and other underrepresented communities. The GCPA's support of voting rights is central to its mission. The organization has committed, and continues to commit, time and resources to conducting voter registration drives, voter education, voter ID assistance, Souls to the Polls, and other get out the vote ("GOTV") efforts in Georgia that seek to encourage voter participation. Applicants who have submitted voter registration forms through voter registration drives conducted by the GCOA have had their applications put into "pending" status due to the "exact match" registration protocol, including the nephew of the organization's executive director whose application was put into pending status as a result of a clerical error by the Fulton County registrar's office. Georgia's "exact match" registration protocol is causing and will continue to cause harm to the GCPA's mission of encouraging minority voter registration and participation. The protocol will cause GCPA to divert a portion of its financial and other organizational resources to educating voters about the protocol and assisting potential voters whose applications have been cancelled or put into "pending" status limbo. As a result, the GCPA has, and will continue to have, fewer resources

7

to dedicate to its other organizational activities, including voter registration drives and GOTV efforts, unless the "exact match" registration protocol of HB 268 is enjoined.

16.     Plaintiff ASIAN AMERICANS ADVANCING JUSTICE – ATLANTA, INC. ("Advancing Justice – Atlanta") is a non-partisan, nonprofit organization that was founded in 2010 and is located in Norcross, Georgia. Advancing Justice – Atlanta protects and promotes the civil rights of Asian Americans and Pacific Islanders ("AAPIs") and other immigrant and refugee communities in Georgia through policy advocacy, legal services, impact litigation, and civic engagement. As part of its civic engagement efforts, Advancing Justice – Atlanta engages in voter registration, voter education, and GOTV efforts in Georgia, with a particular focus on AAPI voters, including newly naturalized citizens. Upon information and belief, persons of color who attempted to register to vote through Advancing Justice – Atlanta's voter registration drives have had their applications put into "pending" status due to the "exact match" registration protocol. Georgia's "exact match" registration protocol is causing and will continue to cause harm to Advancing Justice – Atlanta's mission to promote the rights of the AAPI community. The protocol will cause Advancing Justice – Atlanta to divert a portion of its financial and other organizational resources to

educating voters about the protocol and its impact on the registration process. As a result, Advancing Justice – Atlanta has, and will continue to have, fewer resources to devote to its other organizational activities, including voter registration drives and GOTV efforts, unless the "exact match" registration protocol of HB 268 is enjoined.

17.    PROGEORGIA STATE TABLE, INC. ("PROGEORGIA") is a 501(c)(3) nonprofit organization founded in 2012. Its mission is to coordinate the civic engagement efforts of its nonprofit member groups. PROGEORGIA aims to increase voter engagement among historically underrepresented voters by supplying field coordination for voter education and voter mobilization efforts. Among other activities, PROGEORGIA offers voter registration opportunities at naturalization ceremonies and facilitates voter registration drives by its member organizations. Upon information and belief, minority applicants who attempted to register to vote through registration drives organized by PROGEORGIA have had their applications put into "pending" status due to the "exact match" registration protocol. Georgia's "exact match" registration protocol is causing and will continue to cause harm to PROGEORGIA's mission of encouraging minority voter registration and participation. The protocol will cause PROGEORGIA to divert a portion of its financial and other organizational resources to educating voters about

the protocol and assisting potential voters whose applications have been cancelled or put into pending status. As a result, PROGEORGIA is limited, and will continue to be limited, to devoting fewer resources to its other organizational activities, including voter registration efforts. Unless the enforcement of HB 268 is enjoined, the "exact match" registration protocol will impair PROGEORGIA's voter registration projects by causing the organization to divert personnel and time to assisting its member organizations whose efforts to register voters and civic engagement programs are hindered and made more difficult because of the "exact match" protocol.

18.    Plaintiff GEORGIA STATE CONFERENCE OF THE NAACP ("Georgia NAACP") is a non-partisan, interracial, nonprofit membership organization that was founded in 1941. Its mission is to eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and economic rights of all persons, in particular African Americans. It is headquartered in Atlanta and currently has approximately 10,000 members. The Georgia NAACP works to protect voting rights through litigation, advocacy, legislation, communication, and outreach, including work to promote voter registration, voter education, get out the vote efforts, election protection, and census participation. The Georgia NAACP regularly conducts voter registration

drives and has submitted many voter registration applications to elections officials

throughout Georgia. Upon information and belief, voter registration applications

filled out by voting-eligible Georgia NAACP members and other voting-eligible

Georgians who submit registration forms through the Georgia NAACP's voter

registration drives have, and will be, put into pending status and risk having their

applications cancelled as a result of the "exact match" registration protocol

mandated by HB 268. The HB 268 "exact match" protocol has caused, and will

cause, the Georgia NAACP to divert a portion of its financial and other

organizational resources to educating voters about the protocol and assisting

applicants whose applications have been cancelled or put into pending status as a

result of the "exact match" protocol. As a result, the Georgia NAACP has, and will

continue to have, fewer resources to devote to its civic engagement and other

programs, including voter registration drives and GOTV efforts, unless the "exact

match" registration protocol of HB 268 is enjoined.

19.     Plaintiff, the NEW GEORGIA PROJECT, INC. ("NGP"), is a

Georgia 501(c)(3) not-for-profit corporation. NGP's mission is to civically engage

Georgians in underrepresented communities. NGP regularly conducts voter

registration drives throughout Georgia. Voter registration drives are a substantial

component of its civic engagement mission. On information and belief, eligible

minority applicants who attempted to register to vote through registration drives conducted by NGP have had their applications placed into pending status due to the voter registration verification protocol mandated by HB 268. Georgia's exact match protocol is causing and will continue to cause harm to NGP's mission of encouraging voter registration and participation among minority applicants and underserved communities. The protocol will cause NGP to divert a portion of its financial and other organizational resources to educating voters about the protocol and assisting potential voters whose applications have been cancelled or put into pending status. As a result, NGP is limited, and will continue to be limited, to devoting fewer resources to its other organizational activities, including voter registration drives, unless the "exact match" protocol mandated by HB 268 is enjoined.

