# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

GEORGIA COALITION FOR THE PEOPLES' AGENDA, INC., as an organization; ASIAN AMERICANS ADVANCING JUSTICE-ATLANTA, INC., as an organization; GEORGIA STATE CONFERENCE OF THE NAACP, as an organization; NEW GEORGIA PROJECT, INC., as an organization; GEORGIA ASSOCIATION OF LATINO ELECTED OFFICIALS, INC., as an organization; PROGEORGIA STATE TABLE, INC., as an organization; JOSEPH AND EVELYN LOWERY INSTITUTE FOR JUSTICE AND HUMAN RIGHT, INC., as an organization; and COMMON CAUSE, as an organization;

                    Plaintiffs,

v.

BRIAN KEMP, in his official capacity as Secretary of State for the State of Georgia,

                    Defendant.

Civil Action
Case No. 1:18-cv-04727-ELR

**EXPEDITED TREATMENT REQUESTED**

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................. 1

STATEMENT OF FACTS .................................................................... 3

I.      The Moving Parties ................................................................. 3

II.     Voter Registration in Georgia under State and Federal Law ......................... 4

III.    Georgia's Statutory Proof of Citizenship and Data Matching Regime .......... 5

IV.     The Verification Procedure ........................................................... 6

V.      Georgia DDS Citizenship Information is Frequently Inaccurate. ................. 8

VI.     Current Impact of Georgia's Citizenship Verification Protocol.................. 10

ARGUMENT....................................................................................... 11

I.      The Organizational Plaintiffs Have Standing.................................... 12

II.     There Is a Substantial Likelihood that Plaintiffs Will Succeed on the Merits.
        .................................................................................................. 14

        A.      The Verification Procedure Unconstitutionally  Burdens the
                Fundamental Right to Vote. ............................................. 14

                i.      The Anderson-Burdick Test.................................... 15

                ii.     The Verification Procedures Severely Burden the
                        Fundamental Right to Vote.................................... 16

                iii.    The Verification Procedure Is Unjustified. ............... 19

III.    The Relief Requested is Appropriate and Narrowly Tailored.................... 20

IV.     Plaintiffs Will Suffer Irreparable Harm Absent the Requested Relief. ........ 23

V.      Secretary Kemp Will Not Be Harmed by the Requested Relief. ................ 24

i

## **TABLE OF CONTENTS**
(Continued)

**Page**

VI.     The Public Interest Weighs Heavily in Favor of Granting the Requested
        Relief. .......................................................................................................... 25

CONCLUSION ........................................................................................................ 25

ii

## <u>TABLE OF AUTHORITIES</u>

**Cases** **Page(s)**

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983) ........................................................... 15

*Arcia v. Fla. Sec'y of State*,
   772 F.3d 1335 (11th Cir. 2014) ....................................... 12, 13, 14, 17

*Bonner v. City of Prichard*,
   661 F.2d 1206 (11th Cir. 1981) (*en banc*) ........................................ 14

*Burdick v. Takushi*,
   504 U.S. 428 (1992) ....................................................... 14, 15, 16, 19

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
   324 F. Supp. 2d 1358 (N.D. Ga. 2004),
   *aff'd*, 408 F.3d 1349 (11th Cir. 2005)....................................... 12, 25

*Common Cause Ind. v. Marion Cty. Election Bd.*,
   311 F. Supp. 3d 949 (S.D. Ind. 2018)............................................. 18

*Common Cause/Ga. v. Billups*,
   406 F. Supp. 2d 1326 (N.D. Ga. 2005)....................................... 22, 24

*Common Cause/Ga. v. Billups*,
   554 F.3d 1340 (11th Cir. 2009) ..................................................... 12

*Crawford v. Marion Cty. Election Bd.*,
   553 U.S. 181, 191 (2008) ............................................................. 19

*Curling v. Kemp*,
   No. 1:17-CV-2989-AT, 2018 WL 4625653
   (N.D. Ga. Sept. 17, 2018) ........................................................ 18, 22

*Fla. Democratic Party v. Detzner*,
   No. 4:16cv607-MW/CAS, 2016 WL 6090943
   (N.D. Fla. Oct. 16, 2016)............................................................. 22

## TABLE OF AUTHORITIES
(Continued)

**Page(s)**

*Fla. State Conf. of the NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) ............................................................ 12, 13, 14

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) .................................................................................... 13

*Ga. Coal. for the Peoples' Agenda, Inc. v. Deal*,
  214 F. Supp. 3d 1344 (S.D. Ga. 2016) ........................................................ 22

*Ga. State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*,
  118 F. Supp. 3d 1338 (N.D. Ga. 2015) ........................................................ 25

*Ga. State Conf. of the NAACP v. Georgia*,
  2017 WL 9435558 (N.D. Ga. May 4, 2017) .................................................. 23

*Hunter v. Hamilton Cty. Bd. of Elections*,
  635 F.3d 219 (6th Cir. 2011) ....................................................................... 25

