IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ALTANTA DIVISION

|  |  |  |
|---|---|---|
| GEORGIA COALITION FOR THE PEOPLES' AGENDA, INC., et al., | * * * | |
| Plaintiffs, | * * | Civil Action No.: 1:18-cv-04727-ER |
| vs. | * * | |
| BRIAN KEMP, in his official capacity as Secretary of State for the State of Georgia, | * * * * | |
| Defendant. | * * | |
| _____ | * | |

**DEFENDANT BRIAN KEMP'S RESPONSE IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

## I.   INTRODUCTION

Plaintiffs' emergency motion for a preliminary injunction (Doc. 17) challenges the State of Georgia's procedures for complying with a federal law that requires all voters to be "citizens of the United States." *See* 52 U.S.C. § 10101(a)(1).  To ensure the citizenship of its voters, the State of Georgia maintains a centralized voter registration database under the Help Americans Vote Act ("HAVA").  (Declaration of Chris Harvey ("Harvey Decl."), attached as Exhibit 1, at ¶ 3).  Under HAVA, each county board of registrars is charged with comparing information provided in voter registration applications with information contained in the Georgia Department of

1

Driver Services' database (hereinafter, the "HAVA match process"). (*Id.* 4). One of the fields that is checked for a match in the HAVA match process is the applicant's citizenship status. (*Id.*; O.C.G.A. § 21-2-216(g)(7)). In the event that the HAVA match process reveals a citizenship mismatch, applicants must submit documentation verifying their status as a U.S. citizen.

Plaintiffs contend that this verification requirement is unconstitutional because it allows applicants to submit proof of their citizenship only: (1) when they attempt to cast a ballot, and (2) to a deputy registrar, who may or may not be present at the applicant's polling site. Plaintiffs therefore request an injunction that would "allow for proof of citizenship to be verified by poll workers" and not just deputy registrars.

However, Plaintiffs' characterization of Georgia's verification procedures is inaccurate. It also omits the fact that many of them signed a settlement agreement in a previous lawsuit, *NAACP et al., v. Kemp*, Civil Action File No. 2:16-cv-2190-WCO, Northern District of Georgia, Gainesville Division, that approved of the verification procedures and provided them with essentially the same relief they are currently seeking. (Harvey Decl., ¶ 5). The settlement agreement provides applicants with a HAVA citizenship mismatch with multiple, reasonable means of curing the mismatch: (1) upon receiving written notification of the mismatch, applicants have 26 months to submit proof of citizenship via text message, email, in

person, or facsimile, (2) applicants may present proof of citizenship to a deputy registrar on voting day, (3) if a deputy registrar is not present, the poll manager may send the applicant's proof of citizenship to the registrar's office via text message, email or facsimile, and (4) if such technology is not available, the poll manager may place a mark on the ballot confirming that the applicant produced sufficient proof of citizenship.  (*Id.* at Attach. A, Exh. 5).  Additionally, if the voter does not have proof of citizenship with them, they may cast a provisional ballot and then present proof of citizenship via text message, email, or facsimile to the county registrar "before the close of the provisional ballot period on the Friday following the election."  (*Id.* at ¶ 26).  That provisional ballot is then counted as a regular ballot would be.

Because applicants with a citizenship mismatch are given ample opportunities to cure the mismatch, including providing documentation to poll workers, Plaintiffs cannot prevail on the merits.  Moreover, it is undisputed that most of the Plaintiffs have been fully aware of Georgia's verification procedures since February 8, 2017, when they signed the settlement agreement in *NAACP v. Kemp*.  Their decision to wait until the eleventh hour to file this emergency motion is unjustifiable.  The Court should therefore also conclude that Plaintiffs' request for injunctive relief is barred by the doctrine of laches.

