**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

GEORGIA COALITION FOR THE    *
PEOPLE'S AGENDA, INC., as an      *
organization, et al.,      *
     *
       Plaintiffs,      *
     *
      v.      *      1:18-CV-04727-ELR
     *
BRIAN KEMP, in his official capacity    *
as Secretary of State for the State      *
of Georgia,      *
     *
       Defendant.      *
     *

—————

**O R D E R**

—————

Presently before the Court is Plaintiffs' Emergency Motion for Preliminary
Injunction. [Doc. 17]. For the reasons set forth below, the Court grants Plaintiffs'
Motion.

## I. Background

This case is about the right to vote for approximately 51,111 individuals who
have been flagged by the State of Georgia as ineligible to vote due to alleged errors
with their voter registration information. While the case as a whole seeks to
redress the alleged violation of rights for all of these 51,111 individuals, Plaintiffs'

Emergency Motion for a Preliminary Injunction seeks targeted relief for approximately 3,141 individuals who have been flagged by the State as non-citizens of the United States, and therefore, ineligible to vote in the upcoming November 6, 2018 election.

As background, on October 19, 2018, Plaintiffs Georgia Coalition for the Peoples' Agenda, Inc.; Asian Americans Advancing Justice-Atlanta, Inc.; Georgia State Conference of the NAACP; New Georgia Project, Inc.; Georgia Association of Latino Elected Officials, Inc.; ProGeorgia State Table, Inc.; The Joseph and Evelyn Lowery Institute for Justice and Human Rights, Inc.; and Common Cause filed an amended complaint against Defendant Brian Kemp, in his official capacity as Secretary of State for the State of Georgia. [Doc. 15]. Plaintiffs bring three (3) Counts against Defendant in their amended complaint as follows:

- Count I: Violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 – for the denial or abridgment of the right to vote on account of race, color, or membership in a language minority group;

- Count II: Violation of the First and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983 – for the protection of the right to vote as a fundamental right; and

- Count III: Violation of Section 8 of the National Voter Registration Act of 1993, 52 U.S.C. § 20507(a)(1) – for preventing voter registration applicants who submit timely, facially complete and accurate voter registration forms from being registered as active voters on the Georgia voter registration list for upcoming elections.

Also on October 19, 2018, Plaintiffs Georgia Coalition for the Peoples' Agenda, Inc.; Asian Americans Advancing Justice-Atlanta, Inc.; Georgia State Conference of the NAACP; Georgia Association of Latino Elected Officials, Inc.; and ProGeorgia State Table, Inc.[1] filed an Emergency Motion for Preliminary Injunction. [Doc. 17]. Defendant filed a response and Plaintiffs filed a reply, and the Court heard argument on Plaintiffs' Motion on October 29, 2018. Accordingly, Plaintiffs' Motion is now ripe for the Court's review.

## A. The Exact Match Process in Georgia

### 1. General Overview of the Exact Match Process

In sum, and in very general terms, when a person in Georgia registers to vote and submits a voter registration application, county election officials input the information from the application into a statewide computer voter registration system called "Enet." The Enet system then checks the application information against files from the Georgia Department of Driver Services ("DDS") or files from the Social Security Administration ("SSA"). If the application information in the Enet system does not match the DDS or SSA files, then the voter registration application is placed in "pending status," and the person may not vote until the person corrects the information. The burden is on the applicant to take the next steps to correct any information and/or present the necessary proof required to the

---

[1] While these are "the moving Plaintiffs" for Plaintiffs' Emergency Motion, the Court will refer to these moving Plaintiffs simply as "Plaintiffs" throughout the order.

appropriate officials to become a Georgia voter.  If the applicant does not take the appropriate steps to correct the information within 26 months, then the voter application is rejected, and the individual must start over with a new voter registration application.

### 2. Underlying Law of the Exact Match Process

Pursuant to the Help America Vote Act of 2002 ("HAVA"), Georgia is required to implement a single, centralized computerized statewide voter registration list containing the name and registration information of every legally registered voter in the State.  52 U.S.C. § 21083(a)(1)(A).  The above-mentioned "Enet" is Georgia's computerized statewide voter registration system.  Pursuant to HAVA, the State must enter into an agreement with DDS to match information in the Enet system against information in DDS files in order to verify the accuracy of voter registration information.  Id. at § 21083(a)(5)(B)(i).  Furthermore, the Commissioner of Social Security must enter into an agreement with DDS also for the purpose of verifying voter registration information for those applicants who provide the last 4 digits of their social security number.  Id. at § 21083(a)(5)(B)(ii); see also 42 U.S.C. § 405(r)(8).

In 2017, House Bill 268 was enacted governing elections to, *inter alia*, revise the types of identification acceptable for voting and to require certain information for voter registration.  H.B. 268, 154th Gen. Assemb., Reg. Sess. (Ga.

2017). HB 268 is now codified at O.C.G.A. § 21-2-210, *et seq.* Building upon HAVA, HB 268 requires that any individual desiring to vote in Georgia must be registered to vote and a citizen of the United States. O.C.G.A. § 21-2-216(a)(1)-(2).

When an individual in Georgia wishes to register to vote, the applicant fills out a voter registration application. Id. at § 21-2-220(a). The parties do not dispute that local county election officials take the information from the voter registration application and put it into the Enet system. The voter registration application will only be accepted as valid after the board of registrars has verified the applicant's identity. O.C.G.A. § 21-2-220.1(c). Additionally, the applicant must submit satisfactory evidence of United States citizenship. Id. at § 21-2-216(g)(1). To verify the applicant's identity, including citizenship, the Enet system matches the voter application information against the files of DDS or SSA.[2] Id. at § 21-2-220.1(c)(1).

