# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

GEORGIA COALITION FOR THE PEOPLES' AGENDA, INC., as an organization; ASIAN AMERICANS ADVANCING JUSTICE-ATLANTA, INC., as an organization; GEORGIA STATE CONFERENCE OF THE NAACP, as an organization; NEW GEORGIA PROJECT, INC., as an organization; GEORGIA ASSOCIATION OF LATINO ELECTED OFFICIALS, INC., as an organization; PROGEORGIA STATE TABLE, INC., as an organization; THE JOSEPH AND EVELYN LOWERY INSTITUTE FOR JUSTICE AND HUMAN RIGHTS, INC, as an organization; and COMMON CAUSE, as an organization;

       Plaintiffs,

v.

BRAD RAFFENSPERGER, in his official capacity as Secretary of State for the State of Georgia,

       Defendant.

Civil Action
Case No. 1:18-cv-04727-ELR

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**Section 2 of the Voting Rights Act of 1965 (52 U.S.C. § 10301); Section 8 of the National Voter Registration Act of 1993 (52 U.S.C. § 20507); First and Fourteenth Amendments to the United States Constitution**

## INTRODUCTION

1.     Plaintiffs bring this action to vindicate the right of Georgia voters—primarily naturalized citizens and disproportionately citizens of color—to register and vote under the First and Fourteenth Amendments to the Constitution, the Voting Rights Act, and the National Voter Registration Act.

2.     Plaintiffs challenge the Georgia Secretary of State's unlawful citizenship matching protocol that delays and denies active voter registration status to qualified Georgians who submit facially complete and accurate voter registration forms, including an attestation under penalty of perjury of U.S. citizenship. Defendant does so on the basis of stale Georgia Department of Driver Services (DDS) data that does not reflect the current citizenship status of the applicant.[1] This protocol targets predominantly naturalized citizens for an additional documentary proof of citizenship requirement for voter registration not imposed on other qualified

---

[1] In April 2019—after Plaintiffs filed this lawsuit challenging the entirety of Georgia's "exact match" voter registration process—Georgia enacted Section 6 of HB 316, largely abandoning Georgia's longstanding practice of delaying and denying active voter registration status to tens of thousands of applicants if their name, date of birth, driver's license or Social Security numbers did not "exactly match" data on file with DDS or the Social Security Administration (SSA). In light of the amendments to O.C.G.A. § 21-2-220, Plaintiffs now focus their claims in this litigation on the "citizenship match" aspect of the process which continues to inaccurately flag qualified Georgians who are United States citizens as potential non-citizens, delaying or denying them active voter registration status.

2

voters, disparately and unduly burdens the right to vote of minority citizens, and relies on data that the Secretary of State knows is unreliable.

3.    Since a driver's license for a lawful permanent resident or other noncitizen can be valid for up to five years in Georgia, tens of thousands of individuals become naturalized in Georgia each year, and the DDS records are not automatically updated to reflect current citizenship status, the protocol's design is fatally flawed.

4.    Registrants flagged by the flawed citizenship matching protocol must provide documentary proof of citizenship to a county registrar, deputy registrar or poll manager in order to gain active voter registration status and be permitted to vote. A documentary proof of citizenship requirement is not imposed on other eligible registrants.

5.    In addition to imposing a documentary proof of citizenship ("DPOC") requirement on an arbitrary subsection of Georgia's voter registration applicants, the citizenship matching protocol imposes a 26-month cancellation deadline on flagged applicants to prove their citizenship status. Once the application is cancelled, the applicant must start the process again and is likely to face the same outcome since DDS citizenship data are not routinely updated to reflect the current citizenship status of the applicant.

6.      Since at least 2008, the Georgia Secretary of State's Office has been on notice that its citizenship matching protocol inaccurately flags qualified United States citizens as potential non-citizens when their voter registration form data is compared against DDS records.[2]

7.      Likewise, the Secretary of State's Office has been repeatedly warned of the disproportionate impact this protocol has based on applicants' national origin and race. In 2009, the United States Department of Justice interposed an objection under Section 5 of the Voting Rights Act to Georgia's citizenship matching protocol because of its discriminatory impact on African American, Latino and Asian American applicants who were flagged as potential non-citizens. The letter noted that the protocol's high error rate fell disproportionately on naturalized citizens and minority voters and imposed "real" and "substantial" burdens on those voters.

8.      Despite the fact the Georgia Secretary of State's office has been on actual notice for more than a decade that this flawed process repeatedly and inaccurately flags qualified Georgians—predominantly naturalized citizens and minority applicants—as potential non-citizens, the Defendant continues to use this protocol to deny and

---

[2] *See Morales v. Handel*, No. 1:08-CV-3172, 2008 WL 9401054 (N.D. Ga. Oct. 27, 2008).

delay active voter registration to qualified Georgia citizens who submit facially complete and accurate voter registration forms.

9.    The discriminatory impact of this process on naturalized citizens not born in the United States is a natural outcome of this flawed protocol. The matching protocol is designed to impose a documentary proof of citizenship requirement on those registrants who, at some prior point in time, had a non-citizen status they reported to DDS. The protocol necessarily relies on stale and often outdated DDS data. The protocol does not rely on a meaningful indicator of citizenship status but does predictably target those with a national origin outside of the United States.

10.    Georgia's defective process also inaccurately flags some U.S. born citizens as potential non-citizens for other reasons, such as using an out of state driver's license on their registration form that does not match citizenship data on file with DDS.

11.    The continuing discriminatory impact of Georgia's citizenship matching protocol on applicants of color is reflected in a November 14, 2019 voter file containing voters in "pending" status produced by Defendant in discovery.

12.    This report indicates that 2,996 applicants were in "pending" status because they had been flagged by the citizenship matching protocol. Of these 2,996 applicants, 950 or 31.7% identify as Black; 703 or 23.5% identify as Asian American

or Pacific Islander; 632 or 21.1% identify as Hispanic; and 376 or 12.6% identify as White, not of Hispanic (hereinafter, "White") origin. Thus, approximately 76% of pending for citizenship applicants in the November 2019 report identified as Black, Asian, or Hispanic compared to only 12.6% of White applicants.  By contrast, of Georgia's 7,057,248 registered voters as of February 2, 2019, approximately 53.7 percent are White, 29.8 percent are Black, 3.0 percent are Hispanic, and 2.2 percent are Asian-American.

13.     Georgia's onerous policy is not justified by any legitimate state concern about non-citizens registering to vote in Georgia. Alleged voting by non-citizens nationally is exceedingly rare. To date, Defendant Raffensperger has not produced a single iota of evidence showing that non-citizen voting occurs or is a meaningful problem in Georgia.

14.     The citizenship match process maintained by Defendant Raffensperger is also arbitrary and irrational. Since the matching protocol is applied at the time of voter registration, it relies solely on DDS data that pre-dates the time of registration. As noted above, that data is probative of national origin outside the United States but not of current citizenship status.

