**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC., *et al.*, | |
| *Plaintiffs,* | CIVIL ACTION |
| v. | FILE NO. 1:18-CV-04727-ELR |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State for the State of Georgia | |
| *Defendant.* | |

**<u>BRIEF IN SUPPORT OF DEFENDANT'S</u>
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## INTRODUCTION

Georgia law requires registered voters to be United States citizens. To enforce this requirement, Georgia requires voter-registration applications to be accompanied by proof of citizenship. *See* O.C.G.A. § 21-2-216(g). This requirement places minimal burden on applicants because in almost every case, the requirement is fulfilled by matching driver's license or state identification numbers submitted for voter registration with corresponding records at the Georgia Department of Driver Services ("DDS") that confirm the applicant's citizenship status.[1] The only part of this process challenged in this case is what occurs when DDS records show that the applicant was not a U.S. citizen during their last interaction. In Georgia, individuals who previously provided DDS with documentary evidence indicating they are *not* citizens of the United States and then register to vote are asked to confirm that they have become citizens before being placed in active status in the voter database.

Plaintiffs' ask the court to strike down this entirely reasonable process—which only asks people who were not U.S. citizens during their previous

---

[1] This process works because Georgia has one of the most successful automatic voter registration systems in the country. *See* Brennan Center for Justice, *AVR Impact on State Voter Registration* (April 11, 2019), available at https://www.brennancenter.org/sites/default/files/2019-08/Report_AVR_Impact_State_Voter_Registration.pdf

interaction with state officials to confirm that they are citizens now before being allowed to cast a ballot.[2] Any arguable burden on this small group of people to demonstrate they are now citizens is minimal and does not go beyond the "usual burdens of voting" because it can be resolved as simply as showing the same photo identification that every Georgia voter is required to show in order to vote in person in Georgia. The citizenship process also serves a compelling interest in ensuring that only eligible voters are able to vote.

Plaintiffs allege in their Third Amended Complaint (TAC) that this requirement violates a variety of federal laws, including Section 2 of the Voting Rights Act (VRA), the First and Fourteenth Amendments, the Equal Protection Clause, and Section 8 of the National Voter Registration Act (NVRA). [Doc. 88, ¶¶ 93-124]. Despite Plaintiffs' best efforts to confuse the issues in this case, the extremely narrow nature of the law—combined with Georgia's implementation of measures that even Plaintiffs' experts admit could be working to prevent ineligible people from voting—demonstrate Plaintiffs cannot succeed as a matter of law on the undisputed facts. And the Court can only reach that question if it concludes Plaintiffs have standing—which they do not. This Court should grant judgment as a matter of law to the Secretary.

---

[2] Plaintiffs do not challenge the accuracy of DDS's data that shows applicants were not U.S. citizens when they last interacted with DDS.

## FACTUAL BACKGROUND

Georgia implemented automatic voter registration in 2016. Report of Michael Barber, attached as Ex. A (Barber Report), p. 24. Since that time, unless someone affirmatively opts out, every eligible individual who applies for a Georgia driver's license or state identification card is registered to vote at the same time. 30(b)(6) Deposition of Secretary of State [Doc. 131] (Harvey Dep.) at 59:13-19. When an individual applies at DDS, he or she is required to present documentary proof of citizenship as part of that process. 30(b)(6) Deposition of Department of Driver Services [Doc. 132] (McClendon Dep.) at 95:15-96:16; 49 U.S.C. § 30301 (Sec. 202(c)(1)).

Non-citizens with legal status can also apply for and receive Georgia driver's licenses, but they are stamped with the designation "LIMITED TERM" on the license itself. McClendon Dep. at 91:4-22. Limited-term licenses are only valid for five years or the length of time of the person's legal status, whichever is shorter. *Id*. Limited-term licenses cannot be used as a valid photo identification for voting. Harvey Dep. at 141:23-142:4; O.C.G.A. § 21-2-417(a).

