**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC., *et al.*, | |
| *Plaintiffs,* | CIVIL ACTION |
| v. | FILE NO. 1:18-CV-04727-ELR |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State for the State of Georgia | |
| *Defendant.* | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
<u>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND .................................................................................................2

    I.    Proof of Citizenship Requirements for Georgia Voters........................2

    II.   Defendant Continues Applying Georgia's Citizenship Matching Protocol Despite Its Being Discriminatory and Ineffective. ................5

ARGUMENT.........................................................................................................6

    I.    Plaintiffs Have Standing to Bring Their Claims. .................................7

        A.    The Plaintiff Organizations Have Standing to Sue.....................7

        B.    Plaintiff Judith Martinez Cruz Has Standing............................11

    II.   Georgia's Citizenship Matching Protocol Violates Equal Protection (Count II). ........................................................................12

        A.    Georgia's Citizenship Matching Protocol Discriminates Based on National Origin. ........................................................12

        B.    The Citizenship Matching Protocol Fails Strict Scrutiny. ........19

    III.   Georgia's Citizenship Match Protocol Unduly Burdens the Fundamental Right to Vote (Count III)...............................................20

        A.    The Citizenship Matching Protocol Imposes a Severe and Discriminatory Burden on Naturalized Citizens.......................21

        B.    The State Interest Does Not Justify the Burdens Imposed by the Citizenship Matching Protocol. ....................................26

    IV.   Georgia's Citizenship Matching Protocol Causes Discriminatory Results in Violation of Section 2 of the Voting Rights Act (Count I)..........................................................................27

A. Material Disputes of Fact Relevant to Section 2's Totality of Circumstances Inquiry Preclude Summary Judgment. .................................................................................28

B. Even Applying *Brnovich*'s "Guideposts," Material Disputes of Fact Preclude Summary Judgment. .......................30

V. Georgia's Citizenship Matching Protocol Violates the NVRA (Count IV) ...................................................................................33

CONCLUSION ............................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze*, 460 U.S. 780 (1983)..................................................20, 26

*Arcia v. Fla. Sec'y of State*, 772 F.3d 1335 (11th Cir. 2014) .............................7, 10

*Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1 (2013)...............................33

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019) ..................................................33

*Boustani v. Blackwell*, 460 F. Supp. 2d 822 (N.D. Ohio 2006)........................12, 16

*Brnovich v. Democratic National Committee,* 141 S. Ct. 2321 (2021).......28, 29, 30

*Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472 (1991) .................18

*Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349 (11th
Cir. 2005).......................................................................................................11, 12

*Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259 (D. Colo.
2010).......................................................................................................................34

*Common Cause Ind. v. Lawson*, 937 F.3d 944 (7th Cir. 2019) ..............................10

*Common Cause/Ga. v. Billups*, 554 F.3d 1340 (11th Cir. 2009).................10, 11, 12

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008)..................................7

*Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir.
2019)................................................................................................................20, 26

*Dunn v. Blumstein*, 405 U.S. 330 (1972).................................................................19

*Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251 (N.D.
Ga. 2019) ...............................................................................................................10

*Fish v. Kobach,* 189 F. Supp. 3d 1107 (D. Kan 2016) ............................................26

*Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020)................................22, 26

*Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153
    (11th Cir. 2008) ................................................................9, 19

*Georgia Ass'n of Latino Elected Officials, Inc. v. Gwinnett County
    Board of Registrations and Elections*, 499 F. Supp. 3d 1231 (N.D.
    Ga. 2020), *appeal argued*, No. 20-14540 (11th Cir. Sept. 24, 2021)................10

*Gill v. Scholz*, 962 F.3d 360 (7th Cir. 2020)........................................20

*Graham v. Richardson*, 403 U.S. 365 (1971)....................................12, 13

*Hunt v. Cromartie*, 526 U.S. 541 (1999)..........................................14, 17

*I.L. v. Alabama*, 739 F.3d 1273 (11th Cir. 2014) ...................................18

*Johnson v. DeGrandy,* 512 U.S. 997 (1994) .........................................29

*Johnson v. Miller*, 864 F. Supp. 1354 (S.D. Ga. 1994), *aff'd and
    remanded*, 515 U.S. 900 (1995) .........................................................5

*Kalra v. Minnesota*, 580 F. Supp. 971 (D. Minn. 1983).........................16

*Kramer v. Union Free School Dist. No. 15*, 395 U.S. 621 (1969) ...........14

*Lane v. Wilson*, 307 U.S. 268 (1939)..................................................16

*League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d
    1205 (N.D. Fla. 2018) ........................................................20

*Libertarian Party of NM v. Herrera*, 506 F.3d 1303 (10th Cir. 2007)....................21

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...............................7

*Schneider v. Rusk*, 377 U.S. 163 (1964).............................................12

*Tex. League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-
    074-FB, 2019 WL 7938511 (W.D. Tex. Feb. 27, 2019) ...................................17

*Texas Low Income Housing Information Service v. Carson*, 427 F.
    Supp. 3d 43 (D.D.C. 2019)..................................................11

iv

*Thomas v. Howze*, 348 F. App'x. 474 (11th Cir. 2009)..............................................19

*Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986)....................................................29

*U.S. Student Ass'n Found. v. Land*, 546 F.3d 373 (6th Cir. 2008)........................34

*United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012)..........................17

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ........................................................................................................................18

*Washington v. Davis,* 426 U.S. 229 (1976) ...............................................................14

**Constitutional Provisions**

First Amendment ..........................................................................................................20

Fourteenth Amendment ................................................................................................20

U.S. Constitution ..........................................................................................................35

**Statutes and Rules**

52 U.S.C. § 10301(b)...............................................................................................28, 29

52 U.S.C. § 20501 ........................................................................................................34

52 U.S.C. § 20507(a)(1) ..............................................................................................33

52 U.S.C. § 20507(b)(1) ..............................................................................................35

52 U.S.C. § 20508(b)(1) ..............................................................................................33

52 U.S.C. § 21083(a)(5)(B)(i) .......................................................................................3

52 U.S.C. §§ 21084-21085 ............................................................................................3

Fed. R. Civ. P. 56(c) ......................................................................................................6

Ga. Code Ann. § 21-2-216(a) ........................................................................................2

Ga. Code Ann. § 21-2-216(g).........................................................................................3

Help America Vote Act of 2002 ("HAVA") ............................................................3

National Voter Registration Act ("NVRA") ................................................. *passim*

§ 2 of the Voting Rights Act.......................................................................... *passim*

# PRELIMINARY STATEMENT

This case challenges Defendant Raffensperger's imposition of a documentary proof of citizenship ("DPOC") requirement for voter registration solely on certain eligible naturalized citizens. Georgia, like every other state, allows individuals to register to vote by affirming their citizenship. It does not, in general, require DPOC to register. However, Defendant Raffensperger's citizenship matching protocol systematically targets naturalized citizens by matching voter registration data with Georgia Department of Driver's Services ("DDS") data and placing all registration applicants who were not citizens at the time they received their driver's license into a registration limbo—"pending" status—until they provide DPOC.

