# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC., *et al.*, | |
| *Plaintiffs,* | CIVIL ACTION |
| v. | FILE NO. 1:18-CV-04727-ELR |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State for the State of Georgia | |
| *Defendant.* | |

# REPLY IN SUPPORT OF DEFENDANT'S
# MOTION FOR SUMMARY JUDGMENT

# INTRODUCTION

Plaintiffs' Opposition to Defendant's Motion for Summary Judgment [Doc. 151] ("Response") fails to point to any genuine issue of material fact or application of law that shows that the Secretary is not entitled to summary judgment on all claims. Plaintiffs have not established standing. But even if they had, Plaintiffs have not pointed to any evidence in discovery showing that citizenship verification of applicants for voter registration violates the Equal Protection Clause. Additionally, Plaintiffs ask the Court to apply an incorrect standard of review for their claims, arguing they be reviewed under a strict-scrutiny analysis rather than the *Anderson-Burdick* balancing test which is required in election-related cases. Finally, Plaintiffs misapply *Anderson-Burdick* in a fruitless attempt to save their claims from summary judgment and do not raise any actual issues with the National Voter Registration Act (NVRA). For these reasons, this Court should grant the Secretary's Motion for Summary Judgment ("Motion").

# RESPONSE TO FACTUAL BACKGROUND

The Secretary will not respond to each component of Plaintiffs' effort to confuse the Court about the application of Georgia's citizenship-verification process, but one point is important: The distinction Plaintiffs attempt to draw between native-born citizens and naturalized citizens simply does not exist.

1

Georgia's verifies citizenship of all voters who register through Department of Driver Services (which is the vast majority of voters) and all voters who provide a Georgia driver's license or identification card number on their application (which is required by state and federal law to be included if the applicant has one). Voters who do not provide a Georgia driver's license or identification card number are verified through the Social Security Administration using their name, last four digits of their social security number and date of birth. The citizenship-verification process utilized by the State of Georgia flags individuals who, in their most recent interaction with the Department of Driver Services ("DDS"), have affirmatively provided documentation that they were *not* citizens. [Doc. 151, pp. 10-11; Doc. 142-1, pp. 5-6].

## ARGUMENT AND CITATION OF AUTHORITY

### I. Plaintiffs do not have standing.

Plaintiffs' argument regarding standing ignores directly relevant and controlling authority from the Eleventh Circuit, instead choosing to rely on *Arcia v. Fla. Sec'y of State,* 772 F. 3d 1335, 1341 (11th Cir. 2014). The Secretary does not dispute the holding in *Arcia.* Rather, he contends that this Court must read *Arcia* in light of subsequent Eleventh Circuit decisions, including *Jacobson v. Fla. Sec'y of State,* 974 F. 3d 1236 (11th Cir. 2020), which *inform* the standing analysis in *Arcia* and bring it to a finer point. When considering

Plaintiffs' claims of standing against this backdrop, coupled with recent and persuasive organizational-standing analysis from other circuits, it is evident that Plaintiffs have failed to satisfy the requirements of Article III.

One of the keys to finding standing in *Arcia* was that the challenged practice "impaired the organization's ability to engage in its own projects." *Arcia,* 722 F. 3d at 1341. As the Eleventh Circuit later explained, this impairment can only be established by showing not only what the resources are being diverted *to*, but also "what activities [the organization] would divert resources away *from* in order to spend additional resources on combatting" the impact of the law. *Jacobson,* 974 F. 3d at 1250 (emphasis in original). And as the Secretary outlined in his Motion, this two-part inquiry should be *substantive* rather than merely perfunctory—especially at this stage of the litigation. That is, the party seeking this forum must show "that their *activities have been impeded*" as opposed to "merely [showing] that their mission has been compromised." *Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F. 3d 129, 133 (D.C. Cir. 2006) (emphasis added). The examples cited by Plaintiffs in their Response—like making "a color copy" of naturalization certificates or expending money on extra printers, toner, and ink [Doc. 151, p. 15]—simply fail to establish this. The evidence presented shows no dispute of material fact that the organizational plaintiffs exist to assist voters. And they

3

are assisting voters through all parts of the registration process, including assisting voters with their voter-registration applications related to and unrelated to citizenship. They are not injured—they are pursuing their reason for existence, just as the Democratic-party entities in *Jacobson* were attempting to get more Democrats elected. 974 F. 3d at 1250.

