IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC., *et al.*, | |
| *Plaintiffs*, | |
| v. | CIVIL ACTION |
| | FILE NO. 1:18-cv-04727-ELR |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State for the State of Georgia, | |
| *Defendant*. | |

## DEFENDANT'S REPONSE IN OPPOSITION TO PLAINTIFFS' SEPARATE STATEMENT OF MATERIAL FACTS

As required by Local Rule 56.1(B)(3), Defendant Secretary of State Brad Raffensperger provides this response to Plaintiffs' Separate Statement of Material Facts [Doc. 151-15].

As a preliminary matter, Defendant objects to Plaintiffs' Separate Statement of Material Facts ("SSMF") because it is not a "separate, concise, numbered" statement, as required by L.R. 56.1. Instead, it is an attempt to circumvent the page limits imposed by this Court by including multiple facts and extended argument in a separate filing.

Defendant further objects to the titles and headings used in the SSMF as such do not comport with L.R. 56.1(B)(1) in that they are argumentative

statements unsupported by evidence and should not be considered by the Court for purposes of summary judgment. They are repeated in this document solely for the purpose of clarity and organization and Defendant objects to any inferences or implied statements of fact contained therein.

In addition, Local Rule 56.1 (B) (1) (c) directs courts to not consider legal conclusions in a statement of fact. *Cheatham v. DeKalb Co.,* 682 Fed. Appx. 881, 885 (11th Cir. 2017) (legal conclusions violate LR 56.1(B)(1)(b) and (c) and will not be considered by the courts); *McGhee v. Rent Recovery Sols., LLC*, No. 1:17-cv-72-CC-JKL, 2018 U.S. Dist. LEXIS 220732, at *1 (N.D. Ga. July 6, 2018).

## I.    Plaintiffs Have Standing.

1.    Plaintiff ProGeorgia State Table, Inc. ("ProGeorgia"), a non-profit organization, "is a bold, trusted, and diverse collaborative that champions an equitable and inclusive democracy for and with traditionally underrepresented communities, . . . supports and coordinates the civic engagement programs of [its] diverse partner organizations, and develops the infrastructure, executes the joint strategies, and employs new tools and technology to ensure a government that is more responsive to the needs of [its] constituencies." Deposition of Tamieka Atkins ("Atkins Dep.") 30:22-31:6, ECF 140.

**Response:   Defendant admits the Court may consider this evidence for purposes of the motion for summary judgment.**

2.    In furtherance of its mission, ProGeorgia "coordinate[s] . . . voter registration activities" at naturalization ceremonies "and provides [the] tools and resources necessary for [its] partners"—who are members of "the New American Work Group" at ProGeorgia—to successfully register newly naturalized citizens. *Id.* 31:21-32:6. Because of the citizenship matching protocol, ProGeorgia diverts resources from its "general voter registration," "get out the vote," and "voter education efforts" to "cover additional expenses related to" registering voters at naturalization ceremonies "that don't show up with [its] other voter registration efforts." *Id.* 54:2-55:1.

**Response: Defendant objects to the multiple statements included in SSMF no. 2 as noncompliant with L.R. 56.1 (B)(1) which requires that "[e]ach material fact must be numbered separately". In addition, Defendant objects to the second sentence in SSMF no. 2 to the extent that it asserts a legal conclusion implying that the alleged "diversion of resources" is legally sufficient to confer standing.  To the extent that Ms. Atkins' testimony is taken out of context, it is important to point out that Ms. Atkins also testified that ProGeorgia would still fund the New American Work Group albeit**

3

**to a lesser extent even if the citizenship verification protocol was not in effect. Atkins Dep. at 55:11-16. This is also consistent with ProGeorgia's 990 Forms filed with the IRS which do not show any change in its mission. Atkins Dep. Exh. 6-8, Part III 1-4a., p. 2.**

3.    In particular, at naturalization ceremonies, after a voter has completed their voter registration form, ProGeorgia and its partners "ask them to stand in line" to make a "a color copy" of their naturalization certificate "to include in their voter registration application[] to make sure they're not flagged incorrectly as a noncitizen." *Id.*36:22-37:1. So that voters may do so, ProGeorgia pays for and supplies at the naturalization ceremonies "printers," "ink," "toner," and "paper" that otherwise would not be needed absent the citizenship matching protocol. *Id.*33:12-25. In addition, ProGeorgia and its partners are required to provide additional staff at these events, including, for instance, at least one person for each printer. *Id.*125:8-126:11. The events also take longer because it is "time consuming" to photocopy every registrant's certificate when "67 to 80 percent" of the ceremony attendees are registering to vote, "and ceremonies can be as little as 75 people, and as large as 300 people." *Id.*Finally, after the registration events, ProGeorgia expends resources identifying the newly naturalized citizens it registered who were nevertheless flagged incorrectly as

noncitizens by the matching protocol and provides funding to its partners to "make the phone calls to try and get in touch with these people to help fix their record, and cure the situation." *Id.*; see also *Id.*49:22-50:4, 78:3-9.

**Response:**        **Defendant objects to the numerous statements included as one statement of fact in SSMF no. 3 in violation of the requirement of L.R. 56.1 that each fact be numbered separately.  Ms. Atkins' referenced testimony is incomplete and taken out of context and thus does not support the fact.  Ms. Atkins also testified that the work done by ProGeorgia at naturalization ceremonies includes standing by the door congratulating folks "on becoming citizens and directing them where they can vote" and "passing out clipboards with voter registration forms on them" and asking "permission for photocopying their applications to keep the non-sensitive data" used to follow up as part of an effort concerning  "[a]ll of the problems - - all of the flags that are possible for all eligible citizens and this case, in addition, the citizenship verification flag" as well as handing out additional materials "in language once they are done".  Atkins Dep. at 36:4-7; 13-17; 80:14-17. To the extent these activities do not depend on the citizenship-verification protocol, SSMF 3 does not accurately depict the work done by ProGeorgia at**

**naturalization ceremonies as ProGeorgia would participate in naturalizations ceremonies whether or not there was a challenge to the citizenship verification protocol. Atkins Dep. at 43:11-17.**

4.     Plaintiff Georgia Association of Latino Elected Officials, Inc. ("GALEO") is a non-profit organization whose mission is to "increase civic organization and leadership of the Latino/Hispanic community across Georgia." Deposition of Gerardo Gonzalez ("Gonzalez Dep.") 68:6-24, ECF 133. GALEO participates in ProGeorgia's New Americans Work Group and provides staff to help assist newly naturalized citizens register to vote at naturalization ceremonies, including by making photocopies of their naturalization certificates to include with their registration applications. *Id.*41:11-17, 76:11-77:9, 112:25-113:3. Like ProGeorgia, GALEO is forced to divert additional resources to registering newly naturalized citizens because of the citizenship matching protocol. *Id.*76:11-77:9. In addition, GALEO is forced to divert significant resources to assisting voters who have been flagged incorrectly as noncitizens to resolve the issue with local election officials. *Id.*26:8-14, 28:12-21, 41:11-17, 43:7-16, 44:5-19, 74:17-75:11. The time that its staff spends assisting voters flagged incorrectly as noncitizens takes away from GALEO's efforts to "get out the vote" and increase community engagement. *Id.*74:17-75:11.

**Response:**     **Defendant objects to the inclusion of multiple sentences and facts stated as a single, numbered statement of fact in violation of L.R. 56.1(B)(1).  Defendant also objects to the implied legal conclusion in the third, fourth and fifth sentences that the alleged diversion of resources is sufficient to confer standing. These sentences therefore should be not be considered by the Court to the extent that they include legal conclusions and not facts as required by L.R. 56.1 (B)(1)(c).  The evidence cited in reference to the second sentence do not support the facts asserted.  Mr. Gonzalez does not identify the "New Americans Group" by name.  (Gonzalez Dep. at 76:14-77:3) Atkins Dep. at 33:12-25.  The facts as stated in the first sentence may be considered by the Court for purposes of the motion for summary judgment.**

5.     Plaintiff Asian Americans Advancing Justice – Atlanta, Inc. ("Advancing Justice – Atlanta") is a non-profit organization whose mission is to "uplift and protect the civil rights of Asian Americans in the community in Georgia and in the Southeast." Deposition of Stephanie Cho ("Cho Dep.") 85:21-25, ECF 141. Advancing Justice – Atlanta participates in ProGeorgia's New American Work Group and provides staff to assist newly naturalized citizens register to vote at naturalization ceremonies. *Id.*73:4-7, 126:16-

127:4. Advancing Justice – Atlanta's staff normally devote their time to "educat[ing] the public on the process of voting" and "get out the vote" efforts. *Id.*37:20-39:17, 45:21-46:11, 70:16-72:9. Because of the citizenship matching protocol, Advancing Justice – Atlanta is forced to divert substantial resources from these activities to assist voters incorrectly flagged as noncitizens by the matching protocol to resolve the issue so that they can vote. *Id.*37:20-39:17, 48:8-21, 70:16-72:9, 73:19-74:1, 76:2-6. And, because this "issue became so big in" Advancing Justice – Atlanta's "community and so many people had called" about it, Advancing Justice – Atlanta was forced to divert resources to "put out new materials" addressing the issue in addition to its usual voter education information, and "translate it into different languages." *Id.*38:2-9.

**Response:**     **Defendant objects to the inclusion of multiple sentences and facts stated as a single, numbered statement in violation of L.R. 56.1(B)(1).   References in the third and fourth sentences stating that they were "forced to divert" resources is a disputed legal conclusion, not facts as required by L.R. 56.1 (B)(1)(c) and should not be considered by the Court as facts.   These sentences are also argumentative and not statements of fact.   Defendant does not dispute the facts as stated in the first two sentences.**

6.      Plaintiff Georgia Coalition for the Peoples' Agenda, Inc. ("Peoples'
Agenda") is a non-profit organization whose mission is to "improve
governance by having an active, informed electorate." Deposition of Helen
Butler ("Butler Dep.") 89:23-90:1, ECF 138. Peoples' Agenda participates in
ProGeorgia's New Americans Work Group and provides staff to help newly
naturalized citizens register to vote at naturalization ceremonies, including
by making photocopies of voters' naturalization certificates to submit with
their voter registration applications. *Id.*41:25:42-7; Butler Dep. Ex. 11, ECF
138-1 at 460. Because of the citizenship matching protocol, Peoples' Agenda
is forced to divert substantial resources to registering voters at
naturalization ceremonies that are not necessary for its other registration
efforts. *Id.*53:14-54:2. "[I]n a normal voter registration drive, it takes a voter
about 15 to 30 minutes to complete an application. But with the citizenship
match, you have to have an extended hour of time . . . allowing them to stand
in line, allowing them to get their certificates copied, stuffing that certificate
in the voter registration forms . . . ." *Id.*56:6-15. Peoples' Agenda otherwise
"could use that money" and time "to do another activity of Peoples' Agenda,"
whether that be "a forum on criminal justice reform," a "civic engagement of
candidates forum," "more voter registration activities," *Id.*56:16-57:8 or "Get
Out The Vote activities," *Id.*53:20-54:2.

9

**Response:**       Defendant objects to the inclusion of multiple sentences and facts stated as a single, numbered sentence in violation of L.R. 56.1(B)(1).  Defendant also objects to the implied legal conclusion in the third, fourth and fifth sentences that the alleged diversion of resources is sufficient to confer standing. These sentences therefore should be not be considered by the Court to the extent that they include disputed legal conclusions and not facts as required by L.R. 56.1(B)(1)(c). Moreover, the organization's mission statement in its Form 990s filed with the IRS do not show any change in mission.  Butler Dep. Exh. 6-8, Part III 1-4a., p.2. Defendant does not dispute the facts as stated in the first two sentences.

7.    Plaintiff New Georgia Project, Inc. ("New Georgia Project") is a non- profit organization whose mission is to "civically engage Georgians from underrepresented communities." Deposition of Nsé Ufot ("Ufot Dep.") 48:15-19, ECF 139. Voter registration drives "are an important component" of its "overall mission." *Id.*  Because of the citizenship matching protocol, New Georgia Project is forced to divert resources from its "regular get-out-the-vote messaging" to help voters who have been incorrectly flagged as noncitizens. *Id.*36:7-37:5; see also *Id.*61:22-62:23, 63:5-8. New Georgia Project identifies

those they assisted in registering to vote whose registrations are placed in pending status, and then "call[s]," "text[s]," or "show[s] up at their homes to make sure that they know that they're on the pending list" and helps them resolve the issue. *Id.*64:1-16; see also *Id.*80:1-11. New Georgia Project has had to "raise more money," "hire more staff," and "constantly supplement and augment [its] campaign . . . [and] civic engagement efforts to capture people who are being denied the right to vote because of citizenship." *Id.*79:3-8, see also *Id.*60:23-61:8, 63:5-8, 65:21-25.

**Response:       Defendant objects to the numerous statements included as one statement of fact in SSMF no. 7 in violation of the requirement of L.R. 56.1 that each fact be numbered separately. Defendant also objects to the implied legal conclusion in the third sentence that the organization was "forced to divert resources" and that the activities stated in the fourth and fifth sentences constitute a diversion of resources, which is a disputed legal issue and to that extent they are not facts as required by L.R. 56.1 (B)(1)(c) and should be not be considered by the Court.   Moreover, the organization's mission statement in its Form 990's filed with the IRS do not show any change in mission.   Ufot Dep. Exh. 10 and 12, Part III 1-4, p.2.**

8.    Plaintiff Common Cause is a non-profit organization that works

"to ensure open, honest, and accountable government to promote equal rights, opportunity, and representation for all, and to empower all people to make their voices heard as equals in the political process." Deposition of Sara Henderson ("Henderson Dep.") 125:3-25, ECF 137. The citizenship matching protocol has forced Common Cause to divert staff time from its general voter education activities to educate voters about how to resolve issues arising from the matching protocol, including assisting voters who were forced to vote provisional ballots because of the protocol to cure the issue in the three days following an election so that their ballots will be counted. *Id.*45:15-46:13, 51:9-18, 52:3-13.

**Response:**        **Defendant objects to the numerous statements included as one statement of fact in SSMF no. 8 in violation of the requirement of L.R. 56.1 that each fact be numbered separately. Defendant also objects to the implied legal conclusion in the third and fourth sentences that the alleged diversion of resources is sufficient to confer standing and to that extent are not facts as required by L.R. 56.1 (B)(1)(c) and should be not be considered by the Court.  Defendant does not object to the Court's consideration of the first sentence for purposes of the motion for summary judgment. Moreover, the organization's mission statement in its Form 990's**

**filed with the IRS do not show any change in mission.  Henderson Dep. Exh. 10 through 13, Part III 1-4a which do not mention any specific work in Georgia, either new or continuing.**

9.     Plaintiff Judith Martinez Cruz naturalized as a U.S. citizen in spring 2016. Deposition of Judith Martinez Cruz ("Cruz Dep.") 62:17-25, ECF 134. She registered to vote immediately following her naturalization ceremony and then again online after she did not receive confirmation of her registration. *Id.*at 63:5-64:22. Ms. Cruz voted in the November 2018 election, December 2018 run-off election, and March 2019 special election. *Id.*66:18-69:10. When Ms. Cruz attempted to vote in person during the June 2020 primary election, however, the officials at her polling location told her: "Sorry ma'am, you cannot vote. Your name is listed in the potential non U.S. citizen list, and so you need to show another form of I.D., primarily your passport.'" *Id.*44:3-13. As a result, Ms. Cruz was forced to rush home and return with her passport to vote just before the polls closed. *Id.*44:18-45:22.

**Response:       Defendant objects to the numerous statements included as one statement of fact in SSMF no. 9 in violation of the requirement of L.R. 56.1 that each fact be numbered separately. SSMF no. 9 is an incomplete statement in that Ms. Cruz did in fact vote.  Cruz Dep. at 50:4-5.**

## II.  Georgia's Voter Registration Forms Do Not Require Voters to Provide Documentary Proof of Citizenship.

10.   An individual must be registered as a voter in Georgia to cast a ballot that counts in any election held in the state. Ga. Code Ann. § 21-2-216(a)(1).

**Response:    Plaintiffs' reference to Georgia Code Section 21-2-216 is a legal conclusion and should not be considered by the Court as a statement of fact under L.R. 56.1 (B)(1).**

11.   In order to register to vote in Georgia, an applicant must be a U.S. citizen. *Id.*§ 21-2-216(a)(2).

**Response:        Plaintiffs' reference to Georgia Code Section 21-2-216 is a legal conclusion and should not be considered by the Court as a statement of fact under L.R. 56.1 (B)(1).**

12.   In Georgia, applicants may register to vote using either the state's voter registration forms—submitted by mail, online, or during interactions with the Georgia Department of Driver's Services—or the National Voter Registration form (the "Federal form"). *Id.*§ 21-2-220(a).

**Response:        Plaintiffs' reference to O.C.G.A. § 21-2-220 is a legal conclusion and should not be considered by the Court as a statement of fact under L.R. 56.1 (B)(1).   Defendant objects to the**

14

**extent that Plaintiffs' statement is incomplete as there are additional methods of registering to vote in Georgia such as presenting the application to local county election officials. Harvey Dep. at 58:25-59:3.**

13.   Both the Georgia forms and Federal form require Georgians to swear or affirm under penalty of perjury that they are U.S. citizens. See Deposition of Christopher Harvey ("Harvey Dep.") 61:16-62:3, ECF 131; Harvey Dep. Ex. 9 ("State Form"), ECF 131 at 344; Ex. 5 in Support of Pls.' Resp. to Def. MSJ, Federal Form.

**Response:        Defendant admits that the Court may consider this evidence for purposes of the motion for summary judgment.**

14.   Although Georgia Code Section 21-2-216(g) purports to require all persons registering to vote in Georgia on or after January 1, 2010, to provide documentary proof of citizenship ("DPOC") with their voter registration applications, this requirement is not and cannot be in effect. Christopher Harvey, the 30(b)(6) witness for the Georgia Secretary of State's office, testified that Georgians are not required to submit DPOC with their voter registration forms in order to vote. *Id.*49:16-50:11; 53:7-23; 60:10-62:9.

**Response:   Plaintiffs' reference to Georgia Code Section 21-2-216(g) is a legal conclusion and should not be considered by the**

**Court as a statement of fact under L.R. 56.1 (B)(1).   Defendant objects to the Plaintiffs' inclusion of multiple sentences as a single statement of fact as required under L.R. 56.1(B)(1).**

15.   Neither the Georgia forms nor the Federal form contain any instruction requiring applicants to attach DPOC to their completed applications. State Form, ECF 131 at 344; Ex. 5 in Support of Pls.' Resp. to Def. MSJ, Federal Form. In fact, federal courts have enjoined the Federal Electoral Assistance Commission (EAC) from including Georgia's DPOC requirement in the Federal form instructions since 2016.

**Response: Defendant disputes the implied legal conclusion that the State's form is somehow legally deficient and therefore is not a statement of fact as required under L.R. 56.1(B)(1)(c). Defendant further objects that the rulings of courts are legal conclusions and thus not appropriate facts under L.R. 56.1.**

**III.   HAVA Does Not Require Georgia to Demand Documentary Proof of Citizenship or Deny Active Voter Registration Status to Eligible U.S. Citizens Based on Database Matching Protocols.**

16.   Pursuant to the Help America Vote Act of 2002 ("HAVA"), Georgia must maintain a single, centralized, computerized statewide voter registration database to store and manage the state's official list of registered

voters. 52 U.S.C.§ 21083(a)(1)(A). Georgia's computerized statewide voter registration system is called "ENet." Prelim. Inj. Order ("PI Order"), ECF 33 at 4; Harvey Dep. 41:16- 42:2.

**Response:**      **Plaintiffs' reference to federal law and the entirety of footnote 3 state legal conclusions and should not be considered by the Court as statements of fact under L.R. 56.1 (B)(1)(c). Defendant objects to the multiple sentences included as one statement of fact which does not comport with L.R. 56.1(B)(1). Defendant however admits that Georgia's voter registration system is call ENet and that this fact may be considered by the Court for purposes of the motion for summary judgment. Harvey Dep. at 41:24-42:2.**

17.   Pursuant to HAVA, a voter registration applicant with a current and valid Georgia driver's license or ID card issued by the Georgia Department of Driver's Services ("DDS") must provide their driver's license or ID number on their voter registration form. 52 U.S.C. § 21083(a)(5)(A); see Harvey Dep. 72:11-16. An applicant who lacks a current Georgia driver's license or ID card must provide the last four digits of their social security number. 52 U.S.C. § 21083(a)(5)(A); see Harvey Dep. 72:17-22. An applicant without a valid Georgia driver's license or ID card or social security number

may still register to vote, but the state must assign them a unique identifier for voter registration purposes. 52 U.S.C. § 21083(a)(5); see Harvey Dep. at 72:23-73:12; State Form, ECF 131 at 344; Ex. 5 in Support of Pls.' Resp. to Def. MSJ, Federal Form.

**Response:   Plaintiffs' references to federal laws are legal conclusions and should not be considered by the Court as statements of fact under L.R. 56.1 (B)(1)(c).  Defendant objects to the inclusion of multiple sentences as a single statement of fact as required under L.R. 56.1(B)(1).  Defendant does not object to the Court's consideration of the remaining facts for purposes of the motion for summary judgment.**

18.   HAVA requires the Georgia Secretary of State to enter into an agreement with DDS to match information in the statewide voter registration database with information in DDS records "to the extent required . . . to verify the accuracy of the information provided on applications for voter registration." 52 U.S.C. § 21083(a)(5)(B)(i); see Harvey Dep. 42:4-16.

**Response:   Plaintiffs' reference to federal law is a legal conclusion and should not be considered by the Court as a statement of fact under L.R. 56.1 (B)(1).   Defendant objects to the inclusion of**

**multiple sentences as a single statement of fact as required under L.R. 56.1(B)(1).  The remaining facts as stated may be used in consideration of the motion for summary judgment.**

19.   HAVA, however, does not require that this matching process be used in any way to establish voters' qualifications to vote, including citizenship; the law takes no position at all regarding how a state conducts citizenship verification. *See*, e.g., 52 U.S.C. §§ 21084-21085. HAVA does not require Defendant or county registrars to demand DPOC based on a database matching protocol that predictably flags only certain protected classes of applicants as potential noncitizens. 52 U.S.C. § 21083(a)(5)(A)(iii). Nor does HAVA, or any provision of law, require Defendant or county registrars to deny or delay active voter registration status for qualified U.S. citizens who accurately swear and affirm they are U.S. citizens, based on outdated DDS citizenship data that is not updated to reflect applicants' current citizenship status. See, e.g., 52 U.S.C. §§ 21084-21085.

**Response:  Defendant objects to the statements in SSMF no. 19 because they are legal conclusions, not statements of fact as required by L.R. 56.1(B)(2) and should not be considered by the Court.  In addition, the multiple statements included as a single statement also violates L.R. 56.1.**

19

## IV.   Georgia Maintains a Citizenship Matching Protocol that Is Inherently Inaccurate and Discriminatory.

20.   Georgia's current citizenship matching protocol is a holdover of the state's now-defunct "exact match" policy. Georgia previously denied active voter registration status to tens of thousands of applicants when the spelling of their names, their dates of birth, or the social security or Georgia driver's license numbers on their registration records did not "exactly match" the same information recorded in DDS or Social Security Administration ("SSA") databases. H.B. 268, 154th Gen. Assemb., Reg. Sess. (Ga. 2017); PI Order at 1-2, 5-6; Harvey Dep. 249:7-19. That policy was largely abandoned with the passage of House Bill 316 ("H.B. 316") in April 2019. H.B. 316, § 6, 156th Gen. Assemb., Reg. Sess. (Ga. 2019); Harvey Dep. 249:7-19. But the legislature did nothing in H.B. 316 to address the citizenship matching protocol that accompanied the exact match policy. See H.B. 316, § 6; Harvey Dep. 267:5-22; Harvey Dep. Ex. 27, ECF 131 at 700-01 (noting in bulletin to county election officials that "[t]he citizenship verification and identification requirements remain unchanged" under H.B. 316).

**Response: Defendant objects to SSMF no. 20 as a statement of fact because it is comprised of multiple legal conclusions in violation of L.R.56.1 (B)(1) and is argumentative and not a statement of fact.**

20

21.   Since that time, neither Defendant Raffensperger nor the Georgia Legislature have acted to mitigate the citizenship matching protocol's discriminatory impact on the ability of qualified naturalized citizens and people of color to complete the voter registration process. Harvey Dep. 149:23-150:5.

**Response:   The cited evidence does not support the fact.  Mr. Harvey's testimony has been taken out of context.  In the portion of his testimony cited by Plaintiffs, Mr. Harvey was testifying about whether there had been any discussion between the Secretary's office and DDS concerning the protocol which does not support Plaintiffs' fact no. 21.  In addition, to the extent SSMF no. 21 pertains to failure to mitigate or discriminatory impact, these are both legal conclusions which are not proper factual statements under L.R. 56.1 (B)(1).**

## A. The Operation of Georgia's Citizenship Matching Protocol and Consequences of Being Flagged as a Noncitizen.

22.   Under the current citizenship matching protocol, if a voter registration applicant provides a Georgia driver's license or state ID card number on their registration form, the information from the applicant's voter registration form, as entered into ENet, is transmitted to DDS to verify the

applicant's citizenship. Harvey Dep. 85:15-86:6; Deposition of Angelique

Beauford McClendon ("McClendon Dep.") 55:6-58:6, ECF 132.

**Response:**        **Defendant admits that the Court may consider**

**this evidence for purposes of the motion for summary judgment.**

23.   DDS then attempts to identify a matching record in its own

database based on the following information from the applicant's ENet

record: (1) the first initial of the first name, (2) the first twenty characters of

the last name, (3) the date of birth, (4) the driver's license or ID card number,

(5) the last four digits of the applicant's social security number, and (6) the

applicant's U.S. citizenship status. Harvey Dep. 85:15-87:3; McClendon Dep.

55:6-58:6; McClendon Dep. Ex. P-5, ECF 132 at 240-41.

**Response:**        **Defendant admits that the Court may consider**

**this evidence for purposes of the motion for summary judgment.**

24.   If DDS identifies a match in its database, DDS transmits certain

information back to the Secretary of State and county election offices,

including a code displaying the applicant's citizenship status found in the

DDS database. McClendon Dep. 68:3-69:18; McClendon Dep. Ex. P-5, ECF

132 at 240-41; Deposition of Michael McDonald ("McDonald Dep.") Ex. 1

("McDonald Decl."), ECF 135 at 252-53.

**Response:**        **Defendant objects to the citation to the**

**McDonald deposition as repetitive and unnecessary and the opinion of an expert which not a statement of fact.  The remaining facts as stated may be considered for purposes of the motion for summary judgment.**

25.   An applicant flagged as a noncitizen is not registered to vote and is instead placed into a "pending" status; their county registrar is then supposed to send a letter notifying them that they have been flagged as a potential noncitizen and must produce acceptable DPOC to their county elections office in order to vote and have their vote count. Harvey Dep. 128:19-24, 130:3-132:13, 132:21-134:3, 134:11- 136:1; Harvey Dep. Ex. 15, ECF 131 at 454-58 (prior version of pending citizenship matching notice letter); Harvey Dep. Ex. 16, ECF 131 at 459-60 (current version of pending citizenship matching notice letter).

**<u>Response:</u>        SSMF 25 is objectionable to the extent that it is argumentative, not a proper statement of fact, does not accurately state the testimony of Mr. Harvey and therefore does not comport with the requirements of L.R. 56.1.  Defendant does not dispute that registrants flagged for citizenship are placed on the voters rolls in pending status, are sent multiple letters by county officials after double checking that citizenship documents have not been**

23

**provided, have multiple opportunities to cure their status by presenting proof of citizenship and may vote once they have presented proof of citizenship.  Harvey Dep. at 128:19-23; 130:8-14; 131:9-132:13; 138:11-139:13; 141:2-8; 240:14-241:5.**

26.   Notice letters informing applicants of pending status due to failed citizenship matching are sent in English only, except for those letters sent to residents of Gwinnett County, which is required to provide materials in Spanish under Section 203 of the Voting Rights Act. Harvey Dep. 133:17-134:3; see 52 U.S.C. § 10503.

**Response:     Defendant does not dispute that residents in Gwinnett County are sent bilingual letters and residents in the remaining counties are sent letters only in English.  Harvey Dep. at 133:20-134:3. The remaining allegations are legal conclusions which are not appropriate under L.R. 56.1.**

27.   When an applicant is inaccurately flagged as a noncitizen and arrives at the polls on Election Day, they will be denied a regular ballot unless they present acceptable DPOC to a poll manager, who can override the citizenship flag. Harvey Dep. 138:5-139:13. If the voter cannot present acceptable DPOC at the polls on Election Day, they are permitted only to vote a provisional ballot; their vote will not be counted unless the applicant

returns to their county registrar's office with acceptable DPOC within three days of the election. *Id.*

**Response:  SSMF no. 27 is argumentative and contains multiple statements of opinion and not fact and is not a proper statement of a single, concise statement of fact under L.R. 56.1(B)(1).   SSMF no. 27 does not accurately state the testimony of Mr. Harvey, mischaracterizes his testimony and therefore, SSMF no. 27 does not comport with the requirements of L.R. 56.1.   Mr. Harvey testified registrants flagged for citizenship have multiple opportunities to cure their status by presenting proof of citizenship and may vote once they have presented proof of citizenship.   Harvey Dep. at 128:19-23; 130:8-14; 131:9-132:13; 138:11-139:13; 141:2-8.**

28.   Before the Court's preliminary injunction order in this case, the Secretary of State required applicants erroneously flagged as noncitizens who showed up to the polls to present acceptable DPOC to deputy registrars rather than to poll managers. PI Order at 16-17, 28, 35; Harvey Dep. Ex. 17 (Nov. 2, 2018 Official Election Bulletin), ECF 131-1 at 349.

**Response:  SSMF no. 28 contains legal conclusions and is not a proper statement of fact as required by L.R. 56.1.**

29.   When an applicant who is inaccurately flagged as a noncitizen

requests an absentee ballot, they will be issued a provisional absentee ballot, which will not be counted unless the applicant encloses acceptable DPOC with their provisional absentee ballot or produces acceptable DPOC to their county registrar's office within three days of the election. Harvey Dep. 142:19-144:9. In at least Gwinnett County, the county registrar does not even accept DPOC provided with the provisional absentee ballot, instead requiring voters to provide it by mail in a separate envelope, by fax, or in person. Deposition of Kelvin Williams ("Williams Dep.") 234:6-21, ECF 147.

**Response:  SSMF no. 29 is argumentative, repetitive and is not a concise single statement of fact as required under L.R. 56.1.  The remaining facts as pertains to the Secretary may be considered by the Court for purposes of the motion for summary judgement however the facts that relate to Gwinnett County are immaterial and irrelevant as the claims in this case are asserted against the Secretary only.**

30.   Although Mr. Harvey testified that the Secretary of State had "gotten rid" of a 26-month deadline by which an applicant flagged as a noncitizen must provide DPOC or have their registration application cancelled, Harvey Dep. 255:10- 15, election officials in DeKalb and Gwinnett County testified that the 26-month cancellation deadline is still enforced.

Deposition of Twyla Hart ("Hart Dep.") 15:15-23, 27:24-29:5, ECF 149 ("[T]he voter has 26 months . . . to submit the information for documentation that they are a citizen of the United States."); Williams Dep. 15:4-16:12, 159:11-160:18, 202:1-203:10 (referring to applicants who failed to verify for citizenship being put into a 26-month pending status).

**Response:  SSMF no. 30 states facts that are not material. Plaintiffs are not challenging how long registrants may remain on pending status but rather contest the requirement that newly naturalized citizens are flagged for citizenship and need to provide proof of citizenship when registering to vote.  Further, county officials do not implement any automatic deadlines. Harvey Dep. at 128:19-24.**

31.  Not all voter registration applications undergo the citizenship matching protocol. McDonald Decl., ECF 135 at 253-57.

**Response: Plaintiffs' expert opinion and his interpretation of facts is not a proper statement of fact under L.R. 56.1(B)(1)(c).**

32.  Applicants who attest they are U.S. citizens and do not provide a Georgia driver's license or state ID card number or the last four digits of their social security number on their voter registration form are assigned a unique identifying number in ENet, which allows them to bypass the citizenship

matching protocol entirely; they are registered as active voters if otherwise eligible. Harvey Dep. 76:15- 79:9. Applicants who attest that they are U.S. citizens and provide only the last four digits of their social security number also bypass the protocol and are registered as active voters if otherwise eligible. *Id.*82:20-83:21.

**Response:**     **SSMF no. 32 is argumentative, is not a proper, separate statement of fact, and misstates Mr. Harvey's testimony. Mr. Harvey testified that registrants are required by law to provide their driver's license number, state ID no. and the last four digits of their social security number if they have one and it is not optional. Harvey Dep. at 72:11-22; 79:18-21.**

33.     In Georgia, only applicants flagged as noncitizens and placed in pending status by the citizenship matching protocol are required to provide DPOC in order to cast a ballot that will be counted. *Id.*49:16-50:11.

**Response:**     **SSMF no. 33 is argumentative, conclusory and misstates Mr. Harvey's testimony as such should not be considered by the Court.  Mr. Harvey testified in response to counsel's question that proof of citizenship is enforced with respect to registrants placed in pending status.  Harvey Dep. at 50:1-11.**

**B. The Citizenship Matching Protocol Is Predictably Inaccurate**

**and Discriminates Against Naturalized Citizens and People of Color.**

34.   Dr. Michael McDonald, an expert in U.S. election data analysis and election administration, concluded that the citizenship matching protocol relies on outdated DDS citizenship data to "verify" the citizenship status of voter registration applicants, resulting in eligible U.S. citizens—largely naturalized citizens—being placed into "pending" status when their application data is matched against the stale DDS data. McDonald Decl., ECF 135 at 246-49, 260-63; McDonald Dep. Ex. 4 ("McDonald Rebuttal Decl."), ECF 135 at 334-35; see also Harvey Dep. 213:8- 214:3; McClendon Dep. 123:17-124:23, 125:11-126:5, 129:21-130:18.

**Response:   The conclusions asserted by Plaintiffs' expert are statements of opinion not facts as required under L.R. 56.1 and should be considered by the Court.**

35.   Neither the Secretary of State's office nor DDS instructs naturalized citizens to update their citizenship status with DDS before registering to vote to ensure that new citizens are not erroneously placed in pending status. Harvey Dep. 146:15-148:17; McClendon Dep. 85:7-87:14; Hart Dep. 51:12-16. Nor does DDS make any effort to independently update citizenship data to reflect the current citizenship status of voter registration

applicants when they register to vote. McClendon Dep. 98:2-99:2, 117:11-21, 138:23-139:2.

**Response:**       **Defendant objects to SSMF no. 35 to the extent that it implies a legal conclusion that some requirement under law has been violated and is therefore not a proper statement of fact in compliance with L.R. 56.1(B)(1)(c).   SSMF no. 35 also does not comport with L.R. 56.1 in that it asserts multiple facts as a single statement of fact.**

36.   The Georgia Secretary of State's website and the DDS website contain no information notifying Georgia's naturalized citizens who previously held limited term driver's licenses before becoming naturalized U.S. citizens that they will be inaccurately flagged as potential noncitizens; will not be registered to vote; and will be unable able to cast a ballot that will count unless they produce DPOC to their county registrar, a deputy registrar, or poll manager. *Id.*87:9-14.

**Response:**       **SSMF no. 36 is argumentative, misstates the information on the website, contains multiple statements of fact and thereby does not comply with the requirements of L.R. 56.1(B)(1) and should not be considered by the Court.**

37.   Because temporary driver's licenses offered to noncitizens need

not be renewed for five years, newly naturalized citizens are unlikely to do so after completing their naturalization ceremony. Harvey Dep. 213:8-214:3, 214:14-23 (admitting that people "are not diligent in updating their driver's license information," and adding that he "doubt[s] the first step after leaving the [naturalization] ceremony is going to DDS and updat[ing] their information")

**Response:** **SSMF no. 39 does not comply with L.R. 56.1 in that it combines several facts and statements instead of separately numbering each fact. Mr. Harvey's speculation as to what others might do or not do is not a proper statement of fact under LR. 56.1 and should not be considered by the Court.**

38.   The process of updating a limited term driver's license also entails traveling to DDS in person and paying an "update fee." McClendon Dep. 79:4-19, 84:19-85:4, 103:5-21. Online renewal of licenses is unavailable to individuals who received their licenses as noncitizens. *Id*.80:4-22.

**Response:** **SSMF no. 38 is not in compliance with L.R. 56.1 in that it asserts multiple facts as a single, numbered paragraph. Defendants also object to SSMF no. 38 in that it is an incomplete statement of the facts concerning DDS' procedure for updating non-citizens' driver's licenses.**

39. The citizenship matching protocol works differently for naturalized citizens than it does for native-born citizens. McDonald Rebuttal Decl., ECF 135 at 333-34. Because the matching protocol relies on stale DDS citizenship data and naturalized citizens are not required to update their citizenship information with DDS, any naturalized citizen who obtained a Georgia driver's license before naturalization—and for whom DDS thus has out-of-date citizenship records—will have their active registration blocked until they provide acceptable DPOC. *Id*.; McDonald Decl., ECF 135 at 249, 260-61; Hart Dep. 52:4-12, 98:6-99:2; McClendon Dep. 123:17-124:23, 125:11-126:5. Native-born citizens, by contrast, are not placed in pending status or required to submit any DPOC beyond the usual voter registration form because their DDS records do not reflect that they were previously noncitizens. McDonald Rebuttal Decl., ECF 135 at 334; Harvey Dep. 49:16-50:11; McClendon Dep. 129:21-130:18.

**Response:**        **Defendant objects because the cited testimony does not support the facts, and further objects to the inclusion of multiple sentences and facts stated as a single, numbered statement in violation of L.R. 56.1(B)(1).  Defendant also objects on the ground that reference to conclusions of Plaintiffs' expert is not a proper statement of fact under L.R. 56.1 (B)(1) and should not be considered**

32

**by the Court.**

40.   Dr. McDonald's analysis shows that "a substantial percentage of all Georgians who became naturalized citizens between 2017 and 2019 and attempted to register to vote were incorrectly flagged as potential non-citizens by the database matching process and appeared on a pending list, requiring them to provide additional information to election officials to register to vote." McDonald Rebuttal Decl., ECF 135 at 334-35.

**Response:  The conclusions of Plaintiffs' expert are conclusory statements of opinion, not statements of fact as required by L.R. 56.1 (B)(1) and should not be considered by the Court.**

41.   Tens of thousands of individuals naturalize in Georgia each year. Ex. 7 in Support of Pls.' Resp. to Def. MSJ, "Naturalization Statistics."

**Response: Defendant does not dispute this fact or that it should be considered by the Court for purposes of the motion for summary judgment.**

42.   Dr. McDonald also found that even though naturalized citizens often proactively attempt to prevent their voter registration applications from being put into pending status by enclosing their naturalization certificates with their voter registration forms, they have nevertheless been flagged as potential noncitizens and put into pending status. McDonald

Decl., ECF 135 at 250, 261-64; McDonald Rebuttal Decl., ECF 135 at 334-35 (opining that being "forced to further engage with local election officials and provide proof of citizenship a second time" is a "substantial" burden).

**Response:  The conclusions of Plaintiffs' expert are conclusory statements of opinion, not statements of fact as required by L.R. 56.1 (B)(1) and should not be considered by the Court. Defendant further objects that the cited evidence does not support the fact.**

43.   In January 2019, the Secretary of State's office discovered that when county election officials manually updated an applicant's citizenship status in ENet based on applicant-provided DPOC, the DDS matching protocol would continue to erroneously report that the applicant was a noncitizen based on outdated DDS citizenship data. Harvey Dep. 191:5-194:15; see also Harvey Dep. at Ex. 18, ECF 131 at 464-65 ("Official Election Bulletin" describing software update to account for fact that "DDS may not be updated with the latest citizenship status"). Mr. Harvey testified that the Secretary of State's office implemented a software change to resolve the issue. Harvey Dep. 191:5-194:15; see also Harvey Dep. at Ex. 18, ECF 131 at 464-65.

**Response:  Defendant objects to the assertion of multiple facts as a single factual statement which does not comport with L.R.**

**56.1(B)(1). In addition, Plaintiffs' reference to Mr. Harvey's testimony is incomplete. He testified that "the DDS no citizen response wouldn't override the documentation provided to the registrant, as it shouldn't." Harvey Dep. at 192:20-193:21.**

44. But despite that purported fix, naturalized citizens who provide copies of their naturalization certificates with their voter registration applications are still "being flagged en masse as potential noncitizens by the DDS matching system." McDonald Decl., ECF 135 at 250. Such documentation is frequently overlooked, not properly entered into ENet, or preempted by inaccurate DDS information, requiring the voter to re-submit the documentation or cast a provisional ballot. *Id*.; Hart Dep. 164:10-165:10, 168:12-20; Deposition of LaTasha Howard ("Howard Dep.") 30:22- 31:3, ECF 148; Harvey Dep. 138:2-143:5, 227:23-228:5 ("[T]he voter registration application has a little pocket in the back [where] people can put documentation[,] .. . [and t]hey may fold it up and jack it down in there and it may get missed.").

**Response:  The conclusions of Plaintiffs' expert are statements of opinion and not statements of fact as required by L.R. 56.1 (B)(1) and should not be considered by the Court.  Defendant also objects to  SSMF  44  as  asserting  multiple  "facts"  as  a  single  factual**

35

**statement.  To the extent that SSMF no. 44 is argumentative, it is not a proper statement of fact, and the cited evidence only supports failures of action by county officials, not by the Secretary, and thus does not support the fact.**

45.   For example, the citizenship matching protocol forced Harvey Soto, GALEO's former Policy Analyst and Program Coordinator for Civic Engagement, to take "time-consuming and burdensome" steps to ensure the registration of a registration applicant who had been inaccurately flagged as a potential noncitizen after he registered to vote following a naturalization ceremony in December 2017— even though the applicant submitted a copy of his naturalization certificate as DPOC with his voter registration application. Decl. of Harvey Soto ¶¶ 2, 5-18, ECF 17-12.

**Response:       Defendant objects to SSMF no. 45 on the grounds that the facts stated therein are immaterial to the claims asserted against the Secretary who does not control the actions within the responsibility of the counties.**

46.   In order to resolve the issue, Mr. Soto had to accompany the applicant in person to the Fulton County Board of Registration and Election's office, where they initially received inaccurate information about what documentation was needed to resolve the issue before the applicant was

finally added to the active registration list. *Id.*¶¶ 11-19.

**Response:**       **Defendant objects to SSMF no. 46 as an incomplete statement of fact as it fails to state that Mr. Soto was in fact able to vote.  Soto Decl. ¶ 19.  Defendant also objects to SSMF no. 46 on the grounds that the facts stated therein are immaterial to the claims asserted against the Secretary who does not control the actions within the responsibility of the counties.**

47.   Maria del Rosario Palacios became a permanent resident in 2009 and applied for a Georgia driver's license, which likely led to her being registered as a noncitizen in the DDS database. Decl. of Maria del Rosario Palacios, ¶¶ 4, 13, ECF 17-13. Only with the intervention of GALEO and of the Attorney General's office was she able to register to vote. *Id.*¶¶ 16-18.

**Response:**       **Defendant objects to SSMF no. 47 on the grounds that the facts stated therein are immaterial to the claims asserted against Defendant as they entail activity that is the responsibility of the counties and not the Secretary who Secretary who does not control the counties and does not comport with L.R. 56.1(B).**

48.   Numerous others have been erroneously placed in pending status due to outdated DDS citizenship data despite proactively providing DPOC

with their voter registration applications. See Am. Decl. of Dr. Peyton McCrary ("McCrary Decl."), ECF 136-6 at 77, 137 (noting that a former deputy registrar from Troup County stated she was "aware of several instances where applicants were put into pending status due to the failure to verify for citizenship . . . even though they had submitted a copy of their naturalization certificate with their voter registration form."); Howard Dep. at 6:8-7:8, 30:22-31:3 (DeKalb County official stated that she encountered instances of voters placed in pending status despite indicating that they had submitted DPOC); Hart Dep. at 15:15-23, 154:9-16, 160:12-18, 164:10-166:16 (DeKalb County official testified that, based on emails with the Secretary of State's office, her office interacted with 27 individuals placed in pending status based on citizenship despite submitting DPOC); Hart Dep. at Ex. 4, ECF 149 at 274 (email exchange between county official and naturalized citizen who was erroneously flagged as potential noncitizen despite submitting DPOC with his application); Hart Dep. at Ex. 8, ECF 149 at 280 (email exchange in which DeKalb county official apologized for naturalized citizen's erroneous placement in pending status despite the applicant's submitting DPOC with his application).

**Response:**        **Defendant also objects to SSMF no. 48 on the ground that the facts stated therein are immaterial to the claims**

**asserted against the Secretary who does not control the actions within the responsibility of the counties, does not comport with L.R. 56.1(B), and should not be considered by the Court. SSMF no. 48 is also objectionable in that it asserts multiple facts and statements, including hearsay, as a single factual statement which does not comply with L.R. 56.1.**

49.   A DeKalb County official admitted that, if Plaintiff Advancing Justice– Atlanta and the Center for Pan Asian Community Services had not reached out to the County in November 2018 on an applicant's behalf, the County "wouldn't have known" that that applicant was erroneously placed in pending status. Hart Dep. 218:24-222:9. This voter had "never received notification of her pending status" and had subsequently tried to vote in-person, "but was required to cast a provisional ballot since she . . . did not have proof of citizenship with her." Hart Dep. Ex. 15, ECF 149 at 293-94.

**Response:**      **Defendant also objects to SSMF no. 49 on the ground that the facts stated therein are immaterial to the claims asserted against the Secretary who does not control the actions within the responsibility of the counties, does not comport with L.R. 56.1(B), and should not be considered by the Court.**

50.   In August 2019, the Secretary of State's office became aware that

three voter registration applicants who had been inaccurately flagged as noncitizens when they registered to vote in DeKalb County had proactively submitted DPOC with their voter registration forms and should not have been flagged as potential noncitizens when they attempted to register to vote. Harvey Dep. 243:24-246:1. Ultimately, these voters were put into active status following this discovery. Harvey Dep. 245:22-246:1.

**Response:**       **To the extent that the facts stated in SSMF no. 50 are argumentative and not a statement of fact, SSMF no. 50 fails to comply with the requirements of L.R. 56.1 (B).  The remaining factual statements may be considered by the Court for purposes of summary judgment.**

51.   Dr. McDonald determined that Defendant's citizenship matching protocol disproportionately affects applicants of color, as compared to non-Hispanic white applicants. McDonald Decl., ECF 135 at 264-79.

**Response:  The conclusions of Plaintiffs' expert are statements of opinion and not statements of fact as required by L.R. 56.1 (B)(1) and should not be considered by the Court.**

52.   Mr. Harvey testified that there were approximately 4,200 voter registration applicants in pending status because they were flagged as noncitizens as a result of Defendant's citizenship match protocol at the time

of the general election in November 2020 and runoffs in January 2021. Harvey Dep. 270:5-271:14; 276:2- 14, ECF 131. He opined it would be impossible to identify the total number of U.S citizens overall who have been inaccurately flagged as potential noncitizens by Defendant's citizenship matching protocol. *Id*.

**Response:  Defendant objects to SSMF no. 52 on the ground that it asserts multiple facts as a single fact and does not comply with L.R. 56.1.**

53.   Dr. McDonald, however, was able to identify at least 9,696 voters placed in pending status because of a citizenship flag from the seven "pending" lists he reviewed between 2017 and February 2021 alone. McDonald Decl., ECF 135 at 266-272.

**Response:  The conclusions of Plaintiffs' expert are statements of opinion, not statements of fact as required by L.R. 56.1 (B)(1) and should not be considered by the Court.**

54.   Dr. McDonald found that the applicants put into "pending" status because of the citizenship matching protocol were overwhelmingly applicants of color, as compared to non-Hispanic white applicants; of the individuals put into pending status, 26.9% were Asian American or Pacific Islander ("AAPI"), 19.1% were Hispanic, 28.9% were Black, and 13.7% were non-Hispanic

41

white. *Id*.at 266 tbl.1.

**Response:  The conclusions of Plaintiffs' expert are statements of opinion, not statements of fact as required by L.R. 56.1 (B)(1) and should not be considered by the Court.**

55.   Dr. McDonald also found that the applicants who continued to remain in pending for citizenship matching status and had not been moved into registered voter status were disproportionately applicants of color as compared to non-Hispanic white applicants. See *Id*.at 270-72. A comparison of a February 2021 list of pending applicants to similar lists from recent years showed that just 21.6% of non-Hispanic white applicants who had appeared on previous lists remained in pending status, compared to 43.5% of American Indian or Alaskan Native applicants, 33.7% of Hispanic applicants, 31.9% of non-Hispanic Black applicants, and 22.7% of AAPI applicants. *Id*.at 270-71 & tbl.5.

**Response:  The conclusions of Plaintiffs' expert are statements of opinion, not statements of fact as required by L.R. 56.1 (B)(1) and should not be considered by the Court.**

56.   Additionally, Dr. McDonald found that of the 9,696 voter registration applicants initially listed in pending status from 2017 to 2021, 5,169 of the applicants—more than half—appeared on the February 16,

2021, voter file as active or inactive Georgia registered voters, meaning that they were U.S. citizens eligible to register to vote when they were flagged by Defendant's citizenship matching protocol as noncitizens. *Id.*at 251, 268. That many flagged did not ultimately end up on the voter rolls does not mean those applicants were not eligible citizens; rather it indicates that thousands of Georgia citizens could not overcome the DPOC requirement imposed by the citizenship match protocol. See *Id.*at 278 ("Some [eligible applicants] ultimately navigate the hurdles necessary to provide proof of citizenship; others do not.").

**Response:  The conclusions of Plaintiffs' expert are statements of opinion, not statements of fact as required by L.R. 56.1 (B)(1) and should not be considered by the Court.  SSMF no. 56 is also objectionable in that it combines multiple facts and statements as a single statement of fact which is not in compliance with L.R. 56.1 (B).**

57.   Drawing from a large body of scholarly research on voter turnout rates, Dr. McDonald also found that when Defendant's citizenship matching protocol inaccurately flags eligible citizens as noncitizens, it imposes immediate and long- term harms on those eligible voters' propensity to participate in democracy because it hinders their ability to establish voting habits. *Id.*at 276-78.

**Response:**  **The conclusions of Plaintiffs' expert are statements of opinion, not statements of fact as required by L.R. 56.1 (B)(1) and should not be considered by the Court.**

58.   Dr. McDonald concluded that the citizenship match protocol is deeply flawed because it inaccurately flags eligible U.S. citizens as potential noncitizens; disproportionately affects Georgia's most vulnerable citizens, particularly naturalized citizens; affects persons of color more often than white voters; and affects younger voters more often older voters, potentially retarding those young voters' civic development in their formative years and their willingness to vote in future elections. *Id* at 278-79.

**Response:**  **The conclusions of Plaintiffs' expert are statements of opinion, not statements of fact as required by L.R. 56.1 (B)(1) and should not be considered by the Court. SSMF no. 58 is also objectionable in that it is argumentative and combines multiple facts and statements as a single statement of fact which is not in compliance with L.R. 56.1 (B).**

59.   He also opined that the flawed citizenship matching protocol accomplishes no meaningful election administration function; has multiple failure points that may result in requiring certain people to needlessly jump through additional administrative hurdles through no fault of their own to

exercise their voting rights; and is not justified by any evidence that this process has identified a single known noncitizen, let alone prevented any noncitizen from voting. *Id.*

**Response:  The conclusions of Plaintiffs' expert are statements of opinion, not statements of fact as required by L.R. 56.1 (B)(1) and should not be considered by the Court. SMF no. 59 is also objectionable in that it is argumentative and combines multiple facts and statements as a single statement of fact which is not in compliance with L.R. 56.1 (B).**

V.    **The Citizenship Matching Protocol Has Never Achieved Its Intended Purpose and the State Has Failed to Adopt Known Measures to Protect Naturalized Citizens from Its Discriminatory Impact.**

60.   There are no documented instances of a noncitizen being indicted for or convicted of the crime of voter fraud in Georgia. *Id.*at 250.

**Response:  The conclusions of Plaintiffs' expert are statements of opinion, not statements of fact as required by L.R. 56.1 (B)(1) and should not be considered by the Court.**

61.   Neither Mr. Harvey nor county election officials were unable to name a single instance in which the protocol correctly identified an ineligible noncitizen attempting to vote; thus, Defendant is unaware of any instance

where the protocol has prevented fraud. See Hart Dep. 242:13-20, ECF 149; Harvey Dep. 190:5-18, ECF 131. Additionally, Defendant is unaware of the citizenship matching protocol spurring an investigation or finding that a noncitizen attempted to register to vote. Harvey Dep.190:5-15.

**Response:** **Despite the double negative in SSMF which likely is a typographical error, Defendant objects to the implied legal conclusion that the citizenship protocol is defective. Rather, it demonstrates that the system may be working as admitted by Plaintiffs' expert. McDonald Dep. at 46:18-47:3 [Doc. 135]. Defendant further objects that this fact is immaterial.**

62.   Defendant has also admitted that he is aware of additional possible protocols, such as using the SAVE system "to . . . double check the status of pending citizenship status," *Id.*153:19-154:9, 156:20-157:8, but has failed to adapt its current protocol in any manner to protect affected eligible citizens. SAVE, which stands for "Systematic Alien Verification for Entitlements," is a program enabling a state agency to ask U.S. Citizenship and Immigration Services for information about an applicant's citizenship status. McCrary Decl., ECF 136-6 at 94.

**Response: The conclusions of Plaintiffs' expert are statements of opinion, not statements of fact as required by L.R. 56.1 (B)(1) and**

**should not be considered by the Court and this fact is also immaterial.**

63. Defendant is well aware that the DDS database is "certainly outdated" with respect to citizenship, Harvey Dep. 193:24-194:6, and knows that its current protocol operates in a way that guarantees many naturalized citizens will be inaccurately flagged as noncitizens, *Id.*213:12-214:3, 214:18-215:6.

**Response:      SSMF No. 63 is argumentative and conclusory and is not a proper statement of fact to be considered by the Court under L.R. 56.1.**

64. Despite longstanding knowledge of the citizenship matching protocol's inherent inaccuracies with respect to citizenship of naturalized citizens, McCrary Decl. ECF 136-6 at 147-48, 154, Defendant has decided nevertheless to maintain the protocol, see infra ¶¶ 65-71.

**Response: The conclusions of Plaintiffs' expert are statements of opinion, and not statements of fact to be considered by the Court under L.R. 56.1 (B)(1). SSMF is also argumentative and is not a proper statement of fact under L.R. 56.1 (B) because it relies on other paragraphs instead of evidence in the record.**

**VI.    The Discriminatory Burdens on Minority Applicants**

Subjected to the Citizenship Matching Protocol Are Linked to Social and Historical Conditions of Discrimination.

65. Georgia has maintained some version of a citizenship matching protocol since at least 2008. McCrary Decl., ECF 136-6 at 94. The Georgia Secretary of State's office began implementing a predecessor version of the current citizenship matching protocol—which also inaccurately flagged U.S. citizens as potential noncitizens—shortly before the 2008 presidential election without first obtaining preclearance as required by Section 5 of the Voting Rights Act of 1965. Morales v. Handel, No. 1:08-CV-3172, 2008 WL 9401054 (N.D. Ga. Oct. 27, 2008).

**Response: Plaintiffs' legal conclusions and the conclusions of their expert are not statements of fact as required by L.R. 56.1 (B)(1) and should be not be considered by the Court.**

66. After the Secretary of State finally submitted the protocol for preclearance, the U.S. Department of Justice ("DOJ") objected to Georgia's submission. See Ex. 8 in Support of Pls.' Resp. to Def. MSJ, DOJ Letter. The DOJ concluded that the initial version of the program relied on an error-laden and "possibly improper" usage of the SSA's Help America Vote Verification ("HAVV") system and outdated DDS data in an attempt to find noncitizens. See *id*.

48

**Response:  SSMF no. 66 is based on hearsay, is inadmissible, does not comport with L.R. 56.1(B)(1) and should be not be considered by the Court pursuant to L.R. 56.1(B)(1) and (3).  Fed. R. Evid. 802; Macuba v. DeBoer, 193 F.3d 1316. 1322 (11th Cir. 1999); see also Carr v. Tatanglo, 338 F.3d 1259, 1273 n.27(11th Cir. 1999) (unsworn statements "cannot be considered by a district court in ruling on a summary judgment motion").  Defendant further objects that this fact is immaterial.**

67.   The Attorney General's objection letter also found Georgia's citizenship matching protocol was unreliable and had a discriminatory effect upon non-white applicants:

We have considered the accuracy of the state's verification process. Our analysis shows that the state's process does not produce accurate and reliable information and that thousands of citizens who are in fact eligible to vote under Georgia law have been flagged[,] . . . a large number of [whom] have subsequently demonstrated that they are in fact citizens. Indeed, of the 7,007 individuals who have been flagged . . . as potential non-citizens, more than half were in fact citizens. . . . 45.7 percent [of such citizens] provided proof that they were naturalized citizens, suggesting that the driver's license database is not current for recently naturalized citizens.

The impact of these errors falls disproportionately on minority voters. . . . Although African American and white voters represent approximately equal shares of the new voter registrants between May 2008 and March 2009, more than sixty percent more African Americans voters who registered during this period are currently flagged than are whites. Again, this rate is statistically significant       Hispanic and Asian individuals are more than twice as likely to appear on the list as are white applicants. Each of the differences is

statistically significant.

In sum, the state's proposed procedures for verifying voter registration information are seriously flawed. This flawed system frequently subjects a disproportionate number of African-American, Asian, and/or Hispanic voters to additional and, more importantly, erroneous burdens on the right to register to vote. These burdens are real, are substantial, and are retrogressive for minority voters. As such, an objection based upon the state's failure to establish the absence of a discriminatory effect is warranted."

*Id.*

**Response: SSMF no. 67 is based on hearsay, is inadmissible and should be not be considered by the Court pursuant to L.R. 56.1(B)(1) and (3).  Fed. R. Evid. 802; <u>Macuba v. DeBoer</u>, 193 F.3d 1316. 1322 (11th Cir. 1999); <u>see also Carr v. Tatanglo</u>, 338 F.3d 1259, 1273 n.27(11th Cir. 1999) (unsworn statements "cannot be considered by a district court in ruling on a summary judgment motion"). Defendant further objects that this fact is immaterial.**

68.  While a later iteration of the "exact match" protocol was precleared in 2010, it is not apparent that the Secretary of State ever followed the safeguards promised in the preclearance submission that led to its approval, and a coalition of civic engagement groups sued to enjoin the practice. See McCrary Decl., ECF 136- 6 at 121, 124-25, 130-32; Compl., NAACP v. Kemp, No. 2:16-cv-00219-WCO (N.D. Ga. Sept. 14, 2016), ECF No. 1.

**Response:  Plaintiffs' legal conclusions and the conclusions of their expert are not statements of fact as required by L.R. 56.1 (B)(1) and should be not be considered by the Court. Defendant further objects that this fact is immaterial.**

69.    Brian Kemp, Secretary of State at the time, subsequently agreed to a settlement to end cancellations of voter registration applications based on the "exact match" protocol in early 2017, and the lawsuit was dismissed. McCrary Decl., ECF 136-6 at 132.

**Response:  Plaintiffs' legal conclusions and the conclusions of their expert are not statements of fact as required by L.R. 56.1 (B)(1) and should be not be considered by the Court.**

70.    Nevertheless, in 2017, the legislature codified the "exact match" protocol in H.B. 268, and the legislation predictably continued to cause thousands of prospective Georgia voter registration applicants—the vast majority of whom identify as African-American, Latino and Asian-American—to be placed in "pending" status because they had been incorrectly identified as noncitizens. *Id.*at 132-33, 138.

**Response:  Plaintiffs' legal conclusions and the conclusions of their expert are not statements of fact as required by L.R. 56.1 (B)(1) and should be not be considered by the Court.**

51

71.   After Plaintiffs filed this lawsuit, the Georgia Legislature eliminated the "exact match" process through the enactment of H.B. 316 in 2019, but it did nothing to address the accompanying citizenship matching protocol. *Id.*at 140-41; Harvey Dep. 266:22-267:22; Harvey Dep. Ex. 27, ECF 131 at 700-01. Since that time, neither Defendant Raffensperger nor the state legislature have acted to mitigate the citizenship matching protocol's discriminatory impact on naturalized citizens and people of color. *Id.*149:23-150:5, see supra ¶¶ 20-21.

**Response:   Plaintiffs' legal conclusions and the conclusions of their expert are not statements of fact as required by L.R. 56.1 (B)(1) and should be not be considered by the Court. Defendant further objects because this statement contains multiple facts and relies on other paragraphs, not evidence in the record.**

72.   There is also a long—and well-documented—history of voting-related discrimination in Georgia. See, e.g., Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs, 950 F. Supp. 2d 1294, 1314-16 (N.D. Ga. 2013) ("Generally, Georgia has a history chocked full of racial discrimination at all levels." (internal quotation omitted)), vacated and remanded on other grounds, 775 F.3d 1336 (11th Cir. 2015); Johnson v. Miller, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994) (noting that "we have given formal judicial

notice of the State's past discrimination in voting, and have acknowledged it in the recent cases"), aff'd and remanded, 515 U.S. 900 (1995); McCrary Decl., ECF 136-6 at 84-90.

**Response:  Plaintiffs' legal conclusions and the conclusions of their expert are not statements of fact as required by L.R. 56.1 (B)(1) and should be not be considered by the Court.**

73.   During and following Reconstruction, Georgia used a variety of methods to deny the vote to Black Georgians, including literacy tests, all-white primaries, poll taxes, grandfather clauses, and voter purges. McCrary Decl., ECF 136-6 at 84-90.

**Response:  Plaintiffs' legal conclusions and the conclusions of their expert are not statements of fact as required by L.R. 56.1 (B)(1) and should be not be considered by the Court.  Defendant further objects that this fact is immaterial to the claims in this case.**

74.   In the period after Georgia's white primary was struck down in 1946 and before the Voting Rights Act of 1965 was signed into law by President Lyndon Johnson, the state's voter registration requirements, particularly literacy tests, became even more important tools for white political leaders to limit the participation of Black Georgians in elections. *Id.* at 85-86.

**Response:  Plaintiffs' legal conclusions and the conclusions of their expert are not statements of fact as required by L.R. 56.1 (B)(1) and should be not be considered by the Court.  Defendant further objects that this fact is immaterial to the claims in this case.**

75.    Following the enactment of the Voting Rights Act of 1965, Georgia saw Black voter registration begin to substantially increase, and white political leaders in Georgia responded by finding new ways to limit Black participation in elections, including by limiting the number of voters who could receive assistance in voting—a limitation that was aimed at Black voters who disproportionately needed assistance in voting because of illiteracy. *Id.*at 88-90.

**Response:  Plaintiffs' legal conclusions and the conclusions of their expert are not statements of fact as required by L.R. 56.1 (B)(1) and should be not be considered by the Court. Defendant further objects that this fact is immaterial to the claims in this case.**

76.    The changing demographics of the state—which has seen substantial increases in its Black, Latinx, and AAPI populations, including large populations of immigrants of color—have had a significant impact on the state's politics. *Id.*at 106-08.

**Response:  Plaintiffs' legal conclusions and the conclusions of**

**their expert are not statements of fact as required by L.R. 56.1 (B)(1)
and should be not be considered by the Court.**

77.  The response by the Georgia Legislature and some elected
officials has included proposing and enacting anti-immigration measures,
including a recent proposal by Defendant Raffensperger to amend the
Georgia Constitution to prohibit noncitizens from voting in Georgia's
elections, despite the fact that Georgia law already requires voters in the
state to be U.S. citizens. See Ga. Code Ann. §§ 21-2- 216(a)(2), 21-2-220; Ex.
9 in Support of Pls.' Resp. to Def. MSJ, "Raffensperger's Call for Citizen-Only
Elections Supported by National Election Integrity"; Ex. 10 in Support of
Pls.' Resp. to Def. MSJ, "Georgia elections chief seeks constitutional ban on
voting that's already illegal."

**<u>Response:</u>  Plaintiffs' legal conclusions and the conclusions of
their expert are not statements of fact as required by L.R. 56.1 (B)(1)
and should be not be considered by the Court. Defendant further
objects that this fact is immaterial to the claims in this case.**

78.  In 2016, Georgia State Senator Joshua McKoon unsuccessfully
attempted to pass Senate Resolution 675 to amend the Georgia Constitution
to make English the state's official language and prohibit the use of any
language other than English in any Georgia state or local government

document, proceeding, or publication. See Ex. 11 in Support of Pls.' Resp. to Def. MSJ, S.R. 675 (Ga. 2016); Ex. 12 in Support of Pls.' Resp. to Def. MSJ, "Georgia House panel blocks English- only amendment to constitution."

**Response:  Plaintiffs' legal conclusions and the conclusions of their expert are not statements of fact as required by L.R. 56.1 (B)(1) and should be not be considered by the Court. by the Court.   In addition, SSMF no. 78 is also based on hearsay, is inadmissible and should be not be considered by the Court. pursuant to L.R. 56.1(B)(1) and (3).  Fed. R. Evid. 802; <u>Macuba v. DeBoer</u>, 193 F.3d 1316. 1322 (11th Cir. 1999); <u>see also Carr v. Tatanglo</u>, 338 F.3d 1259, 1273 n.27(11th Cir. 1999) (unsworn statements "cannot be considered by a district court in ruling on a summary judgment motion"). Defendant further objects that this fact is immaterial to the claims in this case.**

79.  In 2016, Senator McKoon also sponsored Senate Bill 6, which, had it not died in the Georgia House, would have required the issuance of a "driver safety card" or special ID card to DACA recipients in lieu of a driver's license, limited term driver's license, or state ID card. Ex. 13 in Support of Pls.' Resp. to Def. MSJ, S.B. 6 § 2 (Ga. 2016). The card would have featured the following language: "DRIVING SAFETY CARD', 'NOT FOR

IDENTIFICATION', 'NO LAWFUL STATUS', and 'NOT ACCEPTABLE FOR OFFICIAL PURPOSES." Id.

**Response:  Plaintiffs' legal conclusions and the conclusions of their expert are not statements of fact as required by L.R. 56.1 (B)(1) and should be not be considered by the Court. by the Court.   In addition, SSMF no. 79 is also based on hearsay, is inadmissible and should be not be considered by the Court. pursuant to L.R. 56.1(B)(1) and (3).  Fed. R. Evid. 802; Macuba v. DeBoer, 193 F.3d 1316. 1322 (11th Cir. 1999); see also Carr v. Tatanglo, 338 F.3d 1259, 1273 n.27(11th Cir. 1999) (unsworn statements "cannot be considered by a district court in ruling on a summary judgment motion"). Defendant further objects that this fact is immaterial to the claims in this case.**

80.   Dr. McCrary found that the increasing racial and ethnic diversity within the state has led to many of these kinds of efforts to enact anti-immigrant measures; a stubborn refusal to increase voter participation in the state's increasingly diverse populations; and the Secretary of State's office's refusal to end its discriminatory citizenship matching protocol, which is reminiscent of the state's discriminatory requirements for registration and voting before the adoption of the Voting Rights Act. McCrary Decl., ECF 136-

6 at 106-21.

**Response:  Plaintiffs' legal conclusions and the conclusions of their expert are not statements of fact as required by L.R. 56.1 (B)(1) and should be not be considered by the Court. Defendant further objects that this fact is argumentative in violation of L.R. 56.1 and is immaterial to the claims in this case.**

81.   Voting patterns in Georgia are racially polarized: courts have repeatedly held that racially polarized voting exists at the state, county, and local levels. See, e.g., Georgia v. Ashcroft, 195 F. Supp. 2d 25, 88 (D.D.C. 2002), rev'd on other grounds, 539 U.S. 461 (2003); Fayette Cnty. Bd. of Comm'rs, 950 F. Supp. 2d at 1316; Ga. State Conf. of the NAACP v. Kemp, 312 F. Supp. 3d 1357, 1360 (N.D. Ga. 2018) (panel majority decision) (noting that voting in Georgia is "highly racially polarized").

**Response:  Plaintiffs' legal conclusions and the conclusions of their expert are not statements of fact as required by L.R. 56.1 (B)(1) and should be not be considered by the Court. Defendant further objects that this fact is immaterial to the claims in this case.**

82.   Persons of color have not been elected to public office in Georgia at a rate that is commensurate with their share of the population: all of the current statewide elected officials are white, and non-white Georgians are

underrepresented in the Georgia House of Representatives and Senate, as well as in the state's congressional delegation. McCrary Decl., ECF 136-6 at 38.

**Response:  Plaintiffs' legal conclusions and the conclusions of their expert are not statements of fact as required by L.R. 56.1 (B)(1) and should be not be considered by the Court. Defendant further objects that this fact is immaterial to the claims in this case.**

Respectfully submitted this 20th day of October, 2021.

STATE LAW DEPARTMENT

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
State Law Department
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot

Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**TAYLOR ENGLISH DUMA LLP**
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249

*Counsel for Defendant Secretary of State*
*Brad Raffensperger*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing DEFENDANT'S REPONSE IN OPPOSITION TO PLAINTIFFS' SEPARATE STATEMENT OF MATERIAL FACTS has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson