**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

GEORGIA COALITION FOR THE    *
PEOPLES' AGENDA, INC.,    *
as an organization, et al.    *
   *
       Plaintiffs,    *
   *
       v.    *       1:18-CV-04727-ELR
   *
BRAD RAFFENSPERGER,    *
in his official capacity as Secretary of    *
State for the State of Georgia,    *
   *
       Defendant.    *
   *

_____

**O R D E R**

_____

Presently before the Court is Defendant Brad Raffensperger's "Motion for Summary Judgment." [Doc. 142]. The Court sets forth its reasoning and conclusions below.

## I.    Background[1]

This case concerns a challenge to the Georgia Secretary of State's citizenship verification protocol for naturalized citizens seeking to become registered voters in (the "citizenship verification protocol").[2]  See generally Defendant's Statement of Material Facts ("Def.'s SOMF") [Doc 142-2]; Plaintiffs' Separate Statement of Material Facts ("Pls.' SOMF") [Doc. 151-15].   On October 11, 2018, Plaintiffs Georgia Coalition for the Peoples' Agenda, Inc.; ProGeorgia State Table, Inc.; Georgia State Conference of the NAACP; Asian Americans Advancing Justice – Atlanta, Inc.; New Georgia Project, Inc.; and Georgia Association of Latino Elected Officials, Inc. initiated this suit against the Georgia Secretary of State ("the Secretary") in his official capacity (at the time, now-Governor Brian Kemp; at present, Mr. Brad Raffensperger).  See Compl. [Doc. 1].  Since that time, Plaintiffs

---

[1] The facts discussed herein are undisputed unless noted otherwise.  The Court uses the Parties' proposed facts and responses as follows: where one side admits a proposed fact in part, the Court includes the undisputed part.  Where one side denies a proposed fact in whole or in part, and the fact is material to the instant order, the Court reviews the record and determines whether a factual dispute exists.  If the denial is without merit, then the Court cites only to the proposed fact and not the response.  Although the Court has endeavored to deal with all objections, given the sheer number of them (particularly objections to form), where the Court has cited a Party's proposed fact with no discussion of the objection thereto, the Court has considered the relevant objection but overruled it.  Finally, the Court excludes proposed facts that are immaterial, includes facts drawn from its own review of the record, and considers all proposed facts in light of the standard for summary judgment.  See LR 56.1(B)(2)(a)(2)(iii), NDGa.; see also FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); Tomasini v. Mt. Sinai Med. Ctr. of Fla., 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004) (explaining that a district court is not obligated to "scour the record" to determine whether triable issues exist).

[2] For further factual and procedural background, the Court refers to its Order dated November 2, 2018.  [See Doc. 33].

have amended their Complaint three (3) times, and they are now joined by the following co-Plaintiffs: Judith Martinez Cruz (an individual), Common Cause, and GALEO Latino Community Development Fund, Inc.[3]   See 1st Am. Compl. [Doc. 15]; 2d Am. Compl. [Doc. 57]; 3d Am. Compl. [Doc. 88].

With the sole exception of Plaintiff Cruz (the "Individual Plaintiff"), all current Plaintiffs are non-profit organizations (collectively, the "Organizational Plaintiffs") whose missions include supporting civic engagement and coordinating voter registration programs.   See Pls.' SOMF ¶¶ 1–9.   In particular, Plaintiffs conduct activities aimed at circumventing the pitfalls associated with registering to vote in Georgia as a newly naturalized United States citizen.[4]   See id.

The election-related protocol Plaintiffs herein challenge is that used by the Secretary's office to verify the citizenship of individuals registering to vote in Georgia.   Pursuant to the Help America Vote Act of 2002 ("HAVA"), a state must maintain a single, centralized, electronic database of all registered voters.   See 52 U.S.C. § 21083(a)(1)(A).   In Georgia, this system is called "eNet."   See Pls.' SOMF

---

[3] Former Plaintiff The Joseph and Evelyn Lowery Institute for Justice and Human Rights, Inc. joined this action at the time Plaintiffs submitted their First Amended Complaint, but thereafter, voluntarily dismissed its claims on April 23, 2021.   See 1st Am. Compl.; [see also Doc. 110]. Additionally, former Plaintiff Georgia State Conference of the NAACP voluntarily dismissed its claims on April 23, 2021.   [See Doc. 110].

[4] The Parties dispute whether Organizational Plaintiffs would participate in these efforts in the absence of the current Georgia citizenship verification protocol for newly naturalized citizens.   See Defendant's Response to Plaintiffs' Separate Statement of Material Facts ("Def.'s Resp. to Pls.' SOMF") ¶¶ 1–8 [Doc. 154-1].

¶¶ 16–17.  Further pursuant to HAVA, the Secretary's office sends the information contained in voter registration applications to the Georgia Department of Driver Services ("DDS").  See id. ¶ 18.  If a record exists in the DDS database that matches the information on the voter registration application, DDS indicates to the Secretary's office that person's citizenship status (as it appears in the DDS database only).  See Def.'s SOMF ¶ 9.  Thus, if an individual who registers to vote in Georgia previously indicated that he or she was a non-citizen when that person last interacted with DDS, DDS will report back to the Secretary's office that the individual is a non-citizen, causing his or her voter registration to be placed in a "pending" category.  See id. ¶ 10.  Once a voter is placed in the "pending" category for citizenship verification, he or she must submit documentary proof of citizenship to the Secretary's office, a county board of elections office, a poll manager, or a deputy registrar for his or her voter registration status to be changed to "active."[5]  See Plaintiffs' Response to Defendant's Statement of Material Facts ("Pls.' Resp. to Def.'s SOMF") ¶ 10 [Doc. 151-16]; [see also Doc. 33 at 35] (this Court requiring

---

[5] As context, Plaintiffs characterize this citizenship verification protocol as a "holdover of the state's now-defunct 'exact match' policy[,]" which the Secretary disputes as a legal conclusion. See Pls.' SOMF ¶ 20; Def.'s Resp. to Pls.' SOMF ¶ 20.

the Secretary to permit naturalized citizens to submit documentary proof of citizenship to poll managers in addition to deputy registrars on election day).[6]

However, whenever a person registers to vote in Georgia (regardless of his or her method of registration), that individual is already required to swear or affirm under penalty of perjury that they are a United States citizen.  See Pls.' SOMF ¶¶ 11, 13.  For voter registrants born in the United States, the Secretary verifies the averment of citizenship using the registrant's Georgia driver's license number or the last four (4) digits of the individual's Social Security number.  See Def.'s SOMF ¶¶ 8–9; Pls.' Resp. to Def.'s SOMF ¶¶ 8–9.  The Secretary is able to verify citizenship through the applicant's Georgia's driver's license number because "full" (or "non-limited") Georgia drivers' licenses are only available to United States citizens, who must show proof of citizenship to qualify for one.  See Def.'s SOMF ¶ 3; see also Deposition of Angelique Beauford McClendon ("McClendon Dep.") at 81:11–82:1 [Doc. 132].

If a person is not a citizen but is lawfully in the United States, he or she may obtain a "limited term" Georgia driver's license, which is valid for a maximum term

---

[6] After filing their First Amended Complaint, on October 19, 2018, Plaintiffs submitted an "Emergency Motion for Preliminary Injunction."  [Doc. 17].  After expedited briefing and with the benefit of oral argument from the Parties, by an Order dated November 2, 2018, the Court granted Plaintiffs' motion for preliminary injunction and directed the Secretary to (among other things) "allow county election officials to permit individuals flagged and placed in pending status due to citizenship to vote a regular ballot by furnishing proof of citizenship to poll managers or deputy registrars."  [Doc. 33 at 35].

of five (5) years.  See Def.'s SOMF ¶¶ 4–5.  Thus, if a person obtains a limited term license from DDS prior to becoming naturalized, that person's DDS records will reflect that they are not a citizen unless the person makes a separate trip (in person) to a DDS office to update his or her records with documentary proof of citizenship, pays a fee, and obtains a full Georgia driver's license.  See Def.'s SOMF ¶ 18; Pls.' Resp. to Def.'s SOMF ¶ 16; McClendon Dep. at 79:4–19, 80:4–82:13.  This process cannot be completed online.  See Pls.' Resp. to Def.'s SOMF ¶ 37.

Of course, there is no requirement that a citizen (naturalized or otherwise) must have a driver's license, much less up-to-date DDS records, to register to vote. See Def.'s SOMF ¶ 17; Pls.' Resp. to Def.'s SOMF ¶ 17.  A naturalized citizen may submit his or her documentary proof of citizenship along with a paper voter registration application, send the same separately to election officials after having registered to vote online, or provide it to a poll manager or deputy registrar at the polls on election day.  See Def.'s SOMF ¶¶ 19–20; Pls.' Resp. to Def.'s SOMF ¶¶ 19–20; [see also Doc. 33 at 35].  If an individual either fails to provide documentary proof of citizenship in one of these ways or is incorrectly flagged as a potential non-citizen, that person may cast a provisional ballot, but he or she must provide documentary proof of citizenship within three (3) days of the election for that vote to be counted.  See Def.'s SOMF ¶ 21.

According to the Secretary, if the citizenship verification protocol results in an individual being "flagged for citizenship by the DDS data, the county registrar is instructed to check for citizenship documentation and update the record to active status if that documentation was already provided." Def.'s SOMF ¶ 15. According to Plaintiffs, evidence demonstrates that county election officials do not undertake this type of review process. See Pls.' Resp. to Def.'s SOMF ¶ 15. Further, Plaintiffs claim that naturalized citizens' documentary proof of citizenship is often ignored or otherwise not accepted such that they are not registered to vote, and that in 2018 alone, this caused hundreds of naturalized citizens who had already provided documentary proof of citizenship to be "incorrectly flagged as potential noncitizens and placed in pending status." See id. ¶ 36. The Parties agree that naturalized citizens who have submitted proof of citizenship are sometimes incorrectly flagged as non-citizens, although the Parties dispute the number of incorrectly flagged individuals and the underlying causes of the errors. E.g., Expert Report of Dr. Michael Barber ("Barber Report") at 3–26 [Doc. 150 at 100–125]; Rebuttal Declaration of Michael McDonald, Ph.D. ("McDonald Rebuttal Decl.") at 4 [Doc. 135 at 335]; Deposition of Twyla Hart ("Hart Dep.") at 164:10–165:16 [Doc. 149].

Individual Plaintiff Judith Martinez Cruz encountered the Georgia citizenship verification protocol at issue firsthand in 2020. She testifies that she became a

naturalized citizen in 2016 and that she registered to vote at her naturalization ceremony.  See Deposition of Judith Martinez Cruz ("Cruz Dep.") at 63:4–22 [Doc. 134].  She voted in three (3) elections prior to being "flagged for citizenship" (without her knowledge) in 2019. See id. at 66:7–69:4.  On June 9, 2020, she arrived at her polling location less than an hour before it closed, handed the poll worker her (non-limited, full) Georgia driver's license, and was then told by a poll worker that she could not vote because she was "listed in the potential non[-]U.S. citizen list." See id. at 44:2–13.  The poll worker told Ms. Cruz that she would be required to bring her passport to the polling location to cast a non-provisional ballot.  See id. at 44:11–20.  Ms. Cruz quickly returned home, obtained her passport, returned to the polling location, and was able to cast her vote just before the polls closed.  See id. at 45:5–10.

Following the close of discovery, the Secretary filed his instant "Motion for Summary Judgment" on September 9, 2021, which Plaintiffs oppose.  [Doc. 142, 151, 154].  Having been fully briefed, the Secretary's motion is ripe for the Court's review.

## II.   Jurisdictional Issues

Before reaching the merits, the Court "must first determine whether [it has] Article III jurisdiction over the [P]arties and issues presented here.  In particular, [the Court] must decide . . . whether the [P]laintiffs have standing" to bring their

claims.   Arcia v. Fla. Sec'y of State, 772 F.3d 1335, 1340 (11th Cir. 2014).

To establish Article III standing:

> the party invoking the power of the court must show (1) injury in fact, which is an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) that the injury is likely to be redressed by a favorable decision.

Cochran v. City of Atlanta, 150 F. Supp. 3d 1305, 1315 (N.D. Ga. 2015) (internal marks omitted) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). "[W]hen standing is raised at the summary judgment stage, the plaintiff[s] must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken as true." Fla. State Conf. of NAACP v. Lee, 576 F. Supp. 3d 974, 981 (N.D. Fla. 2021) (internal quotation marks omitted) (quoting Bischoff v. Osceola Cnty., 222 F.3d 874, 878 (11th Cir. 2000)).

In the matter at bar, the Secretary argues that "[n]one of the Plaintiffs have standing to invoke the jurisdiction of this Court."  [Doc. 142-1 at 7].  The Court examines the Parties' arguments regarding the Organizational Plaintiffs and Individual Plaintiff in turn.

A.    **Organizational Plaintiffs' Standing**[7]

First, the Secretary contends the Organizational Plaintiffs lack standing because they cannot demonstrate the first element: injury in fact.[8]  [See Doc. 142-1 at 8–14].  Generally, an organization may rely on either or both of "two theories of injury" to satisfy the requirement for standing.  Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1248–49 (11th Cir. 2020).  First, an organization may "seek to establish associational standing based on the injuries of [its] members[.]"  Id. (citing Summers v. Earth Island Inst., 555 U.S. 488, 494 (2009)).  Second, an organization may establish standing based on its own injuries through a "diversion of resources theory."  See Democratic Party of Ga., Inc. v. Crittenden, 347 F. Supp. 3d 1324, 1336 (N.D. Ga. 2018) (internal quoting marks omitted); accord Ga. Ass'n of Latino

---

[7] In its November 2, 2018 Order granting Plaintiffs' motion for preliminary injunction, this Court found that the Organizational Plaintiffs possessed standing based on evidence that they "will have to divert personnel and resources to educate individuals about the exact match process and assist those who have been flagged and placed into pending status, including helping to resolve issues surrounding citizenship before Election Day."  [Doc. 33 at 9] (citing Fla. State Conf. of NAACP v. Browning, 522 F.3d 1153, 1165 (11th Cir. 2008)).  The Secretary did not contest (or address) Plaintiffs' arguments regarding standing at that early procedural juncture, which the Court noted. [See id.] ("Defendant did not address Plaintiffs' argument on standing.").  However, because standing is an element of the case or controversy requirement of Article III, it is an issue of subject matter jurisdiction, and a party may raise objections "to a tribunal's jurisdiction . . . at any time, even [if] [that] party . . . once conceded"—or did not contest—"the tribunal's subject-matter jurisdiction over the controversy."  See Sebelius v. Auburn Reg'l Med. Ctr., 568 U.S. 145, 153 (2013); see also Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013).  Thus, it is appropriate for the Court to address the Secretary's current standing arguments.  See FED. R. CIV. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

[8] The Secretary only challenges the standing of Organizational Plaintiffs based on their supposed lack of injury, not traceability or redressability.  [See Doc. 142-1 at 6–14].

Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections, 36 F.4th 1100, 1114 (11th Cir. 2022); Jacobson, 974 F.3d at 1248–49; Common Cause/Ga. v. Billups, 554 F.3d 1340, 1350–51 (11th Cir. 2009). "Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." Lee, 576 F. Supp. 3d at 981 (internal quotation marks omitted) (quoting Arcia, 772 F.3d at 1341).

In this case, Organizational Plaintiffs rely on the diversion of resources theory to establish injury in fact.[9]  [See Doc. 151 at 7–10].   The Secretary argues that because Organizational Plaintiffs "exist to assist voters[] . . . . through all parts of the registration process, including assisting voters with their voter-registration applications related to . . . citizenship[,]" they "are not injured [by the citizenship verification protocol at issue]—they are pursuing their reason for existence[.]" [Doc. 154 at 4–5].   However, this district recently rejected a similar argument in another case involving a nonprofit organization's challenge to a Georgia voting statute:

---

[9] The Court notes that Organizational Plaintiffs do not appear to advance any theory of associational standing (i.e., through their members) to establish injury in fact. [See Doc. 151 at 7–10].   Even if they did, the Secretary raised the issue of associational standing in his motion for summary judgment, and Plaintiffs did not address it in their response brief; thus, Plaintiffs have abandoned any such argument.  [See Docs. 142-1 at 7 n.4; 151 at 7–10]; see also Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1326 (11th Cir. 2000) (finding that a party's failure to brief and argue an issue before the district court is grounds for declaring it abandoned); Resolution Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.").

The Court is not persuaded by State and [c]ounty [d]efendants' argument that [the organizational plaintiff] lacks standing because its alleged diversion of resources is . . . not different in nature from its current work.   In <u>Common Cause/Georgia</u>, the court noted that one of the plaintiffs was "actively involved in voting activities" and planned to divert resources "to educate and assist voters" in complying with the challenged voting identification requirements.  554 F.3d at 1350.  In finding that standing was established there, the court focused on the *diversion* of resources—the shifting of resources from one activity to another—as the essence of the inquiry and did not mention, much less impose, the counterintuitive requirement that the new activities must further a *different* purpose within the organization.  <u>Id.</u>

<u>Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp</u>, 574 F. Supp. 3d 1260, 1270 (N.D. Ga. 2021) (internal record citation omitted and emphasis added).  Thus, the Court does not credit the Secretary's theory that Organizational Plaintiffs lack standing because they already participate in assisting voters with their voter registration applications.  [Doc. 154 at 4–5].

Additionally, the Court is not persuaded by the Secretary's argument that the Organizational Plaintiffs fail to demonstrate that their activities or projects are impaired by the citizenship verification protocol.  [<u>See</u> <u>id.</u> at 4].  The Secretary bases this argument on the Eleventh Circuit's reasoning in <u>Jacobson</u>, wherein the panel found that the organizational plaintiffs failed to establish a concrete injury based on diversion of resources because the organizations' leaders did not "explain[] what activities the [organizations] would divert resources away *from* in order to spend additional resources on combatting" the challenged statute.  <u>Jacobson</u>, 974 F.3d at 1250 (emphasis in original).  However, in that case, when asked how the challenged

statute harmed the organizational plaintiffs, the organizations' leaders merely testified that they would need to "invest more resources" or "spend additional resources" to combat the impact of the statute at issue.[10]  See id.

By comparison, the representatives for Organizational Plaintiffs in the matter at bar offer far more specific testimony about the ways in which the Secretary's citizenship verification protocol causes them to divert their resources away from existing efforts towards new ones.  These include, in part, the money Organizational Plaintiffs spend on efforts to help newly naturalized citizens register to vote, hiring additional staff to counteract the effects of the challenged protocol, the staff time diverted from other projects, and the increased time and cost of registering a new voter who is flagged for citizenship verification.  See, e.g., Pls.' SOMF ¶ 2 (internal punctuation omitted and alteration in original) (quoting Deposition of Tamieka Atkins ("Atkins Dep.") at 54:22–55:11 [Doc. 140]) ("Because of the citizenship [verification] protocol, ProGeorgia diverts resources from its general voter registration, get out the vote, and voter education efforts to cover additional expenses related to registering voters at naturalization ceremonies that don't show up with [its] other voter registration efforts."); Deposition of Gerardo Gonzalez ("Gonzalez

---

[10]  Specifically, the Eleventh Circuit noted in Jacobson that the organizational plaintiffs' representatives did not testify as to "what activities, if any, might be impaired by the [organizations'] decision[s] to allocate" or "invest" additional resources "to target districts because of" the challenged practice.  Jacobson, 974 F.3d at 1250.

Dep.") at 28:12–30:8, 37:15–38:13, 76:21–77:9 [Doc. 133]; Deposition of Stephanie Cho ("Cho Dep.") at 37:20–39:17, 45:21–51:18 [Doc. 141]; Deposition of Helen Butler ("Butler Dep.") at 53:10–54:13, 56:2–57:8 [Doc. 138]; Deposition of Nse Ufot ("Ufot Dep.") at 36:7–37:5, 61:9–62:23, 63:5–8, 79:3–8 [Doc. 139]; Deposition of Sara Henderson ("Henderson Dep.") at 45:15–46:13, 51:2–52:13 [Doc. 137].

Further, contrary to the Secretary's argument, the Eleventh Circuit did not impose additional requirements for organizational standing in Jacobson—instead, the panel reiterated the familiar and well-established standard for injury based on diversion of resources:

> our precedent holds that "an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." In Browning, we ruled that the NAACP and another organization had standing to challenge a voting requirement because the organizations would "divert personnel and time" from other activities "to educating volunteers and voters on compliance with" the requirement. In a later decision [Common Cause/Georgia], we held that the NAACP had standing to challenge a law that required voters to present photo identification because the organization was "actively involved in voting activities and would divert resources from its regular activities to educate and assist voters in complying with" the law.

See Jacobson, 974 F.3d at 1250 (quoting Browning, 522 F.3d at 1165 and Common Cause/Ga., 554 F.3d at 1350); see also Sixth Dist. of Afr. Methodist Episcopal Church, 574 F. Supp. 3d at 1269 (internal quotation marks omitted and alteration in original) (quoting Ga. Latino All. for Hum. Rts. v. Governor of Ga., 691 F.3d 1250, 1260 (11th Cir. 2012)) ("Courts have found that a sufficient injury is demonstrated

for standing purposes even when the diversion of resources is only 'reasonably anticipate[d].'")  Therefore, the Court need not deviate from the Eleventh Circuit's well-established precedent, as the Secretary suggests.

Accordingly, taking as true for purposes of summary judgment those specific facts set forth by Organizational Plaintiffs in the sworn statements of their Rule 30(b)(6) representatives and other evidence, see Bischoff, 222 F.3d at 878, the Court finds that Organizational Plaintiffs establish an injury in fact pursuant to the diversion of resources theory.  See Atkins Dep. at 54:22–55:11; Gonzalez Dep. at 28:12–30:8, 37:15–38:13, 76:21–77:9; Cho Dep. at 37:20–39:17, 45:21–51:18; Butler Dep. at 53:10–54:13, 56:2–57:8; Ufot Dep. at 36:7–37:5, 61:9–62:23, 63:5–8, 79:3–8; Henderson Dep. at 45:15–46:13, 51:2–52:13.   Thus, Organizational Plaintiffs have standing.   See Browning, 522 F.3d at 1166 (holding that organizational plaintiffs established standing based on "diversion of personnel and time to help voters resolve [citizenship verification] problems" because the "net effect is that the average cost of registering each voter increases, and because plaintiffs cannot bring to bear limitless resources, their noneconomic goals will suffer").

### B.    Individual Plaintiff's Standing

The Secretary argues Plaintiff Cruz lacks standing because "her injury was the result of a poll worker's mistake in implementing th[e] [citizenship verification

protocol], not the [protocol] itself[,] [a]nd Ms. Cruz was able to vote in the election in question." [Doc. 142 at 14]. Thus, the Secretary appears to challenge two (2) prongs of Ms. Cruz's standing: injury in fact and traceability. [See id. at 14–16]. In response, Plaintiffs contend that the Secretary "misunderstands the nature of [Ms. Cruz's] injury" and that "[t]he injury Ms. Cruz suffered"—being required to present documentary proof of citizenship in order to vote—was fairly traceable to the Secretary because it was caused by the citizenship verification protocol he promulgates. [Doc. 151 at 11–12].

As a preliminary matter, the Court agrees with Plaintiffs that the fact that Ms. Cruz was eventually able to cast her non-provisional ballot in 2020 is immaterial to the standing inquiry. [See id. at 12 n.2]. "A plaintiff need not have the franchise wholly denied to suffer injury." Charles H. Wesley Educ. Found., Inc. v. Cox, 408 F.3d 1349, 1352 (11th Cir. 2005). "For purposes of standing, a denial of equal treatment is an actual injury even when the complainant is able to overcome the challenged barrier[.]" Common Cause/Ga., 554 F.3d at 1351.

Here, Ms. Cruz testifies that she became a naturalized citizen during 2016 and that she registered to vote at her naturalization ceremony. See Cruz Dep. at 63:4–22. On June 9, 2020, she arrived at her polling location and, before she could vote, she was informed that she had been flagged for citizenship verification. See id. at 44:2–13, 66:7–69:4. The poll worker told Ms. Cruz that she would be required to

bring in her passport to cast a non-provisional ballot.  See id. at 44:11–20.  Ms. Cruz quickly returned home, obtained her passport, and was able to cast her vote just before the polls closed.  See id. at 45:5–10.  Thus, the Court finds that Ms. Cruz suffered an actual injury when she was required to make a second trip to the polls and to present her passport before being able to vote with a non-provisional ballot. See Common Cause/Ga., 554 F.3d at 1351 (citing United States v. Students Challenging Regul. Agency Procs. (SCRAP), 412 U.S. 669, 689 n.14 (1973)) (finding that individual plaintiffs who were required to obtain a photo identification before voting suffered "the imposition of [a] burden" which was "an injury sufficient to confer standing regardless of whether" the individuals were "able to obtain photo identification" and noting that "[t]he slightness of their burden . . . is not dispositive" for standing because even a "small injury . . . is sufficient to confer standing").

Next, the Court rejects the Secretary's contention that Ms. Cruz's injury is not fairly traceable to him.  [See Doc. 142 at 14–16].  In Cox, the Eleventh Circuit confronted and rejected a similar argument from the Secretary (who was, at that time, Ms. Cathy Cox).  See 408 F.3d at 1351.  There, the individual plaintiff's voter registration form was rejected because it was submitted by a non-profit organization, and the Secretary believed Georgia law prohibited such organizations from collecting or submitting voter applications.  See id.  Although the individual plaintiff was already registered to vote, she had intended her voter registration application to

notify the Secretary of her new address, and she brought a claim for wrongful denial of her form.  See id.  The Eleventh Circuit rebuffed the Secretary's argument that the individual plaintiff's alleged injuries were not "fairly traceable" to her actions, explaining:

> [this] causation argument, that the root of [individual plaintiff's] attempted address change's inadequacy was her own lack of compliance with Georgia's requirements, conflates standing with the merits of the case.  Causation in the standing context is a question of fact unrelated to an action's propriety as a matter of law.  To establish causation a plaintiff need only demonstrate, as a matter of *fact,* a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant.  [The individual plaintiff's] alleged injuries flow directly from the denial of her registration form.

Id. at 1352 (emphasis in original and internal punctuation and citation omitted). Here, as in Cox, Ms. Cruz's injury of being prevented from voting without her passport is "fairly traceable" to the Secretary's conduct.  See id.  Though it was a local poll worker who required Ms. Cruz to return home to retrieve and ultimately produce her passport, that worker was carrying out the citizenship verification protocol promulgated by the Secretary.  Thus, like the plaintiff in Cox, Ms. Cruz's "alleged injur[y] flow[s] directly from the" Secretary's conduct: the promulgation of the purportedly illegal citizenship verification protocol.  See id.

Having determined that Plaintiffs have standing to pursue their claims, the Court proceeds to its analysis of Defendant's motion regarding the merits of Plaintiffs' claims, beginning with the relevant legal standard.

## III.   Merits of Plaintiffs' Claims

### A.   Legal Standard

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome pursuant to the governing law.  See id.

When ruling on a motion for summary judgment, the Court must view all evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  The moving party need not positively disprove the opponent's case; rather, the moving party must show the lack of evidentiary support for the non-moving party's position.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

If the moving party meets this initial burden, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial in order to survive summary judgment.  See id. at 324–26.  The essential question is "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson</u>, 477 U.S. at 251–52. "The mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. <u>Id.</u> at 252. There must be evidence on which the jury could reasonably find for the non-moving party. <u>See id.</u>

### B.   Count I—Violation of Section 2 of the Voting Rights Act ("VRA") of 1965, 52 U.S.C. § 10301

In his instant motion, the Secretary argues he is entitled to summary judgment on Plaintiffs' claim for violation of Section 2 of the VRA because "Plaintiffs cannot demonstrate that the citizenship-verification process renders Georgia's election system unequally open." [Doc. 142-1 at 21]. In response, Plaintiffs maintain that Georgia's citizenship verification protocol "results in the denial or abridgment of the right to vote on account of race or color in violation of Section 2 of the [VRA]" and that disputes of fact exist regarding "whether the citizenship [verification] protocol uses stale, outdated data to target naturalized citizens (whom are disproportionately citizens of color) for burdens to registration not applied to other Georgians." [See Doc. 151 at 27–28].

The text of Section 2 of the VRA provides, in relevant part:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on

account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301.  The Supreme Court recently interpreted the language of both parts of Section 2 in Brnovich v. Democratic National Committee, explaining:

The key requirement is that the political processes leading to nomination and election (here, the process of voting) must be "equally open" to minority and non-minority groups alike, and the most relevant definition of the term "open," as used in § 2(b), is "without restrictions as to who may participate," . . . or "requiring no special status, identification, or permit for entry or participation[.]"

141 S. Ct. 2321, 2337–38 (2021) (internal citations omitted).  Thus, the Supreme Court found that the "core . . . requirement" and "touchstone" of Section 2 "is the requirement that voting be 'equally open.'"[11]  Id. at 2338.  "Put another way, the ultimate question is whether a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black or other minority voters and white voters to elect their preferred

---

[11] Notably, pursuant to the amended version of Section 2, a plaintiff no longer bears the burden to prove discriminatory *intent*, only that "that a challenged election practice has resulted in the denial or abridgment of the right to vote based on color or race."  Chisom v. Roemer, 501 U.S. 380, 393–94 (1991); see also Johnson v. Governor of State of Fla., 405 F.3d 1214, 1227 (11th Cir. 2005) ("Congress amended Section 2 of the Voting Rights Act so that a plaintiff could establish a violation without providing discriminatory intent.").

representatives." <u>Lee</u>, 576 F. Supp. 3d at 984 (internal alteration adopted and quotation marks omitted) (citing <u>Thornburg v. Gingles</u>, 478 U.S. 30, 47 (1986)).

Further, Section 2(b) requires courts to assess "the totality of circumstances" when determining whether voting is "equally open" to "minority and non-minority groups alike[.]" <u>Brnovich</u>, 141 S. Ct. at 2337–38.  "In answering that question, this Court may consult 'certain guideposts' articulated by the Supreme Court in <u>Brnovich</u>[.]" <u>Lee</u>, 576 F. Supp. 3d at 984.

> These "guideposts" are[:] (1) "the size of the burden imposed by a challenged voting rule," (2) "the degree to which a voting rule departs" from standard practice in 1982, (3) "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups," (4) "the opportunities provided by a State's entire system of voting," and (5) "the strength of the state interest served by the challenged rule."

<u>Id.</u> at 984 n.5 (second alteration in original) (quoting <u>Brnovich</u>, 141 S. Ct. at 2338–40).  However, the Supreme Court "carefully explained" in <u>Brnovich</u> that the above "guideposts are not exclusive, nor do they comprise an all-governing test under which courts are to evaluate [S]ection 2 claims.  Instead, any circumstance that has a logical bearing on whether voting is equally open and affords equal opportunity may be considered."  <u>See id.</u> (internal quotation marks and citations omitted) (quoting <u>Brnovich</u>, 141 S. Ct. at 2336–38); <u>see also</u> <u>United States v. Georgia</u>, 574 F. Supp. 3d 1245, 1252 n.5 (N.D. Ga. 2021) (citing <u>Brnovich</u> 141 S. Ct. at 2336) (discussing <u>Brnovich</u> and noting that "the Supreme Court was careful to define the alternate factors it offered as mere guideposts" and that "this list of guideposts is

neither exhaustive nor prescriptive"), reconsideration denied sub nom. In re Georgia

Sen. Bill 202, Civil Action No. 1:21-CV-02575-JPB, 2022 WL 1516049 (N.D. Ga.

Apr. 21, 2022).

In the instant matter, the Secretary contends that Georgia's citizenship

verification protocol "does not alter or hinder the equal openness of Georgia's

elections" based on the strict application of the Brnovich factors (although with

regard to the second factor—the degree to which a voting rule departs from standard

practice in 1982—the Secretary concedes that "Plaintiffs are correct that Georgia

began matching voter registration data against DDS citizenship data in or around

2008"). [Doc. 154 at 10–14]. However, "[e]ven accepting [the Secretary's] premise

that Plaintiffs have not come forward with evidence under" all of

the "Brnovich consideration[s]," the Secretary is "not automatically entitled to

summary judgment." Lee, 576 F. Supp. 3d at 984–85. "[T]he absence of evidence

on some, but not all, of Brnovich's considerations does not entitle [the Secretary] to

summary judgment" because "this Court must consider any relevant evidence in

weighing the totality of circumstances[.]" Id. at 985.

With these legal principles in mind, the Court finds that Plaintiffs offer

sufficient evidence to preclude summary judgment on their Section 2 claim. For

example, Plaintiffs' expert witness, Dr. McDonald, declares that "[t]he citizenship

verification [protocol] affects persons of color more often than white registrants.

Georgians who are required to provide citizenship verification are markedly less likely to be *White not of Hispanic Origin* than all registered voters." See Declaration of Michael McDonald, Ph.D. ("McDonald Decl.") at 21 [Doc. 135 at 266] (emphasis in original).  In support, Dr. McDonald provides the following race and ethnicity statistics for Georgia voter registrants whose applications were flagged as "pending citizenship verification" at the time of his expert report:

> Among those requiring citizenship verification, approximately 13.7% identify as *White not of Hispanic Origin*, while 52.7% of registered voters identify as *White not of Hispanic Origin*.  Among persons requiring citizenship verification, 26.9% identify as *Asian or Pacific Islanders*, compared to 2.6% of all registered voters.  Among persons requiring citizenship verification, 28.9.6% [sic] identify as *Black not of Hispanic Origin*, compared to 30.0% of all registered voters.  Among persons requiring citizenship verification, approximately 19.1% identify as *Hispanic*, compared to 3.7% of all registered voters.

Id. (emphasis in original).  Although the Secretary's expert witness, Dr. Michael Barber, disagrees with Dr. McDonald's above statistical findings, it is not appropriate for the Court to resolve this type of dispute on summary judgment. Compare Deposition of Dr. Michael Barber ("Barber Dep.") at 45:18–46:7 [Doc. 150] (disagreeing with Dr. McDonald's findings), with McDonald Rebuttal Decl. at 4–5 [Doc. 135 at 335–36] (questioning the accuracy of the data Dr. Barber used to generate his expert report); see Lee, 576 F. Supp. 3d at 984 (quoting Alves v. Bd. of Regents of the Univ. Sys. of Ga., 804 F.3d 1149, 1159 (11th Cir. 2015)) (explaining

that "on a motion for summary judgment," a district court "may not 'weigh conflicting evidence or make credibility determinations'").

Additionally, Plaintiffs present evidence that at least one naturalized citizen, Individual Plaintiff Ms. Cruz, was turned away from the polls during the June 2020 primary election—despite presenting her non-limited Georgia diver's license (which are only issued to citizens) and despite her having voted in three (3) previous elections—because she was incorrectly flagged as a potential non-citizen. See Pls.' SOMF ¶ 9; see also Cruz Dep. at 44:3–45:22; Deposition of Christopher Harvey ("Harvey Dep.") at 141:17–142:9 [Doc. 131] (Defendant's Rule 30(b)(6) witness testifying that non-limited driver's licenses are "adequate proof of citizenship" for voting purposes). Moreover, Plaintiffs have put forth expert witness testimony that "a substantial percentage of all Georgians who became naturalized citizens between 2017 and 2019 and attempted to register to vote were incorrectly flagged as potential non-citizens by the" citizenship verification protocol at issue such that they "appeared on a [citizenship-]pending list, requiring them to provide additional information to election officials to register to vote." See McDonald Rebuttal Decl. at 6.

In short, Plaintiffs have brought forth a sufficient quantum of evidence to demonstrate that a genuine dispute of material fact exists as to whether Georgia's citizenship verification protocol makes Georgia's elections "unequally open" to

different racial groups.  [See Doc. 142-1 at 21].  "It may well be that this evidence" Plaintiffs have proffered "falls short at trial, but 'a bench trial, with the benefit of live testimony and cross examination, offers more than can be elucidated simply from discovery.'" Lee, 576 F. Supp. 3d at 985 (quoting Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs, 775 F.3d 1336, 1348 (11th Cir. 2015)); see also Fair Fight Action, Inc. v. Raffensperger, Civil Action No. 1:18-CV-5391-SCJ, slip op. at 28 (N.D. Ga. Nov. 15, 2021) (denying the Secretary's motion for summary judgment on a plaintiff's claim for violation of Section 2 of the VRA where the Secretary's "arguments [we]re based upon factual premises for which [the p]laintiff[] ha[d] presented evidence in opposition showing that there [we]re genuine disputes of material facts that w[ould] need to be resolved at trial.").  Accordingly, the Court denies the Secretary's motion as to Plaintiffs' Count I.

## C.  Count II—Section 1983 Claim for Discrimination Based on Citizenship Classification and National Origin in Violation of the Fourteenth Amendment's Equal Protection Clause

Next, the Court discusses the Secretary's motion for summary judgment on Plaintiffs Count II.  The Court begins by discussing what legal standard governs this claim before applying that standard to the facts at bar.

### 1.  The applicable legal standard

When considering the constitutionality of an election law, courts generally apply the framework set out by the Supreme Court in Anderson v. Celebrezze, 460

U.S. 780 (1983), as later refined in <u>Burdick v. Takushi</u>, 504 U.S. 428 (1992) (when discussed together, "<u>Anderson</u>-<u>Burdick</u>").   The <u>Anderson</u>-<u>Burdick</u> test requires a court to "weigh the character and magnitude of the burden the State's" challenged election law "imposes on [voting] rights against the interests the State contends justify that burden[] and [to] consider the extent to which the State's concerns make the burden necessary." <u>See</u> <u>Timmons v. Twin Cities Area New Party</u>, 520 U.S. 351, 358 (1997) (internal quotation marks omitted); <u>accord</u> <u>Stein v. Ala. Sec'y of State</u>, 774 F.3d 689, 694 (11th Cir. 2014) (explaining the <u>Anderson</u>-<u>Burdick</u> test and the levels of scrutiny for reviewing challenged state election rules).   On the other hand, the Supreme Court has instructed that "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny[,]" otherwise known as strict scrutiny.[12] <u>See</u> <u>Graham v. Richardson</u>, 403 U.S. 365, 372 (1971); <u>Kramer v. Union Free Sch. Dist. No. 15</u>, 395 U.S. 621, 628 n.9 (1969) ("Of course, we have long held that if the basis of classification is inherently suspect, such as race, the statute must be subjected to an exacting scrutiny, regardless of the subject matter of the legislation.").

The Parties disagree as to whether the <u>Anderson</u>-<u>Burdick</u> test or strict scrutiny standard should govern the Court's analysis of Plaintiffs' Equal Protection claim.

---

[12] Pursuant to the heightened standard of strict scrutiny, a suspect classification challenged under the Equal Protection Clause passes constitutional muster only if it is "narrowly tailored to further compelling governmental interests." <u>Grutter v. Bollinger</u>, 539 U.S. 306, 331 (2003).

[See Docs. 142-1 at 21–22; 151 at 13].  Plaintiffs contend that "just as this Court would apply strict scrutiny to a voting regulation that classified voters based on race, it must do so too when a voting regulation classifies voters based on national origin and naturalized citizenship."  [Doc. 151 at 12–13] (citing Kramer, 395 U.S. at 628 n.9).  However, Plaintiffs do not cite—nor does the Court locate—any binding authority providing that the Court's should apply strict scrutiny to an Equal Protection claim in this context.[13]  [See generally Doc. 151].  Rather, the Eleventh Circuit has been clear that courts "must evaluate laws that burden voting rights using the approach of Anderson and Burdick, which requires us to weigh the burden imposed by the law against the state interests justifying the law."  See Jacobson, 974 F.3d at 1261 (citing Common Cause/Ga., 554 F.3d at 1352); see also New Ga. Project v. Raffensperger, 976 F.3d 1278, 1280 (11th Cir. 2020) (quoting Timmons, 520 U.S. at 358) (naming Anderson-Burdick as the "appropriate framework" to "weigh the 'character and magnitude of the burden the State's rule imposes' on the right to vote 'against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary'"); People First of Ala. v. Merrill, 491 F. Supp. 3d 1076, 1178 (N.D. Ala. 2020) (internal punctuation

---

[13] As the Secretary points out, all the cases Plaintiffs cite in favor of applying strict scrutiny to their Equal Protection claim "predate the relevant Supreme Court precedents of Anderson . . . and Burdick[.]"  [See Doc. 154 at 6–7].  They are thus of limited utility in answering the question the Court is confronted with here, namely, whether the Anderson-Burdick or strict scrutiny standard is controlling.

omitted) (citing Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 190 (2008)) (applying Anderson-Burdick to an Equal Protection voting rights claim instead of strict scrutiny).   For that reason, the Court finds that the Anderson-Burdick framework—rather than strict scrutiny—governs whether the citizenship verification protocol runs afoul of the Fourteenth Amendment's Equal Protection Clause.

       2.   Discussion

Having decided that the Anderson-Burdick framework governs Plaintiffs' Equal Protection claim, the Court's first task is to identify the burden imposed by the citizenship verification protocol on Plaintiffs' right to vote.  See Jacobson, 974 F.3d at 1261 (internal quotation marks omitted) (quoting Crawford, 553 U.S. at 190) ("As the voters and organizations correctly point out, we must evaluate laws that burden voting rights using the approach of Anderson and Burdick, which requires us to weigh the burden imposed by the law against the state interests justifying the law.  But 'we have to identify a burden before we can weigh it.'").  This preliminary step is necessary because "the extent to which a challenged regulation burdens . . . Fourteenth Amendment rights" controls "the rigorousness of [a court's] inquiry into the propriety of a state election law."  Burdick, 504 U.S. at 434.

The Secretary suggests that the citizenship verification protocol "imposes only reasonable and nondiscriminatory burdens on voters."  [Doc. 142-1 at 23].

Plaintiffs, for their part, characterize the burden as "substantial." [Doc. 151 at 27]. Ultimately, the Court need not resolve this disagreement at this stage. Because "[t]he size of th[e] burden" the citizenship verification protocol imposes on Plaintiffs' voting rights "is a question of fact," Lee, 576 F. Supp. 3d at 986, and the record evidence on the burden question is not "so one-sided that one party must prevail as a matter of law," Anderson, 477 U.S. at 251–52, the Court finds that a grant of summary judgment in the Secretary's favor on Plaintiffs' Equal Protection claim would be inappropriate.

For example, a dispute of material fact remains as to the degree and extent to which naturalized citizens are burdened by having to present documentary proof of citizenship. The Secretary has offered evidence that there is no additional burden on naturalized citizens to show they are qualified to vote above and beyond what is required of all Georgia voter registrants. See Def.'s SOMF ¶¶ 13–14, 35, 43; Harvey Dep. 124:7–125:4 (testifying that all voters who register using a driver's license number or statue-issued ID number, approximately 97% of Georgia voters, go through the citizenship verification protocol at issue); McClendon Dep. at 84:2–15 (stating that "all the [DDS] customers have to show documents, but they're just different documents" that are "verified through different sources"). Plaintiffs, though, have offered evidence tending to show that the burden imposed by the citizenship verification protocol is higher on naturalized citizens than it is for all

others.  For example, they have offered evidence to suggest that unlike their native-born counterparts, naturalized citizens must "update their limited term driver's license to a regular Georgia driver's license in order to cure a noncitizen flag when they register to vote."  See Pls.' Resp. to Def.'s SOMF ¶ 16.  And Plaintiffs have proffered evidence demonstrating that this process is particularly burdensome because it involves going to a DDS office in-person and paying a $32 fee, and further, because DDS does not inform an individual with a limited term license that he or she should update the DDS if they become a citizen.  See McClendon Dep. at 79:4–19, 80:4–82:13;  see also Amended Declaration of Dr. Peyton McCrary ("McCrary Am. Decl.") ¶ 119 [Doc. 136-6 at 77–158] ("DDS does not inform non-citizens that they should update their driver's license file if they become naturalized citizens.").

Another dispute related to the purported burden at issue concerns whether the various systems that Georgia uses to effectuate the citizenship verification protocol function properly.  Plaintiffs cite to multiple pieces of evidence in support of the proposition that "even when newly naturalized citizens" successfully complete the citizenship verification protocol "they are often not registered to vote" or are "incorrectly flagged as potential noncitizens and placed into pending status."  See Pls.' SOMF ¶ 44; Pls.' Resp. to Def.'s SOMF ¶ 19; see also Declaration of Franco Chevalier ("Chevalier Decl.") ¶¶ 10–48 [Doc. 39-2] (sworn statement of a

naturalized citizen setting forth his multiple attempts to correct his citizenship status from "pending" to "active"); Declaration of Harvey Soto ("Soto Decl.") ¶¶ 2, 5–18 [Doc. 17-12] (former staff member for one of Organizational Plaintiffs who assisted a naturalized citizen in describing the time-consuming and burdensome process necessary to correct an incorrect flag for citizenship); McCrary Am. Decl. ¶¶ 108, 119 (describing how "the citizenship status of naturalized citizens is frequently outdated" and averring that "the linkage of records in the statewide voter registration database and the drivers' license database at DDS . . . requires . . . more complex algorithms than Georgia uses"); Deposition of LaTasha Howard ("Howard Dep.") at 30:22–31:3 [Doc. 148] (voting coordinator for Dekalb County, Georgia testifying that that she has encountered voters who already submitted documentary proof of citizenship are still in the "pending" status); Hart Dep. at 164:10–165:16 (discussing thirty-two (32) instances of voters who were flagged as non-citizens despite submitting proof of citizenship in Dekalb County, Georgia); Harvey Dep. at 227:23–228:3 (the Secretary's Rule 30(b)(6) representative testifying that paper voter registration applications have a designated "little pocket in the back" for individuals to submit documentary proof of citizenship but that this documentation "may get missed"); McDonald Decl. at 18 (providing that in the lead-up to the 2018 general election, 362 naturalized citizens were affected by election officials' failure to properly process voter registration applications); id. at 5 ("Election officials have

repeatedly and consistently erred by ignoring these registrants' proof of citizenship when entering their information into eNet, Georgia's statewide voter registration system, which resulted in these registrants being flagged *en masse* as potential noncitizens by the DDS [citizenship verification protocol] system.  Changes to eNet taken in an attempt to remedy this problem have proven to be insufficient because the [citizenship verification protocol] gives unfettered discretion to county officials.").  The Secretary, though, has offered evidence of repairs to the State's systems that minimize or eliminate any burden on naturalized as compared to all citizens.  See Harvey Dep. at 192:5–193:21 (explaining how the DDS records system can override a voter's citizenship status after the voter provided documentary proof of citizenship to the registrar's office, but testifying that "we fixed the eNet system," in 2019 "so the DDS [']no citizen['] response wouldn't override the documentation provided to the registrant"); Barber Dep. at 16:16–17:9 (expert witness for the Secretary testifying that if a voter registrant's citizenship information does not match the records on file with DDS, the voter "is nevertheless registered and placed in what's called active status, missing identification[,] [or] MIDR").

When deciding a motion for summary judgment, "this Court may not 'weigh conflicting evidence or make credibility determinations.'" Lee, 576 F. Supp. 3d at 984 (quoting Alves, 804 F.3d at 1159).  And, as noted above, "[b]oth sides have submitted substantial evidence in support of their positions" on burden question,

"which this Court cannot, at this stage, weigh." Id. at 986.  Accordingly, "because material factual disputes abound" related to the burden imposed by the citizenship verification protocol on naturalized citizens, the Court denies Defendant's motion for summary judgment on Plaintiff's Count II.  Id.

### D. Count III—Section 1983 Claim for Burden on the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments

Next, the Secretary moves for summary judgment on Plaintiffs' Count III, which presents an undue burden claim pursuant to the First and Fourteenth Amendments.  The Parties do not dispute that the Anderson-Burdick test governs this claim.  [See Docs. 142-1 at 24–25; 151 at 27–34].  Here again, however, the multiple disputes of fact regarding the nature and extent of the burden on naturalized voters prevents the Court from resolving this claim on summary judgment.  See generally supra Section V.C.2.  Accordingly, the Court denies the Secretary's motion for summary judgment on Plaintiffs' Count III.

### E. Count IV—Violation of Section 8 of the National Voter Registration Act ("NVRA") of 1993, 52 U.S.C. § 20507(a)(1)

Finally, the Secretary contends he is entitled to summary judgment on Plaintiffs' claim for violation of Section 8 of the NVRA.  [See Docs. 142-1 at 24–25; 154 at 14].  The Secretary supports his position by arguing that "voters who are flagged by the citizenship-verification process are still registered to vote—they just have to present valid proof of citizenship," and that "it . . . does not violate the NVRA

for voters who provided proof they were not citizens to show proof of citizenship before voting." [Doc. 142-1 at 24] (citing Harvey Dep. at 141:17–142:18). In response, Plaintiffs argue "Georgia's citizenship [verification] protocol applies unevenly based on citizens' country of origin," causing "eligible naturalized citizens" to have their voter registration denied or delayed in a "discriminatory" manner in violation of the NVRA (and the VRA, as is relevant to the NVRA's requirements). [See Doc. 151 at 33–34].

Section 8 of the NVRA imposes many requirements for state election activities, at least two (2) of which are relevant here. See generally 52 U.S.C. § 20507. As this district has explained,

> Section 8 of the NVRA, titled "Requirements with respect to administration of voter registration," addresses the States' administration of the voter registration lists to "ensure that any eligible voter is registered to vote in an election." [52 U.S.C.] § 20507(a)(1).
>
> . . .
>
> Section 8 further provides that "[a]ny state program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll" "shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965[.]" Id. § 20507(b)(1).

Project Vote, Inc. v. Kemp, 208 F. Supp. 3d 1320, 1324–25 (N.D. Ga. 2016) (internal footnotes omitted and second alteration in original).

First, regarding the requirement of Section 8(a)(1) to "ensure that any eligible voter is registered to vote," 52 U.S.C. § 20507(a)(1), the Secretary asserts he is

entitled to summary judgment because "voters who are flagged by the citizenship-verification process are still registered to vote—they just have to present valid proof of citizenship" before their ballots will be counted.   [See Doc. 142-1 at 24]. However, the Secretary caveats this assertion by also arguing that "the NVRA has no requirements related to the *status* of voters in the database—only that the individual is 'registered to vote in an election[.]'"   [Id. at 25] (emphasis added) (quoting 52 U.S.C. § 20507(a)(1)).   Thus, the Secretary appears to contend that placing a voter registrant into the "pending" category is sufficient to violate Section 8(a)(1) of the NVRA, whether or not that registrant's voting application is finalized or changed to active status such that the registrant may actually cast their ballot.  [See id.]  Plaintiffs maintain that the Secretary "seeks to evade the NVRA's mandate by arguing that voters flagged" for citizenship verification "are 'registered to vote' under the NVRA" but that "[t]his argument is nothing more than word play" and "[s]uch a definition would render the [NVRA's] requirement meaningless." [Doc. 151 at 34] (internal citations omitted).

The Secretary does not cite any authority, persuasive or otherwise, to support his proposed interpretation of Section 8(a)(1) of the NVRA.  [See Doc. 142-1 at 25] ("the NVRA has no requirements related to the *status* of voters in the database— only that the individual is 'registered to vote in an election'") (emphasis added) (quoting 52 U.S.C. § 20507(a)(1)).   Conversely, Plaintiffs cite to persuasive

authority from the Sixth Circuit finding that an individual is only considered registered to vote according to Section 8 when "he or she is actually able to go to the polls and cast a regular ballot." [Doc. 151 at 34] (internal quotation marks omitted) (quoting U.S. Student Ass'n Found. v. Land, 546 F.3d 373, 383 (6th Cir. 2008)). Moreover, this district has previously explained:

> Congress enacted the NVRA to "increase the number of eligible citizens who register to vote" in Federal elections, "enhance[ ] the participation of eligible citizens as voters," "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b). These provisions show that the NVRA was "designed to ensure that eligible applicants in fact are registered[.]"

Project Vote, 208 F. Supp. 3d at 1340 (first alteration in original) (quoting True the Vote v. Hosemann, 43 F. Supp. 3d 693, 721 (S.D. Miss. 2014)). Thus, the Court rejects the Secretary's unsupported proposition that merely logging a voter registration application as "pending" for citizenship verification—a status which does not allow a voter to cast a regular ballot—acts as a bar to any potential violation of the NVRA.

Second, Section 8(b)(1) of the NVRA requires that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . be uniform, nondiscriminatory, and in compliance with the [VRA]." 52 U.S.C. § 20507(b)(1). Here, Plaintiffs have offered evidence to support their position that

Georgia's citizenship verification protocol violates the VRA and is non-uniform and discriminatory.  See Pls.' SOMF ¶ 9; see also Cruz Dep. at 44:3–45:22; McDonald Rebuttal Decl. at 6.  The Secretary does not provide any evidence to show the lack of support for Plaintiffs' position or to show that he is entitled to judgment as a matter of law.[14]  See FED. R. CIV. P. 56(a); see also Celotex, 477 U.S. at 325. Accordingly, because disputes of material fact remain, the Court denies the Secretary's motion as to Plaintiffs' Count IV.

## IV.    Conclusion

For the foregoing reasons, the Court **DENIES** the Secretary's "Motion for Summary Judgment." [Doc. 142].  Thus, the Court **DIRECTS** the Parties to confer and submit a proposed consolidated pre-trial order ("CPTO") pursuant to Local Rule 16.4 within fourteen (14) days from the date of this order.  See LR 16.4, NDGa.  The Court **DIRECTS** the Clerk to resubmit this action to the undersigned after the fourteen (14)-day period expires.

---

[14] The only evidence the Secretary cites at all in support of his motion for summary judgment on Plaintiffs' NVRA claim is deposition testimony from his Rule 30(b)(6) witness, Mr. Harvey, discussing the function and purpose of limited term drivers' licenses (which are issued to non-citizens prior to them submitting any proof of citizenship).  [See Doc. 142-1 at 24–25] (citing Harvey Dep. at 141:17–142:18).  However, the Court finds this evidence irrelevant to its above analysis.

**SO ORDERED**, this 29th day of September, 2022.


Eleanor L. Ross
United States District Judge
Northern District of Georgia