20.    Plaintiff GEORGIA ASSOCIATION OF LATINO ELECTED OFFICIALS, INC. ("GALEO") is a non-partisan and nonprofit organization founded in Georgia under § 501(c)(6) of the Internal Revenue Code. It was established to increase representation of Latino elected and appointed officials, to proactively address issues and needs facing the Latino community, and to engage Georgia's Latino community in the democratic and political process. It does so through (1) television, radio and print media Spanish public service

announcements; (2) widespread distribution of literature regarding voter registration and other voting-related issues (in both English and Spanish); (3) administration of a voter information hotline and website (in both English and Spanish); (4) provision of electronic access to legislative voting records; and (5) voter mobilization efforts that include voter registration drives, "get out to vote" phone calls and transporting voters to the polls. Upon information and belief, voter registration applications filled out by eligible GALEO members and persons whom GALEO assists in registering to vote will be put into pending status and risk being cancelled as a result of the voter registration verification protocol mandated by HB 268. Additionally, upon information and belief, minority applicants who attempted to register to vote through registration drives conducted by GALEO have had their applications put into "pending" status. Georgia's "exact match" protocol is causing and will continue to cause GALEO to divert a portion of its financial and other organizational resources to educating voters about the protocol and assisting potential voters whose applications have been cancelled or put into pending status. As a result, GALEO has, and will be, forced to divert resources away from other organizational activities, including voter registration drives and GOTV efforts because of the "exact match" protocol mandated by HB 268 unless the Court grants the remedial relief herein requested.

21.     Plaintiff THE JOSEPH AND EVELYN LOWERY INSTITUTE FOR

JUSTICE AND HUMAN RIGHTS ("Lowery Institute") is a non-partisan,

nonprofit organization that was founded in 2001 and is located in Atlanta, Georgia.

The vision of the Lowery Institute is to ensure that everyone has a political voice

and has the tools to be change agents in their community. The Institute serves its

mission by focusing on civil and human rights, social justice, education, and

community health. As part of its civic engagement efforts, the Lowery Institute

conducts voter registration efforts in Georgia focused on college students and

younger voters of color. Upon information and belief, persons of color who

attempt to register through the Lowery Institute's voter registration drives have had

their applications put into "pending" status due to the "exact match" registration

protocol. Georgia's "exact match" registration protocol is causing and will cause

harm to the Lowery Institute's mission to promote the rights of college students

and younger voters of color. The protocol will cause the Lowery Institute to divert

a portion of its financial and other organizational resources to educating voters

about the protocol and its impact on the registration process. As a result, the

Lowery Institute has, and will continue to have, fewer resources to devote to its

other organizational activities, including its civic engagements efforts, unless the

"exact match" registration protocol of HB 268 is enjoined.

14

22.     Plaintiff COMMON CAUSE is a nonprofit corporation organized and existing under the laws of the District of Columbia. It is one of the nation's leading grassroots democracy-focused organizations and has over 1.2 million members nationwide and chapters in 35 states, including 18,785 members and supporters in Georgia. Since its founding in 1970, Common Cause has been dedicated to the promotion and protection of the democratic process, including the right of all citizens to vote in fair, open, and honest elections.  Common Cause, at the national level and in Georgia, conducts significant nonpartisan voter-protection, advocacy, education, and outreach activities to endure that voters are registered and have their ballots counted as cast.  From Georgia, over the last five years, its efforts have increased in the areas of election protection, voter education, and grassroots mobilization around voting rights in the state. Common Cause works on election administration issues with its coalition, much of which is represented by the other plaintiffs in the instant lawsuit. As of 2017, Common Cause, alongside its partners at New Georgia Project, Asian Americans Advancing Justice, ACLU of Georgia, and Spread the Vote, created a program to help recruit volunteers to monitor local board of elections meetings through the Peanut Gallery program. Common Cause also works with these partners in election protection efforts during both midterm and presidential elections. Through its volunteer recruitment for poll monitors, Common

Cause Georgia is on track to help monitor an average of five polling locations in 22 counties for a total of 110 polling places. Common Cause Georgia additionally engages in online petition drives, soliciting signatures from its members and supporters urging government officials to take certain actions.  For example, it urged the Randolph County Board of Elections to vote against polling place closures (the petition drew 13,840 signatures). And just last week, Common Cause informed its membership that the Georgia Secretary of State was holding up roughly 53,000 voter registration applications due to the "exact match" law; as of October 14, 2018, 53,476 members and supporters signed a petition asking the Secretary of State to cease this unconstitutional practice. Indeed, the practice of using an "exact match" system impacts Common Cause's work, as its election protection program focuses on providing resources that enable voters to participate and be educated on the questions they should ask if their registration status is pending on the voter rolls. Common Cause now must double its efforts to counter this latest challenge where tens of thousands of Georgians could be impacted. As a result, Common Cause has, and will continue to have, fewer resources to devote to its other organizational activities unless the "exact match" registration protocol of HB 268 is enjoined.

23.     Defendant BRIAN KEMP is being sued in his official capacity as Georgia's Secretary of State. Secretary Kemp's responsibilities include maintaining the state's official list of registered voters and preparing and furnishing information for citizens pertaining to voter registration and voting. Ga. Code Ann. §§ 21-2- 50(a), 21-2-211. Defendant Kemp also serves as the Chairperson of Georgia's State Election Board, which promulgates and enforces rules and regulations to obtain uniformity in the practices and proceedings of election officials and is responsible for promoting the fair, legal, and orderly conduct of all primaries and elections in the state. *Id*. §§ 21-2-30(d), 21-2-31, 21-2-33.1. Finally, Defendant Kemp is the chief election official responsible for the coordination of Georgia's list maintenance responsibilities under the National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act of 2002 (HAVA). *Id*. §§ 21-2-210, 21-2-50.2.

## FACTS AND BACKGROUND

### Voter Registration in Georgia under State and Federal Law

24.     A voter must be registered as an elector in Georgia to cast a ballot that counts in any election held in the state.  Ga. Code Ann. § 21-2-216(a)(1).

25.     Pursuant to HAVA, the State of Georgia must maintain a centralized, computerized, statewide voter registration database as the single system for storing

and managing Georgia's official list of registered voters. 52 U.S.C. §

21083(a)(1)(A). The registration database must be coordinated with other agency

databases within the state.  *Id*; *see also* Ga. Code Ann. § 21-2-216(g)(7).

26.     This allows matching across databases, where possible, to alleviate

other voter identification requirements under HAVA, as described below.

27.     HAVA imposes certain identification requirements for first-time

voters. 52 U.S.C. § 21083(a)(5). Voter registration applicants who have been

issued a current and valid driver's license must provide their driver's license

number on the application.  52 U.S.C. § 21083(a)(5)(A). Applicants who lack a

current driver's license must provide the last four digits of their social security

number.  *Id.*  If an applicant does not have either, the state must assign the

applicant a unique identifier for voter registration purposes.  *Id*.

28.     HAVA requires that Georgia's chief election official enter into an

agreement with the Georgia Department of Driver Services (DDS) "to match

information in the database of the statewide voter registration system with

information in the database of the motor vehicle authority to the extent required to

enable each such official to verify the accuracy of the information provided on

applications for voter registration."  52 U.S.C. § 21083(a)(5)(B).  Further, DDS

must enter into an agreement with the Commissioner of Social Security for the same purpose. *Id*.

29.     But the HAVA matching protocol is just one potential voter identification method under HAVA. HAVA does not mandate that voter registration applications be put into "pending" status or canceled if the information contained on the application fails to exactly match fields in the DDS or SSA databases. To the contrary, under the NVRA and HAVA, all eligible applicants that submit complete, accurate registration forms must be registered to vote in federal elections.

30.     All applicants who register by mail and have not previously voted in a federal election must provide proof of identification either with their registration application or when voting for the first time. 52 U.S.C. § 21083(b).  Satisfactory proof of identification (HAVA ID) includes a match with DDS or SSA records but also includes a copy of a current utility bill, bank statement, government check, paycheck, other government document showing the name and address of the voter, or any current and valid photo identification.  52 U.S.C. § 21083(b)(2)(A).

31.     First-time voters can submit a copy of their HAVA ID along with their ballot if they choose to vote by mail.  52 U.S.C. § 21083(b)(2)(A)(ii).  If they choose to vote in person, first-time voters can present their current and valid photo

identification or a copy of other HAVA ID to the election official or poll worker. 52 U.S.C. § 21083(b)(2)(A)(i).

32.     Thus, HAVA does not mandate that states cancel voter registration applications or put applications in pending status when they fail to exactly match the applicant's records on file with DDS or SSA. Rather, the SSA and DDS matching is just one of several options for identification for first-time voters. If there is no match, the NVRA still requires eligible voters to be registered, and HAVA only requires that applicants show a form of HAVA ID when they vote for the first time if they registered by mail.

## HB 268's Exact Match Registration Protocol

33.     HB 268's "exact match" registration protocol turns HAVA matching on its head by making a proper "match" a requirement that can lead to the cancellation or rejection of registration rather than one of several options for proving identity when voting for the first time. The protocol is unlawful because it imposes unnecessary and discriminatory burdens on the voter registration process.

34.     HB 268 states that "a voter registration application may be accepted as valid only after the board of registrars has verified the authenticity of the Georgia driver's license number, the identification card number of an identification card

issued pursuant to Article 5 of Chapter 5 of Title 40, or the last four digits of the social security number provided by the applicant."

35.    It further provides that the authenticity of the Georgia driver's license number, state identification card number of last four digits of the social security number provided by the applicant may be accomplished by two methods:

(1) The board of registrars matching the Georgia driver's license number, identification card number of an identification card issued pursuant to Article 5 of Chapter 5 of Title 40, or the last four digits of the social security number provided by the applicant with the applicant's record on file with the Department of Driver Services or the federal Social Security Administration; or

(2) The applicant providing sufficient evidence to the board of registrars to verify the applicant's identity, which sufficient evidence includes, but is not limited to, providing one of the forms of identification listed in subsection (a) of Code Section 21-2-417."

36.    If the application is not "verified" by one of these methods within 26 months, the voter's registration application must be rejected, even if it is facially complete and accurate.

37.    The "exact match" registration protocol in Georgia predates HB 268. It was first implemented in approximately 2009 via an administrative policy of Defendant Kemp.

38.    The "exact match" registration protocol under HB 268 functions in a very similar manner to Defendant Kemp's prior failed "exact match" administrative policy. Upon information and belief, HB 268 is enforced as follows.

39.    First, the automated system matches voter registration data to the DDS or SSA databases. When matching registration data against the DDS database, it compares the following fields: first name, last name, date of birth, driver's license or state ID number, and citizenship status.  When matching registration data against the SSA database, it compares the following fields: first name, last name, date of birth, and last four digits of the social security number.

40.    In the common event that the data in one of the fields of the DDS or SSA databases does not match *exactly* with the information provided on the voter registration application, the ENET system sends a report to the local registrar.  The report identifies whether the information in the application failed to match with information in the DDS or the SSA database.

41.    If a "no-match" applicant provided a driver's license or state ID number on the voter registration application, and information in one of the data fields fails to match the information in the DDS database, the report produced by ENET identifies the exact fields that failed to match.

42.     If a "no-match" applicant provided the last four digits of a social security number on the voter registration application, and information in one of the data fields failed to match the information in the SSA database, the report produced by ENET does not provide any details to the local registrar about which fields failed to match.  The report to the local registrar only returns a code "Z," which indicates that the information from any or all of the data fields did not match to one or more records in the SSA database.

43.     County election officials from all 159 Georgia counties enter data into ENET. Unsurprisingly, clerical errors often occur at the county level that lead to "no-match" results and voters being placed in "pending" status and at risk of having their applications cancelled after 26 months. HB 268 does not require county registrars to investigate the reasons for a verification failure and, where appropriate, resolve the issue without placing the burden on the applicants.

44.     Any data entry errors that occur when applicants' personal information is entered into the DDS or SSA databases will similarly lead to false "no-match" errors.

45.     The SSA database is particularly prone to errors. In 2009, the Social Security Administration Office of the Inspector General produced a report assessing the accuracy of its "Help America Vote Verification program" (HAVV), the

matching program upon which HB 268 relies. A copy of this report is attached and incorporated herein by reference as Exhibit 1.

46. The Inspector General report concluded that "the HAVV program may indicate a no-match when a match does in fact exist in SSA records" due to "the limitations of the matching criteria" and that "the high no-match response rate and the inconsistent verification responses could hinder the States' ability to determine whether applicants should be allowed to vote." *Id*.

47. The report also indicated that the HAVV program's "no-match response rate was 31 percent, while the no-match response rate for other verification programs used by States and employers ranged from 6 to 15 percent." *Id*.

48. Because of the flaws that cause erroneous no match results from "exact match" voter registration protocols like the one required by HB 268 and the consequent burden on applicants, a number of states have declined to enact or enforce existing "exact match" laws. For example, Virginia Governor, Terry McAuliffe vetoed Virginia Senate Bill 1581 during the Commonwealth's 2017 legislative session. Senate Bill 1581 would have imposed an "exact match" voter registration requirement on Virginians when they registered to vote. The Virginia Senate sustained the veto.[1] Wisconsin also scrapped plans to adopt an "exact match"

---

[1] http://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+SB1581

voter registration protocol after four of the six judges charged with overseeing the state's elections failed the exact match protocol in a test run.[2]

49.    Washington State settled a legal challenge to its "exact match" voter registration protocol by agreeing to provisionally register applicants to vote who failed the state's "exact match" voter registration process.[3] Once provisionally registered, the voters are placed on the state's voter list but are required to show ID when they vote in order to have their ballots count.[4]

50.    As a result of a legal challenge to its "exact match" law,[5] Florida also made changes to make the process less burdensome on applicants. For example, Florida's Bureau of Voter Services (BVS) must review every application that fails the matching process to determine whether the matching failure can be explained by common errors that are readily correctable by the BVS without burdening the

---

[2] Adam Skaggs, Brennan Center for Justice, *"No Match" Dropped after 4 of 6 Judges Fail:* https://www.brennancenter.org/blog/no-match-dropped-after-4-6-judges-fail.

[3] *Washington Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264 (W.D. Wash. 2006); see also id., No. CV06-0726RSM, slip op. at 3 (W.D. Wash. March 16, 2007), available at: http://moritzlaw.osu.edu/electionlaw/litigation/documents/STIPULATEDFINALORDERANDJUDGMENTbyJudgeRicardoSMartinez.pdf

[4] *Id.*

[5] *Florida State Conference of the NAACP v. Browning*, 569 F. Supp. 2d 1237 (N.D. Fla. 2008), *rev'd in part and remanded*, 522 F.3d 1153 (11th Cir. 2008).

applicant or county supervisors of elections.[6] If the BVS cannot resolve the matching issue, BVS forwards the matter to the county supervisor of elections who then issues a letter to the applicant explaining that he or she will need to show ID in order to complete the registration process and vote.[7] Unlike HB 268, Florida law does not mandate the cancellation of applications that fail the matching protocol after a specified period of time.[8]

51.     Unlike HB 268, New York law requires that voter registration applicants be given at least two written notices when the Board of Elections is unable to verify the identity of a voter registration applicant by matching their application data against motor vehicle, Social Security or other lawful available source. The notices inform the applicants that if they fail to supply information to correct inaccuracies in the application or provide additional information to the Board of Elections before they vote, they may be requested to produce identification at the polls.[9]  Unlike HB 268, New York's law does not impose any deadline by which applicants must resolve the matching issue to avoid cancellation of their voter registration application.[10]

---

[6] Fla. Administrative Code r.1S-2.039(5)(a)(1)-(5).
[7] *Id.*
[8] F.S.A. § 97.053(6).
[9] McKinney's N.Y. Election Law § 5-210(8)-(9).
[10] *Id.*

52.     The primary difference between Defendant Kemp's prior failed policy and HB 268 is the amount of time voters are given to "cure" the mismatch. Under Defendant Kemp's prior administrative process, the protocol required that election officials cancel a failure to verify application after 40 days if the applicant did not "cure" the matching issue prior to that time. The result was disenfranchisement of tens of thousands of applicants.

53.     When Defendant Kemp settled the prior litigation challenging his administrative "exact match" voter registration process, Defendant Kemp agreed that no outside deadline would be imposed upon applicants to "cure" a matching issue, thus implicitly recognizing that such a deadline was not required by HAVA or existing Georgia law.

54.     Under HB 268, the "exact match" registration protocol is nearly identical in its flagging of tens of thousands of eligible applicants, the majority of whom are minority applicants, for potential cancellation. The primary difference is that HB 268 allows applicants a longer time period—26 months—to "cure" the "no-match." But eligible applicants who turn in complete and accurate registration forms should not be at risk of cancellation regardless of whether they are given 40 days or 26 months to "cure" an error that is often not of their own making.

55.    Once a voter registration application has been cancelled as a result of the "exact match" protocol, the applicant must register anew prior to the fifth Monday before an election in order to vote in that election.  If the applicant's voter registration application is cancelled by the "exact match" protocol close in time to the voter registration deadline, the applicant may not be able to submit another timely application prior to the election and will be disenfranchised.

56.    An additional risk is posed to voters in "pending" status because HB 268 does not mandate that they be informed of when the cancellation period begins or ends.  Consequently, Defendant Kemp's office has drafted notice letters that are issued to applicants in "pending" status that fail to inform applicants when the cancellation period begins or ends.  This is especially problematic because with Defendant Kemp's implementation of HB 268, the cancellation period begins running when a county registrar prints the notice letter to the applicant from the registrar's computer system - a date which is not known to the applicant. Thus, applicants run the risk of having their applications cancelled because the notice letters fail to provide them with any notice of when they must act to avoid having their applications cancelled. Since no subsequent warnings or notices are given to the applicants in pending status, there is a very real danger that the applicants will

have no idea what the actual deadline is by which they need to "cure" the exact match failure before the application is canceled.

57.    Finally, there is an immediate risk that voters casting absentee ballots will be disenfranchised under the regime created by H.B. 268.  Previously, pursuant to Georgia law and the Help America Vote Act, voters could cast an absentee ballot if they submit a copy of a current utility bill, bank statement, government check, paycheck, or other government document showing the name and address of the voter.  52 U.S.C.A. § 21083(b)(2)(A)(ii); O.C.G.A. § 21-2-417(c).

58.    H.B. 268 prevents first-time absentee voters who are inaccurately flagged as a non-match from presenting the non-photographic forms of identification that were permitted by HAVA.  Under H.B. 268, applicants prove their identity to local election officials by "providing one of the forms of identification listed in subsection (a) of Code Section 21-2-417," not subsection (c).  O.C.G.A. § 21-2-220.1(c)(2).  Subsection (a) refers solely to six forms of photographic identification. O.C.G.A. § 21-2-417(c).

59.    Voters who submit copies of non-photographic forms of identification with their absentee ballots are at imminent risk being disenfranchised in the November 2018 election and beyond due to H.B. 268.

**Defendant Kemp's Failure to Provide Safeguards for Naturalized Citizens Who Enclose Proof of Citizenship with Registration Records**

60.   Defendant Kemp's unyielding application of HB 268 has been especially pernicious in the context of naturalized citizens because of the failure to put into place proper safeguards for naturalized citizens who submit proof of their citizenship with their initial application.

61.   Many naturalized citizens receive assistance when registering to vote at naturalization ceremonies in Georgia and regularly include copies of their naturalization certificates or other proof of citizenship when they submit voter registration applications.

62.   For newly naturalized citizens, the HB 268 matching protocol can result in a flag for non-citizenship. This can occur if an individual was not a citizen at the time he or she obtained a driver's license because DDS records do not automatically update citizenship status after naturalization. Many naturalized citizens are thus placed into "pending" status by county registrars for purportedly failing to verify for citizenship and are subject to having their applications cancelled after 26 months.

63.   These citizens receive notices informing them that they must prove their citizenship despite enclosing precisely that proof with their original registration applications.

30

64.     Upon information and belief, Secretary Kemp has no procedures in place to require election officials to check applicants' submissions for proof of identity or citizenship before placing applicants in "pending" status and demanding that applicants re-submit that same documentation.

65.     For naturalized citizens, this failure is particularly onerous because a citizenship status issue will not always be resolvable at the polls. Therefore, eligible naturalized citizens that submit valid and accurate voter registrations, *including* proof of citizenship, are at risk of having their right to vote denied on election day.

66.     Voter registration applicants who are inaccurately flagged as a non-match based on citizenship are differently situated than applicants who are in pending status due to a non-match based on another field, such as name or driver's license number.  Applicants who are in pending status due to a non-match based on another field should be permitted to cast a regular ballot if they provide proof of identity to a poll worker, whereas voters in a pending status due to a non-match based on citizenship must provide proof of identity to a "deputy registrar" – and most poll workers in Georgia are not deputy registrars.  These applicants might therefore be required to take a trip to the county board of elections on Election Day to find such an individual.  Moreover, upon information and belief, such applicants

who seek to vote by mail because of temporary absence from the state have been told they must provide their proof of citizenship in person—something that is physically impossible given their absence.  The primary risk to applicants in pending status due to a non-match based on fields other than citizenship is that they will not vote in an election cycle and be completely purged from the rolls once the 26-month window passes, oftentimes without their knowledge.

### The Exact Match Registration Protocol Disproportionately Impacts Minority Voters

67.    The General Assembly enacted HB 268 with ample notice that it would sharply and disproportionately impact the ability of African-American, Latino, and Asian-American applicants to complete the voter registration process.

68.    Defendant Kemp's administrative "exact match" protocol resulted in the cancellation of tens of thousands of voter registration applications between 2010 and 2016. Between July 2013 and July 2015 alone, approximately 34,874 voter registration applications were cancelled as a result of a "no-match" against DDS and SSA records. Approximately 76.3% of the canceled applications were submitted by applicants who identified as African-American, Latino or Asian-American applicants while only 13.6% were submitted by applicants identifying as White.

69.    Since the enactment of HB 268, the voter registration verification process and its implementation by the Georgia Secretary of State's Office have

continued to produce a high rate of erroneous "no-matches" that disproportionately impacts African-American, Latino and Asian-American applicants.

70.    A preliminary review of data produced by the Georgia Secretary of State's Office on July 4, 2018 indicates that approximately 51,111 voter registration applicants are in "pending" status for reasons related to the failure to verify against DDS or SSA identity or citizenship data. Approximately 80.15% of those pending applications were submitted by African-American, Latino and Asian-American applicants. Only 9.83% of the "pending" for failure to verify applications were submitted by applicants identifying as White.

71.    Thus, the voter registration verification process mandated by HB 268 is continuing to disproportionately and negatively impact the ability of minority applicants to complete the voter registration process so that they can exercise their right to vote.

### HB 268's Disparate Burdens on Minority Applicants Are Linked to Social and Historical Conditions of Discrimination

72.    Georgia's voter registration verification process under HB 268 works in concert with historical, socioeconomic, and other electoral conditions in Georgia to deny African-American, Latino, and Asian-American voter registration

applicants an equal opportunity to register to vote and participate in the political process, in violation of Section 2 of the Voting Rights Act.

73.     Persistent and significant disparities in socioeconomic status and voter participation among minority communities in Georgia are the result of Georgia's unfortunate history of pervasive racial discrimination. Because of these disparate social and economic conditions, including poverty, unemployment, lower educational attainment, and lack of access to transportation, African-American, Latino and Asian-American applicants are disproportionately burdened by the Georgia exact match protocol.

74.     According to the 2016 American Community Survey five-year estimate ("ACS"), there are significant racial disparities in income levels.  The median income in Black households in Georgia is $37,887; in Latino households, $41,157; and in White households, $59,595.  U.S. Census Bureau, 2012-16 American Community Survey 5-Year Estimates, Tables B19013B, B19013H, and B19013I.

75.     The 2016 ACS also indicates that 26 percent of Georgia's Black residents live in poverty, while the poverty rate is 27 percent among Latino residents, 13 percent among Asian-American residents, and 12 percent among

White residents.  U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates, Tables B17001B, B17001D, B17001H, B17001I.

76.    There are racial disparities in language proficiency rates in Georgia as well.  While 38.1 percent of Latino residents and 36 percent of Asian residents speak English less than "very well," less than 1 percent of non-Hispanic White residents are estimated to speak English less than "very well." U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates, Tables B16005D, B16005H, B16005I.

77.    Racial disparities also persist in education levels.  For example, 2012-2016 ACS data indicate that 15.1 percent of Black residents, 40 percent of Latino residents and 14.1 percent of non-Hispanic White residents in Georgia did not graduate from high school.  And 22.1 percent of Black residents, 14.2 percent of Latino residents, and 31.5 percent of non-Hispanic White residents graduated from college.  U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates, Tables C15002B, C15002H, C15002I.

78.    There is also a racial disparity in vehicle ownership rates.  The percentage of households without a vehicle is 13.3 percent in Georgia among Black households, 8.7 percent among Latino households, and 4.5 percent among Asian-American households.  Only 3.5 percent of White households are without a

vehicle.  U.S. Census Bureau, 2006-2010 American Community Survey 5-Year Estimates, Table DP04.

79.     These socioeconomic disparities, caused by the continuing effects of historical and modern racial discrimination, are directly linked to the disparate burdens HB 268 imposes on minority applicants.

80.     First, a history of discrimination and resulting socioeconomic disparities in Georgia has led to a disparity in driver's license and Georgia ID ownership rates between White and Black voters.  In 2006, the Secretary of State of Georgia issued a report revealing that 676,246 registered Georgia voters either had no record of a Georgia driver's license or ID issued, or had their licenses revoked, suspended, canceled, denied, or surrendered.  *Common Cause/Ga. v. Billups*, 439 F.Supp.2d 1294, 1311 (N.D. Ga. 2006).  While 27.8 percent of the voters on the registration list were Black, 35.6 percent of voters who lacked a driver's license or Georgia ID card were Black.  *Id*.

81.     Because Black voter registration applicants are less likely than White applicants to own a Georgia driver's license or state ID card, they are more likely to have to provide the last four digits of their social security number for verification and, as noted above, applicants using the last four digits of their Social Security number to register to vote are submitted for matching through the SSA's

HAVV database which has been demonstrated to have a high no-match rate, produces inconsistent results and can cause eligible applicants to be erroneously denied the right to vote.

82.     The Georgia exact match protocol also turns the act of filling out a voter registration application into an unduly challenging exercise.  The protocol imposes an additional requirement on applicants who make a minor mistake by requiring them to contact election officials and provide updated information to complete their application.  These insubstantial errors will lead to a mismatch under the current protocol, requiring voters to "update" their information without clear guidance or identification of the initial error.

83.     Eligible voter registration applicants with lower levels of educational attainment, a lower level of proficiency in English, or less familiarity with bureaucratic procedures are more likely than other applicants to make minor, insubstantial mistakes when completing their voter registration applications or driver's license or other /Georgia ID applications than other applicants.

84.     These same factors also make it more difficult for these voters to navigate the bureaucratic process after they have been placed into pending status and are sent a notification letter.

85.    Notification letters, other than those sent in Gwinnett County—which is a covered jurisdiction for Spanish language access under Section 203 of the Voting Rights Act—are provided only in English.  Applicants who are limited English proficient have more difficulty understanding the notification letter.  They also face additional challenges when communicating with election officials and completing other tasks required to remedy the problem with their registration status.

86.    In addition, minority applicants are more likely than White applicants to work multiple jobs, have inflexible schedules, maintain irregular work hours, lack access to transportation, or suffer from financial hardship or economic displacement.  It is more difficult for these applicants to follow up with election officials in a timely manner than those who have access to transportation, can afford to take time off from work, and have a flexible schedule.

**Racial Discrimination in Voting in Georgia**

87.    There is a long—and well-documented—history of voting-related discrimination against Blacks in Georgia.  *See Georgia State Conference of the NAACP v. Fayette County Bd. of Comm'rs,* 950 F.Supp.2d 1294, 1314-16 (N.D. Ga. 2013); *see also Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) (noting that "we have given

38

formal judicial notice of the State's past discrimination in voting, and have

acknowledged it in the recent cases").

88. And discrimination in voting is not a relic of Georgia's past. Modern

examples of discrimination in voting in Georgia are also well-documented,

including in the congressional record supporting the 2006 reauthorization of the

Voting Rights Act.

89. For example, in 2005, Georgia adopted a strict photo identification

requirement for voting.  The 2005 photo ID law required individuals lacking photo

ID to pay $20 for a photo ID card or to sign an affidavit declaring indigency. Only

after a federal court enjoined its original photo ID bill did the Georgia Legislature

revise its photo ID law in 2006 to allow for more equal access to the necessary

photo ID.

90. The Georgia Secretary of State's office also has a history of hostility

toward third-party voter registration activity.

91. Organizations that serve communities of color are responsible for a

substantial portion of the third-party voter registration activity in Georgia.

92. In 2005, a charitable and educational organization affiliated with the

predominantly African-American Alpha Phi Alpha fraternity and a voter were

forced to file suit against former Georgia Secretary of State Cathy Cox because her

office refused to accept 64 completed voter registration applications submitted by the organization.  The organization prevailed in its lawsuit. *Charles H. Wesley Education Foundation v. Cox*, 408 F.3d 1349 (11th Cir. 2005).

93.    In 2010, the Georgia Secretary of State's office aggressively pursued an investigation of a dozen Black voting organizers in Brooks County that led to a criminal prosecution. The investigation followed the election of the county's first-ever majority-Black school board, which was catalyzed by the get-out-the-vote activists.  None of the organizers were convicted even though they were initially charged with more than 100 election law violations and more than 1,000 combined years in prison. The Georgia Attorney General subsequently issued an opinion saying that the organizers' alleged crime—mailing absentee ballots by a third party—is permissible under state law.

94.    In 2016, the Georgia Senate passed Senate Resolution 675 ("SR 675"), which sought to amend the Georgia Constitution to make English the state's official language and prohibit the use of any language other than English in any Georgia state or local government document, proceeding, or publication.  SR 675 would have prohibited the dissemination of ballots and other election-related documents in any language other than English in violation of federal law.  After more than 200 ethnic business groups, churches, and other organizations

condemned or lobbied against SR 675, the House did not pass SR 675 prior to the end of the legislative session.

95.    The origins of the "exact match" registration protocol are part and parcel of this history of modern discrimination in voting.

96.    The Georgia Secretary of State's office began implementing a predecessor version of the current "exact match" protocol shortly before the 2008 presidential election without first obtaining preclearance.  The U.S. District Court for the Northern District of Georgia held that doing so violated Section 5 of the Voting Rights Act.  *Morales v. Handel*, 2008 WL 9401054, C.A. No. 1:08-CV-3172 (N.D. Ga. 2008).

97.    After the Secretary of State finally did submit the protocol for preclearance, the U.S. Department of Justice ("DOJ") objected to Georgia's submission of the 2008 "exact match" protocol.  The DOJ concluded that the initial version of the program relied on an error-laden and "possibly improper" usage of the Social Security Administration's HAVV system and outdated Georgia Department of Driver Services data in an attempt to find non-citizens.  Letter from Loretta King, Acting Asst't Att'y Gen., Dep't of Justice, to Ga. Att'y Gen. Thurbert E. Baker, May 29, 2009, *available at* http://www.justice.gov/crt/voting-determination-letters-georgia.  It caused thousands of legitimately naturalized

41

citizens (as well as many natural-born citizens) to be incorrectly flagged as ineligible non-citizens.

98.     The letter concluded that the "flawed system frequently subjects a disproportionate number of African-American, Asian, and/or Hispanic voters to additional and, more importantly, erroneous burdens on the right to register to vote." *Id.* at 4.

99.     While a later iteration of the "exact match" protocol was precleared in 2010, it is not apparent that the Secretary of State ever followed the safeguards promised in the preclearance submission that led to its approval.

100.   Moreover, since implementing the "exact match" protocol in 2010, the Georgia Secretary of State's office was made aware repeatedly by the Department of Justice and concerned individuals and organizations that its registration protocol, in practice, disproportionately burdens eligible minority applicants.

101.   Nevertheless, HB 268 was signed into law, codifying an error-prone "exact match" process that has predictably continued to cause tens of thousands of prospective Georgia applicants—the vast majority of whom identify as African-American, Latino and Asian-American—to be placed in "pending" status limbo with a risk of their application being cancelled after 26 months.  Neither Secretary

Kemp, nor the Georgia Legislature, appear concerned about the disproportionate impact this "exact match" protocol is having on the ability of African-American, Latino and Asian-American applicants to complete the voter registration process. While other states have abandoned or reformed similar registration verification processes to limit the burden on their citizens, Defendant Kemp has failed to take any steps to ameliorate HB 268's disproportionate burden on minority applicants.

**Other Factors Relevant to the Totality of Circumstances in Georgia**

102.   There is a majority vote requirement in all elections in Georgia, which makes it more difficult for Black, Latino, and Asian-American voters to elect candidates of choice because they comprise a minority of the electorate.

103.   Voting patterns in Georgia are racially polarized. Courts have repeatedly held that racially polarized voting exists at the statewide, county, and local levels. *See*, *e.g.*, *Georgia v. Ashcroft*, 195 F.Supp.2d 25, 88 (D.D.C. 2002), *rev'd on other grounds*, 539 U.S. 461 (2003); *Georgia State Conference of the NAACP v. Fayette County Bd. of Comm'rs,* 950 F.Supp.2d 1294, 1314-16 (N.D. Ga. 2013), *vacated and remanded on other grounds*, 775 F.3d 1336 (11th Cir. 2015).

104.   Blacks, Latinos, and Asian-Americans have not been elected to public office in Georgia at a rate that is commensurate with their share of the population.

All of the current statewide elected officials are White, and non-White Georgians are underrepresented in the Georgia House of Representatives and Senate, as well as in the state's congressional delegation.

105.   Voter fraud is extremely rare in Georgia.

106.   The Georgia "exact match" registration protocol is tenuously, if at all, related to the goal of preventing voter fraud. It adds nothing to the identification procedures of HAVA but endangers the valid registration of tens of thousands of eligible Georgia voters.

**COUNT ONE**
**VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT OF 1965**

107.   Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 104 above, as if fully set forth herein.

108.   Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, protects Plaintiffs from denial or abridgment of the right to vote on account of race, color, or membership in a language minority group.  Section 2 provides, in relevant part:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United State to vote on account of race or color, or [membership in a language minority group].

44

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

109.   HB 268's "exact match" voter registration protocol constitutes a qualification or prerequisite to voting within the meaning of Section 2 of the Voting Rights Act and results in the denial or abridgement of the right to vote of Georgia citizens on account of their race or color in violation of Section 2.

110.   It imposes a substantial, unwarranted, and disproportionate burden on Black, Latino, and Asian-American voters and denies them equal opportunity to register and to vote in Georgia elections.

111.   The Georgia voter registration verification protocol interacts with historical, socioeconomic, and other electoral conditions in Georgia to prevent Black, Latino, and Asian-American applicants from having an equal opportunity to register and vote. *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

112.   In this case, the following circumstances are present: (1) a history of discrimination related to voting; (2) racially polarized voting patterns; (3) members of the impacted minority group bear the effects of discrimination in such areas as

education, employment, and health; (4) members of the impacted minority group are underrepresented among Georgia's elected officials; (5) a lack of responsiveness to the needs of the impacted minority community; and (6) an arbitrary policy underlying the HB 268 "exact match" protocol that is tenuously related to its stated purpose, which is to assure the identity and eligibility of voters and prevent fraudulent or erroneous registrations.

113.   As a result of the enactment of HB 268 and under the totality of the circumstances, the political process in Georgia is not equally open to participation by Black, Latino, or Asian-American citizens insofar as they have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

114.   Plaintiffs will continue to suffer the violation of their rights as alleged in the Complaint absent relief granted by the Court.

**COUNT TWO**
**42 U.S.C. § 1983**
**(VIOLATION OF THE FIRST AND**
**FOURTEENTH AMENDMENTS)**

115.   Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 112 above, as if fully set forth herein.

116.    The First and Fourteenth Amendments of the United States Constitution protect the right to vote as a fundamental right.  The First Amendment's guarantees of freedom of speech and association protect the right to vote and to participate in the political process.  The right to vote is a fundamental constitutional right also protected by both the due process and equal protection clauses of the Fourteenth Amendment.  *See*, *e.g.*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966) (Virginia's poll tax violates the Equal Protection Clause); *Anderson v. Celebrezze*, 460 U.S. 780, 786-87 (1983) (the right to vote is incorporated into the Due Process Clause).

117.    By preventing applicants from fully registering to vote until certain application information exactly matches with corresponding fields in the DDS or SSA databases, the Georgia voter registration process mandated by HB 268 imposes severe burdens on the fundamental right to vote of Georgia citizens.  The "exact match" protocol, along with its 26-month cancellation period, are not narrowly drawn to advance any state interest sufficiently compelling to justify the imposition of such severe burdens.

118.    While the burdens of this process are undeniably severe, the process cannot pass muster even under the less restrictive *Anderson-Burdick* balancing test

47

for more ordinary voting regulations. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (holding that courts "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiffs rights'" (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983))).

119.   There is no sufficient state interest justifying this "exact match" process and 26-month cancellation period that is not already adequately protected by preexisting criminal laws and election procedures, particularly given Georgia's strict voter ID law.

120.   If enforcement of the statute is not enjoined or otherwise modified to ameliorate the severe burdens it imposes, HB 268's "exact match" protocol will continue to indefinitely impose severe burdens on citizens' right to vote, requiring Plaintiff organizations to divert resources in an attempt to remedy the deprivation.

121.   Defendant Kemp, acting in his capacity as Georgia's Secretary of State, is acting under color of state law to deprive Plaintiffs of the rights, privileges, and immunities secured to them by the First and Fourteenth

Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

122.   Plaintiffs will continue to suffer the violation of their rights as alleged in the Complaint absent relief granted by the Court.

## COUNT THREE
## VIOLATION OF SECTION 8 OF THE NATIONAL VOTER REGISTRATION ACT OF 1993, 52 U.S.C. § 20507(a)(1)

123.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 120 above, as if fully set forth herein.

124.   Section 8 of the NVRA, 52 U.S.C. § 20507(a)(1) requires each state to:

(1) *ensure* that any eligible applicant is registered to vote in an election—

A) in the case of registration with a motor vehicle application under section 20504 of this title, if the valid voter registration form of the applicant is submitted to the appropriate State motor vehicle authority not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(B) in the case of registration by mail under section 20505 of this title, if the valid voter registration form of the applicant is postmarked not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(C) in the case of registration at a voter registration agency, if the valid voter registration form of the applicant is accepted at the voter registration agency not later than the lesser of 30 days, or the period provided by State law, before the date of the election; and

(D) in any other case, if the valid voter registration form of the applicant is received by the appropriate State election official not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

52 U.S.C. § 20507(a)(1)(Emphasis added).

125.   Congress' purpose in passing the NVRA was to "increase the number of eligible citizens who register to vote in elections"; "enhance[] the participation of eligible citizens as voters"; and protect the active role that community-based voter registration groups play in the registration process. 52 U.S.C. § 20501.

126.   The NVRA was intended to "ensure that no American is denied the ability to participate in Federal elections because of real or artificial barriers . . . [and] to make voter registration an inclusive, rather than an exclusive opportunity in the United States." 139 Cong. Rec. H495-04 (1993) (statement of Rep. Martin Frost).

127.   HB 268's "exact match" voter registration protocol violates Section 8 of the NVRA because it prevents voter registration applicants who submit timely, facially complete and accurate voter registration forms from being registered as active voters on the Georgia voter registration list for upcoming elections. In other words, Georgia is failing to *ensure* that those applicants are registered to vote for elections as required by Section 8 of the NVRA.

128.   Thus, HB 268's "exact match" protocol and Defendant Kemp's implementation of it will continue to negatively impact the ability of voting-eligible Georgians to complete the voter registration process in violation of Section 8 of the NVRA unless the Court orders relief to enjoin enforcement of this process.

129.   On July 18, 2018, Plaintiffs' counsel served Defendant Kemp with notice of the violation of Section 8 of the NVRA.  A copy of said written notice is attached and incorporated herein by reference as Exhibit 2. To date, Defendant Kemp has not responded to Plaintiffs' counsel with any evidence that he has implemented, or will implement, remedial action.  Therefore, Plaintiffs have no recourse by to commence litigation to obtain remedial relief from the Court.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray that the Court:

1.      Enter judgment in favor of Plaintiffs and against Defendant Kemp on the claims for relief as alleged in this Complaint;

2.      Enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that HB 268's "exact match" protocol for voter registration (a) violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, (b) violates the fundamental right to vote under the First and Fourteenth Amendments and (c)

violates Section 8 of the National Voter Registration Act of 1993, 52 U.S.C. § 20507.

3. Grant Plaintiffs preliminary and/or permanent injunctive relief by enjoining the enforcement of HB 268 and by ordering Defendant Kemp, his employees, agents, servants and his successors to undertake the following remedial actions:

a. Enjoin enforcement of the 26-month cancellation period mandated by HB 268;

b. Place, in active status, all applicants who are either (1) currently in "pending" status due to a failure to match or (2) had their voter registration applications cancelled as a result of a failure to match based on DDS, SSA or citizenship information since November 17, 2016;

c. Require the voter registration applicants referenced in paragraph (b) to produce the following when they attempt to vote, if they have not already submitted HAVA ID or evidence of their citizenship at the time they submitted their registration form:

i. an acceptable form of HAVA ID, by giving it in person to a poll worker when they vote for the first time, or by sending a

copy of it in the mail if they are requesting an absentee ballot; or

    ii.  if a voter registration applicant is inaccurately flagged as a non-citizen, evidence of their United States citizenship;

d.  Allow county election officials to permit eligible voters who registered to vote, but who are inaccurately flagged as non-citizens to vote a regular ballot by furnishing proof of citizenship to poll workers or deputy registrars;

e.  Permit voter registration applicants inaccurately flagged as non-citizens who wish to vote by mail to furnish their proof of citizenship electronically, by mail, or by fax;

f.  Require Defendant to transmit any Order of this Court granting preliminary or final injunctive relief to county boards of elections;

g.  Require Defendant to cause the counties to post a list of acceptable documentation to prove citizenship, which includes a naturalization certificate, birth certificate issued by a state or territory within the United States, U.S. passport, and other documents or affidavits explicitly identified by Georgia law and listed on the Georgia Secretary of State's website, at polling places on Election Day;

h. Require Defendant to conduct training of poll workers to ensure they understand and can properly confirm citizenship status consistent with Georgia law;

i. Count, in the November 2018 election and all future elections, (1) all absentee ballots cast by Georgia voters using non-photographic forms of identity pursuant to O.C.G.A. § 21-2-417(c), and (2) all provisional ballots cast by Georgia voter registration applicants who are in pending status because they have been inaccurately flagged as a potential "non-citizen";

j. Enforce a strict protocol that when voter registration applicants are flagged as "non-citizen" by DDS or produce "no-match" from the DDS or SSA databases, before contacting the applicant about the issue, registrars must check the initial registration. If proof of citizenship or identity was provided, voters should mark those requirements as met.

4. Order that Defendant Kemp, his employees, agents, servants and successors maintain, preserve, and not destroy until after December 31, 2028, any and all records relating to HB 268 and its implementation.

5.     Order that the Court shall retain jurisdiction over the Defendant and

his successors for such period of time as may be appropriate to ensure compliance

with relief ordered by this Court;

6.     Award Plaintiffs their reasonable attorneys' fees and costs pursuant to

statute; and

7.     Grant Plaintiffs such other and further relief as may be just and

equitable.

Dated: October 19, 2018          Respectfully submitted,

                        By:     /s/ Bryan L. Sells
                                Bryan L. Sells
                                Georgia Bar No. 635562
                                The Law Office of Bryan L. Sells, LLC
                                Post Office Box 5493
                                Atlanta, Georgia 31107-0493
                                Telephone: (404) 480-4212
                                bryan@bryansellslaw.com

                                Kristen Clarke, Esq. (*pro hac vice – to be filed)
                                Jon Greenbaum, Esq. (*pro hac vice filed)
                                Ezra D. Rosenberg, Esq. (*pro hac vice filed)
                                Julie Houk, Esq. (*pro hac vice)
                                John Powers, Esq. (*pro hac vice)
                                kclarke@lawyerscommittee.org
                                jgreenbaum@lawyerscommittee.org
                                erosenberg@lawyerscommittee.org
                                jhouk@lawyerscommittee.org
                                jpowers@lawyerscommittee.org

Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue NW, Suite 400
Washington, D.C. 20005
Telephone:  (202) 662-8600
Facsimile:   (202) 783-0857

Vilia Hayes, Esq.  (*pro hac vice filed)
Gregory Farrell, Esq.  (*pro hac vice filed)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone:  (212) 837-6000
Facsimile:   (212) 422-4726

Danielle Lang, Esq. (*pro hac vice)
Mark Gaber (*pro hac vice)
J. Gerald Hebert (*pro hac vice filed)
dlang@campaignlegalcenter.org
MGaber@campaignlegalcenter.org
GHebert@campaignlegalcenter.org
Campaign Legal Center
1411 K Street NW, Suite 1400
Washington, DC  20005
Telephone:  (202) 736-2200
Facsimile:    (202) 736-2222

Phi Nguyen
Georgia Bar No. 578019
Asian Americans Advancing Justice – Atlanta
5680 Oakbrook Parkway, Suite 148
Norcross, Georgia 30093
pnguyen@advancingjustice-atlanta.org
Telephone: (770) 818-6147

*Counsel for Plaintiffs*