*Johnson v. Miller*,
  929 F. Supp. 1529 (S.D. Ga. 1996) .............................................................. 23

*League of Women Voters of Fla., Inc., v. Detzner*,
  314 F. Supp. 3d 1205 (N.D. Fla. 2018) ............................................. 14, 16, 18

*Osmose, Inc. v. Viance, LLC*,
  612 F.3d 1298 (11th Cir. 2010) .................................................................... 12

*Touchston v. McDermott*,
  234 F.3d 1133 (11th Cir. 2000) .................................................................... 23

*United States v. Georgia*,
  892 F. Supp. 2d 1367 (N.D. Ga. 2012) .................................................. 12, 21

*United States v. McLeod*,
  385 F.2d 734 (5th Cir. 1967) ....................................................................... 14

*Washington Ass'n of Churches v. Reed*,
  492 F. Supp. 2d 1264 (W.D. Wash. 2006) ............................................. 24, 25

iv

# TABLE OF AUTHORITIES
(Continued)

**Page(s)**

**Statutes and Rules**

52 U.S.C. § 21083 ................................................................................................ 4, 5

52 U.S.C. § 21084 .................................................................................................... 5

52 U.S.C. § 21085 .................................................................................................... 5

Fed. R. Civ. P. 65(c) ............................................................................................... 25

Ga. Code Ann. § 21-2-50 ......................................................................................... 4

Ga. Code Ann. § 21-2-92 ......................................................................................... 2

Ga. Code Ann. § 21-2-93 ......................................................................................... 2

Ga. Code Ann. § 21-2-99 ......................................................................................... 2

Ga. Code Ann. § 21-2-210 ....................................................................................... 4

Ga. Code Ann. § 21-2-213 ....................................................................................... 2

Ga. Code Ann. § 21-2-214 ....................................................................................... 2

Ga. Code Ann. § 21-2-216 .......................................................................... 5, 6, 7, 21

Ga. Code Ann. § 21-2-220.1 .................................................................................. 5, 7

Ga. Code Ann. § 21-2-419 ....................................................................................... 8

Ga. DDS Rule § 375-3-1-.02 .................................................................................... 9

Ga. DDS Rule § 375-3-1-.13 .................................................................................. 8, 9

Ga. DDS Rule § 375-3-1-.14 .................................................................................... 9

Ga. DDS Rule § 375-3-2-.01 .................................................................................... 9

## PRELIMINARY STATEMENT[1]

This motion seeks very targeted emergency relief to allow Georgian citizens inaccurately flagged as potential non-citizens as a result of the flawed "exact match" voter registration process codified by HB 268 to produce an acceptable form of documentary proof of citizenship to a poll worker on Election Day in order to cast a regular ballot.

In response to the filing of this litigation, Defendant Brian Kemp has repeatedly asserted to the press in recent days that the only thing Georgians have to do if they are not on the voter rolls because of the "exact match" voter registration process is to show one of the forms of acceptable photo ID to a poll worker on Election Day, just as other Georgia voters do.[2] This is not true for United States citizens who are incorrectly flagged as non-citizens as a result of the "exact match" process, and are at serious risk of losing their right to vote.

---

[1] Moving parties seek partial emergency relief to prevent a class of Georgian citizens from being disenfranchised on Election Day. Nothing in this motion is intended to waive Plaintiffs' right to full relief on the merits their claims at trial.

[2] Curt Yoemans, "Brian Kemp addresses voter registration flap," Gwinnett Daily Post (October 12, 2018) https://www.gwinnettdailypost.com/local/brian-kemp-addresses-voter-registration-flap/article_43ba1f6e-71b1-52d5-b735-d67d12a0085e.html.

The "exact match" process relies upon outdated Georgia Department of Driver's Services records that are not updated when a former non-citizen becomes a naturalized U.S. citizen. Thus, voting-eligible Georgians who obtained driver's licenses as lawful residents, are incorrectly flagged as non-citizens when they register to vote after they become citizens, even if they produced proof of citizenship when they registered to vote. In order to vote a regular ballot, these individuals will be required to produce proof of citizenship on Election Day to a deputy registrar. But deputy registrars are not present at all polling places all the time. They also do not have qualifications, training or experience substantially different from poll workers.[3]

Georgians incorrectly flagged as non-citizens will often have to leave the poll, travel to the county seat or other location where a deputy registrar is present, show the documentary proof of citizenship to that individual and then travel back to the poll in order to cast a regular ballot.  This is burdensome for anyone, but particularly for those who reside in large counties, who rely on public or shared transportation, who typically walk to their polling location, or who have jobs or other time constraints that limit the amount of time they can spend voting.

---

[3] *See* Ga. Code Ann. § 21-2-92, 93 and 99 (poll worker qualifications and training); Ga. Code Ann. § 21-2-213 and 214 (deputy registrars' qualifications)

2

This requirement, which is not mandated by HB 268 and is instead the product of Defendant Kemp's administrative implementation of the law, disproportionately and negatively impacts African American, Latino and Asian American citizens. There is a real danger now that with Defendant Kemp's pronouncements in the press that individuals in pending status because of the "exact match" law need bring only photo IDs to the polls to vote, they will not know that they have to bring proof of citizenship and show that proof to a deputy registrar who might not be present in their particular polling location.

There is an easy fix: an injunction authorizing poll workers — already trained to review photo IDs at the poll — to review the documentary proof of citizenship at the polls so that these people can vote.  This is a narrowly tailored remedy for Georgia citizens whose fundamental right to vote is imperiled by no fault of their own, but rather by Defendant Kemp's flawed "exact match" process.

## STATEMENT OF FACTS

### I.      The Moving Parties

Plaintiffs Georgia Coalition for the People's Agenda ("GCPA"), Georgia Association of Latino Elected Officials ("GALEO"), Asian Americans Advancing Justice-Atlanta ("Advancing Justice") Georgia State Conference of the NAACP ("Georgia NAACP"), and ProGeorgia State Table, Inc. ("ProGeorgia"), hereafter,

"moving parties," are non-profit organizations whose missions include civic engagement, voter registration, get out the vote efforts, election protection, and voter education and outreach.  Declaration of Gerardo E. Gonzalez ("Gonzalez Decl."), Exhibit 1 ¶¶ 3, 7-9; Declaration of Helen Butler ("Butler Decl."), Exhibit 2 ¶ 4; Declaration of Stephanie Cho ("Cho Decl."), Exhibit 3 ¶¶ 3, 5-7; Declaration of Phyllis Blake ("Blake Decl."), Exhibit 4 ¶¶ 6-8; Declaration of Tamieka Atkins, Exhibit 5 ("Atkins Decl.") ¶¶ 4-5.

Defendant Brian P. Kemp is Georgia's Secretary of State and Chief Elections Administrator, Ga. Code Ann. § 21-2-210, overseeing all election activity, including voter registration, and municipal, state, county, and federal elections, and maintaining the official list of registered voters.  Ga. Code Ann. § 21-2-50(a)(14).

## II.    Voter Registration in Georgia under State and Federal Law

Georgia voter registration applications require a person to swear or affirm that he or she is a U.S. citizen.[4]

The Help Americans Vote Act ("HAVA") requires Georgia to maintain a centralized voter registration database, 52 U.S.C. § 21083(a)(1)(A)(i), into which

---

[4] State of Georgia Application for Voter Registration, *available at* http://sos.ga.gov/admin/files/GA_VR_APP_2018.pdf.

local officials enter all voter registration information, § 21083(a)(1)(A)(vi). Voter

registration applicants with valid driver's licenses provide their license number on

the application, § 21083(a)(5)(A)(i). The chief election official is required to

compare information in the voter registration  database with information in the

DDS database "to the extent required . . . to verify the accuracy of the information

provided on applications for voter registration," *id.* § 21083(a)(5)(B)(i).

HAVA does ***not*** mandate that voter registration applications be rejected if

information in the DDS database indicates that individual is not a citizen. 52

U.S.C. § 21083(a)(5)(A)(iii). HAVA takes no position concerning verification of

citizenship, neither requiring nor prohibiting state action to verify the citizenship of

voter registration applicants.  *See*, *e.g.*, 52 U.S.C. §§ 21084-21085.

## III.   <u>Georgia's Statutory Proof of Citizenship and Data Matching Regime</u>

Under HB 268, all Georgia registration applicant's driver's license (or ID

card) number or last four digits of his or her social security number are matched

"with the applicant's record on file with the Department of Driver Services or the

federal Social Security Administration."  Ga. Code Ann. § 21-2-220.1(c).  One of

the fields matched as part of the process is with citizenship information contained

in the DDS and other databases, as required by Georgia's revised proof of

citizenship statute.  *Id*. § 21-2-216(g)(7).  If the DDS database indicates that the

applicant previously "provided satisfactory evidence" of citizenship to DDS, or "an equivalent government agency," the voter is considered to have provided "[s]atisfactory evidence of citizenship." *Id*. § 21-2-216(g)(2)(A).

## IV.   <u>The Verification Procedure</u>

Georgia's verification procedure, which is described in a 2010 submission for preclearance under Section 5 of the Voting Rights Act, is initiated when county election officials enter the applicant's registration information into Enet, the statewide voter registration system.  Section 5 Submission, Exhibit 6, at p. 1. If the applicant supplied a Georgia driver's license number or identification card number, DDS attempts to match the following information from the application, as entered into the voter registration database, against the information maintained by DDS: (1) first name, (2) last name, (3) date of birth, (4) driver's license number or identification card number, (5) last four digits of the applicant's Social Security number, and (6) United States citizenship status.  *Id*.[5]

If an applicant is inaccurately flagged as a potential non-citizen, the county board of registrars mails the applicant a letter stating that the application status is "pending" and the applicant must provide proof of citizenship to be able to vote.

---

[5] If the applicants provide the last four digits of their Social Security number, then the match is through SSA data, which does not match for citizenship, and does not result in the incorrect flagging of citizens as non-citizens.

*Id*. at 4; Georgia Registrar Official Certification Course No. 4, "Registration Basics," Exhibit 7, at p. 50.  If the applicant does not respond to the letter or provide proof of citizenship while attempting to vote, his or her application is cancelled after 26 months and then the applicant must start the registration process anew.  Ga. Code Ann. § 21-2-220.1(d)(4).

Although HB 268 does not require that only the deputy registrar can review proof of citizenship documentation at the polls, Georgia's poll worker training manual (issued by Defendant Kemp's office) provides that the following steps must be taken when a voter, flagged as a non-citizen, appears at the polls:

> . . . the poll worker is to have the voter contact the board of registrars. A poll officer shall not allow such an individual to cast a ballot on a DRE without the poll officer's first confirming through the board of registrars that such individual is, in fact, a United States citizen. This confirmation can take place by the poll officer reviewing the documentation provided by the voter if the poll officer has been duly sworn and trained as a deputy registrar. If the board of registrars does not or cannot confirm citizenship status, the poll officer should allow the voter to cast a provisional ballot and notify the poll manager.

Georgia Poll Worker Manual, 2018 Edition, Exhibit 8, at p. 42.  The acceptable documentary evidence includes a U.S. passport, naturalization certificate, alien registration number from naturalization documents, photocopy of a U.S. birth certificate, tribal ID card or enrollment number, and other documents permitted by the federal Immigration Reform and Control Act or state regulations.  Ga. Code

7

Ann. § 21-2-216(g)(2)(B)-(G).  Provisional ballots cast by incorrectly flagged voters will not count unless the voter presents proof of citizenship to the board of registrars within three days of the election.  Section 5 Submission at p. 6, Ex. 6; Ga. Code Ann. § 21-2-419(c)(2).  Deputy registrars are not at all polling places all the time, and impacted voters will have to leave the polling places to locate the appropriate deputy registrar. Butler Decl. ¶ 17, Ex. 2.

## V.  **Georgia DDS Citizenship Information is Frequently Inaccurate.**

Georgia's citizenship verification protocols have long been shown to be inaccurate with respect to identifying non-citizens. From 2007 to 2008, the Georgia Secretary of State flagged 7,007 individuals as non-citizens using the database matching process, more than half of whom proved that they were in fact citizens before the practice was enjoined.  Letter from Thomas E. Perez, Ass't Att'y General, to Thurbert E. Baker, Georgia Att'y General, Exhibit 9, at p. 4.  More than one in seven "established eligibility with a birth certificate, showing they were born in this country, while more than 45 percent provided proof that they were naturalized citizens, suggesting that the driver's license database is not current for recently naturalized citizens." *Id*.

The source of the inaccuracies are systemic: in Georgia, newly naturalized citizens are not required to update their citizenship status with DDS.  Ga. DDS

Rule § 375-3-1-.13(1) (providing "[a] person *may* have the following personal data modified on his or her driver's license. . . or identification card upon presentation of satisfactory documentation supporting the change," including "U.S. Citizenship Status" (emphasis added)). Naturalized citizens may retain driver's licenses with outdated citizenship information for years; non-citizens receive IDs that are valid for up to five years. *Id*. § 375-3-2-.01(1)(b)-(c).

Applicants have to pay for a new identification reflecting a change in citizenship status. *See id*. § 375-3-1-.13(3) ("a person requesting a change to the information recorded" shall pay an "update fee"). Updating citizenship status with DDS cannot be done remotely – applicants must present proof of citizenship in person at a DDS office. *Id*. § 375-3-1-.13(5). DDS applicants must present one of nine forms of identification, which include a naturalization certificate, valid and unexpired U.S. passport, or Georgia birth certificate if the name matches that on the driver's license and, potentially, other documents. *Id*. § 375-3-1-.02(6)(a). Even if a person produces one or more of these documents, "the decision to change customer personal data on the license . . . is at the discretion of the Department based on a review of the documents provided to determine their validity and authenticity." *Id*. § 375-3-1-.14.

## VI.   Current Impact of Georgia's Citizenship Verification Protocol

Dr. Michael P. McDonald, a political science professor at the University of Florida and expert on U.S. elections, analyzed the list of voters in "pending" status as of July 5, 2018.  Declaration of Dr. Michael P. McDonald ("McDonald Decl."), Exhibit 10, at 3.  Based on that analysis, Dr. McDonald finds that "registrants required to provide documentary proof of citizenship tend to be more often persons of color and younger than all persons on the voter registration file." *Id.* at 6.  Only 13.7% of registrants required to prove citizenship were White, despite making up 54.0% of all registrants.  *Id.* at 7-8; Tbl. 3, 4.  Dr. McDonald noted that research shows increasing the cost of voter registration decreases voter turnout rates, especially among low propensity voters like persons of color and young people, leading them to not vote at all.  *Id.* at 12-13.  He concludes that "Georgia's practice of denying a voting opportunity to registrants who fail to provide required citizenship documentation has an immediate and long-term harm on registrants' participation in America's democracy. Furthermore, harms will be disproportionally be borne by persons of color and young people." *Id.* at 13.

Georgia's citizenship verification protocol creates real-world barriers to voting for eligible citizens.  For example, Harvey Soto, GALEO's Policy Analyst and Program Coordinator for Civic Engagement, assisted Francisco Barreto, who

10

had been inaccurately flagged as a potential non-citizen after he registered to vote following a naturalization ceremony in December, 2017 - even though Mr. Barreto submitted a copy of his naturalization certificate as proof of citizenship with his voter registration application.  Declaration of Harvey Soto ("Soto Decl."), Exhibit 11 ¶¶ 1-12. In order to resolve the issue, Mr. Soto had to accompany Mr. Barreto to the Fulton County registrar's office in person, where they initially received inaccurate information about what was needed to resolve the issue before Mr. Barreto was finally added to the active registration list.  *Id.* ¶¶ 13-19.

Maria del Rosario Palacios ran for Gainesville City Council in 2017, yet was almost unable to vote for herself because she was inaccurately flagged as a non-citizen.  Declaration of Maria del Rosario Palacios ("Palacios Decl."), Exhibit 12 ¶ 14.  Ms. Rosario Palacios became a permanent resident in 2009 and applied for a Georgia driver's license, which likely led to her being registered as a noncitizen in the DDS database.  *Id.* ¶¶ 4, 13.  Only with the intervention of GALEO and of the Attorney General's office was she able to register.  *Id.* ¶¶ 16-18.

## **ARGUMENT**

To prevail on a motion for a preliminary injunction, Plaintiffs must show: (1) a substantial likelihood that they will succeed on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the

threatened injury absent an injunction outweighs the injury an injunction may impose on Defendant; and (4) that the injunction would not be adverse to the public interest. *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1307 (11th Cir. 2010). Denial of the right to vote is the quintessential irreparable injury. *See Charles H. Wesley Educ. Found., Inc. v. Cox*, 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004), *aff'd*, 408 F.3d 1349 (11th Cir. 2005) ("no monetary award can remedy the fact that she will not be permitted to vote in the precinct of her new residence."); *see also United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) (entering a preliminary injunction where "the potential deprivation of the ability to vote, the most basic of American citizens' rights, outweigh[ed] the cost and inconvenience" that the state might suffer).

## I.   **The Organizational Plaintiffs Have Standing.**

Organizations engaged in voter registration have standing to sue when a defendant illegally impairs those activities, forcing the organization to divert time, money and staff resources to assist impacted registrants. *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014); *see also Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350-51 (11th Cir. 2009) (Georgia NAACP has standing to challenge photo ID statute because it needed to divert resources to educate and assist voters); *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1165-66

(11th Cir. 2008) (organizational standing to challenge new voter registration verification process satisfied due to the anticipated diversion of resources to educate voters and resolve problems).  Here, as set forth in the accompanying declarations, the moving parties participate in voter registration activities and have averred they must divert resources to educate voters about Georgia's "exact match" verification protocol, assist voters inaccurately flagged as non-citizens, and resolve issues they may face when attempting to prove their citizenship. Gonzalez Decl. ¶¶ 28-29, Ex. 1; Butler Decl. ¶¶ 21-22, Ex. 2;  Cho Decl. ¶¶ 19-21, Ex. 3; Blake Decl. ¶¶ 27-28, Ex. 4; Atkins Decl. ¶¶ 19-21, Ex. 5.

GALEO and the Georgia NAACP also have associational standing.  To have associational standing, an organizational plaintiff has standing "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). An organization only needs to establish "that at least one member faces a realistic danger of [injury]." *Browning*, 522 F.3d at 1163. This is particularly true for organizations with high membership rates. *See Arcia*, 772 F.3d at 1342 (citing *Browning*, 522 F.3d at 1163)(Organizations with high membership rates "had

13

standing because there was a high probability that at least one of the members would be [injured].”). Here, GALEO has hundreds of members, one of whom was inaccurately flagged as a potential non-citizen and put into pending status as a result of the exact match process when she registered to vote.  Gonzalez Decl. ¶¶ 5, 19, Ex. 1; Palacios Decl. ¶¶ 5-13, Ex. 12.

## II.     There Is a Substantial Likelihood that Plaintiffs Will Succeed on the Merits.

### A.     The Verification Procedure Unconstitutionally Burdens the Fundamental Right to Vote.

The right to vote “is of the most fundamental significance under our constitutional structure.” *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citation omitted). The right to vote includes the right to register. *See United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967).[6]

Creating a “second class of voters” by subjecting an identifiable group of voters to heightened burdens is “constitutionally untenable.” *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1217 (N.D. Fla. 2018). Accordingly, courts have developed a balancing test to prevent the unjustified burdening of the right to vote, which the verification procedure and the

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

requirement that proof of citizenship may be accepted only by a deputy registrar fail on both ends of the scale.

      i.     *The Anderson-Burdick Test*

A State may not place any burdens on the right to vote that are not adequately justified by the State's asserted interests. *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick*, 504 U.S. 428. When considering challenges to state election laws that impact the fundamental right to vote, courts must "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Anderson*, 460 U.S. at 789.

The *Anderson-Burdick* framework is a "flexible" sliding scale, in which the "rigorousness of [the court's] inquiry" increases with the severity of the burden. *Burdick*, 504 U.S. at 434. When a state imposes a severe burden, strict scrutiny applies and any burdensome action must be narrowly tailored to advance a compelling state interest. *See id*. An election regulation constitutes a "severe" restriction on the fundamental right to vote when that regulation "categorically" burdens the ability of an identifiable class of voters to take actions necessary to

vote successfully.  *See*, *e.g.*, *League of Women Voters of Fla.*, 314 F. Supp. at 3d 1219 (distinguishing "disparate inconveniences" from "denial or abridgement" because the regulation in question "categorically prohibited" on-campus voting). Even where the burden is not "severe" enough to warrant strict scrutiny, courts weighing the burden on voters against the state's interest will look to the "precision" with which the state's interests are advanced by the burdensome regulation.[7] *Burdick*, 504 U.S. at 434.

ii.   *The Verification Procedures Severely*
     *Burden the Fundamental Right to Vote.*

The citizenship verification procedure and the requirement that proof of citizenship may be accepted only by a deputy registrar severely burden the right to vote of applicants who are inaccurately flagged as potential non-citizens.  Many of these voters will appear at a polling place on Election Day and be surprised to learn that they cannot vote due to the state's flawed verification protocol, which relies on outdated information contained in the DDS database.

---

[7] *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1216 (holding that the regulation failed the *Anderson-Burdick* test "because it disparately impose[d] significant burdens on Plaintiffs' rights weighted against imprecise, insufficiently weighty government interests").

Applicants whose voter registration applications are put on hold as a result of the citizenship verification process are mailed deficiency letters, but there are many reasons why the letters may not help the voter cure the deficiency:  The letters are in English only, and it is reasonable to infer that English is not the primary language of many of the recipients.  It is also reasonable to infer that the letters may intimidate voters who are concerned that their citizenship status is being questioned by a governmental agency.  Thus, it is likely that many voters may appear at the polls on Election Day and not have their proof of citizenship with them.  Even if they do, they may not have the time to make multiple trips to travel to the board of elections or some other place where a deputy registrar is located.  This constitutes a severe burden on the right to vote.

Moreover, this burden impacts a large class of voting-eligible Georgia citizens who are being inaccurately flagged as non-citizens because the citizenship verification process relies on outdated DDS information.[8]  Such a burden on a large

---

[8] The systematic denial of registrations because of a mismatch of citizenship status is similar to one employed by the state of Florida that removed names based on matching information between state and federal databases.  *Arcia*, 772 F.3d at 1339-40.  In striking down the program for violating the NVRA's 90-day notice period, the Court noted removing people from the voter rolls days or weeks before Election Day means eligible voters "will likely not be able to correct the State's errors in time to vote."  *Id.* at 1346.

class of would-be voters cannot be justified in absence of precise articulation of a sufficiently weighty or important regulatory interest as required under the *Anderson-Burdick* balancing test. *League of Women Voters of Fla.,* 314 F.Supp.3d at 1220-21.

The serious risk that these burdens may occur is more than sufficient to establish a sufficient likelihood of success under existing case law.  *See Curling v. Kemp*, No. 1:17-CV-2989-AT, 2018 WL 4625653, at *15-16 (N.D. Ga. Sept. 17, 2018) (finding that "[p]laintiffs are substantially likely to succeed on the merits of one or more of their constitutional claims" based on evidence "that their votes cast by DRE may be altered, diluted, or effectively not counted").

Further, "[d]isparate impact matters" when evaluating the burden under the *Anderson-Burdick* test.  *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1216-17 ("A majority of the *Crawford* Court determined that "[i]t 'matters' in the *Anderson-Burdick* analysis ... whether the effects of a facially neutral and nondiscriminatory law are unevenly distributed across identifiable groups."); *see also Common Cause Ind. v. Marion Cty. Election Bd.*, 311 F. Supp. 3d 949, 968 & n. 18 (S.D. Ind. 2018) (identifying the six-justice *Crawford* majority).

The McDonald analysis confirms that the citizenship verification procedure has a disparate impact on minority voters.  McDonald Decl. at 7-8. Asian

applicants constitute 27.0 percent of those flagged as non-citizens even though they comprise only 2.1 percent of Georgia's registered voter pool; Latino applicants constitute 17.0 percent of those flagged as non-citizens even though they comprise 2.8 percent of Georgia's registered voter pool. *Id.* at 8. By contrast, white applicants constitute only 13.7 percent of those flagged as non-citizens even though they comprise 54.0 percent of Georgia's registered voter pool. *Id.*

### iii. *The Verification Procedure Is Unjustified.*

The citizenship verification procedure and the requirement that proof of citizenship may be accepted only by a deputy registrar are so unnecessary to advance any state interest that it would not pass the *Anderson-Burdick* test, even under the most lenient scrutiny. *See Burdick*, 504 U.S. at 434. Even where a regulation creates a slight burden, the state must show that the regulation is justified by a relevant state interest. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008).

Georgia's stated justification for its citizenship verification procedure as a whole, which is to "assure the identity and eligibility of voters and to prevent fraudulent or erroneous registrations," Section 5 Submission at p. 3, Ex. 6, does not withstand scrutiny because Georgia's existing election laws already protect this interest. The requirement that proof of citizenship may be accepted only by a

deputy registrar cannot survive any level of scrutiny because there is no legitimate justification for why they, but not poll workers, can accept documentary proof of citizenship offered by applicants who have been inaccurately flagged as non-citizens.  Poll workers are no less qualified to accept documentary proof of citizenship than are deputy registrars. In fact, this burden is not mandated by HB 268 and is instead being imposed by Defendant Kemp in his administrative implementation of the law. The fact that this severe burden is not mandated by Georgia law and that there has been no precise articulation of a weighty or important regulatory interest by Defendant Kemp is indicative of the lack of any justification for treating this class of applicants any different from those who must show photo ID at the polls to cure a failure to match DDS or SSA records.

## III.   <u>The Relief Requested is Appropriate and Narrowly Tailored.</u>

To ensure no eligible applicants are disenfranchised when they attempt to vote in the November 2018 election, Plaintiffs request that this Court direct the Georgia Secretary of State's Office to (1) allow county election officials to permit eligible voters who registered to vote, but who are inaccurately flagged as non-citizens to vote a regular ballot by furnishing proof of citizenship to poll workers or deputy registrars; (2) instruct county election officials that poll workers may accept documents proving citizenship from voters whose registrations are

pending because they have been inaccurately flagged as non-citizens by the

verification process; (3) send the order of this Court to county boards of elections;

and (4) order that counties post a list of acceptable documentation to prove

citizenship, which includes a naturalization certificate, birth certificate issued by a

state or territory within the United States, U.S. passport, and other documents or

affidavits explicitly identified by Georgia law and listed on the Georgia Secretary

of State's website, at polling places on Election Day.[9]

County election officials and deputy registrars already accept documentary

proof of citizenship and are equipped to provide proper instruction to poll workers.

The burden of training poll workers to accept these forms of identification, when

poll workers are already required and trained to accept photo identification at the

polls, is minimal when compared to the threat of improperly disenfranchising

eligible citizens.  This insignificant burden is no bar to preliminary relief:

> The potential hardships that Georgia might experience are minor when
> balanced against the right to vote, a right that is essential to an effective
> democracy. In fact, the hardships that Georgia might suffer are
> minimized by the fact that the requested remedy is tailored to this
> particular circumstance.

---

[9] *See* Ga. Code Ann. § 21-2-216(g)(2); Ga. Sec'y of State, *Acceptable Proof of Citizenship*, *available at* http://sos.ga.gov/index.php/general/acceptable_proof_of_citizenship.

21

*United States v. Georgia*, 892 F. Supp. 2d at 1377.[10]  Plaintiffs' proposed relief is similar to that ordered by a district court three weeks before Election Day to remedy a statute that prohibited voters from curing an absentee ballot rejected by election officials due to allegedly non-matching signatures.  *Fla. Democratic Party v. Detzner*, No. 4:16cv607-MW/CAS, 2016 WL 6090943, at *9-10 (N.D. Fla. Oct. 16, 2016).  To remedy the constitutional violation, the court ordered the Florida Secretary of State to issue a directive to local supervisors of elections "to allow mismatched-signature ballots to be cured in precisely the same fashion as currently provided for non-signature ballots."  *Id.* at *1, 9.

Similarly, courts in Georgia have repeatedly ordered election officials to remedy constitutional or statutory violations in close proximity to an election.  *See*, *e.g.*, *Ga. Coal. for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345 (S.D. Ga. 2016) (extending the registration deadline in Chatham County following Hurricane Matthew, conceding "the extension would present some administrative difficulty" but did not compare to the strain felt by residents); *Common Cause/Ga.*

---

[10] The remedy requested in this case, which involves little to no interference with the administration of the election and will not affect the vast majority of voters, distinguishes this case from *Curling v. Kemp*, 2018 WL 4625653, at *16, in which the plaintiffs sought to replace Georgia's voting systems statewide for the November general election.

*v. Billups*, 406 F. Supp. 2d 1326, 1376 (N.D. Ga. 2005) (granting a preliminary injunction shortly before the November 2005 municipal election although it would cause "inconvenience and expense" to the state because "the right to vote is a fundamental right" and "[d]enying an individual the right to vote works a serious, irreparable injury upon that individual."); *Johnson v. Miller*, 929 F. Supp. 1529, 1561 (S.D. Ga. 1996) (rescheduling an election in a redistricting case); *Ga. State Conf. of the NAACP v. Georgia*, No. 1:17-cv-1397-TCB, 2017 WL 9435558, at *5 (N.D. Ga. May 4, 2017) (extending registration deadline for the June 20, 2017 special election).

## IV.  Plaintiffs Will Suffer Irreparable Harm Absent the Requested Relief.

"[B]y finding an abridgement to the voters' constitutional right to vote, irreparable harm is presumed and no further showing of injury need be made." *Touchston v. McDermott*, 234 F.3d 1133, 1158-59 (11th Cir. 2000).  Here, many applicants have already had their registrations placed into "pending" status and are at risk of being disenfranchised in the November election.  As of July 5, 2018, 3,143 voter registration applications were listed as "pending" in Georgia's voter registration system for failing the citizenship matching procedure.  McDonald Decl. at 2.  The number of individuals inaccurately flagged as non-citizens today is likely significantly higher, given the large number of registration applications

submitted within the last several months.  Any such voter who is stopped from voting in November will suffer an injury that can never be undone.  *See Washington Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1271 (W.D. Wash. 2006) (finding irreparable harm where applicants were rejected for failing to match with motor vehicle or SSA databases).

Plaintiffs will also suffer irreparable injury distinct from the injuries of eligible voters if this Court does not grant injunctive relief.  With each eligible voter denied access to the polls, the verification procedure will continue to frustrate registration and mobilization efforts critical to Plaintiffs' organizational missions.  The mobilization opportunities that will be lost during the 2018 presidential election cycle cannot otherwise be remedied.  *See Common Cause/Ga.*, 406 F. Supp. 2d at 1365-66.

## V.    <u>Secretary Kemp Will Not Be Harmed by the Requested Relief.</u>

Secretary Kemp will not be significantly harmed if the Court grants the requested relief.  All that is being sought is an order allowing eligible voters to vote, by a process virtually identical to that of every other eligible Georgia voter: let the poll workers check the required documentation. Plaintiffs merely seek to

allow for proof of citizenship to be verified by poll workers in the same manner as proof of identity.[11]

## VI.  The Public Interest Weighs Heavily in Favor of Granting the Requested Relief.

The public interest will be best served by a procedure that allows every eligible citizen of Georgia to register and cast a ballot that will count, thereby preserving this fundamental right and fostering trust in the integrity of the elections. *Washington Ass'n of Churches*, 492 F. Supp. 2d at 1271; *Wesley*, 408 F.3d at 1355; *Ga. State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1348-49 (N.D. Ga. 2015); *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court enter an order granting their motion for a preliminary injunction and such further relief as it deems just and proper.

Dated: October 19, 2018          Respectfully submitted,

                                 By:    /s/ Bryan L. Sells

---

[11] Because Secretary Kemp will not suffer monetary loss due to the entry of the requested preliminary injunctive relief, a bond is not required under Rule 65(c) of the Federal Rules of Civil Procedure.

Bryan L. Sells
Georgia Bar No. 635562
The Law Office of Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
bryan@bryansellslaw.com

Kristen Clarke, Esq. (*pro hac vice to be filed)
Jon Greenbaum, Esq. (*pro hac vice filed)
Ezra D. Rosenberg, Esq. (*pro hac vice filed)
Julie Houk, Esq. (*pro hac vice)
John Powers, Esq. (*pro hac vice)
kclarke@lawyerscommittee.org
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
jpowers@lawyerscommittee.org
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue NW, Suite 400
Washington, D.C. 20005
Telephone:           (202) 662-8600
Facsimile:           (202) 783-0857

Vilia Hayes, Esq.  (*pro hac vice filed)
Gregory Farrell, Esq.  (*pro hac vice filed)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone:           (212) 837-6000
Facsimile:           (212) 422-4726

Danielle Lang, Esq. (*pro hac vice)
Mark Gaber (*pro hac vice)
J. Gerald Hebert (*pro hac vice filed)
dlang@campaignlegalcenter.org
MGaber@campaignlegalcenter.org
GHebert@campaignlegalcenter.org

Campaign Legal Center
1411 K Street NW, Suite 1400
Washington, DC  20005
Telephone:              (202) 736-2200
Facsimile:              (202) 736-2222

Phi Nguyen
Georgia Bar No. 578019
Asian Americans Advancing Justice – Atlanta
5680 Oakbrook Parkway, Suite 148
Norcross, Georgia 30093
pnguyen@advancingjustice-atlanta.org
Telephone: (770) 818-6147

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of October 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and served a copy by electronic mail upon the following attorney of record for the defendant:

Cristina M. Correia
Senior Assistant Attorney General
Georgia Department of Law
40 Capitol Square, SW Atlanta, GA 30334
404-656-7063
FAX: 404-651-9325
ccorreia@law.ga.gov

/s/ Bryan L. Sells
Bryan L. Sells