## II.   ARGUMENT AND CITATION OF AUTHORITY

**A.   Plaintiffs Fail to Meet Their Burden of Showing Entitlement to a Preliminary Injunction.**

"It is settled law in this Circuit that a preliminary injunction is an 'extraordinary and drastic remedy.'" *Dekalb County Sch. Dist. v. Ga. Bd. of Educ.*, 2013 U.S. Dist. LEXIS 29535, *4 (N.D. Ga. Mar. 4, 2013) (citing *Zardui-Quintana v. Richard*, 768 F.2d 1213, 1216 (11th Cir. 1985)). "There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, that the issuing of an injunction." *Congress of Racial Equality v. Douglas*, 318 F.2d 95, 98 n. 2 (5th Cir. 1963). Accordingly, such relief "never ought to be extended, unless to cases of great injury, where courts of law cannot afford an adequate and commensurate remedy in damages." *Id.* The Eleventh Circuit has instructed its district courts to be even more tentative in issuing injunctions when, as here, the party to be enjoined is a state governmental entity, stating:

> when, as in this case, [equitable remedies] are sought to be applied to officials of one sovereign by the courts of another, they can impair comity, the mutual respect of sovereigns—a legitimate interest even of such constrained sovereigns as the states and the federal government . . . [T]here is not an absolute right to an injunction in a case in which it would impair or affront the sovereign powers or dignity of a state . . . .

*McKusick v. City of Melbourne, Fla.*, 96 F.3d 478, 487-88 (11th Cir. 1996).

In order to obtain such relief, the movant must show: (i) a substantial likelihood of success on the merits of the underlying case; (ii) irreparable harm in the absence of an injunction, (iii) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued; and (iv) an injunction would not disserve the public interest. *See id.* The movant has the burden of persuasion as to all four requirements. *See United States v. Jefferson County*, 720 F. 2d 1511 (11th Cir. 1983).

A typical injunction is prohibitive in nature and seeks simply to maintain the status quo pending a resolution of the merits of the case. *See Mercedes-Benz U.S. Int'l, Inc. v. Cobasys, LLC*, 605 F. Supp. 2d 1189, 1196 (N.D. Ala. 2009). "When a preliminary injunction is sought to force another party to act, rather than simply to maintain the status quo, it becomes a 'mandatory or affirmative injunction,' and the burden on the moving party increases." *Exhibitors Poster Exch. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971); *see also, Dantzler, Inc. v. Hubert Moore Lumber Co.,* 2013 U.S. Dist. LEXIS 78664 (M.D. Ga. June 5, 2013) ("Plaintiff's request must be considered by the Court with greater scrutiny because the burden for a movant requesting a mandatory injunction is higher."). A plaintiff seeking a mandatory injunction "must make a clear showing of entitlement to the relief sought or demonstrate that extreme or serious damage would result absent the relief."

*Verizon Wireless Pers. Commc'n LP v. City of Jacksonville, Fla.*, 670 F. Supp. 2d 1330, 1346 (M.D. Fla. 2009). "[M]andatory injunctions are rarely issued . . . except upon the clearest equitable grounds." *United States v. Bd. of Educ. of Green Cty., Miss.*, 332 F.2d 40, 46 (5th Cir.1965). *See Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored").

Additionally, in election cases such as this one, courts must consider the proximity of the election and the potential for voter confusion that a last minute change to the State's voting processes could create. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). Even in cases where a plaintiff is likely to prevail, "issuing an injunction on the eve of an election is an extraordinary remedy with risks of its own." *Colón-Marrero v. Conty-Pérez*, 703 F.3d 134, 139 n. 9 (1st Cir. 2012).

As explained below, Plaintiffs have failed to establish the elements necessary to support their extraordinary request for mandatory, preliminary injunctive relief, with the result that it should be denied.

### 1. Plaintiffs Cannot Show a Substantial Likelihood of Prevailing on the Merits.

The most important factor in deciding whether to grant or deny a preliminary injunction is the plaintiff's likelihood of succeeding on the merits; a failure to meet this initial hurdle relieves a court from considering the remaining factors. *Church v.*

*City of Huntsville*, 30 F.3d 1332, 1341-45 (11th Cir. 1994) (citing *Northeastern Fl. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Here, Plaintiffs do not have a substantial likelihood of prevailing on the merits.

### a. Plaintiffs' Requests for Preliminary Injunctive Relief are Barred by Laches.

It is axiomatic that parties requesting a preliminary injunction "must show reasonable diligence" in pursuing their request. *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018). "That is as true in election law cases as elsewhere." *Id.*; *see also Lucas* v. *Townsend*, 486 U. S. 1301, 1305 (1988) (Kennedy, J., in chambers); *Fishman* v. *Schaffer*, 429 U. S. 1325, 1330 (1976) (Marshall, J., in chambers). The doctrine of laches therefore bars requests for equitable relief when: (1) there was a delay in asserting the request; (2) the delay was not excusable; and (3) the delay caused the non-moving party undue prejudice. *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005); *Kason Indus. v. Component Hardware Group*, 120 F.3d 1199, 1203 (11th 1997); *see also Costello v. United States*, 365 U.S. 265, 282 (1961). As discussed below, all three elements of laches are present in this case. Plaintiffs' eleventh hour requests for injunctive relief are, accordingly, barred by laches.

7

By their motion for preliminary injunction, Plaintiffs are challenging Georgia's HAVA match process as it relates to the citizenship of the elector; specifically, the process for verifying the citizenship of individuals whose citizenship status in their voter registration form does not match their citizenship status in the Georgia Department of Drivers' Services ("DDS") database.  (Doc. 15).  But the HAVA match process is not new.  Rather, it is, in substance, the same process that several of these same Plaintiffs challenged two years ago in *NAACP et al., v. Kemp*, Civil Action File No. 2:16-cv-2190-WCO, Northern District of Georgia, Gainesville Division, that was resolved in a publicly available settlement agreement.  (Harvey Decl.  Attach. A).  Under the Settlement Agreement, the  parties agreed that, if applicants fail the match process, they will be "placed in pending status and permitted to vote upon showing satisfactory identification. . . ." (*Id.* at Section b).  The Settlement Agreement then described a process that is exactly what Plaintiffs are now challenging in this lawsuit:

> Unless mandated by a future statutory requirement, voter registration applicants whose information fails to match during the HAVA match process will be placed in pending status and permitted to vote upon showing satisfactory identification as described in Exhibit 1, attached hereto and incorporated herein by reference.

(*Id.*).  The Settlement Agreement further provided that, for "voter registration applicants whose HAVA match results in some mismatch of information regarding

8

citizenship status," the county registrars would mail notification letters, which would be generated by the State's Enet system, "in substantially the form attached as Exhibit 4 to the Settlement Agreement." (*Id.* at Section h).

The form notification letter, which was attached as Exhibit 4 to the Settlement Agreement, is in substance the same as the notification letters about which Plaintiffs now complain in this lawsuit. (Harvey Decl. ¶ 10; Attach. D). The notification letter plainly identifies the citizen mismatch issue ("One of the pieces of information that did not match up was whether you are a United States Citizen."), and it gives the applicant clear instructions on how to remedy the mismatch by verifying his or her citizenship. (Attach. D, Section h, Ex. 4). The parties signed the Settlement Agreement on February 8, 2017—i.e., almost two years ago. (Attch. A,. at p. 10). Therefore, Plaintiffs have been aware of these procedures for many months.

As the foregoing facts demonstrate, Plaintiffs have been fully cognizant of Georgia's citizenship verification procedures for a considerable period of time. Yet, despite this knowledge, Plaintiffs inexplicably failed to file their operative complaint (Doc. 15) and emergency motion for a preliminary injunction (Doc. 17) in advance of the 2018 election. Instead, they waited until October 19, 2018, to file both documents, which was three days *after* Georgia had already commenced early

voting.[1] Given Plaintiffs' significant involvement in the settlement agreement their delay in seeking injunctive relief is unjustifiable.

Courts have found that similar unreasonable delays in the election context warranted the denial of the requested relief based on the doctrine of laches. For example, in *Perry v. Judd*, 471 Fed. Appx. 219 (4th Cir. 2012), Rick Perry and others filed an emergency motion to enjoin two Virginia statutes (one that set forth a residency requirement and another that set forth a 10,000 signatures requirement) on the grounds that they violated the First Amendment. *Id.* at 222. The Fourth Circuit affirmed the district court's denial of the plaintiffs' request for injunctive relief based on laches. The Court determined that the plaintiffs could have challenged the Virginia statutes "as soon as they were able to circulate petitions in the summer of 2011," but instead chose to wait until after the December 22, 2011 deadline. *Id.* The Court readily found that the plaintiffs' four-month delay was inexcusable, stating that:

> Plaintiffs had every opportunity to challenge [the Virginia statutes] at a time when the challenge would not have created the disruption that this last-minute lawsuit has. [Plaintiffs'] request contravenes repeated Supreme Court admonitions that federal judicial bodies not upend the orderly progression of state electoral processes at the eleventh hour. [Plaintiffs] knew long before now the requirements of Virginia's election laws.

---

[1] Early voting began in Georgia on October 15, 2018, and will continue through November 2, 2018. *See* O.C.G.A. § 21-2-385(d)(1).

*Id*. at 220-21.  Eleventh hour changes to an election process are "not just caution lights to lower federal courts; they are sirens."  *Id.* at 228.

The Fourth Circuit's admonition in *Perry* is fully applicable here.  Plaintiffs have had over a year and a half to challenge Georgia's citizenship verification process.  Their decision to wait to do so until after the 2018 election had already begun creates a severe, unjustifiable disruption to the "orderly progression" of the on-going election.  *Id.* at 221.  Their last-minute challenge not only prejudices governmental defendants, who must administer and supervise the elections, but the "public is potentially prejudiced as well, as [governmental defendants] are charged with ensuring the uniformity, fairness, accuracy, and integrity of [the state's] elections."  *Perry*, 471 Fed. Appx. at 227.

For all of these reasons, the Court should conclude that Plaintiffs' emergency request for injunctive relief is barred by laches.  *See, e.g., Marshall v. Meadows*, 921 F. Supp. 1490, 1493-94 (E.D. Va. 1996) (laches barred challenge to Virginia's open primary law when the plaintiffs filed suit 95 days before the primary was scheduled to begin, noting that "plaintiffs have slept on their rights"); *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) (laches barred the plaintiff's claim when he waited 11 weeks to file suit as the election approached); *Soules v. Kauaians for Nukolii Campaign Committee*, 849 F. 2d 1176 (9th Cir. 1988) ("The record establishes

without dispute that appellants knew the basis for their alleged equal protection challenge well in advance of the proposed special election . . . [and] district court did not err in barring . . . relief on the ground of laches").

### b. Plaintiffs do not have a Substantial Likelihood of Prevailing on the Merits of Their First and Fourteenth Amendment Claims

Although the right to vote is generally protected under the First and Fourteenth Amendments, *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) and *Bush v. Gore*, 531 U.S. 98, 104-105 (2000), the Supreme Court has long recognized that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974). However, there is no "bright line" that "separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms." *Id.* at 359 (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974)) (explaining that "[n]o litmus-paper test . . . separates those restrictions that are valid from those that are invidious . . . . The rule is not self-executing and is no substitute for the hard judgments that must be made"). Instead, the general rule is that regulations "that impose severe burdens must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests'

12

will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'"
*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).

Here, the State of Georgia has a strong interest in ensuring that its voters are citizens of the United States. Indeed, federal law expressly limits the right to vote to "citizens of the United States who are otherwise qualified by law to vote." *See* 52 U.S.C. § 10101(a)(1). To fulfill this federal mandate, Georgia's voter registration form requires applicants to swear or affirm that they are a United States citizen. *See* https://registertovote.sos.ga.gov/GAOLVR/beginRegistration.do (last accessed October 23, 2018). Thus, in the event of a HAVA mismatch in citizenship status, the State has a strong regulatory interest in taking additional steps to determine whether the applicant is, in fact, a U.S. citizen. The State has chosen to do so using the most logical and reasonable means available: requiring the mismatched applicants to submit documentation proving their citizenship. To that end, county registrars are required to send a letter to applicants notifying them of the citizenship mismatch. (Harvey Decl. at ¶ 8; Attach. A). The letter then explains how to remedy the mismatch by submitting verification of their citizenship, and it lists twenty types of documents sufficient to prove citizenship. (*Id.*).

In their emergency motion, Plaintiffs give the impression that the State's verification requirement is burdensome and unreasonable because applicants can

fulfill it only by presenting proof of citizenship to a deputy registrar, who may or may not be located at the applicant's polling place.

Contrary to Plaintiffs' assertion, there are *five* ways applicants can rectify a HAVA citizenship mismatch:

(1) When applicants receive a letter from their county registrar notifying them of the mismatch, they may provide the county registrar "with a document that shows [they] are a United States citizen" via "personal delivery, mail, email as an attachment, or facsimile." (Harvey Decl. at Attach. 4). Applicants are given ample time to provide the county registrar with such documentation: twenty-six months. (*Id.* at ¶ 12).

(2) Applicants may "produce one of the forms of acceptable proof of citizenship to a deputy registrar when they appear to vote at a polling location." (Harvey Decl. at Attach. A, Ex. 5, p. 3).

(3) If a deputy registrar is not present, then applicants may present proof of their citizenship to the poll manager, "who shall transmit a copy of the applicant's proof of citizenship to the county registrar's office via text message, email or fax." (*Id.* at Attach. A, Ex. 5, p. 3). At that time, the

country registrar will update the applicant's citizenship status, and the applicant will be permitted to cast a regular ballot.  (*Id.* at p. 4).

(4)  If the poll manager cannot be reached (or the requisite technology is not available), then the applicant "shall be offered the opportunity to cast a provisional ballot."  In such a situation, the provisional ballot "should be marked by the poll manager . . . to confirm that the applicant presented one of the forms of acceptable proof of citizenship and ID at the time the ballot was cast, and the provisional ballot shall be counted as a vote without requiring any further action."  (Harvey Decl. at Attach. A, Ex. 5, p. 4).

(5)  Finally, if the applicant is unable to present one of the accepted forms of proof of citizenship, then "the applicant shall be offered the opportunity to cast a provisional ballot."  (Harvey Decl. at Attach. C, p. 3).  The applicant must then "present proof of citizenship in person, via fax, email or text to the county registrar before the close of the provisional ballot period on the Friday following the election."  (*Id.*).

Significantly, the first, second, third, and fourth verification methods were expressly included in *NAACP v. Kemp*.  (Harvey Decl. at Attach. A, pp. 10-11).

15

As the foregoing demonstrates, applicants with a citizenship mismatch are given multiple reasonable opportunities to cure the mismatch.  The burden that Georgia's verification requirements impose on applicants with a citizenship mismatch is, accordingly, minimal and is more than justified by the State's important regulatory interest in assuring that its voters are U.S. citizens.  Plaintiffs therefore cannot establish that they have a substantial likelihood of prevailing on the merits.

### 2.    Plaintiffs Cannot Show That They Will Suffer Irreparable Harm Absent the Granting of a Preliminary Injunction.

Even if Plaintiffs established a likelihood of success on the merits (which, as discussed, they have not), their failure to demonstrate "a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). "A showing of irreparable injury is the sine qua non of injunctive relief." *Id.* "[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Id.* Plaintiffs are not (and do not claim to be) suffering irreparable harm currently, and, as discussed below, the purported threat of future injury to which they point – that citizens whose voter registration applications were placed in pending status due to citizenship verification will "los[e] their right to vote" – is entirely conjectural and, indeed, inconsistent with the record. *See Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994) (injunctive relief is warranted only when a party "alleges, and

16

ultimately proves, a real and immediate – as opposed to a merely conjectural or hypothetical – threat of future injury"). Accordingly, it cannot and does not provide a basis for the extraordinary relief Plaintiffs seek.

1. The purported harm to which Plaintiffs point is speculative and hypothetical.

In support of their claim of irreparable harm, Plaintiffs point to the Affidavit of Michael McDonald and, in particular, to his observation that, as of July 5, 2018, 3,143 voter registration applications in Georgia were listed as "pending" documentary proof of citizenship. *See* Doc. 17-1 at 29; Doc. 17-11 at 4. From this Plaintiffs conclude that "many applicants" are "at risk of being disenfranchised in the November election." Doc. 17-1 at 29. The conclusion is wholly unwarranted.

Indeed, this group of "pending" applicants may include non-citizens who do not have documentary proof of citizenship and are not, by law, qualified to vote. Of those that were inaccurately flagged as non-citizens during the HAVA match process, Plaintiffs do not point to anyone who has not cured or cannot cure the pending status by providing documentation of citizenship in a manner described in the notification letter which is routinely and promptly sent out to all such applicants.[2] Indeed,

---

[2] As discussed, Secretary Kemp directs county registrars to mail out the notification letters, which advise voters of the pending status of their application and of what documentation is required to finalize the application, to *every* individual whose application has resulted in a mismatch of citizenship status. *See* Harvey Aff., ¶¶ 8-11.

17

Plaintiffs acknowledge that applicants who are subject to a hold as a result of the citizenship verification process are mailed such letters notifying them of the situation and of how to cure the deficiency prior to Election Day. Doc. 17-1 at 23. And while Plaintiffs point to the hypothetical possibility that a recipient may not be able to read the letter because it is written in English, or may be "intimidated" by the letter because it pertains to citizenship verification, they fail to point to a single example of either situation actually occurring. Nor do they provide any other factual basis to support the baseless inference they ask this Court to make – that a substantial likelihood exists that "many applicants" will be denied their right to vote as a result of intimidation by, or an inability to comprehend, the notification letter. *See* Doc. 17-1 at 29. Indeed, such inference is inconsistent with the evidence in the record, which shows instead that "[t]he vast majority of citizenship mismatches are cured . . . by applicants responding to the notification by submitting verification of their citizenship."[3] *See* Harvey Aff., ¶ 13.

Plaintiffs also contend that the options available to individuals who, for whatever reason, fail to provide the requested citizenship verification prior to

---

[3] Notably, the only individuals Plaintiffs identify in their motion as having been inaccurately flagged as non-citizens by the challenged voter registration process – Mr. Barreto and Ms. Rosario Palacios – provided the citizenship documentation requested after receiving letter notification and are now registered to vote. Doc. 17-1 at 16-17.

Election Day are inadequate and suggest that the result may be a denial of these individuals' right to vote in the November elections. This contention is equally speculative and, moreover, fails accurately to explain – or even acknowledge – the numerous and reasonable options available to such individuals for casting a ballot. As Plaintiffs do not dispute, an applicant in pending status due to citizenship verification may cast a regular ballot if he or she produces one of the forms of acceptable proof of citizenship to a deputy registrar at a polling location. *See* Harvey Aff., ¶ 17. In some counties, including Fulton County, a deputy registrar is present at all polling sites and the process can be completed on site. *Id.*, ¶ 18. Even when a deputy registrar is not present at the time the applicant requests a ballot, however, the applicant may present proof of citizenship to the poll manager, a copy of which is transmitted to the county registrar's office via text message, email or fax. *Id.*, ¶ 19. Such an applicant can then be permitted to cast a regular ballot without, as Plaintiff incorrectly contends, "hav[ing] to leave the polling places to locate the appropriate deputy registrar" or having to "travel to the county seat or other location . . . and then travel back to the poll." *Id.*; *see* Doc. 17-1 at 8, 14. And, while Plaintiffs speculate, without evidentiary support, that irreparable injury is imminent because "it is likely" that many applicants in pending status due to citizenship verification will be unable to cast a regular ballot under the procedures currently in effect, citizenship mismatch issues may be resolved

19

prior to Election Day or at the polls where a regular ballot may then be cast. *Id.*, ¶ 18. If a deputy registrar cannot be reached or the requisite technology is not available, the applicant can vote by casting a provisional ballot, which is marked by the poll manager to confirm that the applicant presented one of the forms of acceptable proof of citizenship and identification at the time the ballot was cast. *Id.*, ¶ 19. Contrary to Plaintiffs' suggestion, however, such individuals are not required "to make multiple trips to travel to the board of elections or some other place" (Doc. 17-1 at 23) in order to cast their ballot. On the contrary, as clearly set forth in the attachments to the settlement agreement in *Georgia NAACP v. Kemp*, **the provisional ballot is counted as a vote without requiring any further action**. *Id.*, ¶ 19. Plaintiffs fail entirely to demonstrate how this process is "likely" to lead to any, much less "many," situations in which an individual is disenfranchised.

Finally, Plaintiffs also contend that they, as voting advocacy organizations, will suffer irreparable harm absent emergency injunctive relief. But this assertion is based on the same conjecture which underlies their claim that "many voters" will be disenfranchised absent this Court's immediate intervention in Georgia's election process. Plaintiffs contend, in particular, that they will be forced to divert significant organizational resources to assist "each eligible voter denied access to the polls" as a result of the citizenship verification process, and "mobilization opportunities . . .

20

during the 2018 presidential election cycle" will be lost as a result. *See* Doc. 17-1 at 30. Because the purported "denial of [voter] access to the polls" referenced in Plaintiffs' motion is, as discussed, entirely speculative, Plaintiffs' assertion that they will suffer lost opportunities as a result is equally so.

2. Plaintiffs' delay in seeking an injunction suggests an absence of irreparable harm.

There is another component to Plaintiffs' failure to demonstrate a substantial likelihood of irreparable harm which warrants discussion. In particular, as discussed in connection with the laches argument, *infra*, Plaintiffs were aware of the election rules, provisions, and circumstances which underlie their claims for injunctive relief well before their emergency motion was filed. Their delay in seeking the relief requested belies their claim of irreparable harm.

"[C]ourts have frequently considered delay in initiating an action where . . . preliminary injunctive relief has been requested" and held that "delay is suggestive of a lack of irreparable harm." *Calhoun v. Lillenas Publg.*, 298 F.3d 1228, 1235 (11th Cir. 2002). As the Eleventh Circuit has observed, its "sister circuits and district courts within this Circuit and elsewhere have found that a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016) (affirming district court's finding of absence of irreparable harm where

preliminary injunction motion "relied exclusively on evidence that was available to [the plaintiff]" five months prior to the time the motion was filed). "A delay in seeking a preliminary injunction of even only a few months – though not necessarily fatal – militates against a finding of irreparable harm." *Id. See also Regions Bank v. Kaplan*, 2017 U.S. Dist. LEXIS 127803, *9 (M.D. Fla. Aug. 11, 2017) (plaintiff's five month delay in filing action and seeking injunction after learning about allegedly fraudulent transfers "belie[d] [the plaintiff's' claim of an imminent and irreparable injury"); *U.S. Bank Nat'l Ass'n v. Turquoise Props. Gulf*, 2010 U.S. Dist. LEXIS 60882, 13-14 (S.D. Ala. June 18, 2010) (moving party's failure to act with reasonable diligence to protect its own interests after being on notice of the challenged conduct undercuts the movant's plea that it will suffer irreparable injury unless the court issues a mandatory injunction); *Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2nd Cir. 1993) (holding that a party's delay in seeking an injunctive relief "severely undermines [its] argument that absent a stay irreparable harm w[ill] result").

Here, Plaintiffs complain that certain individuals – primarily naturalized citizens who received a driver's license when they were non-citizens and thus may have outdated citizenship information in the DDS system – have been incorrectly flagged as potential non-citizens in the voter registration process and are required, accordingly, to provide additional documentation of citizenship to finalize their

22

applications. Plaintiffs do not and cannot, however, contend that they were unaware of such circumstances until recently. On the contrary, as mentioned, such situations, as well as the manner in which individuals are notified by letter of the need to provide documentary verification of citizenship to complete their application *and* the various ways in which the deficiency can be cured, were a subject of the settlement agreement in *NAACP et al. v. Kemp*, entered into over a year-and-a-half ago and to which three of the Plaintiffs in this case were parties.

And to the extent Plaintiffs base their request for emergency injunctive relief upon complaints that the process of providing verification of citizenship is in some way problematic, their own affidavits and brief make clear that Plaintiffs were aware of these complaints months, and even a year, before filing this action. Indeed, Plaintiffs identify only two individuals they contend were incorrectly flagged as non-citizens – Francisco Barreto and Maria del Rosario Palacios – and point to their experiences in finalizing their voter applications as "evidence" that "Georgia's citizenship verification protocol creates real-world barriers to voting for eligible citizens." Doc. 17-1 at 16. But Mr. Barreto went through and completed the citizenship verification process months ago, in April 2018, and Ms. Rosario Palacios did so over a year ago, in July 2017. *See* Doc. 17-12, 17-13. Plaintiff GALEO was necessarily aware of the experiences of both individuals at the time they occurred, as

GALEO assisted Mr. Barreto in finalizing his application (*see* Doc. 17-12, ¶¶ 5-6, 11, 19), and Ms. Rosario Palacios was employed by GALEO at the time (*see* Doc. 17-13, ¶¶ 10, 13).  Plaintiffs nonetheless waited until October 2018 – and only weeks before the November 6 elections – to seek an injunction related to such alleged concerns.

Plaintiffs' delay in seeking the injunctive relief requested is sufficient to deny the injunction, and at a minimum, it severely undercuts their claim of irreparable harm and any need for immediate relief.

### 3.    The Damage to Secretary Kemp Outweighs any Alleged Damage to Plaintiffs.

It is undisputed that the 2018 general election is currently underway with less than two weeks remaining before election day.  Moreover, when faced with a request to interfere with a state's election process "just weeks before an election," federal courts are "required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). "These considerations often counsel restraint." *Feldman v. Reagan*, 843 F.3d 366, 375-376 (9th Cir. 2016). Indeed, the Supreme Court cautioned in an apportionment challenge that, **"**where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief . . . even though the existing apportionment scheme was found

invalid." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). Utilizing similar caution in *Williams v. Rhodes*, 393 U.S. 23, 34 (1968), the Supreme Court declined to order the printing of new ballots at a "late date" even though the existing ballots were held to have unconstitutionally excluded certain candidates.  *See also Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (en banc) ("[T]he district court should fashion an appropriate remedy in accord with its findings; provided, however, that any remedy will not be made effective until after the November 2016 election."); *Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1012 (6th Cir. 2006) (vacating in part a temporary restraining order that "needlessly creates disorder in electoral processes").

**4.      An Injunction is Adverse to the Public Interest.**

An injunction in the middle of the 2018 general election would be against the public interest.  Each of Georgia's 159 counties have begun early in-person voting, and they have already trained their personnel on current election processes.

## CONCLUSION

For the reasons set forth above, Plaintiffs' request for a temporary injunction should be denied.

Respectfully submitted,

CHRISTOPHER M. CARR      112505
Attorney General

ANNETTE M. COWART        191199
Deputy Attorney General

*/s/ Russell D. Willard*
RUSSELL D. WILLARD        760280
Senior Assistant Attorney General

*/s/ Cristina M. Correia*
CRISTINA M. CORREIA        188620
Senior Assistant Attorney General

Attorneys for Secretary of State Brian Kemp

Please address all
Communication to:
CRISTINA CORREIA
Senior Assistant Attorney General
40 Capitol Square SW
Atlanta, GA  30334
ccorreia@law.ga.gov
404-656-7063
404-651-9325

26

## Certificate of Compliance

I hereby certify that the forgoing document was prepared in 14-point Times New Roman in compliance with Local Rules 5.1(C) and 7.1(D).

/s/ Cristina Correia
Cristina Correia          188620
Senior Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2018, I electronically filed DEFENDANT BRIAN KEMP'S RESPONSE IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

Bryan L. Sells
The Law Office of Bryan L. Sells, LLC
P.O. Box 5493
Atlanta, GA  31107

Kristen Clarke
Jon Greenbaum
Ezra Rosenberg
Julie Houk
John Powers
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue NW, Suite 400
Washington, DC 20005

Brian R. Dempsey
Richard A. Carothers
Carothers & Mitchell, LLC
1809 Buford Highway
Buford, GA  30518

Vilia Hayes
Gregory Farrell
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004

28

Danielle Lang
Mark Gaber
J. Gerald Hebert
Campaign Legal Center
1411 K. Street NW, Suite 1400
Washington, DC 20005

Phi Nguyen
Asian Americans Advancing Justice -- Atlanta
5680 Oakbrook Parkway, Suite 148
Norcross, GA 30093

This 24th day of October, 2018.

/s/ Cristina Correia
Cristina Correia          188620
Senior Assistant Attorney General
40 Capitol Square SW
Atlanta, GA  30334
ccorreia@law.ga.gov
404-656-7063
404-651-9325