When information in the Enet system does not exactly match with information either from the files of DDS or SSA, this creates a "non-match," and the individual is flagged and placed in "pending status." County registrars are then required to send a letter to the flagged applicants notifying them of their pending status and the ways to remedy the issue. Applicants have 26 months following the

---

[2] The information provided in the application determines whether DDS or SSA files are checked, for example, depending on whether the applicant provided a social security number.

date of their voter registration application to remedy the issue and verify their identity by presenting sufficient evidence of identity to the board of registrars.  Id. at § 21-2-220.1(d)(4).  Failure to cure the issues before 26 months results in the individual's voter registration application being rejected and the individual having to submit a new application.  Id.

A "flag," resulting in an individual being placed in "pending status," can occur for various reasons, but for purposes of this lawsuit and particularly Plaintiffs' Emergency Motion, the flags can be broken down into two categories: (1) flags for citizenship and (2) flags for any other non-matching information, such as a misspelled name.  This lawsuit focuses on both (1) and (2), challenging the matching process as a whole.  However, Plaintiffs' Emergency Motion and this order address (1), individuals who have been flagged and placed into pending status due to citizenship, and the hurdles these individuals face as they relate to voting in the upcoming election.

**B.  How to Vote in the November 6, 2018 Election with a Non-Match Flag for a Reason Other than Citizenship**

As just stated, while Plaintiffs' Motion is only about those individuals placed in pending status for citizenship, in light of the confusion about the matching process, the Court will set forth below how individuals who have been flagged and placed in pending status for reasons *other than citizenship* may still vote in the November 6, 2018 election.  The Court takes no opinion as to whether

6

this process for voting is sufficient, as this issue is not before the Court at this time. To be clear, the Court is merely reiterating the process as set forth by Defendant Kemp in an effort to help clarify how voting may occur.

Elections Division Director Chris Harvey posted to an online bulletin board an Official Election Bulletin dated October 23, 2018, to County Election Officials and County Registrars (hereinafter "October 23 Memorandum"). [Doc. 27-1]. This Memorandum explains how those individuals flagged and placed in pending status can vote in the November 6, 2018 election. As to those voter applicants placed in pending status due to a flag for any non-matching information *other than citizenship,* these individuals may still vote in the November 6, 2018 election as follows:

> Pending applicants whose information (other than citizenship status) did not match are eligible to vote during early voting or on Election Day and must be allowed to vote a regular ballot if they show one of the following forms of identification and there are no other issues that would require the voter to vote a provisional ballot (i.e. wrong county, wrong precinct, already voted, etc.):
>
> (1) A Georgia driver's license (including an expired Georgia driver's license);
>
> (2) A valid Georgia voter identification card or other valid photo identification card issued by a branch, department, agency, or entity of the State of Georgia, any other state, or the United States which is authorized by law to issue personal identification. This includes a valid student photo ID card issued by a Georgia public college, university, or technical school; a valid out-of-state driver's license; public transit issued

photo ID card; and any other federal or state agency or government issued photo ID card;

(3) A valid United States passport;

(4) A valid employee photo identification card issued by any branch, department, agency, or entity of the United States government, this state, or any county, municipality, board, authority, or other entity of this state;

(5) A valid United States military photo identification card; or

(6) A valid tribal photo identification card.

Oct. 23 Mem. at 1 [Doc. 27-1].  Defendant's Memorandum makes clear that these applicants may present proof of identity as explained above to a **poll worker**.  Id. at 5 (explaining that the poll worker can check identity and create a voter access card).  Moreover, the poll worker "must simply confirm that the voter is the same person as the applicant."  Id. at 3.  Once a poll worker verifies the applicant's identity, the individual is "given credit for voting," and their Enet status should be updated from "pending" to "active."  Id.

## II.  Plaintiffs' Emergency Motion for a Preliminary Injunction

The Court now turns to Plaintiffs' Emergency Motion for a Preliminary Injunction, which seeks relief for those individuals who have been flagged and placed in pending status due to citizenship.

## A.  Standing

Plaintiffs argue that they have organizational standing to seek relief in their Emergency Motion.  Defendant did not address Plaintiffs' argument on standing. "An organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response."  <u>Arcia v. Fla. Sec'y of State</u>, 772 F.3d 1335, 1341 (11th Cir. 2014).   Plaintiffs argue that they participate in voter registration activities and must divert resources to educate voters about Georgia's exact match verification protocol, assist voters inaccurately flagged as non-citizens, and resolve issues these voters may face when attempting to prove their citizenship.  Plaintiffs submit the declarations of the Executive Directors or President for each of their organizations in support.  <u>See</u> Pls.' Mem. of Law in Supp. of Pls.' Emergency Mot. for Prelim. Inj. at 19 [Doc. 17-1].  Based on the evidence presented by Plaintiffs, the Court finds that Plaintiffs have organizational standing because these organizations will have to divert personnel and resources to educate individuals about the exact match process and assist those who have been flagged and placed into pending status, including helping to resolve issues surrounding citizenship before Election Day.  <u>See</u> <u>Fla. State Conference of NAACP v. Browning</u>, 522 F.3d 1153, 1165 (11th Cir. 2008) (organization had standing to challenge election law by showing that they would have to divert personnel and time to educating

potential voters on compliance with the laws and assisting voters who might be affected by the challenged election law).

**B. Doctrine of Laches**

Defendant argues that Plaintiffs' Motion is barred by the doctrine of laches. "To establish laches, [Defendant] must demonstrate (1) there was a delay in asserting a right or a claim, (2) the delay was not excusable, and (3) the delay caused [Defendant] undue prejudice." United States v. Barfield, 396 F.3d 1144, 1150 (11th Cir. 2005). Defendant argues that Plaintiffs have been fully cognizant of Georgia's citizenship verification procedures for a considerable period of time. Defendant asserts that HAVA and the matching process are not new, and that some of the Plaintiffs in this suit challenged this matching process, in substance, two (2) years ago in NAACP v. Kemp, No. 2:16-cv-00219-WCO (N.D. Ga. 2017). Specifically, Defendant contends that Plaintiffs have been aware of the citizenship mismatch issue and how to remedy it because these were topics covered by the Settlement Agreement in NAACP v. Kemp. Despite knowing of these issues for some time, Defendant argues that Plaintiffs waited to file their amended complaint and Emergency Motion less than a month before the November 6, 2018 election and three (3) days after Georgia had already begun early voting. Defendant asserts that Plaintiffs' last-minute challenge prejudices Defendant, who must administer

and supervise the elections, as well as the public, because Defendant must ensure the uniformity, fairness, accuracy, and integrity of Georgia's elections.

In response, Plaintiffs argue that O.C.G.A. § 21-2-216(g), which is the part of HB 268 that addresses the documentary proof for citizenship and is discussed below, was not yet implemented at the time of the Settlement Agreement in NAACP v. Kemp and was exempted from the Settlement Agreement in NAACP v. Kemp. Moreover, the settling parties agreed that Plaintiffs could challenge this statute in the future. The Court agrees with Plaintiffs' arguments. See Decl. of Chris Harvey, Ex. A, Settlement Agreement at 1(a) [Doc. 22-1].

Plaintiffs also assert that they did not delay in bringing this action because this case is based on new facts that Plaintiffs have developed over time, including individual stories that were not necessarily indicative of a policy problem until Plaintiffs could gather sufficient data to identify a pattern. The Court finds this argument certainly plausible, as evidenced by the Declaration of Mr. Yotam Oren, discussed below, who encountered hurdles while trying to vote as recently as October 16-17, 2018. Therefore, to the extent Plaintiffs delayed in seeking relief in this suit, the Court finds that this delay was excusable. See SunAmerica Corp. v. Sun Life Assur. Co. of Canada, 77 F.3d 1325, 1345 (11th Cir. 1996) (Birch, J., concurring) (when determining whether delay was excusable, court should not rely solely on the time period involved but also examine the reasons for any delay).

Additionally, the Court does not find that granting Plaintiffs injunctive relief this close to Election Day will cause undue prejudice to Defendant or the public, particularly where the relief sought by Plaintiffs is very limited and targeted.  As recently recognized by this Court, "multiple courts within the Eleventh Circuit have granted injunctive relief against election officials in close temporal proximity to an election despite recognizing the administrative burden inherent in such relief." Martin v. Kemp, No. 1:18-CV-4776-LMM, 2018 WL 5276242, at *6 n.6 (N.D. Ga. Oct. 24, 2018) (collecting cases).

Finally, the defense of laches is dependent on the specific facts of a case. Id. at *6 (citing Coca-Cola Co. v. Howard Johnson Co., 386 F. Supp. 330, 334 (N.D. Ga. 1974)).  Due to this, "courts have been hesitant to bar claims under a laches defense when there is limited factual information available," as is the case here. Martin, 2018 WL 5276242, at *6 (citation omitted).  Therefore, the Court finds that Plaintiffs are not barred by the doctrine of laches in seeking relief because Plaintiffs' delay was excusable, Defendant will not suffer undue prejudice, and there is a limited factual record at this early stage of the case.

## C. The Merits of Plaintiffs' Emergency Motion for a Preliminary Injunction

Plaintiffs' Emergency Motion for a Preliminary Injunction seeks limited and targeted relief for those individuals who are in pending status because their citizenship information did not match.  To better understand the relief Plaintiffs

seek in their Motion, the Court will provide additional information about the matching process to prove citizenship. As already noted, voter registration application information input into the Enet system is checked against either DDS or SSA files. Only the DDS files indicate citizenship. One need not be a United States citizen to hold a Georgia driver's license. Ga. DDS Rule § 375-3-1-.02(6). After becoming a citizen, a person may update citizenship information with DDS but need not do so. Id. at § 375-3-1-.13(1). Therefore, if a person receives a Georgia driver's license based on lawful status in the United States but is not yet a citizen, the DDS files will reflect that the person is not a citizen. If that person then becomes a naturalized citizen and submits a voter registration application stating that he or she is a citizen, when Enet checks the voter registration application against the DDS files, there will be "no match" because the DDS files will indicate that the person is not a citizen based on outdated information. Herein lies the source of the problem.

Now the Court turns to the merits of Plaintiffs' Motion. A plaintiff seeking a preliminary injunction must demonstrate that: (1) there is a substantial likelihood of success on the merits; (2) it will suffer irreparable injury if relief is not granted; (3) the threatened injury outweighs any harm the requested relief would inflict on the non-moving party; and (4) entry of relief would serve the public interest. See, e.g., KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1268 (11th Cir.

2006).  The decision as to whether a plaintiff carried this burden "is within the

sound discretion of the district court and will not be disturbed absent a clear abuse

of discretion."  Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc., 303

F.3d 1242, 1246 (11th Cir. 2002) (quoting Palmer v. Braun, 287 F.3d 1325, 1329

(11th Cir. 2002)) (internal quotation marks omitted).

## 1.  Substantial Likelihood of Success on the Merits

Plaintiffs seek a preliminary injunction on their claims that Defendant is

infringing upon Plaintiffs' fundamental right to vote.  The parties do not dispute,

and the Court agrees, that the following framework is appropriate for evaluating

Plaintiffs' claims.

> When deciding whether a state election law violates First and
> Fourteenth Amendment associational rights, we weigh the character
> and magnitude of the burden the State's rule imposes on those rights
> against the interests the State contends justify that burden, and
> consider the extent to which the State's concerns make the burden
> necessary.

Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997) (quotation

omitted).

Stated differently, the Court

> must first "consider the character and magnitude of the asserted injury
> to the rights protected by the First and Fourteenth Amendment."
> [Anderson v. Celebrezze,] 460 U.S. 780, 789, 103 S. Ct. 1564 (1983).
> Then the court must "identify and evaluate the precise interests put
> forward by the State as justifications for the burden imposed by its
> rule." Id. Finally, the court must "determine the legitimacy and
> strength of each of those interests," while also considering "the extent

14

to which those interests make it necessary to burden the Plaintiff's rights." Id.

Stein v. Ala. Sec'y of State, 774 F.3d 689, 694 (11th Cir. 2014).

> "[I]f the state election scheme imposes "severe burdens" on the plaintiffs' constitutional rights, it may survive only if it is "narrowly tailored and advance[s] a compelling state interest." Timmons, 520 U.S. at 358. But when a state's election law imposes only "reasonable, nondiscriminatory restrictions" upon a plaintiff's First and Fourteenth Amendment rights, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." Id. (quotations omitted). In short, the level of the scrutiny to which election laws are subject varies with the burden they impose on constitutionally protected rights—"Lesser burdens trigger less exacting review." Id.

Stein, 774 F.3d at 694. Therefore, the "Supreme Court has rejected a litmus-paper test for constitutional challenges to specific provisions of a State's election laws and instead has applied a flexible standard." Common Cause/Georgia v. Billups, 554 F.3d 1340, 1352 (11th Cir. 2009) (quotation omitted).

Thus, the Court begins by evaluating the burden the election scheme places on Plaintiffs' First and Fourteenth Amendment rights. To evaluate this burden, the Court must clarify the facts as presented by the parties. Plaintiffs, relying on information from a Georgia Poll Worker Manual for 2018, assert that on Election Day, there is only one way that an individual in pending status for citizenship can vote in the upcoming election and that this way is severely burdensome. In response, Defendant presented five (5) Options that such an individual could vote in the upcoming election, as supported by the Declaration of Chris Harvey. The

evidence presented by Defendant shows that Plaintiffs' contention is incorrect, as the evidence from Mr. Harvey is more thorough and up to date than the Poll Worker Manual.

Accordingly, these are the five (5) Options that an individual in pending status for citizenship may vote in the upcoming election as argued by Defendant and as supported by Mr. Harvey's October 23 Memorandum:

1. When applicants receive a letter from their county registrar notifying them of the mismatch, they may provide the county registrar with a document that shows they are a United States citizen via personal delivery, mail, email as an attachment, or facsimile.

2. Applicants may produce one of the forms of acceptable proof of citizenship to a deputy registrar when they appear to vote at a polling location.

3. If a deputy registrar is not present, then applicants may present proof of their citizenship to the poll manager, who shall transmit a copy of the applicant's proof of citizenship to the county registrar's office via text message, email or fax. At that time, the country [sic] registrar will update the applicant's citizenship status, and the applicant will be permitted to cast a regular ballot.

4. If the [deputy registrar[3]] cannot be reached (or the requisite technology is not available), then the applicant shall be offered the opportunity to cast a provisional ballot. In such a situation, the provisional ballot should be marked by the poll manager . . . to confirm that the applicant presented one of the forms of acceptable proof of citizenship and ID at the time the ballot was cast, and the

---

[3] The Court has quoted the five (5) Options from Defendant's Response. In this original quote, Defendant has stated that if a "poll manager" cannot be reached. However, at other times throughout his brief and at the hearing, Defendant refers to Option 4 as whether the "deputy registrar" is not available.

provisional ballot shall be counted as a vote without requiring any further action.

5. Finally, if the applicant is unable to present one of the accepted forms of proof of citizenship, then the applicant shall be offered the opportunity to cast a provisional ballot. The applicant must then present proof of citizenship in person, via fax, email or text to the county registrar before the close of the provisional ballot period on the Friday following the election.

Def.'s Resp. in Opp'n to Pls.' Emergency Mot. for Prelim. Inj. at 14-15 [Doc. 24-1] (quotations and citations omitted).

Defendant maintains that these five (5) Options are currently being implemented and will be in effect on Election Day. However, Plaintiffs cite to evidence that shows otherwise. Plaintiffs present the declaration of Yotam Oren, who states that he legally obtained a Georgia driver's license in 2010 and renewed his license as a non-citizen, legal permanent resident several times to keep it active. On December 18, 2017, Mr. Oren became a naturalized citizen of the United States, and after the naturalization ceremony, he completed a Georgia voter registration form and included a copy of his naturalization certificate with his form. Mr. Oren further states that he does not recall ever being informed that he needed to update his records with DDS to reflect the change in his citizenship after becoming a naturalized citizen. Sometime after submitting his voter registration application, he received a letter from the Fulton County voter registration office indicating that his voter registration was in pending status due to citizenship and

that he would need to show proof of citizenship to vote. Mr. Oren understood from the letter that he could bring proof of citizenship to the polling station at the time he voted.

Prior to voting early in the November 6, 2018 election, Mr. Oren checked Defendant Kemp's Secretary of State website, which informed Mr. Oren that he could vote if he brought proof of citizenship to the polling station. On October 16, 2018, Mr. Oren went to his designated early-voting polling location in Fulton County. He checked in with a poll worker and showed her his valid United States passport as proof of citizenship. The poll worker directed Mr. Oren to another election official, who informed Mr. Oren that she would need to call yet another person to change his status from "pending" to "active" so that he could vote. While Mr. Oren waited, the official was unable to reach the intended person on the phone and informed Mr. Oren that he could continue to wait or come back another time to vote. No one offered Mr. Oren an option to cast a provisional ballot. Mr. Oren did not want to wait any longer and left.

The following day, Mr. Oren called the Fulton County voter registration office to learn how he could resolve the issue, and he was provided with a name and phone number to call when he returned to his polling location. Later that day, Mr. Oren returned to the same polling location as the previous day, checked in again with a poll worker showing his passport, and he was again directed to

another election official. This time, however, he provided the election official with the name and telephone number he had received from the Fulton County voter registration office, and the election official was able to speak with this person via telephone. Mr. Oren's status was changed from pending to active, and he was finally able to cast his first vote as a United States citizen. <u>See generally</u> Decl. of Yotam Oren [Doc. 27-2]. The evidence from Mr. Oren contradicts Defendant's position that the five (5) Options to prove citizenship and vote in the upcoming election are being implemented. At a minimum, of the five (5) Options, Mr. Oren was not offered Options 3, 4, or 5.

In response, Defendant has submitted the Declaration of Rick Barron, the Director of Elections for the Fulton County Board of Elections and Registration, who attests that Fulton County has deputy registrars available at each polling location for both early voting and Election Day who can verify proof of citizenship. But at least for Mr. Oren, this was not true. Mr. Barron also states that Fulton County has a process in place to update a voter's status when they show proper proof of citizenship so that they can cast a regular ballot, which might "take a few minutes." Decl. of Rick Barron at ¶ 4 [Doc. 29-1]. However, Mr. Barron does not say what this process is and whether it aligns with the five (5) Options Defendant has presented to the Court. Finally, Mr. Barron boldly states that Mr. Oren "was able to present proof of citizenship at the polls and cast a regular

ballot." Id. at ¶ 5. Indeed, Mr. Oren was able to do so, after two trips to his polling location, looking up information on Defendant's website, placing his own call to the Fulton County voter registration office, and providing election officials with a name and telephone number to call to help change his status. Mr. Barron seems to overlook the hurdles Mr. Oren jumped.

There are additional problems with Defendant's position. First, the October 23 Memorandum was simply posted to an online bulletin board for election officials, where, according to Mr. Harvey, county election and registration officials regularly communicate regarding election matters, but it was not sent directly to anyone. Second, the Georgia Poll Worker Manual is incomplete, leaving out Options 3 and 4 for voting and leaving out information about how to convert a provisional ballot in Option 5 into a non-provisional ballot. Ga. Poll Worker Manual (2018 ed.) at 42 [Doc. 17-9]. This indicates a lack of training to poll workers about the citizenship verification process. Finally, Defendant's website titled, "Information for Pending Voters," merely says that an individual in "pending status" due to citizenship may "show acceptable proof of citizenship when you go to vote or when you request an absentee ballot."[4] The site further provides that to specifically vote in the November 6, 2018 election, the individual will need to show proof of citizenship to a deputy registrar. This confusing

---

[4] GEORGIA SECRETARY OF STATE, Information for Pending Voters, http://sos.ga.gov/index.php/general/information_for_pending_voters (last visited Oct. 31, 2018).

information does not match the five (5) Options Defendant has presented to the Court as to how these individuals can vote on Election Day.

Additionally, Plaintiffs argue that the citizenship verification procedure has a disparate impact on minority voters. Plaintiffs rely on the declaration of Michael McDonald, Associate Professor of Political Science at the University of Florida, who states that Asian applicants constitute 27.0 percent of those flagged as non-citizens even though they comprise only 2.1 percent of Georgia's registered voter pool; Latino applicants constitute 17.0 percent of those flagged as non-citizens even though they comprise 2.8 percent of Georgia's registered voter pool; and white applicants constitute only 13.7 percent of those flagged as non-citizens even though they comprise 54.0 percent of Georgia's registered voter pool. Decl. of Michael McDonald at 7-8 [Doc. 17-11]. Plaintiffs argue that this disparate impact "matters" when evaluating the severity of the burden on individuals' constitutional right to vote. See League of Women Voters of Fla., Inc. v. Detzner, 314 F. Supp. 3d 1205, 1216-20 (N.D. Fla. 2018) (disparate impact "matters" in the balancing test to evaluate whether the effects of a facially neutral and nondiscriminatory law are unevenly distributed across identifiable groups). Defendant did not respond to Plaintiffs' argument on disparate impact.

Based on this evidence, the Court must assess the burden on the constitutional right to vote for those individuals who have been flagged and placed

into pending status due to citizenship. "Ordinary and widespread burdens, such as those requiring nominal effort of everyone, are not severe." <u>Crawford v. Marion Cty. Election Bd.</u>, 553 U.S. 181, 205 (2008) (Scalia, J., concurring) (quotation omitted). But burdens "are severe if they go beyond the merely inconvenient." <u>Id.</u> Based on the limited factual record before the Court, including the uncontested evidence of disparate impact on a particular class of individuals, as well as the parties' arguments presented on an emergency basis, the Court finds that Plaintiffs have shown a substantial likelihood of success that the burden is severe for those individuals who have been flagged and placed in pending status due to citizenship. As shown at least by Mr. Oren's experience, it was not a nominal effort for him to vote; it was a burdensome process requiring two trips to the polls, his own research, and his hunting down a name and telephone number to give to election officials so that his citizenship status could be verified, all after he had already submitted proof of citizenship with his voter registration application. This is beyond the merely inconvenient.

Next, the Court must identify the precise interests put forward by Defendant to justify the severe burdens on these individuals. Defendant asserts that the State's regulatory interest is in assuring that voters are United States citizens, which the Court finds to be compelling.

Therefore, the process of verifying proof of citizenship may only survive if it is narrowly tailored and advances a compelling state interest. <u>Timmons</u>, 520 U.S. at 358. In their Reply, Plaintiffs argue two ways in which Defendant Kemp's five (5) Options for verifying proof of citizenship severely burden the right to vote of eligible Georgians who have been inaccurately flagged as non-citizens without advancing any state interest, much less a narrowly tailored, compelling state interest. First, Plaintiffs contend that Defendant is burdening the right to vote for these individuals by placing newly naturalized United States citizens into pending status based on a reliance of DDS files, even when they have submitted proof of citizenship with their voter registration application. In their filings before the Court, Plaintiffs did not seek relief that would address relieving this burden nor did Plaintiffs' counsel at the hearing specifically ask for this relief, even when the Court asked counsel to state precisely the relief sought. Nevertheless, to the extent that Plaintiffs are asking the Court to issue relief that would require the county registrars of the 159 counties in Georgia to review the voter registration applications for all individuals placed in pending status due to citizenship, by checking to see if these individuals submitted proof of citizenship with their applications, all before November 6, 2018, is impractical, overly burdensome to Defendant, and will inject chaos into an election already fraught with challenges.[5]

---

[5] There may be substantial merit to Plaintiffs' argument that county registrars failed to review

The second way that Plaintiffs contend Defendant has severely burdened the right to vote of eligible Georgians who have been inaccurately flagged due to citizenship without advancing a narrowly tailored, compelling state interest is by placing needless hurdles in front of voters when they bring documentary proof of citizenship with them to vote. As noted above, Defendant has proposed five (5) Options for these individuals to vote in the upcoming election. All of these Options, except Option 4, require proof of citizenship to a deputy registrar. In response, Plaintiffs argue that Defendant's requirement that proof of citizenship may be accepted only by a deputy registrar cannot survive any level of scrutiny because Defendant has not offered any legitimate justification for why deputy registrars, and not poll workers or managers, can accept documentary proof of citizenship.

Defendant's justification at the hearing for why deputy registrars must verify proof of citizenship was because the law requires deputy registrars to do so. Indeed, O.C.G.A. § 21-2-216(g)(1) provides that "[t]he board of registrars shall not determine the eligibility of the applicant until and unless satisfactory evidence of citizenship is supplied by the applicant." See also id. at § 21-2-216(g)(2) (satisfactory evidence of citizenship includes photocopies of a birth certificate,

proof of citizenship submitted with voter registration applications. But this is an issue for another day, one that cannot be resolved before the November 6, 2018 election. Moreover, the Court's remedy in this order effectively reaches the same result – allowing individuals flagged due to citizenship to be able to vote on November 6, 2018.

United States passport, and United States naturalization documents presented to the board of registrars).

The Court must now evaluate "the extent to which [the state interest of ensuring that only United States citizens vote] make it necessary to [severely] burden [Plaintiffs'] rights." <u>Stein</u>, 774 F.3d at 694.  The Court finds that § 21-2-216(g)(1)-(2), requiring that the board of registrars determine whether the individual has supplied satisfactory evidence of citizenship, as well as Defendant's implementation of HB 268, for the upcoming election on November 6, 2018, burden the constitutional right of individuals flagged and placed into pending status due to citizenship more than is necessary.  Therefore, § 21-2-216(g)(1)-(2) and Defendant's implementation of HB 268 are not narrowly tailored to serve the compelling state interest of ensuring that only United States citizens are voting.

The legislative history of § 21-2-216(g)(1)-(2) does not explain why the board of registrars must verify proof of citizenship.  Additionally, Defendant makes the leap from allowing the board of registrars, as required by the law, to verify proof of citizenship, to allowing a deputy registrar to do so, without any explanation.  While "[t]he board of registrars in each county may appoint deputy registrars to aid them in the discharge of their duties," it is unclear if the board can discharge its duty to verify proof of citizenship.  <u>See</u> O.C.G.A. at § 21-2-213.  Further, Defendant has not explained why a deputy registrar has been selected as

the person who can verify citizenship. Defendant has presented no information about a deputy registrar's particular qualifications or training that make these registrars more qualified than anyone else to accept proof of citizenship.

Importantly, Defendant's requirement that a deputy registrar must verify citizenship crumbles when the Court reviews Defendant's own proposals. As set forth above, Defendant proposes five (5) Options for verifying proof of citizenship in the upcoming election. Again, Option 4 is as follows:

> 4. If the [deputy registrar] cannot be reached (or the requisite technology is not available), then the applicant shall be offered the opportunity to cast a provisional ballot. In such a situation, the provisional ballot should be marked by the poll manager . . . to confirm that the applicant presented one of the forms of acceptable proof of citizenship and ID at the time the ballot was cast, and the provisional ballot shall be counted as a vote without requiring any further action.

Def.'s Resp. in Opp'n to Pls.' Emergency Mot. for Prelim. Inj. at 15 [Doc. 24-1] (quotations and citations omitted). Option 4 does not require that a deputy registrar verify proof of citizenship. At the hearing, Defendant explained that under Option 4, the provisional ballot envelopes will have notations from the poll manager, which will become "self-authenticating" regarding the citizenship verification. If a poll manager can verify proof of citizenship only when a deputy registrar is not available or the technology for sending proof of citizenship to a deputy registrar is not available, then this begs the question of why a poll manager cannot verify all proofs of citizenship and why a provisional ballot needs to be cast

in the first place.  Thus, Defendant's own solution in Option 4 demonstrates that requiring a deputy registrar to verify proof of citizenship unnecessarily burdens these individuals' right to vote more than necessary.  Such a hurdle need not be jumped.  See Fla. Democratic Party v. Scott, 215 F. Supp. 3d 1250, 1257 (N.D. Fla. 2016) (finding that it was wholly irrational for a state to refuse to extend a voter registration deadline when the state already allows the Governor to do so); Green Party of Ga. v. Kemp, 171 F. Supp. 3d 1340, 1365 (N.D. Ga. 2016) (petition requirement was not narrowly tailored where a lower number of signatures to access the general election ballot would have eased the burden on voters' and political bodies' rights while still serving the state's interests).[6]

All of the five (5) Options derive from the Settlement Agreement in NAACP v. Kemp.  However, the Settlement Agreement does not tie this Court's hands on the proof of citizenship issue.  As the Court has explained above, the Settlement Agreement specifically exempted O.C.G.A. § 21-2-216(g), which is the part of HB 268 that addresses the documentary proof for citizenship.  This law was not yet implemented at the time of the Settlement Agreement and became enacted months later.  Moreover, not all parties in this suit were part of the Settlement Agreement.

---

[6] Similarly, the experience of Mr. Oren further demonstrates that a deputy registrar need not necessarily verify proof of citizenship.  It has not been presented to the Court whether the person who eventually verified Mr. Oren's proof of citizenship via a phone call was a deputy registrar.

In addition, Defendant's method for checking the proof of identity for those who have been flagged and placed into pending status based on information other than citizenship also belies Defendant's claim that a deputy registrar must verify proof of citizenship. As explained above, Defendant has publicized that if an individual is in pending status for a mismatch for information other than citizenship, the individual need only go to a polling location and present proof of identity to a **poll worker**. <u>See</u> Oct. 23 Mem. at 1 [Doc. 27-1]. However, to verify identity, the law requires that an individual must provide "sufficient evidence to the board of registrars." O.C.G.A. § 21-2-220.1(c)(2); <u>see also</u> <u>id.</u> at § 21-2-220.1(c)(1). Defendant has not explained why he is willing to ignore the law's requirement of proving identity to a board of registrars for individuals flagged for reasons other than citizenship but intends to enforce the law against individuals flagged for citizenship. This raises grave concerns for the Court about the differential treatment inflicted on a group of individuals who are predominantly minorities.

The requirement that a deputy registrar verify proof of citizenship is also overly broad because poll managers are capable of verifying proof of citizenship. Allowing poll managers to verify proof of citizenship would alleviate the severe burden placed on individuals who have been flagged and placed in pending status for citizenship while still serving the State's interest of ensuring that only United

States' citizens are voting.  See Fla. Democratic Party, 215 F. Supp. 3d at 1257; Green Party of Ga., 171 F. Supp. 3d at 1365.  Allowing a poll manager to verify proof of citizenship is a practical and viable alternative for several reasons.  First, Mr. Harvey attests that each polling place has one poll manager.  See O.C.G.A. §§ 21-2-2(11), 21-2-90.  Second, Defendant proposed under Option 4 that a poll manager would be able to self-authenticate proof of citizenship for a provisional ballot.  Third, pursuant to the October 23 Memorandum, the poll manager has authority to override the status using their password for a voter flagged as a possible non-citizen.  Oct. 23 Mem. at 4.  The poll manager can change the voter status, such that a poll worker could then issue a voter access card.  Id.  Fourth, the Court finds that a poll manager can actually look at citizenship documents and verify them; poll managers are required to be "judicious, intelligent, and upright citizens of the United States."  O.C.G.A. § 21-2-92(a).  Lastly, poll managers are already tasked with verifying identity documents.  As mentioned above, Defendant has presented no argument that deputy registrars possess additional training or skills that make them superiorly qualified to check citizenship documents.

For all of these reasons, the Court concludes that the specific requirements of § 21-2-216(g)(1)-(2) – that proof of citizenship be verified by a board of registrars, which Defendant has implemented as verification by a deputy registrar – as well as Defendant's five (5) Options for allowing individuals with flags for

citizenship to vote in the upcoming election, sweep broader than necessary to advance the State's interest, creating confusion as Election Day looms.  See Norman v. Reed, 502 U.S. 279, 290 (1992) (finding law for gathering signatures for a new party was not narrowly tailored when it swept broader than necessary to advance the state's interest).  As a result, the Court invalidates the requirement that proof of citizenship be verified *only* by a board of registrars or a deputy registrar for the November 6, 2018 election for a regular ballot.[7]  Thus, Plaintiffs have shown a substantial likelihood of success on the merits of their claim that Defendant has violated the right to vote for individuals placed in pending status due to citizenship.

## 2.  Irreparable Harm

Defendant argues that Plaintiffs cannot show that irreparable harm will result in the absence of a preliminary injunction because Plaintiffs' alleged harm about individuals flagged as non-citizens losing a right to vote is conjectural and hypothetical.  However, as Mr. Oren's experience indicates, there is a very substantial risk of disenfranchisement.  Additionally, in light of the Court invalidating the requirement that a deputy registrar must verify proof of citizenship, there is misleading information at least on the Secretary of State's

---

[7] As set forth below, the Court finds that if an individual arrives at a polling location but cannot show sufficient proof of citizenship, that individual may return to the poll with valid proof of citizenship or cast a provisional ballot.

website about how to prove citizenship at the polls and there has been a lack of training of election officials for verifying citizenship at the polls, all of which could lead to these individuals not being able to cast a vote in the upcoming election.[8]

Defendant further argues that Plaintiffs' delay in bringing this suit indicates an absence of irreparable harm. However, Plaintiffs' facts for this case developed over time, including gathering evidence like the experience of Mr. Oren, which would have been unknown to Plaintiffs until Mr. Oren attempted to vote on October 16, 2018. Plaintiffs had no other way of knowing whether Defendant was actually implementing the citizenship verification procedure at the polls as Defendant claimed it was until that procedure was tested. Therefore, if a preliminary injunction is not granted, the loss of a right to vote cannot be remedied.

Moreover, the Court finds that Plaintiffs, as organizations, will also suffer irreparable injury distinct from the injuries of eligible voters. Without an injunction to address the citizenship verification procedure, Plaintiffs' organizational missions, including registration and mobilization efforts, will continue to be frustrated and organization resources will be diverted to assist with the citizenship mismatch issue. Such mobilization opportunities cannot be

---

[8] The misleading information on the Secretary of State's website and the lack of training for election officials was true even before the Court invalidated the deputy registrar requirement.

remedied once lost.  See League of Women Voters of Fla. v. Cobb, 447 F. Supp. 2d 1314, 1339 (S.D. Fla. 2006) (finding irreparable harm to community organizations engaged in collecting and submitting voter registration applications, where their voter registration operations had been interrupted and they were losing valuable time to engage in core political speech and association and to add new registrants to the election rolls).  Therefore, the Court finds that Plaintiffs have shown they will suffer irreparable harm if an injunction does not issue.

### 3.  Balance of Harms & Public Interest

The Court finds that the threatened injury to Plaintiffs as organizations and to the individuals flagged as non-citizens outweighs any harm Plaintiffs' requested relief would inflict on Defendant.  The Court recognizes the administrative burden the Court's order may place on Defendant, particularly this close to the election. However, the Court finds that this burden – disseminating information about who may check proof of citizenship and training poll managers how to do so, as set forth below – is minimal compared to the potential loss of a right to vote altogether by a group of people.   Moreover, Defendant's harm appears to be minimal given that Defendant proposed having poll managers verify proof of citizenship in Option 4.  Finally, granting Plaintiffs the relief they seek would be in the public's interest to ensure that there is a procedure in place to allow every eligible Georgia citizen to register and vote.

**D. Bond**

Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). In its discretion, the Court waives the bond requirement. See BellSouth Telecoms., Inc. v. MCIMetro Access Transmission Serv., LLC, 425 F.3d 964, 971 (11th Cir. 2005) ("[I]t is well-established that the amount of security required by [Rule 65(c)] is a matter within the discretion of the trial court, and the court may elect to require no security at all.") (internal citation and punctuation omitted).

**E. Summary**

In sum, the Court finds that Plaintiffs have met their burden to grant a preliminary injunction. Plaintiffs have standing to pursue this relief, and the relief they seek is not barred by the doctrine of laches. Plaintiffs have shown a substantial likelihood of success on the merits of their claim that Defendant is violating the right to vote, as guaranteed by the First and Fourteenth Amendments to the United States Constitution, for individuals Defendant has flagged and placed into pending status due to citizenship. The election scheme here places a severe burden on these individuals. The specific requirements of § 21-2-216(g)(1)-(2),

that citizenship must be verified by only a board of registrars, and Defendant's proposed five (5) Options for verifying proof of citizenship are not narrowly tailored to advance a compelling state interest. These individuals will suffer irreparable harm if they lose the right to vote, this harm outweighs any harm to Defendant, and granting an injunction is in the public's interest.

As set forth below, because Plaintiffs have met their burden to warrant the issuance of a preliminary injunction, the Court will direct Defendant to allow county election officials to permit individuals flagged and placed in pending status due to citizenship to vote a regular ballot by furnishing proof of citizenship to poll managers or deputy registrars. To be clear, once an individual's citizenship has been verified by a deputy registrar or a poll manager, that individual may cast a regular ballot and the vote counts.

## III. Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Emergency Motion for Preliminary Injunction [Doc. 17]; and **GRANTS** Defendant's Motion for Leave to File Corrected Brief [Doc. 24].

The Court **DECLARES** as follows:

For individuals who have been flagged and placed in pending status due to citizenship, these individuals may vote in the November 6, 2018 election in these ways:

1. Prior to voting, and pursuant to the instructions in the notification letter the individual received from the county board of registrars, the individual may provide the county registrar with a document showing that the individual is a United States citizen via personal delivery, mail, email as an attachment, or a fax.

2. At a polling location, the individual may provide proof of identity and acceptable proof of citizenship to a poll manager or a deputy registrar, and after verification, cast a regular ballot.

3. At a polling location, if the applicant is unable to present one of the accepted forms of proof of citizenship at a polling location, then the applicant (a) may return to the polling location with sufficient proof of citizenship and follow (2) above, or (b) shall be offered the opportunity to cast a provisional ballot. If the applicant casts a provisional ballot, the applicant must then present proof of citizenship in person, or via fax, email or text message to the county registrar before the close of the provisional ballot period on the Friday following the election.

The Court **ISSUES** the following **INJUNCTION**:

The Court **HEREBY DIRECTS** Brian Kemp, in his official capacity as the Secretary of State, to act immediately, as follows:

1. Allow county election officials to permit eligible voters who registered to vote, but who are inaccurately flagged as non-citizens to vote a regular ballot by furnishing proof of citizenship to poll managers or deputy registrars.

2. Update the "Information for Pending Voters" on the Secretary of State's website so that it provides (a) clear instructions and guidance to voters in pending status due to citizenship and (b) a contact name and telephone number that individuals may call with questions about the pending status due to citizenship.

3. Direct all county registrars, deputy registrars, and poll managers on how to verify proof of citizenship to ensure that they can properly confirm citizenship status consistent with this order.

4. Issue a press release (a) accurately describing how an individual flagged and placed in pending status due to citizenship may vote in the upcoming election, as set forth herein; and (b) providing a contact name and telephone number that individuals may call with questions about the pending status due to citizenship.

5. Direct the county boards of elections to post a list of acceptable documentation to prove citizenship, which includes a naturalization certificate, birth certificate issued by a state or territory within the United States, U.S. passport, and other documents or affidavits explicitly identified by Georgia law and listed on the Georgia Secretary of State's website, at polling places on Election Day.

**SO ORDERED**, this  2nd  day of November, 2018.

Eleanor L. Ross
United States District Judge
Northern District of Georgia