15.     Moreover, the arbitrary nature of the protocol is reflected by the fact that it only applies to applicants who use a driver's license number on their voter

registration form. Applicants avoid the citizenship match process altogether if they do not have a Georgia driver's license, and thus use their social security number to register to vote, or if they have neither a driver's license nor social security number.

16.     This process has disenfranchised, and delayed voter registration to, qualified Georgians who are United States citizens for more than a decade. It is finally time to bring an end to this discriminatory practice. It serves no legitimate or compelling state purpose yet continues to disproportionately deny or delay access to the ballot for qualified African American, Latino, and Asian American Georgians.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1343(a) because it seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Voting Rights Act, and 28 U.S.C. § 1331 because it arises under the laws of the United States.

18.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

20.     Plaintiff THE GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC. ("GCPA") is a Georgia nonprofit corporation with its principal place of business located in Atlanta, Georgia. The GCPA is a coalition of more than 30 organizations, which collectively have more than 5,000 individual members. The GCPA encourages voter registration and participation, particularly among Black and other underrepresented communities including Georgians who are naturalized citizens. The GCPA's support of voting rights is central to its mission. The organization has committed, and continues to commit, time and resources to conducting voter registration drives, voter education, voter ID assistance, Souls to the Polls, and other get out the vote ("GOTV") efforts in Georgia that seek to encourage voter participation. The GCPA in coalition with other civic engagement organizations in Georgia also participates in voter registration drives following naturalization ceremonies, which seek to encourage eligible naturalized citizens and their qualified family and friends to register to vote. Applicants who have submitted voter registration forms through voter registration drives conducted by the GCPA have had their applications put into "pending" status due to Georgia's citizenship matching protocol, which is causing harm, and will continue to cause harm, to the GCPA's mission of encouraging minority voter registration and participation. The protocol has caused, and will continue to cause, GCPA to divert a portion of its

financial and other organizational resources to educating voters about the protocol and assisting potential voters whose applications have been put into "pending" status or cancelled as a result of the state's defective citizenship matching process which relies upon outdated DDS data that is not updated to reflect current citizenship status. As a result, the GCPA has, and will continue to have, fewer resources to dedicate to its other organizational activities, including voter registration drives and GOTV efforts, unless the Court enjoins Defendant Raffensperger from continuing to delay or deny voter registration status to qualified Georgia citizens based upon the defective citizenship match with outdated DDS citizenship data.

21. Plaintiff ASIAN AMERICANS ADVANCING JUSTICE – ATLANTA, INC. ("Advancing Justice – Atlanta") is a non-partisan, nonprofit organization that was founded in 2010 and is located in Norcross, Georgia. Advancing Justice – Atlanta protects and promotes the civil rights of Asian Americans and Pacific Islanders ("AAPIs") and other immigrant and refugee communities in Georgia through policy advocacy, legal services, impact litigation, and civic engagement. As part of its civic engagement efforts, Advancing Justice – Atlanta engages in voter registration, voter education, and GOTV efforts in Georgia, with a particular focus on AAPI voters, including naturalized citizens. Advancing Justice – Atlanta also participates in coalition with other civic engagement

organizations in Georgia in voter registration drives following naturalization ceremonies, which seek to encourage eligible naturalized citizens and their qualified family and friends to register to vote. Upon information and belief, Georgia citizens who have attempted to register to vote through Advancing Justice – Atlanta's voter registration drives have had their applications put into "pending" status due to the citizenship matching protocol. The citizenship matching protocol has caused, and will continue to cause, harm to Advancing Justice – Atlanta's mission to promote the rights of the AAPI community. The protocol will cause Advancing Justice – Atlanta to divert a portion of its financial and other organizational resources to educating voters about the protocol and its impact on the registration process. As a result, Advancing Justice – Atlanta has, and will continue to have, fewer resources to devote to its other organizational activities, including voter registration drives and GOTV efforts, unless the citizenship matching protocol is enjoined.

22.　PROGEORGIA STATE TABLE, INC. ("PROGEORGIA") is a 501(c)(3) nonprofit organization founded in 2012. Its mission is to coordinate the civic engagement efforts of its nonprofit member groups. PROGEORGIA aims to increase voter engagement among historically underrepresented voters by supplying field coordination for voter education and voter mobilization efforts. Among other activities, PROGEORGIA offers voter registration opportunities at naturalization

ceremonies and facilitates voter registration drives by its member organizations. Upon information and belief, qualified minority and naturalized citizen applicants who attempted to register to vote through registration drives organized by PROGEORGIA have had their applications put into "pending" status due to the citizenship matching protocol. Georgia's citizenship matching protocol is causing, and will continue to cause, harm to PROGEORGIA's mission of encouraging minority voter registration and participation. The protocol will cause PROGEORGIA to divert a portion of its financial and other organizational resources to educating voters about the protocol and assisting potential voters whose applications have been cancelled or put into pending status. As a result, PROGEORGIA is limited, and will continue to be limited, to devoting fewer resources to its other organizational activities, including voter registration efforts. Unless the enforcement of the citizenship matching protocol is enjoined, it will impair PROGEORGIA's voter registration projects by causing the organization to divert personnel and time to assisting its member organizations whose efforts to register voters and civic engagement programs are hindered and made more difficult because of the citizenship matching protocol.

23.    Plaintiff GEORGIA STATE CONFERENCE OF THE NAACP ("Georgia NAACP") is a non-partisan, interracial, nonprofit membership

organization that was founded in 1941. Its mission is to eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and economic rights of all persons, in particular African Americans. It is headquartered in Atlanta and currently has approximately 10,000 members. The Georgia NAACP works to protect voting rights through litigation, advocacy, legislation, communication, and outreach, including work to promote voter registration, voter education, GOTV efforts, election protection, and census participation. The Georgia NAACP regularly conducts voter registration drives and has submitted many voter registration applications to elections officials throughout Georgia. Upon information and belief, voter registration applications filled out by voting-eligible Georgia NAACP members and other voting-eligible Georgians who submit registration forms through the Georgia NAACP's voter registration drives have been, and will be, put into pending status and risk having their applications cancelled as a result of the citizenship matching protocol. The citizenship matching protocol has caused, and will cause, the Georgia NAACP to divert a portion of its financial and other organizational resources to educating voters about the protocol and assisting applicants whose applications have been cancelled or put into pending status as a result of the citizenship match protocol. As a result, the Georgia NAACP has, and will continue to have, fewer resources to devote to its civic engagement and

other programs, including voter registration drives and GOTV efforts, unless the citizenship matching protocol is enjoined.

24. Plaintiff, the NEW GEORGIA PROJECT, INC. ("NGP"), is a Georgia 501(c)(3) not-for-profit corporation. NGP's mission is to civically engage Georgians in underrepresented communities. NGP regularly conducts voter registration drives throughout Georgia. Voter registration drives are a substantial component of its civic engagement mission. On information and belief, eligible minority applicants who attempted to register to vote through registration drives conducted by NGP have had their applications placed into pending status due to the citizenship matching protocol. Georgia's citizenship matching protocol is causing and will continue to cause harm to NGP's mission of encouraging voter registration and participation among minority applicants and underserved communities. The protocol will cause NGP to divert a portion of its financial and other organizational resources to educating voters about the protocol and assisting potential voters whose applications have been cancelled or put into pending status. As a result, NGP is limited, and will continue to be limited, to devoting fewer resources to its other organizational activities, including voter registration drives, unless the citizenship matching protocol is enjoined.

25.    Plaintiff GEORGIA ASSOCIATION OF LATINO ELECTED OFFICIALS, INC. ("GALEO") is a non-partisan and nonprofit organization founded in Georgia under § 501(c)(6) of the Internal Revenue Code. It was established to increase representation of Latino elected and appointed officials, to proactively address issues and needs facing the Latino community, and to engage Georgia's Latino community in the democratic and political process. It does so through (1) television, radio and print media Spanish public service announcements; (2) widespread distribution of literature regarding voter registration and other voting-related issues (in both English and Spanish); (3) administration of a voter information hotline and website (in both English and Spanish); (4) provision of electronic access to legislative voting records; and (5) voter mobilization efforts that include voter registration drives, "get out to vote" phone calls and transporting voters to the polls. Upon information and belief, voter registration applications filled out by eligible GALEO members and persons whom GALEO assists in registering to vote have been and will be placed into pending status and risk being cancelled as a result of the citizenship matching protocol. Georgia's citizenship matching protocol is causing and will continue to cause GALEO to divert a portion of its financial and other organizational resources to educating voters about the protocol and assisting potential voters whose applications have been cancelled or put into pending status.

14

As a result, GALEO has, and will be, forced to divert resources away from other organizational activities, including voter registration drives and GOTV efforts because of the citizenship match protocol unless the Court grants the remedial relief herein requested.

26.     Plaintiff THE JOSEPH AND EVELYN LOWERY INSTITUTE FOR JUSTICE AND HUMAN RIGHTS ("Lowery Institute") is a non-partisan, nonprofit organization that was founded in 2001 and is located in Atlanta, Georgia. The vision of the Lowery Institute is to ensure that everyone has a political voice and has the tools to be change agents in their community. The Institute serves its mission by focusing on civil and human rights, social justice, education, and community health. As part of its civic engagement efforts, the Lowery Institute conducts voter registration efforts in Georgia focused on college students and younger voters of color. Upon information and belief, persons of color who attempt to register through the Lowery Institute's voter registration drives have had their applications put into "pending" status due to the citizenship matching protocol. Georgia's citizenship matching protocol is causing and will cause harm to the Lowery Institute's mission to promote the rights of college students and younger voters of color. The protocol will cause the Lowery Institute to divert a portion of its financial and other organizational resources to educating voters about the protocol and its impact on the

registration process. As a result, the Lowery Institute has, and will continue to have, fewer resources to devote to its other organizational activities, including its civic engagements efforts, unless the citizenship matching protocol is enjoined.

27.     Plaintiff COMMON CAUSE is a nonprofit corporation organized and existing under the laws of the District of Columbia. It is one of the nation's leading grassroots democracy-focused organizations and has over 1.2 million members nationwide and chapters in 35 states, including 18,785 members and supporters in Georgia. Since its founding in 1970, Common Cause has been dedicated to the promotion and protection of the democratic process, including the right of all citizens to vote in fair, open, and honest elections. Common Cause, at the national level and in Georgia, conducts significant nonpartisan voter-protection, advocacy, education, and outreach activities to ensure that voters are registered and have their ballots counted as cast. Over the last five years, its efforts in Georgia have increased in the areas of election protection, voter education, and grassroots mobilization around voting rights. Common Cause works on election administration issues with its coalition, much of which is represented by the other plaintiffs in the instant lawsuit. Common Cause works with these partners in election protection efforts during both midterm and presidential elections. The citizenship matching protocol directly impacts Common Cause's election protection program, which provides

voters with necessary resources for Election Day including information about pending status due to the citizenship matching protocol. Common Cause now must continue its efforts to counter the citizenship matching protocol through its educational efforts. As a result, Common Cause has, and will continue to have, fewer resources to devote to its other organizational activities unless the citizenship matching protocol is enjoined.

28.     Defendant BRAD RAFFENSPERGER is sued in his official capacity as Georgia's Secretary of State. Secretary Raffensperger's responsibilities include maintaining the state's official list of registered voters and preparing and furnishing information for citizens pertaining to voter registration and voting. Ga. Code Ann. §§ 21-2- 50(a), 21-2-211. Defendant Raffensperger also serves as the Chairperson of Georgia's State Election Board, which promulgates and enforces rules and regulations to obtain uniformity in the practices and proceedings of election officials and is responsible for promoting the fair, legal, and orderly conduct of all primaries and elections in the state. *Id*. §§ 21-2-30(d), 21-2-31, 21-2-33.1. Finally, Defendant Raffensperger is the chief election official responsible for the coordination of Georgia's responsibilities under the National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act of 2002 (HAVA). *Id*. §§ 21-2-210, 21-2- 50.2.

## FACTS AND BACKGROUND

### Legal Background

29.     A voter must be registered as an elector in Georgia to cast a ballot that counts in any election held in the state. Ga. Code Ann. § 21-2-216(a)(1).

30.     In order to register to vote in Georgia, an applicant must be (1) a citizen of Georgia and of the United States; (2) at least 18 years of age on or before the date of the primary or election in which such person seeks to vote; (3) a resident of Georgia and of the county or municipality in which he or she seeks to vote; and (5) possessed of all other qualifications prescribed by law. Ga. Code Ann. § 21-2-216 (a).

31.     Both the Georgia and federal voter registration forms require the applicant to swear or affirm to their U.S. citizenship in order to register to vote.[3]

32.     Although Georgia amended Section 21-2-216 to include a documentary proof of citizenship requirement for all persons registering to vote in Georgia on or after January 1, 2010 in subsection (g), it is undisputed that this requirement is not

_____

[3] *See* box number 6 on the Georgia voter registration form, *available at* https://sos.ga.gov/admin/files/GA_VR_APP_2019.pdf; *see also* box number 9 on the National Voter Registration Form for United States Citizens, *available at* https://www.eac.gov/assets/1/6/Federal_Voter_Registration_ENG.pdf.

in force.[4] Thus, the only documentary proof of citizenship requirement in place is the one that arises from the citizenship matching protocol and targets naturalized U.S. citizens.

33.    Pursuant to Georgia Code Section 21-2-220(b), the person authorized to offer registration (i.e., county registrars) "shall inquire as to whether the individual seeking registration is a citizen of the United States, and the person offering registration shall not be required to offer registration to an individual who answers such inquiry with a negative response."

34.    Section 21-2-220(b) only authorizes rejecting a voter registration application when applicants state that they are not a United States citizen. It does not authorize county registrars (or the Secretary of State) to deny voter registration to applicants who swear and affirm under penalty of perjury that they *are* United States citizens at the time they apply to vote simply because of data purporting to indicate that the applicant was not a U.S. citizen at some time in the past. Citizenship status is not immutable. In a country of immigrants, new citizens join the U.S. political community every day.

---

[4] *See, e.g.*, *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (observing that Georgia was not enforcing its proof of citizenship law).

35.     Pursuant to HAVA, the State of Georgia must maintain a centralized, computerized, statewide voter registration database as the single system for storing and managing Georgia's official list of registered voters. 52 U.S.C. § 21083(a)(1)(A).

36.     HAVA imposes certain identification requirements for first-time voters. 52 U.S.C. § 21083(a)(5). Voter registration applicants who have been issued a current and valid driver's license must provide their driver's license number on the application. 52 U.S.C. § 21083(a)(5)(A). Applicants who lack a current driver's license must provide the last four digits of their social security number. *Id.* If an applicant does not have either, the state must assign the applicant a unique identifier for voter registration purposes. *Id*.

37.     HAVA requires that Georgia's chief election official enter into an agreement with DDS "to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration." 52 U.S.C. § 21083(a)(5)(B). Further, DDS must enter into an agreement with the Commissioner of Social Security for the same purpose. *Id*. However, HAVA does not require that

this matching process be used in any way for establishing voters' qualifications to vote, including citizenship.

38.    To the contrary, under the NVRA and HAVA, all eligible applicants who submit complete, accurate registration forms must be registered to vote in federal elections and there is nothing in HAVA or Georgia law that requires Defendant Raffensperger or county registrars to deny active voter registration to qualified U.S. citizens who accurately swear and affirm they are U.S. citizens based upon outdated DDS citizenship data that is not updated to reflect the current citizenship status of the applicant.

**The Citizenship Matching Protocol Is Inaccurate and Discriminatory**

39.    In April 2019, Georgia enacted Section 6 of HB 316, which amended Georgia's "exact match" registration process.  Georgia had previously denied active voter registration status to tens of thousands of applicants when the spelling of their name, date of birth, social security or Georgia driver's license number on their registration record did not "exactly match" the same information recorded on SSA or DDS databases. However, Georgia and Defendant Raffensperger have done nothing to reform the defective citizenship matching protocol that continues to deny active voter registration status – and the ability to vote a ballot that counts – to qualified Georgians who are United States citizens.

21

40.     The protocol places significant burdens on voting on the subset of U.S. citizens flagged by its flawed methodology. Citizens who are incorrectly flagged as potential noncitizens by the matching protocol are required to provide documentary proof of their citizenship in order to obtain active voter registration status and vote. No other voters are required to submit documentary proof of citizenship to vote.

41.     The protocol's underlying methodology for flagging potential non-citizens is designed to be both inaccurate and discriminatory.

42.     It is inaccurate because it relies on outdated driver's license records. DDS records are not routinely updated to reflect the current citizenship status of the license holder. Non-citizens can obtain driver's license that are valid for up to five years.  According to a 2015 Department of Homeland Security estimate, there were approximately 260,000 legal permanent residents residing in Georgia, of which 160,000 were eligible to naturalize.  The Department of Homeland Security reports the following number of persons who naturalized in Georgia in recent years: 20,794 in fiscal year 2015; 18,866 in fiscal year 2016; and 16,461 in fiscal year 2017. These figures indicate that the vast majority—if not virtually all—of the 2,996 Georgians on the current pending list based on the citizenship matching protocol are likely naturalized citizens. Yet, these outdated records are used to repeatedly deny or delay

active voter status, imposing a unique documentary proof of citizenship on the subset of voters flagged by the protocol.

43.     The protocol's methodology is also necessarily discriminatory. While the protocol is not reasonably designed to identify noncitizen voters, it is remarkably well crafted to identify and burden naturalized citizens—born outside of the United States—who seek to exercise their right to vote. Its methodology is targeted to sweep in applicants who were not citizens at some previous point in time—i.e. immigrants who were not born in the United States. Thus, the methodology successfully targets new Americans but fails to consider their current citizenship status. Moreover, since the vast majority of naturalized citizens in Georgia are non-White, the protocol discriminates on both the basis of national origin and race.

44.     Indeed, the November 14, 2019 file of voters in "pending" status produced by Defendant indicates that approximately 76 percent of pending applicants identified as Black, non-Hispanic, Asian or Pacific Islanders, or Hispanic. Only 12.6 percent of the voters in "pending" status are White, even though approximately 53.7 percent of Georgia's registered voter population is White.  This disparity demonstrates the racially discriminatory impact of the defective citizenship matching protocol.

45.     The protocol is also arbitrary in its application. It does not apply to voters who use their social security number rather than their driver license on their voter registration or do not use either a driver's license or social security number on the form.

46.     Meanwhile, there is no evidence that the voter registration requirement that each applicant affirm citizenship under penalty of perjury and criminal statutes preventing voting by non-citizens are sufficient barriers to prevent non-citizens from voting or that non-citizen voter registration is a significant problem in Georgia.

47.     Other states' failed past attempts to implement programs similar to Georgia's only further confirm the discriminatory and untailored nature of the citizenship matching protocol.

48.     In 2012, Florida's Secretary of State launched a voter purge program on the basis of stale driver license citizenship data. Out of 185,000 registrants identified as purported "non-citizens" by Florida's program (relying on the same type of data as Georgia's protocol), less than 0.05 percent could be lawfully removed from the rolls. *See* Steve Bouquet & Amy Sherman, Florida suspends non-citizen voter purge efforts, Miami Herald (Mar. 27, 2014), https://www.miamiherald.com/news/politics-government/article2087729.html.    A district court held that the program likely violated the NVRA because it targeted

naturalized citizens and "[a] state cannot properly impose burdensome demands in a discriminatory manner." *United States v. Florida*, 870 F. Supp. 2d 1346, 1347-48 (N.D. Fla. 2012). Florida ultimately abandoned the program.

49.    In January 2019, Texas's Secretary of State initiated a purge program based on the same type of stale driver license citizenship data. Once again, the program targeted naturalized citizens and failed to accurately identify noncitizen registrants. Of the approximately 98,000 individuals on the Texas Secretary of State's list of purported non-citizens, only a handful were identified as ineligible to vote. A district court issued a preliminary injunction and called the program a "ham-handed" "mess" that burdened the right to vote of "perfectly legal naturalized Americans." *Texas LULAC v. Whitley*, No. SA-10-CA-074-FB, Doc. 61 (W.D. Tex. Feb. 27, 2019). Soon thereafter, Texas abandoned its program.

50.    But Georgia has not heeded the lessons of history – including the November 2, 2018 preliminary injunction issued by the Court in this case. Defendant Raffensperger has chosen, without statutory mandate, to continue the automated citizenship matching process even though it relies on a methodology that has proven to be fundamentally flawed.

**Defendant Raffensperger's Citizenship Matching Protocol Imposes
Substantial Burdens on Flagged Voters**

51.    The citizenship matching process is a harsh and discriminatory welcome to the American democratic process for naturalized citizens. Many of these newly naturalized citizens register to vote for the first time immediately following naturalization ceremonies, often at voter registration drives organized by some of the Plaintiff organizations. But shortly thereafter, rather than receiving their precinct card confirming their voter registration, they receive a potentially intimidating and confusing official letter from election officials questioning their citizenship and demanding they provide documentation of citizenship before they can vote.

52.    As a result, newly naturalized citizens who apply to vote following naturalization ceremonies—and even many who *included* copies of their naturalization forms with their registration applications—have been denied active voter registration status or faced extra hurdles to becoming a registered voter in Georgia.

53.    Although county registrars should theoretically be checking voter files to ascertain whether a voter registration provided documentary proof of citizenship with their registration form to avoid having the applicant inaccurately flagged as a potential non-citizen, Defendant has not produced any evidence that this new practice has been successful in all cases.  Similarly, Defendant has not provided any

evidence that all of Georgia's 159 county registrars have been directed to review existing voter files to determine whether applicants currently in pending status due to the citizenship match prior to the change in practice provided proof of citizenship.

54.     Flagged voters receive only one notification that they must provide documentary proof of citizenship in order to cast a ballot that counts, which is woefully insufficient. This is particularly true since many newly naturalized citizens are likely to be persons who have limited English proficiency and may not understand notices that are not in their first language. In fact, with the exception of Gwinnett County, which is a covered jurisdiction under Section 203 of the Voting Rights Act for Spanish language voting assistance, all of the notices are only in English. Therefore, many flagged voters do not fully understand the import of the notice.[5]

55.     If flagged voters appear at the polls on Election Day, they will not be issued a regular ballot unless they happen to have their citizenship documentation

---

[5] According to data reported by Georgia to the Election Assistance Commission, only 9 percent of NVRA notices sent to voters between the November 2016 and November 2016 Elections were returned by recipients. In contrast, 15 percent were returned undeliverable and 76 percent were not returned at all. There is no reason to believe that applicants who receive citizenship flag notices will be any more likely to respond to the citizenship flag notices, especially given the fact that these notices are only in English, except for Gwinnett County.

on their person. Upon information and belief, many naturalized citizens—like most other citizens—do not carry documentation of citizenship on their person.

56.     Moreover, Defendant Raffensperger's policies—even as softened by this Court in its preliminary injunction order intended to mitigate the citizen matching protocol's damage in the immediate run-up to the 2018 elections—require flagged individuals to produce their proof of their citizenship (if they have it on their person) to a poll manager at their precinct. Therefore, they must leave the general check-in line at the polling place where other voters are processed. Singling out these voters is unnecessary—poll workers can easily perform this function—intimidating, and discourages newly naturalized citizens from voting in future elections.

57.     Finally, qualified United States citizens who are inaccurately flagged as purported non-citizens run the risk of having their applications cancelled after 26 months by the citizenship matching protocol.

58.     If the voter's registration is cancelled, the applicant will have to start the registration process over again and is likely be incorrectly flagged as a purported non-citizen *again* based on the same stale data.

59.      It is well recognized that the duty to register—and in this case re-register—is the primary obstacle to voting. H.R. Rep. No. 103-9 at 3 ("Public opinion polls, along with individual testimony . . . indicate that failure to become

registered is the primary reason given by eligible citizens for not voting. It is generally accepted that over 80 percent of those citizens who are registered vote in Presidential elections.").

60.    Requiring re-registration for these individuals may prove particularly burdensome because the citizenship matching protocol may stoke fear among flagged voters that the legitimacy of their citizenship is being questioned by a government agency. Moreover, voters who speak English as a second language, have lower literacy or education levels, have limited access to technology, or face other barriers to registration will be disproportionately burdened by this process.

**Disparate Burdens on Minority Applicants Subjected to the Citizenship Match Process are Linked to Social and Historical Conditions of Discrimination**

61.    Defendant Raffensperger's discriminatory citizenship match process works in concert with historical, socioeconomic, and other electoral conditions in Georgia to deny voter registration applicants of color an equal opportunity to register to vote and participate in the political process.

62.    Persistent and significant disparities in socioeconomic status and voter participation among minority communities in Georgia are the result of Georgia's unfortunate history of pervasive racial discrimination. Because of these disparate social and economic conditions, including poverty, unemployment, lower

educational attainment, and lack of access to transportation, voter registration applicants of color are disproportionately burdened by the Georgia citizenship matching protocol.

63.    According to the 2017 American Community Survey five-year estimate ("ACS"), there are significant racial disparities in income levels.  For example, the median income in Black households in Georgia is approximately $40,112; in Latino households, $43,162; and in White households, $61,880.  U.S. Census Bureau, 2013-17 American Community Survey 5-Year Estimates, Tables B19013B, B19013H, and B19013I.

64.    ACS data also indicate that approximately 24.4 percent of Georgia's Black residents live in poverty, while the poverty rate is 26.7 percent among Latino residents, 11.9 percent among Asian-American residents, and 11.1 percent among White residents.  *Id.*, Tables B17001B, B17001D, B17001H, B17001I.

65.    There are racial disparities in language proficiency rates in Georgia as well.  While approximately 37.0 percent of Latino residents and 35.1 percent of Asian residents speak English less than "very well," less than 0.01 percent of non-Hispanic White residents speak English less than "very well." *Id.*, Tables B16005D, B16005H, B16005I.

66.    Racial disparities also persist in education levels.  For example, 2013-2017 ACS data indicate that 14.6 percent of Black residents, 39.6 percent of Latino residents and 10.1 percent of non-Hispanic White residents in Georgia did not graduate from high school.  And 22.6 percent of Black residents, 16.0 percent of Latino residents, and 33.7 percent of non-Hispanic White residents graduated from college.  *Id.*, Tables C15002B, C15002H, C15002I.

67.    These socioeconomic disparities, caused by the continuing effects of historical and modern racial discrimination, are directly linked to the disparate burdens the citizenship matching protocol imposes on minority applicants.

68.    The Georgia citizenship matching protocol turns the voter registration process into a challenging exercise for some voters. Eligible voter registration applicants with lower levels of educational attainment, a lower level of proficiency in English, or less familiarity with bureaucratic procedures are more likely than other applicants to be unable to navigate this bureaucratic process.

69.    Notification letters, other than those sent in Gwinnett County, are provided only in English. Applicants who are limited English proficient will have more difficulty understanding the notification letter. They also face additional challenges when communicating with election officials, following instructions, and completing the registration process.

31

70.     In addition, naturalized citizens are disproportionately non-White and are more likely than White applicants to work multiple jobs, have inflexible schedules, maintain irregular work hours, lack access to transportation, or suffer from financial hardship or economic displacement. It is more difficult for these applicants to follow up with election officials in a timely manner than those who have access to transportation, can afford to take time off from work, and have a flexible schedule.

### Racial Discrimination in Voting in Georgia

71.     There is a long—and well-documented—history of voting-related discrimination in Georgia. *See Georgia State Conference of the NAACP v. Fayette County Bd. of Comm'rs,* 950 F.Supp.2d 1294, 1314-16 (N.D. Ga. 2013); *see also Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) (noting that "we have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases").

72.     And discrimination in voting is not a relic of Georgia's past. Modern examples of discrimination in voting in Georgia are also well-documented, including in the congressional record supporting the 2006 reauthorization of the Voting Rights Act.

73.    For example, in 2005, Georgia adopted a strict photo identification requirement for voting. The 2005 photo ID law required individuals lacking photo ID to pay $20 for a photo ID card or to sign an affidavit declaring indigency. Only after a federal court enjoined its original law did the Georgia Legislature revise its photo ID law to provide more equal access to the required photo ID.

74.    The Georgia Secretary of State's office also has a history of hostility toward third-party voter registration activity.  Organizations that serve communities of color are responsible for a substantial portion of the third-party voter registration activity in Georgia.

75.    Although much of the written history of discrimination in Georgia has focused upon African Americans, incidents of discrimination against other racial and ethnic groups have increased in more recent years.

76.    In 2016, for example, the Georgia Senate passed Senate Resolution 675 ("SR 675"), which sought to amend the Georgia Constitution to make English the state's official language and prohibit the use of any language other than English in any Georgia state or local government document, proceeding, or publication. SR 675 would have prohibited the dissemination of ballots and other election-related documents in any language other than English in violation of federal law. After more than 200 ethnic business groups, churches, and other organizations condemned or

lobbied against SR 675, the House did not pass SR 675 prior to the end of the legislative session.

77.    The origins of the citizenship matching protocol are part and parcel of this history of modern discrimination in voting.

78.    The Georgia Secretary of State's office began implementing a predecessor version of the current "exact match" voter registration process—which also inaccurately flagged United States citizens as potential non-citizens—shortly before the 2008 presidential election without first obtaining preclearance. The U.S. District Court for the Northern District of Georgia held that doing so violated Section 5 of the Voting Rights Act. *Morales v. Handel*, No. 1:08-CV-3172, 2008 WL 9401054 (N.D. Ga. Oct. 27, 2008).

79.    After the Secretary of State finally did submit the protocol for preclearance, the U.S. Department of Justice ("DOJ") objected to Georgia's submission. The DOJ concluded that the initial version of the program relied on an error-laden and "possibly improper" usage of the Social Security Administration's HAVV system and outdated Georgia Department of Driver Services data in an attempt to find non-citizens. Letter from Loretta King, Acting Asst't Att'y Gen., Dep't of Justice, to Ga. Att'y Gen. Thurbert E. Baker, May 29, 2009, *available at* https://www.justice.gov/crt/voting-determination-letter-58.

80.     The   Attorney   General's   objection   letter   also   found   Georgia's

citizenship matching protocol was unreliable and had a discriminatory effect upon

non-White applicants:

> "We have considered the accuracy of the state's verification process.
> Our analysis shows that the state's process does not produce accurate
> and reliable information and that thousands of citizens who are in fact
> eligible to vote under Georgia law have been flagged . . . a large
> number of persons who have subsequently demonstrated that they are
> in fact citizens. Indeed, of the 7,007 individuals who have been
> flagged . . . as potential non-citizens, more than half were in fact
> citizens. Perhaps the most telling statistic concerns the effect of the
> verification process on native-born citizens. Of those persons
> erroneously identified as non-citizens, 14.9 percent, more than one in
> seven, established eligibility with a birth certificate, showing they
> were born in this country. Another 45.7 percent provided proof that
> they were naturalized citizens, suggesting that the driver's license
> database is not current for recently naturalized citizens.
>
> The impact of these errors falls disproportionately on minority voters.
> . . . Although African American and white voters represent
> approximately equal shares of the new voter registrants between May
> 2008 and March 2009, more than sixty percent more African
> Americans voters who registered during this period are currently
> flagged than are whites. Again, this rate is statistically significant.
> Similar disproportion arises with regard to flagged Asians and
> Hispanics . . . Hispanic and Asian individuals are more than twice as
> likely to appear on the list as are white applicants. Each of the
> differences is statistically significant.
>
> In sum, the state's proposed procedures for verifying voter registration
> information are seriously flawed. This flawed system frequently
> subjects a disproportionate number of African-American, Asian,
> and/or Hispanic voters to additional and, more importantly, erroneous
> burdens on the right to register to vote. These burdens are real, are
> substantial, and are retrogressive for minority voters. As such, an

objection based upon the state's failure to establish the absence of a discriminatory effect is warranted."

81.   While a later iteration of the "exact match" protocol was precleared in 2010, it is not apparent that the Secretary of State ever followed the safeguards promised in the preclearance submission that led to its approval.

82.   Moreover, since implementing the "exact match" protocol in 2010, the Georgia Secretary of State's office was made aware repeatedly that its registration protocol, in practice, disproportionately burdened eligible minority applicants. In 2016, a coalition of civic engagement groups sued to enjoin the practice. The Secretary of State subsequently agreed to a settlement to end cancellations based on the "exact match" protocol.

83.   Nevertheless, in 2017, the legislature codified the "exact match" protocol in HB 268. The legislation predictably continued to cause thousands of prospective Georgia voter registration applicants—the vast majority of whom identify as African-American, Latino and Asian-American—to be placed in "pending" status because they had been incorrectly identified as non-citizens.

84.   After Plaintiffs filed this lawsuit, the Georgia Legislature eliminated the "exact match" process through the enactment of HB 316 (2019) but did nothing to address the accompanying and similarly unlawful citizenship matching process.

85.    Neither Secretary Raffensperger nor the Georgia Legislature have acted to mitigate the citizenship matching protocol's discriminatory impact on the ability of Georgia's qualified African-American, Latino and Asian-American applicants to complete the voter registration process. Efforts by voting rights and civic engagement advocates, among others, to encourage the Legislature to include reforms to the matching protocol in HB 316 failed during the 2019 legislative session.

**Other Factors Relevant to the Totality of Circumstances in Georgia**

86.    Voting patterns in Georgia are racially polarized. Courts have repeatedly held that racially polarized voting exists at the statewide, county, and local levels. *See*, *e.g.*, *Georgia v. Ashcroft*, 195 F. Supp. 2d 25, 88 (D.D.C. 2002), *rev'd on other grounds*, 539 U.S. 461 (2003); *Ga. State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs,* 950 F. Supp. 2d 1294, 1314-16 (N.D. Ga. 2013), *vacated and remanded on other grounds*, 775 F.3d 1336 (11th Cir. 2015); *Ga. State Conf. of the NAACP v. Kemp*, 312 F. Supp. 3d 1357, 1360 (N.D. Ga. 2018) (panel majority decision) (noting that voting in Georgia is "highly racially polarized").

87.    Persons of color have not been elected to public office in Georgia at a rate that is commensurate with their share of the population. All of the current statewide elected officials are White, and non-White Georgians are underrepresented

37

in the Georgia House of Representatives and Senate, as well as in the state's congressional delegation.

88.     There is a majority vote requirement in all elections in Georgia, which makes it more difficult for non-White voters to elect candidates of choice because they comprise a minority of the electorate.

89.     Defendant Raffensperger has not shown that voter registration by non-citizens is a problem in Georgia, let alone one that justifies delaying or denying active voter registration to thousands of qualified Georgians who are United States citizens based upon a defective process that relies upon outdated citizenship data.

90.     The Georgia citizenship match protocol is tenuously, if at all, related to the goal of preventing voter fraud or non-citizens registering to vote. It arbitrarily applies only to persons who use a driver's license number on their voter registration form. Given the absence of evidence that non-citizen voter registration is a problem in Georgia, moreover, it is a defective solution to a nonexistent problem.  Ultimately, it disproportionately and negatively delays or denies qualified Georgians who are U.S. citizens access to the ballot. Indeed, the protocol creates obstacles for eligible Georgia applicants on the basis of national origin and race.

91.     The defective citizenship match process also imposes an arbitrary 26-month cancellation period resulting in the rejection of registration applications that

are facially complete, fully accurate and submitted by qualified Georgians. The cancellation of qualified applicants does nothing to further any state interest.

## COUNT ONE
## VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT

92.     Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 91 above, as if fully set forth herein.

93.     Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, protects Plaintiffs from denial or abridgment of the right to vote on account of race, color, or membership in a language minority group. Section 2 provides, in relevant part:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United State to vote on account of race or color, or [membership in a language minority group].

> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

94.     Defendant Raffensperger's citizenship matching protocol constitutes a qualification or prerequisite to voting within the meaning of Section 2 of the Voting

Rights Act and results in the denial or abridgement of the right to vote of Georgia citizens on account of their race or color in violation of Section 2.

95.    It imposes a substantial, unwarranted, and disproportionate burden on applicants of color, in particular Latino and Asian-American citizens, and denies them equal opportunity to register and to vote in Georgia elections.

96.    The citizenship matching protocol interacts with historical, socioeconomic, and other electoral conditions in Georgia to prevent applicants of color, in particular Latino and Asian-American citizens, from having an equal opportunity to register and vote. *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

97.    In this case, the following circumstances are present: (1) a history of discrimination related to voting; (2) racially polarized voting patterns; (3) members of the impacted minority group bear the effects of discrimination in areas such as education, employment, and health; (4) members of the impacted minority group are underrepresented among Georgia's elected officials; (5) a lack of responsiveness to the needs of the impacted minority community; and (6) an arbitrary policy underlying the matching protocol that is tenuously related to its stated purpose.

98.    As a result of the citizenship matching protocol and under the totality of the circumstances, the political process in Georgia is not equally open to participation by registrants of color, in particular Latino and Asian-American

40

citizens, insofar as they have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

99.   Plaintiffs will continue to suffer the violation of their rights as alleged herein absent relief granted by the Court.

**COUNT TWO**
**42 U.S. § 1983**
**DISCRIMINATION BASED ON CITIZENSHIP CLASSIFICATION AND NATIONAL ORIGIN**
**EQUAL PROTECTION CLAUSE, FOURTEENTH AMENDMENT**

100.   Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 99 above, as if fully set forth herein.

101.   The Fourteenth Amendment of the United States Constitution prohibits states from depriving "any person within its jurisdiction the equal protection of the laws."

102.   Under the Equal Protection Clause, discrimination based on naturalized citizenship and on national origin is presumptively unconstitutional and subject to strict scrutiny.

103.   As described in the foregoing Complaint, Defendant Raffensperger's citizenship matching protocol discriminates against naturalized citizens. Its design necessarily targets naturalized citizens who applied for a driver license prior to their naturalization. By design, these naturalized citizens are burdened with a

41

documentary proof of citizenship requirement to vote and a 26-month timeline for cancellation of their voter registration.

104.   Likewise, by creating a protocol that singles out voters that *at some point* were not U.S. citizens, the Secretary has made a classification on the basis of national origin.

105.   These classifications are neither justified by nor narrowly tailored to promote substantial or compelling state interests.

106.   The citizenship matching protocol unlawfully discriminates on the basis of naturalized citizenship status and national origin in violation of the Equal Protection Clause and should be enjoined. *See, e.g., Boustani v. Blackwell,* 460 F. Supp. 2d 822 (2006) (striking down election procedure that targeted naturalized citizens for differential treatment in the voter challenge process).

## COUNT THREE
### 42 U.S.C. § 1983
### BURDEN ON THE FUNDAMENTAL RIGHT TO VOTE
### FIRST AND FOURTEENTH AMENDMENTS

107.   Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 106 above, as if fully set forth herein.

108.   The First and Fourteenth Amendments of the United States Constitution protect the right to vote as a fundamental right. The First Amendment's guarantees of freedom of speech and association protect the right to vote and to

participate in the political process. The right to vote is a fundamental constitutional right also protected by both the due process and equal protection clauses of the Fourteenth Amendment. *See*, *e.g.*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Anderson v. Celebrezze*, 460 U.S. 780, 786-87 (1983).

109.   Severe and discriminatory burdens on the right to vote are subject to close scrutiny. *Burdick v. Takushi*, 504 U.S. 428, 434 (1993). Defendant Raffensperger's defective citizenship matching protocol is discriminatory imposes severe burdens on the right to vote by preventing naturalized citizens and other eligible applicants from gaining active voter registration status and voting based on stale unreliable citizenship data.

110.   The citizenship match protocol, along with its 26-month cancellation period and documentary proof of citizenship requirement, are not narrowly drawn to advance any state interest sufficiently compelling to justify the imposition of such severe burdens.

111.   While the burdens of this protocol are undeniably severe and discriminatory, the protocol cannot pass muster even under the less restrictive *Anderson-Burdick* balancing test for more ordinary voting regulations. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (holding that courts "must weigh 'the character

43

and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiffs rights'" (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983))).

112.   There is no sufficient state interest justifying this citizenship matching protocol, 26-month cancellation period, and documentary proof of citizenship requirement that is not already adequately protected by preexisting criminal laws and election procedures, particularly in light of Georgia's strict photo identification requirement and the fact that applicants must affirm their United States citizenship on the voter registration form under penalty of perjury.

113.   If enforcement of the citizenship matching protocol is not enjoined or otherwise modified to ameliorate the severe burdens it imposes, the citizenship matching protocol will continue to indefinitely impose severe burdens on citizens' right to vote, requiring Plaintiff organizations to divert resources in an attempt to remedy the deprivation.

114.   Defendant Raffensperger, acting in his capacity as Georgia's Secretary of State, is acting under color of state law to deprive Plaintiffs of the rights,

44

privileges, and immunities secured to them by the First and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

115.   Plaintiffs will continue to suffer the violation of their rights as alleged herein absent relief granted by the Court.

## COUNT FOUR
## VIOLATION OF SECTION 8 OF THE NATIONAL VOTER REGISTRATION ACT OF 1993, 52 U.S.C. § 20507(a)(1)

116.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 115 above, as if fully set forth herein.

117.   Section 8 of the NVRA, 52 U.S.C. § 20507(a)(1) requires each state to *ensure* that any eligible applicant is registered to vote in an election" so long as that applicant submits a valid voter registration form not later than the lesser of 30 days or the period provided by State law before an election. 52 U.S.C. § 20507(a)(1) (emphasis added).

118.   Congress' purpose in passing the NVRA was to "increase the number of eligible citizens who register to vote in elections"; "enhance[] the participation of eligible citizens as voters"; and protect the active role that community-based voter registration groups play in the registration process. 52 U.S.C. § 20501.

119.   The NVRA was intended to "ensure that no American is denied the ability to participate in Federal elections because of real or artificial barriers . . .

45

[and] to make voter registration an inclusive, rather than an exclusive opportunity in the United States." 139 Cong. Rec. H495-04 (1993) (statement of Rep. Martin Frost).

120.   Defendant Raffensperger's citizenship matching protocol violates Section 8 of the NVRA because it denies or delays active voter registration to qualified Georgia voter registration applicants who submit timely, facially complete and accurate voter registration forms.

121.   Section 8 of the NVRA also provides that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." 52 U.S.C. § 20507(b)(1).

122.   The citizenship matching protocol—and particularly the practice of removing flagged applicants after 26 months—falls squarely within the scope of this directive. Yet, as described in detail in the foregoing complaint, the protocol by design discriminates on the basis of national origin and race.

123.   On July 18, 2018, Plaintiffs' counsel served Defendant Raffensperger's predecessor, Brian Kemp, with notice of the violation of Section 8 of the NVRA. A copy of said written notice is attached and incorporated herein by reference as

Exhibit 1. No Georgia election official has undertaken any remedial action since that date. Therefore, Plaintiffs have no recourse but to continue this litigation to obtain remedial relief from the Court.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray that the Court:

1.      Enter judgment in favor of Plaintiffs and against Defendant Raffensperger on the claims for relief as alleged in this Complaint;

2.      Enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that Defendant Raffensperger's citizenship matching protocol for voter registration (a) violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, (b) violates the Equal Protection Clause by discriminating on the basis of national origin and class of citizenship, (c) violates the fundamental right to vote under the First and Fourteenth Amendments, and (d) violates Section 8 of the National Voter Registration Act of 1993, 52 U.S.C. § 20507.

3.      Grant Plaintiffs preliminary and/or permanent injunctive relief by enjoining the enforcement and continued implementation of the citizenship matching protocol and by ordering Defendant Raffensperger, his employees, agents, servants and his successors to undertake the following remedial actions:

a.      Enjoin enforcement of the 26-month cancellation period applied to applicants who allegedly fail the citizenship matching protocol;

b.      Place in active voter registration status all applicants who either (1) are currently in "pending" status due to an alleged failure to verify citizenship based upon DDS data that has not been updated to reflect the current citizenship status of the applicant so long as the applicant has sworn or affirmed he or she is a United States citizen, or (2) had their voter registration applications cancelled since October 1, 2014 as a result of an alleged failure to verify citizenship based upon DDS data that has not been updated to reflect the applicant's current citizenship status so long as the applicant has sworn or affirmed he or she is a United States citizen;

c.      Notify all voters who are placed in active voter registration status pursuant to subsection (b).

d.      Transmit any Order of this Court granting preliminary or final injunctive relief to county boards of elections;

4.      Order that Defendant Raffensperger, his employees, agents, servants and successors maintain, preserve, and not destroy until after December 31, 2030, any and all records relating to the citizenship matching protocol and its implementation.

48

5.     Order that the Court shall retain jurisdiction over the Defendant and his successors for such period of time as may be appropriate to ensure compliance with relief ordered by this Court;

6.     Award Plaintiffs their reasonable attorneys' fees and costs pursuant to statute; and

7.     Grant Plaintiffs such other and further relief as may be just and equitable.

Dated: December _20, 2019          Respectfully submitted,

>           */s/ Bryan L. Sells*
>           Bryan L. Sells
>           Georgia Bar No. 635562
>           The Law Office of Bryan Sells, LLC
>           PO Box 5493
>           Atlanta, Georgia 31107
>           Tel: (404) 480-4212
>           Email: bryan@bryansellslaw.com
>
>           Jon Greenbaum*
>           Ezra D. Rosenberg*
>           Julie Houk*
>           John Powers*
>           jgreenbaum@lawyerscommittee.org
>           erosenberg@lawyerscommittee.org
>           jhouk@lawyerscommittee.org
>           jpowers@lawyerscommittee.org
>           Lawyers' Committee for Civil Rights Under Law
>           1500 K Street NW, Suite 900
>           Washington, D.C. 20005
>           Telephone:  (202) 662-8600

Facsimile:    (202) 783-0857

Vilia Hayes*
Gregory Farrell*
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone:   (212) 837-6000
Facsimile:    (212) 422-4726

Danielle Lang*
Mark Gaber*
J. Gerald Hebert*
dlang@campaignlegalcenter.org
mgaber@campaignlegalcenter.org
ghebert@campaignlegalcenter.org
Campaign Legal Center
1411 K Street NW, Suite 1400
Washington, DC  20005
Telephone:   (202) 736-2200
Facsimile:    (202) 736-2222

Phi Nguyen
Georgia Bar No. 578019
Asian Americans Advancing Justice – Atlanta
5680 Oakbrook Parkway, Suite 148
Norcross, Georgia 30093
pnguyen@advancingjustice-atlanta.org
Telephone: (770) 818-6147

*Admitted pro hac vice

Counsel for Plaintiffs

## CERTIFICATE OF COMPLIANCE AND OF SERVICE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing SECOND AMENDED COMPLAINT has been prepared in Times New Roman 14, a font and type selection approved by the Court in L.R. 5.1(C), and that I provided notice and a copy of the foregoing using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

Respectfully submitted this 20th day of December, 2019,

s/ Bryan L. Sells
Bryan L. Sells
Georgia Bar No. 635562
The Law Office of Bryan Sells, LLC
PO Box 5493
Atlanta, Georgia 31107
Tel: (404) 480-4212
Email: bryan@bryansellslaw.com

*Counsel for Plaintiffs*