When an individual registers to vote using a paper registration form, their information is provided by the Secretary's office to DDS for verification, as required by the Help America Vote Act. 52 U.S.C. § 21083(a)(5)(B)(i); Harvey Dep. at 47:16-48:18. If an individual has no record in the DDS database

3

because they never had a Georgia driver's license, their information is sent to the Social Security Administration (SSA) for verification. McClendon Dep. at 38:11-39:23; Harvey Dep. at 82:20-83:13. This general HAVA-matching process is not challenged by Plaintiffs in this case. [Doc. 88, ¶ 2, n.1].

What Plaintiffs challenge is a separate process that receives information on citizenship status. [Doc. 88, ¶ 2]. If an individual has a record in the DDS database that matches the information on the form, the Secretary's office receives data back from DDS indicating that person's citizenship status as it is currently held in the DDS database. McClendon Dep. at 98:2-99:2.

Individuals who were non-citizens at the time of their last interaction with DDS, who have not updated their information prior to registering to vote, and who did not include proof of citizenship documentation with their application [3] are placed into pending-citizenship status in the voter-registration database. Harvey Dep. at 128:19-24; Barber Report, pp. 9-10. Thus, the only registrants who should appear on the pending list for citizenship are those registrants who previously affirmed that they were not citizens and

---

[3] Voter registration drives at naturalization ceremonies usually include copiers to allow new voters to submit copies of a naturalized citizens' naturalization certificate with the voter-registration application. A software change ensured that individuals who provide documentation with their paper applications cannot have that information overridden by older information in the DDS database. Harvey Dep. at 192:5-193:21

4

did not submit proof of citizenship with their application. Harvey Dep. at 128:15-24; Barber Report, p. 20. From 2017 through 2020, 93.7% of voter registrants in Georgia were checked for citizenship through DDS when they registered to vote. Barber Report, p. 3. Over that time, 7,209 registrants were flagged for citizenship out of a total of 1,696,554 Georgians that registered to vote—meaning that only 0.4% of all registrants were flagged for citizenship. Barber Report, p. 12.

When an individual is flagged for citizenship by the DDS data, the county registrar is instructed to check for citizenship documentation and update the record to active status if that documentation was already provided. Harvey Dep. at 130:3-14. Individuals who are flagged because they previously provided documents proving they were not citizens receive multiple letters from their county registrar explaining the methods to cure that issue, including by showing a valid, non-limited-term Georgia driver's license to poll workers. Harvey Dep. at 131:2-134:3; O.C.G.A. § 21-2-216(g)(2).

If an individual who held a limited-term license becomes a citizen and wishes to register to vote, he or she has a variety of options. Harvey Dep. at 58:2-59:25, 138:5-139:13. *First*, the individual can update his or her information at DDS with their citizenship documentation and this will automatically register to them to vote. Harvey Dep. at 59:13-19, 213:8-215:24.

5

*Second*, they can send in a paper registration form and include their naturalization documents. Harvey Dep. at 247:5-19. *Third*, they can send a paper registration form without naturalization information and later respond to requests for that documentation by providing it to election officials or poll workers. Harvey Dep. at 138:2-139:13. Individuals who do not provide citizenship documentation before or at the time of voting can still vote a provisional ballot and provide proof of citizenship up to three days after the election. *Id.*; O.C.G.A. § 21-2-417(c).

## ARGUMENT AND CITATION OF AUTHORITY

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden but is not required to negate the opposing party's claims. Instead, the moving party may point out the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 91 L. Ed. 2d 265 (1986); *Marion v. DeKalb County, Ga.*, 821 F. Supp. 685, 687 (N.D. Ga. 1993).

## I.    Plaintiffs lack standing to bring their claims.

The Constitution limits the authority of federal courts to actual "Cases" and "Controversies," which means, among other things, that "a litigant must establish" standing in order to avail herself of this judicial forum. *Jacobson v.*

6

*Fla. Sec. of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). Plaintiffs here must prove "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Id*. Where a plaintiff is an organization rather than an individual, it can establish an injury either by (1) showing they diverted resources in response to the purportedly illegal acts of Defendants, or (2) "stepping in the shoes" of their members. Here, Plaintiffs are all organizations except for one individual, Judith Martinez Cruz. None of the Plaintiffs have standing to invoke the jurisdiction of this Court. Their claims must be dismissed on this basis alone.

## A.    Organizational Plaintiffs lack standing.

A plaintiff claiming diversion of resources as an injury [4] must demonstrate that "a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia v. Sec'y of Fla.,* 772 F.3d 1335, 1341 (11th Cir. 2014). This

---

[4] While some organizational plaintiffs made the conclusory allegation in the TAC that "upon information and belief," that some of their members were negatively affected by the citizenship matching protocol, they have not provided any evidence in discovery to support this accusation. Since the party invoking federal jurisdiction bears the burden of establishing standing at each phase of litigation, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 570 n.5 (1992), the Court should grant summary judgment to the Secretary on these tacit claims of associational standing. But even if there were evidence produced by Plaintiffs, their associational standing claims would fail for the same reason Ms. Cruz lacks individual standing. *See,* Section I.B., *infra.*

requires the plaintiff to show not only what the organization is diverting resources to, but also "what activities [the organization] would divert resources away from in order to spend additional resources on combatting" the impact of the law. *Jacobson*, 974 F.3d at 1250 (emphasis added). As another judge on this court held regarding one of the plaintiffs in this case, this requires more than evidence of an accounting transfer: there must be an "indication" that the organization "would in fact be diverting . . . resources away from [its] core activities." *Ga. Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cty. Bd. of Registrations & Elections*, 499 F. Supp. 3d 1231, 1240 (N.D. Ga. 2020) (*GALEO*). Indeed, as discussed below, a growing consensus is emerging that more closely reviews organizational access to the federal judiciary.

As the Seventh Circuit recently explained, organizations cannot support a claim of standing "based solely on the baseline work they are already doing." *Common Cause Ind. v. Lawson,* 937 F.3d 944, 955 (7th Cir. 2019). Further, organizations "cannot convert ordinary program costs into an injury in fact. The question is what *additional or new burdens* are created by the law the organization is challenging. It must show that the disruption is real and its response is warranted." *Id*. (cleaned up) (emphasis added). The key question is "not whether the organization has diverted resources from one priority to another, but whether its activities have been directly impeded by defendant's

8

activities, thus necessitating the diversion of resources." *Long Term Care Pharm. Alliance v. UnitedHealth Group, Inc.*, 498 F. Supp. 2d 187, 192 (D.D.C. 2007). Two recent district court cases serve to illustrate the jurisdictional shortcomings of Plaintiffs' case here.

In *GALEO*, the organizational plaintiff alleged it had standing because it was forced to divert resources "from getting out the vote and voter education to 'reach out to and educate [limited English proficiency voters] about how to navigate the mail voting process… as well as other aspects of the electoral process." *GALEO*, 499 F. Supp. 3d at 1240. But GALEO's mission included "organizing voter education, civic engagement, [and] voter empowerment." *Id.* The district court dismissed the case and found "there is no indication that GALEO would in fact be diverting any resources away from the core activities it already engages in by continuing to educate and inform Latino voters." *Id.* And allegations of ostensibly new or additional efforts were "precisely of the same nature as those that GALEO engaged in before . . .." *Id.*

Another district court ruling from the D.C. Circuit echoes *GALEO*. In *Tex. Low Income House. Info. Serv. v. Carson,* a non-profit organization "dedicated to promoting affordable housing," brought a civil-rights action against the Department of Housing and Urban Development (HUD) and its Secretary "for their alleged failure to enforce federal civil rights laws against

9

the City of Houston." 427 F. Supp. 3d 43, 48 (D. D.C. 2019). The plaintiff relied entirely on the purported injury it suffered by diverting resources from its traditional projects as a result of the allegedly unlawful inaction of HUD.

The district court required two showings, both of which the plaintiff failed to demonstrate. First, the court required an injury to "the organization's interest.'" *Id.* at 52 (citing *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,* 878 F. 3d 371, 378 (D.C. Cir. 2017)). The court distinguished between "organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised." *Id.* (quoting *Abigail All. for Better Access to Dev. Drugs v. Eschenbach,* 469 F. 3d 129, 133 (D.C. Cir. 2006)).

Second, it required the organization to establish that it "used its resources to counteract [the purported] harm." *Id.* at 53 (citing *Food & Water Watch, Inc. v. Vilsack,* 808 F. 3d 905, 919 (D.C. Cir. 2015)). Neither "advocacy" efforts suffice nor "expend[ing] resources to educate [an organization's] members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" *Food & Water Watch*, 808 F. 3d at 919-920 (quoting in the second part *Nat'l Taxpayers Union v. United States,* 68 F. 3d 1428, 1434 (D.C. Cir. 1995)).

The district court noted Texas Housers was able to continue its current

10

mission but explained the "key inquiry is whether the plaintiff has alleged that the defendant's conduct perceptibly impaired the organization's ability to provide *services*." 427 F. Supp. 3d at 53. (emphasis original) (cleaned up). The court then concluded Texas Housers failed this inquiry because it "has effectively alleged that it has more work to do because of HUD's inaction" and that this was not an injury for purposes of standing. *Id.* at 55. Because "the plaintiffs are largely engaged in the same kinds of activities now that they were undertaking before [the challenged procedure]... namely education, research, advocacy, and counseling," *id.* at 56, they had not established organizational standing. Without this limitation, the courthouse would always be open to any organization that merely changed its budget.

In this case, the evidence for each organization's purported injuries is the same as the organizational plaintiffs in *Carson* and *GALEO*. In many ways, organizational Plaintiff ProGeorgia State Table, Inc. acts as a proxy for all the organizations because the other organizational plaintiffs are, themselves, members of ProGeorgia. 30(b)(6) Deposition of ProGeorgia State Table [Doc. 140] (Atkins Dep.) at 28:8-18; 31:18-32:6; 141:3-12. ProGeorgia's mission is "to increase voter engagement among historically underrepresented voters by supplying field coordination for voter education and voter mobilization efforts." *Id.* at 27:18-21. They accomplish this by "coordinat[ing] the voter registration

11

activities happening at the [citizenship naturalization] ceremonies, and to provide any tools and resources necessary for our partners to do that work properly and successfully." *Id.* at 31:21-25. They allocate funds to their partner organizations for, among other things, paying for the cost of printers, toner, and paper. *Id.* at 38:10-14. As a result of the citizenship-matching protocol it challenges, ProGeorgia claims it "had to divert funding from our, like, larger voter registration program, our funding for that." *Id.* at 54:5-7.

ProGeorgia also asserts that they would "[n]ot [provide] the same level of funding" to their partners if the citizenship-match requirements were not in place. *Id.* at 55:11-16. But the evidence shows these are purely discretionary budgetary allocations made to fulfill the longstanding organizational mission of ProGeorgia. While it is true that ProGeorgia and its members participate in naturalization ceremonies in order to register voters in part because of the citizenship verification law, but it is also true that registration of new citizens is part of the *raison d'etre* of ProGeorgia and all its member organizations. The evidence demonstrates that ProGeorgia has only shown it "has to do more work"—which is insufficient for standing. *Carson,* 427 F. Supp. 3d at 55.

The remaining organizational plaintiffs fare no better than ProGeorgia. Like ProGeorgia, GALEO "do[es] work around helping poor people become citizens. [They] do work around registering, assisting voters to register in the

12

process of making sure that they fill out the forms correctly." 30(b)(6) Deposition of GALEO [Doc. 133] (Gonzalez Dep.) at 40:19-23. GALEO also describes its mission as "increas[ing] representation of Latino elected and appointed officials, to proactively address issues and needs facing the Latino community, and to engage Georgia's Latino community in the democratic and political process." [Doc. 88, ¶ 25]. But like ProGeorgia, GALEO is banking on the fact that doing "more work" they are already engaging in constitutes an injury in fact. It does not. Sending staff to naturalization ceremonies clearly falls under the umbrella of GALEO's stated mission of "engaging Georgia's Latino community in the democratic and political process." [Doc. 88, ¶ 25]. Indeed, finding a new citizen at the naturalization ceremony and registering them to vote likely represents that individual's first step on the path of American democratic political participation. It is a worthy objective, to be sure. But not one that confers Article III standing on GALEO.

Each of the remaining organizations[5] faces similar shortfalls. Rather than belabor the point, the Secretary points the Court to relevant portions of the organization's depositions. 30(b)(6) Deposition of Ga. Coalition for the

---

[5] Former Plaintiffs Ga. State Conference of the NAACP and the Joseph and Evelyn Lowery Institute for Justice and Human Rights dismissed their claims earlier this year. [Doc. 110].

13

People's Agenda [Doc. 138] at 41:19-45:25; 55:20-74:23; 75:2-102:19; 30(b)(6) Deposition of New Georgia Project Vol. I [Doc. 139] at 60:10-80:11; 86:10-87:6; 30(b)(6) Deposition of Asian Americans Advancing Justice-Atlanta, Inc. [Doc. 141] at 35:12-76:12; 30(b)(6) Deposition of Common Cause [Doc. 137] at 50:4-85:17; 90:23-106:22.

## B.   The individual Plaintiff lacks standing.

Finally, we come to the question of standing for the sole individual plaintiff in this action, Ms. Judith Martinez Cruz. Ms. Cruz claims she had trouble voting in a primary election on June 9, 2020 as a result of the citizenship-verification process, but the evidence shows that her injury was the result of a poll worker's mistake in implementing that process, not the process itself. And Ms. Cruz was able to vote in the election in question. Deposition of Judith Martinez Cruz [Doc. 134] at 45:7-10, 50:1-5; [Doc. 88, ¶ 28].

Voters are not entitled to vote in any manner they like. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). And while this experience may have been frustrating for Ms. Cruz, it is not the kind of injury in fact sufficient to afford standing in federal court. But even if it was, the purported injury was the result of the failure of a local election official to provide Ms. Cruz with correct information (that her driver's license was enough) or a provisional ballot. If the local official had followed the

14

correct procedure, Ms. Cruz would not have needed to quickly go home to get more identification and return the polls. "Traceability is the second element of the standing doctrine. It requires 'a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant.'" *Anderson v. Raffensperger,* 497 F. Supp. 3d 1300, 1328 (N.D. Ga. 2020 (quoting *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 103 (1998)). Here, there is no connection between the Secretary of State and an alleged injury suffered at the hands of a local election official improperly applying the law to Ms. Cruz. Thus, she has no standing against the Secretary in this action.

## II.    Plaintiffs' claims under Section 2 fail as a matter of law because Georgia's election system is equally open to all voters (Count I).

Plaintiffs challenge the provisions of Georgia law that require registrants flagged for citizenship to "provide documentary proof of citizenship to a county registrar, deputy registrar or poll manager," which Plaintiffs claim is not "imposed on other eligible registrants."[6] [Doc. 88, ¶ 4]. Section 2 of the Voting Rights Act prohibits jurisdictions from diluting the strength of minority voters through a practice "which results in a denial or abridgement of the right

---

[6] In several instances in the complaint, Plaintiffs challenge the protocol based on the proof of citizenship requirement within the 26-month period. [Doc. 88, ¶¶ 5, 111, 123]. There is no longer a 26-month timeline in effect so that part of Plaintiffs' claims is no longer applicable. Harvey Dep. p. 255:10-15.

15

of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Proof of illegal vote dilution is established through a "totality of the circumstances" analysis. 52 U.S.C. § 10301(b).

After discovery, Plaintiffs cannot carry their burden to demonstrate that Georgia process is not equally open to all voters. *Brnovich v. Dem. Nat. Comm.*, 141 S. Ct. 2321, 2336 (2021).[7] Plaintiffs' claim is a vote-denial claim, as opposed to vote-dilution claims that apply to districts. *Id.* at 2333. "[E]qual openness [to voting] remains the touchstone" of a Section 2 claim. *Id.* at 2336. Here, Plaintiffs challenge the citizenship-verification process, but when the *Brnovich* guideposts are applied, Plaintiffs cannot prevail on their VRA claim.

The key question for this Court is whether "the political process leading to the nomination and election (here, the process of voting) [are] equally open to minority and non-minority groups alike." *Id.* at 2337. For purposes of Section 2, "equally open" looks to equal opportunity to participate, but "equal openness remains the touchstone." *Id.* at 2338. Equal openness under Section 2 is determined in light of the totality of the circumstances, as Section 2(b) requires, using the five guideposts outlined in *Brnovich*. *Id.* All of those

---

[7] Even though *Brnovich* had not been decided when Plaintiffs filed their various Complaints, it "must be given full retroactive effect." *Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 96 (1993).

guideposts point to the validity of Georgia's citizenship-matching process.

First, courts must consider the "size of the burden imposed by a challenged voting rule." *Id*. Plaintiffs alleging Section 2 claims cannot satisfy their burden by showing "[m]ere inconvenience," as "every voting rule imposes a burden of some sort." *Id.* The burden of providing proof of citizenship is entirely consistent with the "'usual burdens of voting'" and is similar to showing photo identification. *Id.* (citing *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008) (Stevens, J.)). It is part of the usual burdens of voting that an individual demonstrate they are eligible to vote. Almost all Georgia voters provide proof of citizenship when registering because they register at DDS. Barber Report, p. 5. The burden for those who fail this simple check is no more than that of an individual who changes their name after getting married and thus cannot be more than merely the "usual burdens" of voting.

Newly registered citizens are also provided numerous opportunities to show proof of citizenship to election officials. Harvey Dep. at 58:2-59:25, 138:2-139:13, 141:17-20; Barber Report, p. 3. Moreover, Georgia provides numerous opportunities to register to vote, including automatic voter registration, online voter registration, and mail-in voter registration. Harvey Dep. at 58:2-59:25. In considering the minimal burden, if any, on newly naturalized registrants to provide proof of their recent change in citizenship

17

status, this requirement does not make Georgia's election system unequally open to all voters, especially when those flagged for citizenship make up 0.4% of the total of registrants over a four-year period. Barber Report, p. 12.

Second, the Court evaluates the "degree to which a [challenged] voting rule departs from what was standard practice when § 2 was amended in 1982." *Brnovich*, 141 S. Ct. at 2338. The analysis must take into account the Court's "doubt that Congress intended to uproot facially neutral time, place, and manner regulations that have a long pedigree or are in widespread use in the United States." *Id.* at 2339.

When Congress passed the current version of the Voting Rights Act in 1982, county registrars were required to verify whether a person was eligible to vote before voting. *See, e.g., McCoy v. McLeroy*, 348 F. Supp. 1034, 1036-37 (M.D. Ga. 1972). The citizenship verification process thus has the same kind of "long pedigree or . . . widespread use in the United States . . . that must be taken into account." *Brnovich*, 141 S. Ct. at 2339.

Third, the "size of any disparities in a rule's impact on members of different racial or ethnic groups is also an important factor to consider." *Id*. This consideration requires acknowledgement that "even neutral regulations, no matter how crafted, may result in some predicable disparities … but the mere fact there is some disparity in impact does not necessarily

18

mean that a system is not equally open or that it does not give everyone an equal opportunity to vote." *Id.* In *Brnovich*, a "meaningful comparison" focused on racial disparities in "absolute terms." *Id.* at 2344-45. It considered the district court's findings of fact that "a little over 1%" of minority voters cast ballots outside of their precinct, while the rate for non-minority voters was about 0.5%." *Id.* The *Brnovich* majority did not highlight the difference between 0.5% (white voters) and 1% (voters of color). *Id.* Instead, the majority looked to the total numbers and concluded that the policy "work[s] for 98% or more of voters to whom it applies—minority and non-minority alike."[8] *Id.*

The miniscule number of individuals flagged by the process likewise demonstrates there is no disparity. But even when comparing the racial information of individuals on the pending-citizenship list to individuals who have been naturalized, there is almost no disparity. Barber Report, p. 24.

Fourth, the *Brnovich* Court instructed federal courts to "consider the opportunities provided by a State's *entire* system of voting when assessing

---

[8] The Court also opined on how the "use of statistics [can be] highly misleading." *Brnovich*, 141 S. Ct. at 2345. For example, "if 99.9% of whites had photo IDs, and 99.7% of blacks did, it could be said that blacks are three times more likely as whites to lack qualifying ID (0.3 ÷ 0.1 = 3), but such a statement would mask the fact that the populations were effectively identical."*Id.* (quoting *Frank v. Walker*, 768 F.3d 744, 752, n. 3 (7th Cir. 2014)) (internal quotation marks omitted). This is just the kind of misleading statistics Plaintiffs use in their TAC. *See, e.g.*, [Doc. 88, ¶¶ 12, 45, 64-67].

the burden imposed by a challenged provision." *Id.* at 2339 (emphasis added). In other words, "where a State provides multiple ways to vote," any burden imposed by one of those available methods "cannot be evaluated without also taking into account the other available means." *Id.* Not only does Georgia provide multiple opportunities to register to vote and vote, there are multiple opportunities for registrants to also provide proof of citizenship if required to do so and opportunities to vote provisional ballots if needed.

Finally, "the strength of a state's interests served by a challenged voting rule" must also be taken into account. *Id.* The *Brnovich* majority reaffirmed that the prevention of fraud is a "strong and entirely legitimate state interest." *Id.* at 2340. And, "it should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Id.* at 2348. In other words, proactive steps are permissible. Georgia has a "strong and entirely legitimate state interest[s]" in complying with federal law, maintaining the accuracy of the voter registration list, and preventing fraud in the registration process. *Id.* at 2340. The citizenship-verification process ensures that non-eligible individuals do not vote in Georgia. And even Plaintiffs' expert agreed that the lack of non-citizens voting in Georgia may mean the process is working properly. Deposition of Michael McDonald [Doc. 135] at 46:18-47:3.

20

Based on the guideposts outlined in *Brnovich* and the evidence in this case, Plaintiffs cannot demonstrate that the citizenship-verification process renders Georgia's election system unequally open. Accordingly, Plaintiffs' Section 2 claim challenging the proactive requirement of proof of citizenship must be rejected and the Secretary is entitled to judgment as a matter of law.

## III.    Plaintiffs' Equal Protection claim has no merit (Count II).

In Count II, Plaintiffs raise an Equal Protection claim, asserting that the proof of citizenship requirement discriminates on the basis of national origin and is presumptively unconstitutional. [Doc. 88, ¶¶ 101-107]. Plaintiffs claim that the citizenship-verification process is designed to burden naturalized citizens, claiming that the process "singles out voters that *at some point* were not U.S. citizens." *Id.* at ¶ 105 (emphasis in original).

As an initial matter, this Court cannot apply an analysis separate from that of the fundamental-right-to-vote claim discussed below. The Eleventh Circuit has made clear that "we must evaluate laws that burden voting rights using the approach of *Anderson* and *Burdick*, which requires us to weigh the burden imposed by the law against the state interests justifying the law." *Jacobson*, 974 F.3d at 1261; *accord New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020). As discussed below, the state's compelling interests in ensuring only eligible voters vote more than justifies the slight

21

burden placed on voters who previously provided proof they were *not* citizens.

But if this Court applies an equal-protection analysis separate from *Anderson/Burdick*, Plaintiffs must show more than a disproportionate effect on voters of color—they must also show evidence of discriminatory *intent. See, e.g.*, *Rogers v. Lodge*, 458 U.S. 613, 618 (1982); see also *Dem. Exec. Comm. v. Lee*, 915 F.3d 1312, 1319, n.9 (11th Cir. 2019) (requiring animus for non-*Anderson-Burdick* claims). Intent can be shown if the policy or action is "unexplainable on grounds other than race." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). That is not the case here.

As demonstrated above, the citizenship-verification requirement applies equally to all registrants who have driver's licenses or state IDs. Plaintiffs have produced no evidence that the match protocol does anything more than requiring non-citizens who had Georgia driver's licenses to provide the same information that citizens who have Georgia driver's licenses have already provided—proof of citizenship. Further, Dr. McCrary conspicuously avoided any testimony that there was any racial intent behind the process. Deposition of Peyton McCrary [Doc. 136] at 29:11-19. Plaintiffs have not carried their burden to show discriminatory intent because they cannot. The Secretary is entitled to judgment as a matter of law on this count.

**IV.    The State's interests more than justify any burden on the right to vote, dooming Plaintiffs' fundamental right to vote claim (Count III).**

Plaintiffs next attempt a fundamental right to vote challenge to the citizenship verification process. Challenges to election practices weigh the alleged burden on the right to vote against the interests of government. *See Anderson*, 460 U.S. at 789. "Regulations imposing severe burdens on the plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a state's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick*, 504 U.S. at 434). Lesser burdens impose no burden of proof or evidentiary showing on states. *See Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009). To establish the requisite severe burden in voting cases under *Anderson/Burdick*, one must show that the burden imposed was a direct result of a State's laws and policies, not "arising from life's vagaries." *Crawford*, 553 U.S. at 197-98.

The citizenship-verification process imposes only reasonable and nondiscriminatory burdens on voters. Every Georgia voter who has a driver's license or state ID card is subject to the same requirements, because every Georgia voter who has a driver's license or state ID card must show proof of

23

citizenship prior to being found eligible to vote.[9] Barber Report, p. 4. And Georgia has a "strong and entirely legitimate state interest" in preventing voter fraud, including the ability to "prevent election fraud without waiting for it to occur." *Brnovich*, 141 S. Ct. at 2340, 2348. This is especially true when dealing with new registrants who previously provided documentary proof they were *not* citizens. The Secretary is entitled to judgment as a matter of law on Count III because the Plaintiffs cannot carry their burden on this count.

**V.    Plaintiffs' NVRA claim fails because individuals who are pending citizenship are still registered to vote (Count IV).**

Finally, Plaintiffs claim that the citizenship process violates the NVRA because it "denies or delays active voter registration to qualified Georgia voter registration applicants." [Doc. 88, ¶ 121]. But the evidence in this case makes clear that voters who are flagged by the citizenship-verification process are still registered to vote—they just have to present valid proof of citizenship, which will many times be the same identification (a non-limited term Georgia driver's license) that almost every other Georgia voter shows prior to voting. Harvey Dep. at 141:17-142:18. If a voter flagged by the citizenship-verification process presents a valid, non-limited-term Georgia driver's license, he or she may not

---

[9] Federal and state law require that applicants who have a Georgia driver's license or a state ID card include the number of that card on their application when they register to vote. 52 U.S.C. § 21083(a)(5); O.C.G.A. § 21-2-220.1

even be aware that they were in pending citizenship status. *Id*. Further, HAVA requires a match to the DDS database for new voters, and it is not unreasonable for the state to confirm the citizenship status of the small number of individuals who previously provided documentary proof that they were *not* citizens. Finally, the NVRA has no requirements related to the status of voters in the database—only that the individual is "registered to vote in an election," 52 U.S.C. § 20507(a)(1). It does not violate the NVRA to require voters to show a photo identification before voting and it likewise does not violate the NVRA for voters who provided proof they were not citizens to show proof of citizenship before voting.

## CONCLUSION

Now that discovery is complete, Plaintiffs cannot sustain their challenge to a reasonable, nondiscriminatory election process. The only voters flagged by the citizenship-verification process are those who previously provided documentary proof that they were not citizens when they received their limited-term licenses or state ID cards. Requiring those voters to provide proof of citizenship—like every other voter with a Georgia driver's license or state ID card is required to do—is not discriminatory and does not burden the right to vote. This Court should grant judgment as a matter of law to the Secretary and dismiss this case.

25

Respectfully submitted this 8th day of September, 2021.

**STATE LAW DEPARTMENT**

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
State Law Department
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**TAYLOR ENGLISH DUMA LLP**
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249

*Counsel for Defendant Secretary of State Brad Raffensperger*

26

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

/s/ *Bryan P. Tyson*
Bryan P. Tyson