Defendant is well aware that this protocol relies on stale data and imposes additional burdens on naturalized citizens (who are also disproportionately voters of color). At the same time, Defendant is unaware of the protocol successfully addressing any problem of noncitizen voting fraud. If designed to address fraud, it is designed to fail. But it is remarkably well-designed to disproportionately burden immigrant voters of color. For this reason, other states that have adopted similar programs have been quickly forced to abandon them. Georgia must do the same.

Plaintiffs have established, at minimum, disputed material facts relevant to both their standing and each of their claims: violations of Equal Protection, the Right

to Vote, Section 2 of the Voting Rights Act ("VRA"), and the National Voter Registration Act ("NVRA"). Defendant's cursory motion for summary judgment ignores these material facts—and this Court's prior findings at the preliminary judgment stage—and instead bases its reasoning on the false (or at least disputed) contention that the DPOC requirement applies to all voters evenly, disputed allegations regarding the extent of the burden and relevant state interests, and cramped readings of both the VRA and NVRA. As discussed more fully below, Defendant Raffensperger has failed to demonstrate that he is entitled to summary judgment as a matter of law with respect to this pernicious, discriminatory policy and his motion should be denied in its entirety.

## BACKGROUND

### I. Proof of Citizenship Requirements for Georgia Voters

In Georgia, as in every state, an applicant must be a U.S. citizen to successfully register to vote. Ga. Code Ann. § 21-2-216(a). Every Georgia applicant, no matter their method of application, must swear or affirm under penalty of perjury that they are a citizen as a part of their registration. Dep. of Chris Harvey ("Harvey Dep.") 61:16-62:3, ECF 131. There is no statewide requirement for applicants to submit any DPOC with their registration application, *id.* at 49:16-50:11, 53:7-23, 60:10-62:9, despite Defendant's assertion to the contrary. *See* Br. in Supp. of Def.'s

2

Mot. for Summ. J. ("MSJ Br."), ECF 142-1 at 1 (citing Ga. Code Ann. § 21-2-216(g), which is unenforced).

While many citizens who obtain a driver's license (a process that entails providing proof of citizenship or lawful residence) choose to simultaneously register to vote, voter registration itself does not require provide proof of citizenship. Harvey Dep. 59:13-19, 61:16-62:9. For native-born citizens, their affirmation of citizenship on their registration application suffices. *Id*. 61:16-62:9, 49:16-50:11. The same cannot be said, however, for naturalized citizens because of Georgia's citizenship matching protocol, a vestige of the state's now-defunct "exact match" policy. Harvey Dep. 267:5-22; Harvey Dep. Ex. 27, ECF 131 at 700-01.

Pursuant to the Help America Vote Act of 2002 ("HAVA"), applicants who provide a Georgia driver's license number—as the registration form directs them to do if they have one—have their identifying information transmitted to DDS and the agency attempts to identify a matching record in its own database. Harvey Dep. 85:15-87:3; Dep. of Angelique McClendon ("McClendon Dep.") 55:6-58:6, ECF 132; McClendon Dep. Ex. P-5, ECF 132 at 240-41. HAVA requires this to verify the identity of the voter, 52 U.S.C. § 21083(a)(5)(B)(i); *see* Harvey Dep. 42:4-16, not to establish applicants' citizenship or qualifications to vote. *See*, *e.g.*, 52 U.S.C. §§ 21084-21085.

DDS citizenship records are based upon information provided to DDS at the time of obtaining a Georgia driver's license, and they are therefore out of date for any naturalized citizen who last interacted with DDS prior to their naturalization. McClendon Dep. 123:17-124:23. Because thousands of Georgians naturalize each year, limited term licenses need only be renewed every five years, and renewal requires an in-person visit and payment of a fee, DDS has outdated citizenship data for thousands of eligible citizens. McClendon Dep. 79:8-19, 90:19-91:11, 103:5-15, 123:24-124:1; McDonald Dep. Ex. 1 ("McDonald Decl."), ECF 135 at 265. Any applicant flagged by DDS as a noncitizen based on these stale records has their application placed into a "pending" status and is not registered to vote without taking more steps. *See* Dep. of Twyla Hart ("Hart Dep.") 27:15-23, 123:3-9, 171:4-15, ECF 149. Native-born citizens are not placed in pending status because their DDS records do not reflect that they were previously noncitizens. *See* Harvey Dep. 49:16-50:11.

Naturalized citizens placed in pending status are then forced to complete their registration by submitting additional DPOC to their election office, Hart Dep. 123:3-9, or bringing such proof with them to the polling place, in addition to the standard voter ID that is required to vote in Georgia. Dep. of LaTasha Howard ("Howard Dep.") 36:15-37:7, ECF 148; Harvey Dep. 138:11-139:13. Even naturalized citizens who submit additional proof of citizenship along with their registration applications

often have it overlooked, improperly entered into ENet, or preempted by inaccurate DDS information, requiring the voters to re-submit the documentation or cast a provisional ballot. Hart Dep. 164:10-165:10; Howard Dep. 30:22-31:3; McDonald Decl., ECF 135 at 250, 261-64.

## II. Defendant Continues Applying Georgia's Citizenship Matching Protocol Despite Its Being Discriminatory and Ineffective.

The State's citizenship matching protocol only requires additional DPOC from naturalized citizens. Harvey Dep. 49:16-50:11. Naturalized citizen applicants flagged as requiring DPOC and put into "pending" status until it is provided are overwhelmingly applicants of color compared to non-Hispanic white applicants. Dr. Michael McDonald, an expert in U.S. election data analysis and election administration, found the breakdown of applicants in "pending" status to be 26.9% Asian American Pacific Islander ("AAPI"), 19.1% Hispanic, 28.9% Black, and 13.7% Non-Hispanic White. McDonald Decl. ECF 135 at 268. Georgia's citizenship matching protocol is the latest chapter in a long and well-documented history of voting-related discrimination in Georgia. *See, e.g.*, *Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) ("[W]e have given formal judicial notice of [Georgia's] past discrimination in voting, and have acknowledged it in the recent cases."); Am. Decl. of Dr. Peyton McCrary ("McCrary Decl."), ECF 136-6 at 84-90.

While there is significant evidence of naturalized citizens of color being improperly flagged as noncitizens and prevented from successfully registering, there is no evidence of the citizenship matching protocol spurring an investigation or finding that a noncitizen attempted to register to vote. Harvey Dep. 190:5-15.

Defendant acknowledges the DDS database is "certainly outdated" with respect to citizenship, Harvey Dep. 193:24-194:6, and that the citizenship matching protocol operates in a way that guarantees naturalized citizens will be inaccurately flagged as noncitizens, *id.* 213:12-214:3, 214:18-215:6. Defendant is also aware of other possible methods "to . . . double check the status of pending citizenship status," *id.* 153:19-154:9, 156:20-157:8, but has taken no action to mitigate the citizenship matching protocol's discriminatory impact on the ability of qualified naturalized citizens to complete the voter registration process, *id.* 149:23-150:5.

## ARGUMENT

Summary judgment is appropriate only when, drawing the inferences from the evidence most favorably to the non-movant, the pleadings, depositions, and affidavits submitted by the parties show no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Defendant has utterly failed to establish, beyond any factual dispute, that it is entitled to judgment as a matter of law on any of Plaintiffs' claims.

## I. Plaintiffs Have Standing to Bring Their Claims.

The "constitutional minimum of standing contains three elements:" that (i) the plaintiff "suffered an injury in fact" (ii) that is "fairly traceable to the challenged action of the defendant" and (iii) "likely" to "be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations omitted). Although Plaintiffs need prove the standing of only one plaintiff for this case to proceed, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189 n.7 (2008), the record easily establishes the standing of all of them.

### A. The Plaintiff Organizations Have Standing to Sue.

Defendant challenges the standing of organizational plaintiffs by alleging they cannot prove "injury-in-fact." MSJ Br. at 7-14. In so arguing, Defendant ignores this Court's previous finding of organizational standing at the preliminary injunction stage, and evidence supporting it, because all the organization plaintiffs "have to divert personnel and resources to . . . assist those who have been flagged and placed into pending status, including helping to resolve issues surrounding citizenship before Election Day." Prelim. Inj. Order ("PI Order"), ECF 33 at 9. The controlling authority in this Circuit finds the requisite injury when the challenged practice "impair[s] the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia v. Fla. Sec'y of State*, 772 F.3d

1335, 1341 (11th Cir. 2014). The Eleventh Circuit has further held that arguments that an organization's "purely discretionary budgetary allocations," MSJ Br. at 12, cannot constitute injury-in-fact "find[] no support in the law, and . . . miss[] the point." *Fla. State Conference of NAACP v. Browning*, 552 F.3d 1153, 1166 (11th Cir. 2008). "Costs unrelated to the legal challenge," such as organization plaintiffs', "do qualify as an injury, whether they are voluntarily incurred or not." *Id.*

Organizational plaintiff ProGeorgia "coordinate[s]" "voter registration activities" at "naturalization ceremonies" and "provide[s] [the] tools and resources necessary for [its] partners to do that work properly and successfully." Dep. of Tamieka Atkins ("Atkins Dep.") 31:18-25, ECF 140. Because of the citizenship matching protocol, ProGeorgia makes "a color copy" of the registrant's naturalization certificate "to include in their voter registration application[] to make sure they're not flagged incorrectly as a noncitizen." *Id.* 36:22-37:1. This additional step is only necessary to register naturalized citizens because of the protocol and it increases the amount of money (*e.g.*, costs of the "printers," "toner," "ink," and "paper," and staff time) that ProGeorgia must expend to register voters at naturalization ceremonies. *Id.* 33:12-25, 38:10-39:6. As was the case for the *Browning* plaintiffs, ProGeorgia's "diversion of personnel and time to help voters resolve [citizenship] matching problems effectively counteracts what would

otherwise be [the Citizenship Matching Protocol]'s negation of the organization's efforts to register voters." 522 F.3d at 1166. Plaintiffs have standing where "the net effect [of the law] is that the average cost of registering each voter increases, and because plaintiffs cannot bring to bear limitless resources, their noneconomic goals . . . suffer." *Id.*

Defendant's arguments that the other plaintiff organizations suffered no injury are similarly meritless. MSJ Br. at 13-14. The evidence shows that plaintiffs GALEO, Advancing Justice – Atlanta, People's Agenda, New Georgia Project, and Common Cause are each forced to divert resources from their general voter engagement activities to educate and assist voters affected by the citizenship matching protocol. *See, e.g.*, Dep. of Gerardo Gonzalez ("Gonzalez Dep.") 28:12-21, 37:15-38:13, 76:22-77:9, ECF 133 (GALEO); Dep. of Stephanie Cho ("Cho Dep.") 37:20-39:17, 45:21-46:11, 48:8-21, ECF 141 (Advancing Justice – Atlanta); Dep. of Helen ("Butler Dep.") 53:14-54:2, 56:6-57:8, ECF 138 (People's Agenda); Dep. of Nse Ufot ("Ufot Dep.") 36:7-37:5, 61:22-62:23, 63:5-8, 79:3-8, ECF 139 (New Georgia Project); Dep. of Sara Henderson ("Henderson Dep.") 5:15-46:13, 51:9-18, 52:3-13, ECF 137 (Common Cause).

"[Eleventh Circuit] precedent provides that organizations can establish standing to challenge election laws by showing that they will have to divert

9

[resources] on compliance with the laws and assisting voters who might be left off the registration rolls on Election Day." *Arcia*, 772 F.3d at 1341. That registering voters is part of organizational plaintiffs' "longstanding organizational mission[s]," MSJ Br. at 12, does not negate their standing. *See*, *e.g.*, *Arcia*, 772 F.3d at 1341 (finding "all three of the organizational plaintiffs" had standing because they had "missions that include[d] voter registration and education, or encouraging and safeguarding voters rights, and that they had diverted resources to address the [state's] programs"); *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (finding standing where "the record reflect[ed] that the NAACP [was] actively involved in voting activities and would divert resources from its regular activities to educate and assist voters in complying with the [voting] statute" at issue); *see also Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1267 (N.D. Ga. 2019). Indeed, it is hard to imagine why organizational plaintiffs "would undertake [this] additional work if that work had nothing to do with [their] mission." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 955 (7th Cir. 2019) ("[I]t would be an inside-out world indeed if organizations had standing to assert only interests that they shared with the general public.").[1]

---

[1] Defendant's reliance on *Georgia Ass'n of Latino Elected Officials, Inc. v. Gwinnett County Board of Registrations and Elections*, 499 F. Supp. 3d 1231 (N.D. Ga. 2020),

**B.      Plaintiff Judith Martinez Cruz Has Standing.**

Defendant's argument that plaintiff Judith Martinez Cruz lacks standing misunderstands the nature of her injury. Ms. Cruz is injured by the citizenship matching protocol's unlawful requirement that she show proof of citizenship before voting—not just the way it was applied by a local election official on a particular occasion. *See, e.g.*, *Billups*, 554 F.3d at 1351-52 ("Requiring a registered voter . . . to produce photo identification to vote . . . is an injury sufficient for standing."); Dep. of Judith Martinez Cruz ("Cruz Dep.") 44:3-45:22, ECF 134 (describing how Defendant's protocol required Ms. Cruz to make an extra trip home to retrieve her passport to vote in 2020). "To establish causation" for standing purposes, "a plaintiff need only demonstrate, as a matter of *fact*, a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) (internal

---

*appeal argued*, No. 20-14540 (11th Cir. Sept. 24, 2021) ("*GALEO*") and *Texas Low Income Housing Information Service v. Carson*, 427 F. Supp. 3d 43 (D.D.C. 2019) is misplaced in light of controlling Eleventh Circuit precedent. *GALEO* is currently on appeal to the Eleventh Circuit. And unlike the organizational plaintiffs here, the plaintiff in *Carson* lacked standing because it asserted only injuries "to its overall 'mission,'" not that the defendant's action "ha[d] directly impeded its ability to engage in" its normal activities. 427 F. Supp. 3d at 54.

quotation omitted). The injury Ms. Cruz suffered when, because of the protocol, she

was required to produce DPOC to vote is "fairly traceable" to Defendant.[2]

## II. Georgia's Citizenship Matching Protocol Violates Equal Protection (Count II).

Georgia's citizenship matching protocol discriminates, by design, against

naturalized citizens based on their national origin and fails any applicable standard

of review. At minimum, Plaintiffs have demonstrated material disputed facts in

support of this claim, precluding summary judgment.

### A. Georgia's Citizenship Matching Protocol Discriminates Based on National Origin.

The Equal Protection Clause guarantees "the rights of citizenship of the native

born and of the naturalized person are of the same dignity and are coextensive."

*Schneider v. Rusk*, 377 U.S. 163, 165 (1964). Discrimination based on naturalized

citizenship and national origin is presumptively unconstitutional and subject to strict

scrutiny. *Graham v. Richardson*, 403 U.S. 365, 372 (1971) (finding such

classifications to be "inherently suspect"); *Boustani v. Blackwell*, 460 F. Supp. 2d

---

[2] That "Ms. Cruz was able to vote in the election in question," MSJ Br. at 14, is immaterial. It is well established that "[a] plaintiff need not have the franchise wholly denied to suffer injury." *Cox*, 408 F.3d at 1352. Just as the "inability of a voter to pay a poll tax . . . is not required to challenge a statute that imposes a tax on voting," *Billups*, 554 F.3d at 1352, a voter need not lack acceptable proof of citizenship to challenge the citizenship matching protocol.

822, 825 (N.D. Ohio 2006) (finding that a law that "discriminate[d] against naturalized citizens" constituted "discriminat[ion] based on national origin"). Because Defendant's citizenship matching protocol targets naturalized citizens with additional burdens not imposed on native-born citizens, it can stand only if it can survive strict scrutiny. It does not, and Defendant does not even attempt to justify the protocol under strict scrutiny or any heightened scrutiny.

*First,* Defendant argues that this Court cannot apply the applicable national origin discrimination doctrine in right to vote cases but instead must apply the *Anderson-Burdick* framework. MSJ Br. at 21. This is wrong. The proper standard for Equal Protection claims concerning discrimination against protected classes is strict scrutiny, regardless of whether the discrimination is in voting or otherwise. *Graham*, 403 U.S. at 371-72 ("[T]he Court's decisions have established that classifications based on alienage, like those based on nationality or race, are . . . subject to close judicial scrutiny." (footnotes omitted)). The *Anderson-Burdick* framework applies to cases about burdens on the fundamental right to vote, whether or not those burdens are imposed on a suspect class. But just as this Court would apply strict scrutiny to a voting regulation that classified voters based on race, it must do so too when a voting regulation classifies voters based on national origin and naturalized citizenship. *Kramer v. Union Free School Dist. No. 15*, 395 U.S. 621,

626, 628 n.9 (1969) ("Of course, we have long held that if the basis of classification is inherently suspect, such as race, the statute must be subjected to an exacting scrutiny, regardless of the subject matter of the legislation.").

*Second,* Defendant argues that to prevail on this claim Plaintiffs must show evidence of discriminatory intent. MSJ Br. at 22. However, because the citizenship matching protocol is not neutral in its design or application, Plaintiffs need not show discriminatory intent.[3] *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (explicit classifications based on protected class do not require an "inquiry into legislative purpose"); *Washington v. Davis,* 426 U.S. 229, 241-42 (1976) (requiring a discriminatory purpose analysis only when the statute is "neutral on its face").

Defendant attempts to frame the citizenship matching protocol as facially neutral by arguing that it "applies equally to all registrants who have driver's licenses or state IDs." MSJ Br. 22. But Georgia does not require DPOC from all voter registrants. McDonald Decl., ECF 135 at 253-57; Harvey Dep. 49:16-50:11, 61:16-62:9, 76:15-79:9, 82:20-83:21. While many native-born citizens provide proof of citizenship to obtain a drivers' license and may *choose* to register to vote

---

[3] Contrary to Defendant's characterization, Plaintiffs' equal protection claim is based on national origin and naturalized citizenship status, Pls.' Third Am. Compl. ¶ 107, ECF 88, not "a disproportionate effect on voters of color." MSJ Br. at 22.

simultaneously, they are *not required* to provide proof of citizenship to register to vote. Harvey Dep. 59:13-19, 61:16-62:9. Rather, whether they have a driver's license or not, native-born voters can simply check a box on their registration form affirming citizenship, *id.*; Harvey Dep. Ex. 9, ECF 131 at 344, and they will not be asked to provide any DPOC to election officials, Harvey Dep. 49:16-50:11; McDonald Decl., ECF 135 at 256-57. Meanwhile, in addition to submitting the standard voter registration form that native-born citizens submit, naturalized citizens are forced to clear an extra hurdle to complete their registration by submitting DPOC to their election office, Harvey Dep. 128:19-24, 130:3-14, or bringing such proof with them to the polling place, in addition to the standard voter ID required in Georgia, Howard Dep. 36:15-37:7, ECF 148; Harvey Dep. 138:11-139:13.[4]

Defendant cannot deny that, *by design,* the State requires only naturalized citizens to provide DPOC to election officials under this protocol. Rather than a

---

[4] Unfortunately, even submitting DPOC along with the registration application can be insufficient for naturalized citizens to be able to vote, as such documentation is often overlooked, not properly entered into ENet, or preempted by inaccurate DDS information, requiring the voter to re-submit the documentation or cast a provisional ballot. McDonald Decl., ECF 135 at 250; Hart Dep. 164:10-165:10, 168:12-20, ECF 149; Harvey Dep. 138:2-143:5, 227:23-228:5; Howard Dep. 30:22-31:3. Moreover, absent this Court's preliminary injunction, Defendant would needlessly require these citizens to present that proof to deputy registrars rather than poll managers or workers, making the process even more burdensome. PI Order at 16-17, 28, 35.

glitch, this is a feature of Defendant's reliance on stale DDS citizenship data: any naturalized citizen who obtained a Georgia driver's license prior to naturalization—and thus for whom DDS therefore has out-of-date citizenship records—will have their active registration blocked. Hart Dep. 52:4-12; 98:6-99:2; Harvey Dep. 194:2-6, 213:8-214:23. Thus, the challenged citizenship matching protocol is not a neutrally applicable law with mere disparate results. It is triggered *only* by the registration of naturalized citizens. Indeed, Defendant admits that the protocol addresses "individuals who previously provided documentary proof that they were not citizens," in other words: people born outside the United States. MSJ Br. at 26 (emphasis omitted). The law thus "effectively . . . classifies applicants . . . on the basis of" national origin and naturalized citizenship. *Kalra v. Minnesota*, 580 F. Supp. 971, 973 (D. Minn. 1983). Just as grandfather clauses by design targeted Black voters without mentioning race, this protocol's design surgically targets naturalized citizens. *See Lane v. Wilson*, 307 U.S. 268, 275 (1939) (holding the Constitution "nullifies sophisticated as well as simple-minded modes of discrimination").

Other states that have attempted similarly discriminatory DPOC requirements have failed. In *Boustani*, the court struck portions of an Ohio statute that, as part of the voter challenge process, required naturalized citizens—but not native-born citizens—to show DPOC in order to vote a regular ballot. 460 F. Supp. 2d at 825

(finding the provisions "target[ed] naturalized citizens for differential treatment; facially discriminate[d] against one group of citizens with regard to their right to vote; and cast them as 'second-class citizens'"). Both Texas and Florida were forced to abandon citizenship matching protocols nearly identical to Georgia's protocol because they failed to identify unlawful voters but rather burdened naturalized voters. *See United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012) ("The Secretary's methodology made it likely that the properly registered citizens who would be required to respond and provide documentation would be primarily newly naturalized citizens. . . . A state cannot properly impose burdensome demands in a discriminatory manner."); *Tex. League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-074-FB, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019) (finding that "perfectly legal naturalized Americans were burdened" by Texas's process and "[n]o native born Americans were subjected to such treatment").

Finally, even if Plaintiffs were required to prove discriminatory intent under these circumstances (they are not), the disputed facts in this case provide ample evidence of discriminatory intent and foreclose summary judgment. *Hunt*, 526 U.S. at 549 (holding that the state's "motivation is itself a factual question"). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as

17

may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Summary judgment is not proper to resolve such questions. *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (1991).

Defendant's office is well aware that the DDS database is "certainly outdated" with respect to citizenship of naturalized citizens, Harvey Dep. 194:2-6, 213:8-214:23. Yet, despite the citizenship matching protocol's inherent inaccuracies, Defendant has decided to maintain it for years. McCrary Decl., ECF 136-6 at 147-48. And while Defendant takes as a given that voter registrants who "previously provided documentary proof they were *not* citizens" should be suspect, MSJ Br. at 25, that assumption itself is discriminatory. Tens of thousands of individuals naturalize in Georgia each year.[5] These registrants, like all other registrants, have affirmed their citizenship under penalty of perjury. *See* Harvey Dep. 61:16-62:3. Defendant provides no explanation as to why their affirmations are less trustworthy. Where there is evidence of a "clear pattern" of disparate impact, as the evidence shows there is here, it can be enough to show discriminatory intent. *I.L. v. Alabama*, 739 F.3d 1273, 1278 (11th Cir. 2014) (quotations omitted).

---

[5] Ex. 7 in Support of Pls.' Resp. to Def. MSJ, "Naturalization Statistics."

**B.  The Citizenship Matching Protocol Fails Strict Scrutiny.**

Defendant cannot contend that the citizenship matching protocol survives strict scrutiny. While preventing voter fraud may be a compelling purpose in the abstract, the State offers no evidence of a widespread problem or the success of the protocol in averting any fraud. Neither Defendant nor any official was able to name a single instance where the protocol correctly identified an ineligible noncitizen attempting to vote. Hart Dep. 242:13-20; Harvey Dep. 190:5-18. Instead, the evidence shows that the protocol frequently and systematically flags eligible naturalized citizens. *See supra*, Section II.A at 15-18.

The citizenship matching protocol is not narrowly tailored to prevent fraud or serve any other compelling interest. *Dunn v. Blumstein*, 405 U.S. 330, 351-52 (1972) (finding that a durational residence requirement was a "classification" that "[was] all too imprecise"); *see also Browning*, 522 F.3d at 1187-88 (11th Cir. 2008) (Barkett, J. concurring in part) (stating that a state law that "den[ied] otherwise eligible voters a chance to have a voice in our democracy" was not narrowly drawn to further a state interest in "preventing voter fraud"). At minimum, whether Georgia's citizenship matching protocol is narrowly tailored to a state interest is an outstanding dispute of material fact, precluding summary judgment. *See Thomas v. Howze*, 348 F. App'x. 474, 478 (11th Cir. 2009).

## III. Georgia's Citizenship Match Protocol Unduly Burdens the Fundamental Right to Vote (Count III).

In addition to facially discriminating against naturalized citizens, Defendant's citizenship matching protocol imposes discriminatory and severe burdens on naturalized citizens' right to vote in violation of the First and Fourteenth amendments.

In assessing constitutional right to vote claims, a court must apply the *Anderson-Burdick* test to "weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule, taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). A higher level of scrutiny applies when the burden on the right is severe or discriminatory. *Id.*; *accord League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018) ("Disparate impact matters under *Anderson-Burdick*."). This inquiry is necessarily fact-intensive and thus rarely ripe for disposition by summary judgment. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (rejecting any "litmus-paper test" for electoral regulations, in favor of a fact-specific analysis); *Gill v. Scholz*, 962 F.3d 360, 364-365 (7th Cir. 2020) ("These cases reject cursory or perfunctory analyses; precedent requires courts to conduct fact-intensive analyses when evaluating state

electoral regulations."); *Libertarian Party of NM v. Herrera*, 506 F.3d 1303, 1308 (10th Cir. 2007) (noting the "highly fact specific inquiry" demanded by the *Anderson-Burdick* test).

Because the citizenship match protocol imposes discriminatory and substantial burdens on naturalized citizens, it can only survive if it is tailored to address an important state interest. Defendant cannot meet this burden. Indeed, this Court has already found that Plaintiffs "have shown a substantial likelihood of success that the burden is severe for those individuals who have been flagged and placed in pending status due to citizenship." PI Order at 22. At minimum, the evidence demonstrates genuine issues of material fact regarding the Plaintiffs' burden and the State's interest, precluding summary judgment.

### A. The Citizenship Matching Protocol Imposes a Severe and Discriminatory Burden on Naturalized Citizens.

Defendant concedes there is a burden on naturalized citizens but incorrectly maintains that the burden is "reasonable and nondiscriminatory." MSJ Br. at 23. But as was explained above, the citizenship matching protocol is discriminatory because it systematically forces naturalized citizens to take additional steps to prove their citizenship that are not required of native-born citizens. And as described below, the burden on affected voters is also substantial. When a DPOC requirement for registration was applied statewide in Kansas, over ten percent of registrations were

suspended or cancelled. *Fish v. Schwab*, 957 F.3d 1105, 1128 (10th Cir. 2020) (affirming finding that Kansas's DPOC requirement imposed an unconstitutional burden on the right to vote). Far from a "usual burden[] of voting," DPOC is not a generally applicable requirement for federal registration anywhere in the country.

To avoid the citizenship matching protocol in the first instance, a naturalized citizen would need to update DDS with their change in citizenship status before registering to vote. But the state does not instruct naturalized citizens to take such action. McClendon Dep. 85:7-87:14; Harvey Dep. 148:6-17; Hart Dep. 51:12-16. And because temporary driver's licenses offered to noncitizens need not be renewed for five years, new citizens rarely think to do so. Harvey Dep. 213:12-18. The process entails traveling to DDS in-person—online renewal is unavailable to individuals who received their license as a noncitizen—and paying an "update fee," which are already burdensome. McClendon Dep. 79:4-19; 84:19-85:4; 103:5-21.

In the likely scenario where the new citizen does not update their information with DDS, they may decide to submit DPOC, often a naturalization certificate, with their voter registration form to ensure their registration is successful. McDonald Decl., ECF 135 at 250. Yet, even when a naturalized applicant takes this additional step (not required of their native-born peers), their proof of citizenship is frequently overlooked, as "the voter registration application has a little pocket in the back that

people can put documentation," and "they may fold it up and jack it down in there and it may get missed." Harvey Dep. 138:2-143:5, 227:23-228:5; *see also* Hart Dep. 164:10-165:16 (discussing thirty-two such instances in DeKalb County alone); *see also* McCrary Decl., ECF 136-6 at 77, 137.[6]

Thus, when a recently naturalized citizen submits a voter registration application—with or without DPOC—their application will regularly be flagged and placed in the purgatory of pending status.[7] The naturalized citizen may be unaware of this status if they fail to receive, read, or understand[8] a notice in the mail requiring them to submit (sometimes for the second or third time) documentary proof of citizenship. If the naturalized citizen does not become aware of their pending status,

---

[6] As this evidence demonstrates, there is a material disputed fact as to whether the "software change" referenced in Defendant's brief, MSJ Br. at 4 n.4, has resolved the repeated failures of registrars to ensure naturalized citizens are not placed in pending status when they have already provided proof of citizenship. While the "only registrants who *should* appear on the pending list for citizenship" after the software change are those who do not submit proof upon application, *id.* (emphasis added), that does not answer the question of who *does* appear on the pending list. McDonald Decl., ECF 135 at 250 (explaining that "[c]hanges to eNet taken in an attempt to remedy this problem have proven to be insufficient").

[7] Defendant claims there is no longer a 26-month deadline for naturalized applicants to submit DPOC, but testimony of county officials suggests the deadline is still applied. Hart Dep. 27:24-29:5; Dep. of Kelvin Williams ("Williams Dep.") 159:11-160:18, ECF 147.

[8] These mailers are distributed only in English (except in Gwinnett County, where they are sent only in English and Spanish). Harvey Dep. 133:17-134:3.

they may be denied a regular ballot at their polling place or when applying to vote by mail. Harvey Dep. 138:5-139:13. At the polling place, at *best*, if they have adequate proof of citizenship with them, the naturalized citizen must wait for a deputy registrar to verify their documents and change their registration status. Or alternatively, if they provided proof ahead of voting, they must wait for a poll official to call the county office to check their file. Howard Dep. 31:3-32: 13. In either event, the process singles out naturalized citizens, adds delays and confusion, and can require multiple trips to the polls. PI Order at 22 ("As shown at least by Mr. Oren's experience, it was not a nominal effort for him to vote; it was a burdensome process requiring two trips to the polls, his own research, and his hunting down a name and telephone number to give to election officials so that his citizenship status could be verified, all after he had already submitted proof of citizenship with his voter registration application."); Cruz Dep. 44:3-45:22; McDonald Decl., ECF 135 at 250.

If there is no response from the county office, the office cannot locate voter's DPOC, the voter does not have DPOC at the polls, or the voter does not have additional time for this process, then the naturalized citizen will be forced to cast a provisional ballot and submit their proof of citizenship before the end of the cure period. Harvey Dep. 138:5-139:13. If the voter cannot locate and transmit appropriate DPOC to their county elections office within that three-day period, then

their vote will not be counted. *See id.* This "burdensome process" is "beyond merely inconvenient." PI Order at 22.[9]

Defendant relies on Defendant's expert Dr. Barber's unsupported claim that the "*same* requirements" are imposed on "[e]very Georgia voter who has a driver's license or state ID card." MSJ Br. at 23 (emphasis added). But, for the reasons discussed above, this is incorrect. At minimum, there is a material dispute of fact concerning the protocol's allegedly neutral application. *See* McDonald Dep. Ex. 4 ("McDonald Rebuttal Decl."), ECF 135 at 334-35; Dep. of Michael Barber 45:18-46:7, ECF 150 (acknowledging a "disagreement of fact" with Dr. McDonald as to the mechanics of the citizenship matching protocol). In any event, the weight of the evidence shows that the "burdensome process" described above—triggered by the error-prone citizenship matching protocol conducted *after* submission of a valid registration application affirming citizenship—falls squarely on new citizens and is not faced by all voters alike. PI Order at 22.

---

[9] Defendant attempts to downplay the impact of these burdens on naturalized citizens by alleging that affected individuals can simply show their documentation to "poll workers" at the time that they vote. MSJ Br. at 7. But this is only true *because* of this Court's preliminary injunction in 2018, which remains in effect. PI Order at 29-30. Defendant cannot rely on the relief this Court ordered in this case to minimize the burdens the protocol would impose absent that relief. Moreover, Defendant ignores the evidence of the remaining burdens like the singling out of affected voters, the requirement that poll managers verify DPOC, and the DPOC requirement itself.

**B.     The State Interest Does Not Justify the Burdens Imposed by the Citizenship Matching Protocol.**

The legitimacy of Defendant's asserted state interest of using its citizenship matching protocol to stop noncitizens from voting is also in dispute, as discussed *supra* with respect to the Equal Protection claim. A valid state interest in the abstract does not outweigh the burden of a state law on voters if the state fails to show that its interest will be impaired without that law. *Lee*, 915 F.3d at 1325-26.[10]

Further, a court "must take into consideration not only the 'legitimacy and strength' of the state's asserted interest, but also 'the extent to which those interests make it necessary to burden' voting rights." *Lee*, 915 F.3d at 1322 (quoting *Anderson*, 460 U.S. at 103) (emphasis removed). Defendant has failed to show that the registration requirement of affirmation of citizenship is insufficient to enforce its voter qualifications. *Fish v. Kobach,* 189 F. Supp. 3d 1107, 1137 (D. Kan 2016) (finding "an attestation along with an applicant's signature under penalty of perjury" was a "less burdensome alternative" to a DPOC requirement); *see also Schwab*, 957 F.3d at 1133 ("[T]he Secretary points to no concrete evidence that '[the state]

---

[10] This Court has already found that Plaintiffs are likely to succeed in showing that the State's insistence on limiting verification of DPOC to poll managers is unfounded. PI Order at 27 ("[R]equiring a deputy registrar to verify proof of citizenship unnecessarily burdens these individuals' right to vote more than necessary.").

interests make it necessary to burden the plaintiff's rights' in this case."). Moreover, Defendant has admitted he is aware of possible alternatives to "double check the status of pending citizenship status," Harvey Dep. 153:19-154:9; 156:20-157:8, but has failed to do so. Thus, Defendant knows that its current process operates in a way that guarantees many naturalized citizens will be inaccurately flagged as noncitizens, *id*.; Harvey Dep. 213:12-214:3, 214:18-215:6, is unaware of any instance where the protocol has prevented fraud, and yet has not adapted its protocol to protect affected eligible citizens.

**IV. Georgia's Citizenship Matching Protocol Causes Discriminatory Results in Violation of Section 2 of the Voting Rights Act (Count I).**

Because Georgia's citizenship matching protocol imposes particular and substantial burdens on immigrant voters not imposed on other Georgians, its application renders the electoral system unequally open to those disproportionately minority voters. As such, it results in the denial or abridgment of the right to vote on account of race or color in violation of Section 2 of the Voting Rights Act. At minimum, there are numerous material disputes of fact relevant to the Section 2 analysis, precluding summary judgment.

## A. Material Disputes of Fact Relevant to Section 2's Totality of Circumstances Inquiry Preclude Summary Judgment.

Section 2 applies to a broad range of voting rules, practices, and procedures and does not require outright denial of the right nor demand proof of discriminatory purpose. *Brnovich v. Democratic Nat'l Comm.,* 141 S. Ct. 2321, 2341 (2021). Here, the central disputes of material fact in this case—whether the citizenship matching protocol uses stale, outdated data to target naturalized citizens (whom are disproportionately citizens of color) for burdens to registration not applied to other Georgians, *see supra*, Background I and II—go to the heart of the "key requirement" of Section 2: "that . . . the process of voting[] must be 'equally open' to minority and non-minority groups alike." *Id.* at 2337. Indeed, as the Supreme Court explained in *Brnovich*, "the most relevant definition of the term 'open,' as used in [Section 2] is 'without restrictions as to who may participate,' or 'requiring no special status, identification, or permit for entry or participation[.]'" *Id.* (internal citations omitted). The citizenship matching protocol renders the ballot box prototypically "not equally open," 52 U.S.C. §10301(b), for naturalized individuals, disproportionately persons of color, and not for other voters.

This feature of the citizenship matching protocol renders Defendant's wholesale reliance on *Brnovich* unavailing. In *Brnovich*, the Court stressed that it was addressing "generally applicable time, place, or manner voting rules." 141 S.

28

Ct. at 2333; *see also id.* at 2340 (discussing "cases involving neutral time, place, and manner rules"). *Brnovich* reviewed laws that applied to all voters in Arizona. *Id.* at 2334-35. Here, as discussed above, the citizenship matching protocol only applies to voters who at some point had a noncitizen driver's license, *i.e.* naturalized citizens.

Further, in determining whether a challenged voting practice violates the "results" prong of Section 2, courts must examine whether, under the totality of the circumstances, voting is not equally open to the applicable minority groups in that their members have less opportunity than others to participate in the political process. 52 U.S.C. §10301(b); *Brnovich*, 141 S. Ct. at 2337-38. "Totality of the circumstances" means that "any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered." *Brnovich*, 141 S. Ct. at 2338. The analysis required by the Supreme Court and Eleventh Circuit in Section 2 claims is fact-driven, making it ill-suited for summary judgment. *See, e.g., Johnson v. DeGrandy,* 512 U.S. 997, 1011 (1994). The totality of the circumstances also includes the interaction between historical discrimination—both in voting and the persistent effects of socio-economic discrimination—and the practice at issue. *See Brnovich*, 141 S. Ct. at 2340; *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986). Defendant's motion ignores these facts entirely, and for that reason alone should be denied.

**B.     Even Applying *Brnovich*'s "Guideposts," Material Disputes of Fact Preclude Summary Judgment.**

Defendant's motion for summary judgment relies almost exclusively on the "guideposts" identified in *Brnovich.* MSJ Br. at 15-21. As an initial matter, this approach is fatally flawed for at least three reasons. *First,* the *Brnovich* Court expressly declined to "announce a test to govern all VRA § 2 claims," and made clear that these guideposts are not exhaustive. *Brnovich*, 141 S. Ct. at 2336, 2338. *Second*, the Court in *Brnovich* was analyzing a record developed during a 10-day trial on the merits, which enabled a full totality of the circumstances inquiry. *Id.* at 2334. *Third,* as discussed above, *Brnovich*'s "guideposts" were designed to address neutral, generally applicable rules. *Id.* at 2336.

Nevertheless, even viewing the record through the prism of these "guideposts," material facts are in dispute.

*Size of the Burden*: As detailed in Section III.A, naturalized citizens face substantial burdens to voting because of the citizenship matching protocol. Far from a "usual burden[] of voting," MSJ Br. at 2, 17, DPOC is not, and may not, be required for federal voter registration anywhere in the country. *See infra* at 33. And Defendant identifies no similar commonplace policy that imposes an additional registration requirement on only a subset of its voters.

This Court has already held that the burdens these voters face in proving their citizenship can be severe. PI Order at 22; *see also supra* Section III.A. And the group saddled with these burdens is composed disproportionately of people of color. McDonald Decl., ECF 135 at 264-79. These facts present a sufficient basis for the need to assess the burden of the challenged process within the totality of the circumstances.

*Deviation From 1982 Voting Practices:* Georgia began matching voter registration data against DDS citizenship data in or around 2008. McCrary Decl., ECF 136-6 at 94. Thus, the state deviated from its 1982 voting practices when it adopted this protocol. Prior to that time, Georgia did not use database matching to verify the citizenship status of voter registration applicants but instead relied upon the voter's affirmation of citizenship, the very method Georgia continues to accept as reliable for native-born voters.

*Disparate Impact:* The size of the disparity between white and non-white voters impacted by the Defendant's citizenship match protocol is striking. McDonald Decl., ECF 135 at 266, tbl.1. This is unsurprising since the protocol's disparate impact is a direct result of its targeting of immigrant communities rather than the incidental result of the interaction of a facially neutral rule and discriminatory social conditions. The citizenship match protocol disparately impacts

Black, Latinx and AAPI voter registration applicants at significantly greater percentages than non-Hispanic white applicants. *Id*. To the extent that Defendant's expert, Dr. Michael Barber, disagrees with Dr. McDonald's report and findings, these disputes cannot be resolved on a motion for summary judgment.

Defendant attempts to minimize these disparities by focusing on the relatively small number of applicants flagged by this system as a percentage of all registrants. MSJ Br. at 19-20. But Defendant uses the wrong denominator. As established above, the citizenship matching protocol by design will *only affect* naturalized citizens. And Dr. McDonald's analysis shows that "a substantial percentage of all Georgians who became naturalized citizens between 2017 and 2019 and attempted to register to vote were incorrectly flagged as potential non-citizens by the database matching process and appeared on a pending list, requiring them to provide additional information to election officials to register to vote." McDonald Rebuttal Decl., ECF 135 at 334-35.

*Entire System of Voting:* U.S. citizen Georgians of color are being denied voter registration and the ability to vote when they are inaccurately flagged as noncitizens by the citizenship matching protocol. Unlike in *Brnovich*, where a voter could avoid the challenged procedures by opting into a different method of voting (such as early voting, vote by mail, or Election Day voting), a voter in pending status cannot cast a ballot until they proffer DPOC regardless of how she seeks to vote.

*State Interest:* As discussed above in Section III.B, there are, at minimum, material disputes of fact as to whether the citizenship matching protocol furthers any legitimate state interest. Common sense dictates that there must be a fit between the state's interest and the state's means of furthering that interest. But once again, the record demonstrates that Defendant is unaware of the citizenship matching protocol spurring *any* investigation or finding that a noncitizen attempted to register to vote. Harvey Dep. 190:5-15. Meanwhile, Defendant is aware of thousands of eligible voters being placed into pending status because the protocol systemically relies on stale data. The assessment of Georgia's interest thus presents a triable material fact.

## V. Georgia's Citizenship Matching Protocol Violates the NVRA (Count IV)

The NVRA requires states to "ensure that any eligible applicant is registered to vote in an election," 52 U.S.C. § 20507(a)(1), thereby "affirmatively requir[ing] states to register eligible voters." *Bellitto v. Snipes*, 935 F.3d 1192, 1201 (11th Cir. 2019). The statute also precludes states from creating additional documentation requirements to register to vote beyond a valid voter registration application, which must contain all the necessary information to assess an applicant's eligibility. 52 U.S.C. § 20508(b)(1). Indeed, federal courts have specifically held that states cannot impose DPOC requirements as a general condition of federal voter registration. *Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1, 11, 20 (2013). It cannot be

that Georgia would violate the NVRA by applying such a requirement neutrally to all applicants but does not do so by applying it discriminatorily to naturalized citizens. Congress enacted the NVRA in part to "increase the number of eligible citizens who register to vote in elections" and "enhance[] the participation of eligible citizens as voters." 52 U.S.C. § 20501. Defendant's citizenship matching protocol violates the NVRA by denying and delaying voter registration to eligible applicants.

Defendant seeks to evade the NVRA's mandate by arguing that voters flagged by this system are "registered to vote" under the NVRA. MSJ Br. at 24. This argument is nothing more than word play.[11] Such a definition would render the law's requirement meaningless. Courts have held that a person is not "registered" for NVRA purposes until they are deemed eligible to vote, *Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1276 (D. Colo. 2010), and "actually able to go to the polls and cast a regular ballot," *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 383 (6th Cir. 2008). Here, Georgia treats voters in pending status as not "registered" and ineligible to cast regular ballots, as it makes clear in communications with voters who fail to clear the protocol. Harvey Dep. Ex. 16, ECF 131 at 459-60 (directing

---

[11] Defendant's attempt to cast this matching protocol as similar to a voter ID requirement falls flat. The protocol is tied to registration, not the act of voting. Only voters in this peculiar pending registration status are required to show DPOC to vote.

pending applicants to "finalize [their] application[s]" by providing DPOC). Thus, the protocol is a straightforward violation of the NVRA's requirement that states register voters who submit complete and valid voter registration applications.

Finally, Section 8 of the NVRA requires that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . be uniform, nondiscriminatory, and in compliance with the [VRA]." 52 U.S.C. § 20507(b)(1). As detailed above, Georgia's citizenship matching protocol applies unevenly based on citizens' country of origin, resulting in a particular group of eligible applicants being prevented from completing their registration and successfully casting their ballots. Since evidence shows that eligible naturalized citizens have been denied registration and have had their registration delayed, and since the citizenship matching protocol is discriminatory and in violation of the VRA, Defendant's motion for summary judgment should be denied.

## CONCLUSION

Defendant has failed to show that there are no disputed material facts and that he is entitled to judgment as a matter of law. To the contrary, the material facts in dispute support each of Plaintiffs' claims that this discriminatory process violates the Constitution, the VRA, and the NVRA. The motion should be denied.

35

Dated: October 6, 2021

*/s/ Bryan L. Sells*
Bryan L. Sells
Georgia Bar No. 635562
The Law Office of Bryan L. Sells,
LLC
PO Box 5493
Atlanta, Georgia 31107
Tel: (404) 480-4212
Email: bryan@bryansellslaw.com

Jon Greenbaum*
Ezra D. Rosenberg*
Julie Houk*
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
Lawyers' Committee for Civil Rights
Under Law
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

Vilia Hayes*
Gregory Farrell*
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Alice Huling*
Aseem Mulji*^
Danielle Lang*
Mark Gaber*
J. Gerald Hebert*
AMulji@campaignlegalcenter.org
AHuling@campaignlegalcenter.org
DLang@campaignlegalcenter.org
MGaber@campaignlegalcenter.org
GHebert@campaignlegalcenter.org
Campaign Legal Center
1411 K Street NW, Suite 1400
Washington, DC 20005
Telephone: (202) 736-2200
Facsimile: (202) 736-2222

Phi Nguyen
Georgia Bar No. 578019
Asian Americans Advancing Justice
– Atlanta
5680 Oakbrook Parkway, Suite 148
Norcross, Georgia 30093
pnguyen@advancingjustice-
atlanta.org
Telephone: (770) 818-6147

*Admitted pro hac vice*
*^ Licensed in CA only; supervised by*
*Mark Gaber, member of the D.C. Bar*

*Counsel for Plaintiffs*

# CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT has been prepared in Times New Roman 14, a font and type selection approved by the Court in L.R. 5.1(B).

/s/ Julie M. Houk
Julie M. Houk