Ms. Cruz fares no better than the organizational plaintiffs in establishing standing. Ms. Cruz claims injury because "Defendant's protocol required [her] to make an extra trip home to retrieve her passport to vote in 2020." [Doc. 151, p. 18]. But of course, Ms. Cruz was only subject to this requirement because a county election official did not correctly recognize her non-limited-term Georgia driver's license as proof of citizenship. That ends any traceability to the Secretary. She may have a claim against the county official for not correctly following state law, but that is not the claim made in this case. Ms. Cruz also could have brought the document with her in the first place or voted provisionally and followed up within three days with citizenship documentation. None of these steps required an additional trip back home. The fact that a poll worker made a mistake and Ms. Cruz did not have her passport with her is not "a direct result of a State's laws and policies," but rather, "arise[] from life's vagaries." *Crawford v. Marion Cty. Election Bd.,* 553 U.S. 181, 197-

198 (2008). Ms. Cruz was able to vote and had a multitude of options beyond choosing to make an extra trip home.

## II. Georgia's citizenship-verification process does not violate Equal Protection and does not demand strict scrutiny.

Georgia's citizenship verification process does not violate the Equal Protection Clause for the simple reason that it does not discriminate on the basis of national origin or naturalized status, as Plaintiffs claim. *All* registrants, regardless of national origin or naturalized status, are checked for citizenship status if they register at DDS or include, as required by law, their driver's license or ID number on their voter registration application. Indeed, the *only* reason any Georgia citizen fails citizenship verification is because they have *provided documentary proof* to the state at their last interaction with a state agency that checked their citizenship proving that they are not a citizen. And all those applicants have to do when they are flagged as a potential non-citizen is to provide documents showing they are now a citizen—documents which include a non-limited term driver's license, and they can show those documents at their polling place or even after they vote if they choose to vote a provisional ballot. This is so the state of Georgia can take the eminently

5

reasonable and fundamentally democratic precaution of ensuring that only its citizens vote in its elections.[1]

Even Plaintiffs' cited cases agree. Plaintiffs cite a case that explains that "the term 'person' in [the Equal Protection] context encompasses lawfully admitted resident aliens as well as citizens of the United States and entitles both citizens and aliens to the equal protection of the laws of the State in which they reside." *Graham v. Richardson*, 403 U.S. 365, 371 (1971). But this case has no bearing on the practice that Plaintiffs challenge in this case. Georgia verifies citizenship in the same manner for all applicants. The challenged practice turns on an *action* of an individual in submitting documents proving that they are not citizens, as distinct from their status of "naturalized" or "native-born" citizen, there can be no Equal-Protection claim.

Because the challenged law does not discriminate on the basis of national origin, and thus does not necessitate a strict-scrutiny analysis, the cases Plaintiffs cite in their Response do not apply. More problematic still, they all predate the relevant Supreme Court precedents of *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992) and, as the

---

[1] This is not controversial. Even Justice Kagan in dissent acknowledged that participation is for "*Citizens* of every race." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (Kagan, J., dissenting) (emphasis added).

Eleventh Circuit explained, "we must evaluate laws that burden voting rights using the approach of *Anderson* and *Burdick*." *Jacobson*, 974 F.3d at 1261; *accord New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020). While Plaintiffs would have this Court review their claims as though the state is targeting members of a protected class, the reality is that the law at issue is facially neutral and evinces no discriminatory intent in design or in practice. And as the Secretary explained in the Motion, he is entitled to judgment as a matter of law on Plaintiffs' Equal Protection claim.

**III. Even if the Court disagrees with the application of *Anderson/Burdick*, the citizenship-verification law survives strict scrutiny.**

Even if this Court were to apply a strict-scrutiny analysis to Plaintiffs' claims, and it should not, the challenged law survives all the same. Plaintiffs first inappropriately limit the State's interest in the citizenship-verification protocol. It is not just "fraud" that the process is designed to ferret out—even though this is a perfectly legitimate state interest, *Brnovich*, 141 S. Ct. at 2340. The citizenship-verification process also serves the very important interest of ensuring that participation in a democratic election is properly limited to its citizenry. Without such a limitation, the democratic process is subverted because a democracy requires first and foremost a *demos*, or a "body of *citizens* collectively." Christopher W. Blackwell, *Athenian Democracy: an overview*, in

7

DEMOS: CLASSICAL ATHENIAN DEMOCRACY (C. Blackwell ed., 2003), available at https://www.stoa.org/demos/democracy_overview.pdf (emphasis added). These are weighty interests, which certainly qualify as "compelling" under the circumstances.

Next, Plaintiffs claim that "the citizenship matching protocol is not narrowly tailored to prevent fraud or any other compelling interest." [Doc.151 p. 26]. But it is hard to imagine a more narrowly tailored way of verifying citizenship than Georgia's process. Plaintiffs rely only on the concept that the "State offers no evidence of a widespread problem or the success of the protocol in averting any fraud." *Id.* But even Plaintiffs' expert admitted that a possible explanation for the fact that Georgia is doing a good job ensuring that only citizens vote in Georgia *is because the protocol is working.* McCrary Dep. 71:13-19. And Plaintiffs' expert also specifically mentioned that he did not look at or analyze any data from before 2007, which was the year the citizenship-verification process started. Plaintiffs are attempting to rely on a lack of evidence because they do not have evidence that actually supports their claims—and this cannot save them from summary judgment. Ultimately, the burdens imposed on the individuals who are flagged by Georgia's citizenship verification process are slight, and the requirement that they demonstrate the

change in their circumstances before voting (or after voting provisionally) is narrowly tailored to achieve a compelling government interest.

## IV. Because the citizenship-verification process survives strict scrutiny, it also survives *Anderson/Burdick*.

When considering an election law, a court must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (cleaned up). Given the extremely small burden that may arise pursuant to the State's citizenship verification process weighed against the interests of the State in ensuring only citizens vote, the citizenship-verification process does not burden the fundamental right to vote. The fact that Plaintiffs can point to a handful of circumstances and imagined scenarios that "arise[] from life's vagaries," *Crawford*, 553 U.S. at 197-198, does not rescue their claims about the process. The breadth of documents (including non-limited term driver's licenses or identification cards) and opportunities (including before you vote with county election office, at your polling place, or after you vote a provisional ballot) to resolve a non-matching citizenship status claim make it

clear that this is a lesser burden that triggers less exacting review, and a State's "important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (cleaned up).

## V. The citizenship-verification process does not violate Section 2's requirement of equal openness.

"The key requirement [of Section 2 of the Voting Rights Act] is that the political processes leading to nomination and election (here, the process of voting) must be 'equally open' to minority and non-minority groups alike, and the most relevant definition of the term "open," as used in §2(b), is 'without restrictions as to who may participate,'" *Brnovich,* 141 S. Ct. at 2337. The citizenship-verification process does not alter or hinder the equal openness of Georgia's elections. As the Secretary made clear in his Motion, there is nothing about the inherent status of naturalized citizens that subjects them to the requirement that they provide documentary proof of citizenship prior to voting in a Georgia election after their naturalization. The process for all applicants depends on the *documents* they have provided to the state. The fact that some applicants submitted documents to the state affirmatively showing that they are not citizens is what changes the orientation of the individual to the state with respect to the requirements he or she must satisfy before voting.

Plaintiffs' position is that the State *must* ignore the fact that certain voter-registration applicants have previously affirmatively proven to a state agency that they are not citizens. This position does not have any support in law and does not adequately satisfy the State's compelling interest in ensuring that only citizens are allowed to vote.

"Equal openness" requires that states treat similarly situated voters similarly, and that is exactly what the existing process does. But once the *individual* changes the situation based on affirmative documentation they have previously presented to the State, the State is free to craft additional requirements provided they otherwise comply with federal and state law. *Compare* O.C.G.A. § 21-2-385 (procedures for voting by absentee ballot) *with* O.C.G.A. § 21-2-417 (setting different procedures for in-person voters).

Plaintiffs make several mistakes trying to prevent *Brnovich* from applying to this case. First, while it is true that *Brnovich* declined to expressly "announce a test to govern all VRA § 2 claims," [Doc. 151, p. 37], that does not cabin its holding to only the facts and circumstances then before the Court. *Brnovich,* 141 S. Ct. at 2336. Indeed, the Supreme Court deliberately announced its "guideposts" to do just that—"guide" future courts when confronted with Section 2 claims going forward. *Id*. Thus, Plaintiffs' attempt to completely sideline *Brnovich* is unavailing.

11

Second, Plaintiffs attempt to further limit *Brnovich* by noting that it occurred after a 10-day bench trial. But once again, nothing in the Court's language indicates *Brnovich* is only useful after a bench trial. Indeed, the record in this case is well-developed, including testimony and discovery from Plaintiff organizational representatives, individuals, and several experts. It is unclear why Plaintiffs believe *Brnovich* should be withheld from the analysis until only after a trial has occurred—except that it ends their case.

Finally, Plaintiffs try to limit *Brnovich* to only claims involving "neutral, generally applicable rules." [Doc. 151, p. 37]. The Secretary does not believe this Court can read the case that narrowly, but even if it did, the citizenship-verification process is a facially neutral law.

Turning to the relevant *Brnovich* factors, Plaintiffs attempt to create disputes where none exist. With respect to the overall size of the purported burden, Plaintiffs do not even dispute the Secretary's figures from the Motion. Instead, Plaintiffs simply note this Court's preliminary-injunction order stated "burdens these voters face can be severe." Doc. 151, p. 38. But *Brnovich* highlighted the discrepancy created with respect to the *overall* electorate. *Brnovich,* 141 S. Ct. at 2344-45. The Court then found persuasive the fact that the policy "work[s] for 98% or more of voters to whom it applies…". *Id.* And here, as the Defendant noted in his Motion, "[a]lmost all Georgia voters provide

proof of citizenship when registering to vote…" [Doc. 142, p. 18]. These numbers fall in line with the *Brnovich* analysis, notwithstanding Plaintiffs' subjective claims of burden severity, and this Court's preliminary analysis can now be informed by actual evidence adduced during discovery.

With respect to departure from 1982 practices, Plaintiffs are correct that "Georgia began matching voter registration data against DDS citizenship data in or around 2008." [Doc. 151, p. 38]. But that does not alter the fact that registrars have been required to determine voter eligibility based on one's geographic location and other factors for time immemorial. And Georgia, like other democracies around the world, has long ensured only citizens may vote in its elections. The citizenship verification is a natural extension of that legitimate and longstanding practice.

Plaintiffs next attempt to distinguish *Brnovich* from this case because "a voter in pending status *cannot cast a ballot* until they proffer [documentary proof of citizenship] regardless of how she seeks to vote." *Id.* at 39. But this is plainly inaccurate. The Georgia election system permits voters who have failed to correct their prior statements to vote provisionally in any election. This vote will count as long as the voter makes the correction and satisfies the citizenship-verification process within three days of the election—just like a voter who forgets his or her photo ID at the polls on Election Day.

13

Finally, Plaintiffs undercut the State's legitimate interest in verifying citizenship of its voters by making the conclusory statement that there are "material disputes of fact as to whether the citizenship matching protocol further any legitimate state interest." *Id.* at 40. The Secretary has discussed the State's interest in this policy at length, both in the Motion and in this Reply. It cannot be seriously disputed that a state has a compelling interest in ensuring that only citizens vote.

## VI.  The citizenship-verification process does not violate the NVRA.

Plaintiffs last attempt to save themselves from summary judgment by claiming a violation of the NVRA. But the process utilized in Georgia is significantly different than the other state's processes that Plaintiffs cite. Instead, voters who affirmatively told the State that they were not citizens and then register to vote are simply asked to confirm their change in citizenship status. Voters in pending citizenship status are free to vote by providing the exact same identification requirements that every in-person voter in Georgia must provide—a non-limited-term Georgia driver's license—and can vote provisionally if they do not have appropriate documentation at the polls. It is Plaintiffs who are engaging in word play about when a voter is eligible, not the Secretary. This is not enough to show a violation of the NVRA.

## CONCLUSION

Plaintiffs do not have standing to bring their claims. But even if they did, they have failed to create a genuine issue of material fact sufficient to survive this Court granting summary judgment to the Secretary. Georgia's citizenship-verification law is narrowly tailored and applies equally to all voter-registration applicants who register through DDS and who register via paper application and, as required by law, include their driver's license or identification card number on the application. It is a reasonable method to secure the compelling state interest of ensuring only citizens can vote while allowing plenty of opportunities for an applicant flagged as a potential non-citizen to vote by providing readily available documentation before they vote, at the polls, or after they vote a provisional ballot.

While Plaintiffs try mightily to find disagreements on facts, they ultimately cannot point to any dispute over any facts *material* to the resolution of their claims. Accordingly, summary judgment should be granted to the Secretary.

Respectfully submitted this 20th day of October, 2021.

**STATE LAW DEPARTMENT**

Christopher M. Carr
Attorney General
Georgia Bar No. 112505

15

Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
State Law Department
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**TAYLOR ENGLISH DUMA LLP**
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249

*Counsel for Defendant Secretary of State Brad Raffensperger*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson
