## ATTACHMENT A

**1. Plaintiffs' Succinct Factual Statement**

Plaintiffs—six non-profit, non-partisan civic engagement and civil rights organizations and one individual voter—allege that Defendant Georgia Secretary of State's database matching protocol for voter registration violates Section 2 of the Voting Rights Act (VRA), Section 8 of the National Voter Registration Act (NVRA), and the First and Fourteenth Amendments to the United States Constitution.

All Georgians who register to vote in Georgia must swear or affirm under penalty of perjury that they are United States citizens. Neither the Georgia nor Federal voter registration forms require voter registration applicants to submit documentary proof of U.S. citizenship ("DPOC"). Irrespective of O.C.G.A. § 21-2-216(g), it is not the case that all Georgians are required to produce DPOC when registering to vote, as this provision is unenforceable.[1]

After a Georgia applicant submits a voter registration application, the application data is uploaded into Georgia's centralized voter registration database (now referred to as GARVIS) and submitted to the Georgia Department of Driver

---

[1] The Defendant is *prohibited* from enforcing O.C.G.A. § 21-2-216(g) because the Election Assistance Commission has to date not included Georgia's purported DPOC requirement in the Federal voter registration form instructions and the State cannot add that requirement to Georgia's own voter registration form under Section 9 of the NVRA.

1

Services ("DDS") electronically by the Defendant pursuant to the Help America Vote Act ("HAVA").

Pursuant to Defendant's DDS database matching protocol, voter registration application data is compared with DDS driver's license data. If DDS cannot verify the citizenship status of the applicant, Defendant flags the applicant as a potential noncitizen and places the applicant into "pending for citizenship verification" status rather than in "active" voter status.

Defendant's protocol specifically discriminates against naturalized citizens because it relies on the information an applicant provided to DDS at the time they applied for a license, which may not reflect their current citizenship status. Georgia residents who are legally present in the United States but are not U.S. citizens are issued "limited-term" licenses, while U.S. citizens are issued "full-term" licenses. There is no requirement that a newly naturalized citizen update their citizenship status with DDS by obtaining a full-term license, which must be done in person and requires payment of a fee. Because DDS does not update its records to reflect current citizenship status—and therefore inherently relies on stale data—applicants who became naturalized U.S. citizens after previously applying for a limited-term license are routinely incorrectly flagged as noncitizens, and additional steps are imposed upon them to be able to cast a ballot which will count as a vote.

Defendant's DDS database matching protocol has a dramatically disproportionate effect on voter registration applicants of color, who make up a far greater percentage of applicants in pending for citizenship verification status than their white non-Hispanic counterparts. Defendant has been on notice of this discriminatory impact for well over a decade and has not taken any adequate corrective action to alleviate the unconstitutional and unlawful burdens imposed on voter registration applicants, particularly naturalized U.S. citizens and Black, Latinx, AAPI, and other applicants of color.

Notably, neither the Defendant nor DDS provide any information to the public on their websites warning voter registration applicants who previously applied for limited-term driver's licenses, or who do not otherwise have a positive record in the DDS system establishing they are U.S. citizens, that they should take any proactive action to prevent being flagged as a potential non-citizen when they attempt to register to vote.

Unlike other Georgia citizens who have paid the fee to acquire a full-term Georgia driver's license or Georgia ID card and have positive proof of citizenship in the DDS database, applicants in pending for citizenship verification status are required to produce DPOC before they are able to vote and have that vote counted.[2]

---

[2] If DDS records are able to confirm the applicant is a U.S. citizen at the time the records are compared, they will be registered as "active" voters if they are otherwise qualified.

Moreover, absent the preliminary injunction order entered by this Court in 2018, voters in pending for citizenship verification status would not be able to show DPOC to poll workers at the polling place and would instead be required to provide DPOC to a board of registrars or deputy registrar in order to vote a regular ballot.[3] The burden on the right to vote is substantial, if not severe, for those who have been flagged.

Following the close of discovery in this matter, Defendant revealed publicly for the first time that the Secretary of State's office was planning to use the United States Citizenship and Immigration Services (USCIS) Systematic Alien Verification for Entitlements (SAVE) database to attempt to verify the citizenship of voter registration applicants flagged as potential non-citizens. However, after representing that SAVE would imminently become operationalized as a routine part of the

---

If DDS does not have a record for a particular applicant in its database at all, the applicant's voter registration application data is sent to the Social Security Administration (SSA). However, SSA's "Help America Vote Verification" system, known as HAVV, does not verify or otherwise check an applicant's citizenship status. Nevertheless, if a Georgia voter registration applicant has no record on file with DDS, but does match a unique record in the SSA's HAVV system, they will be registered as an active Georgia voter if they are otherwise qualified.

[3] It remains unclear whether applicants will be purged from the registration list if they do not resolve their pending status within 26 months. While Defendant had claimed he is temporarily not enforcing the 26-month deadline, it is not clear whether he has permanently chosen not to subject applicants to removal from the registration list in violation of Section 8 of the NVRA if they do not provide DPOC within 26 months.

Defendant's voter registration protocol more than a year ago, Defendant has produced no evidence that he has actually operationalized SAVE for the purpose of verifying citizenship status. Critically, an initial SAVE audit of a backlog of pending voters conducted by the Defendant also revealed that even if it became a routine component of voter registration, SAVE would not do nearly enough to prevent the DDS database matching protocol from violating federal law and the United States Constitution.

Defendant's database matching protocol has been responsible for preventing and delaying the ability of eligible U.S. citizens in Georgia from being able to exercise their right to vote without impediment for well over a decade. Georgia previously denied active voter registration status to tens of thousands of applicants when the spelling of their names, their dates of birth, or the social security or Georgia driver's license numbers on their registration records did not "exactly match" the same information recorded in DDS or Social Security Administration databases. That policy was largely abandoned with the passage of House Bill 316, but the legislature did nothing to address the citizenship verification problems resulting from the Defendant's DDS database matching protocol. As a result, thousands of voter registration applicants have been denied active voter registration status despite being U.S. citizens eligble to vote, and more will continue to be denied active voter registration status absent relief ordered by this Court.

The burden on naturalized citizens—who are disproportionately people of color—resulting from Defendant's policy is substantial, if not severe, for those who have been flagged and are denied "active" registration status. Defendants are unable to offer any legitimate justification for their imposition of this burden.

2. **Relevant Authority**

   a. **Section 2 of the Voting Rights Act (VRA), 52 U.S.C. § 10301**

Section 2 of the VRA prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). To prevail on a Section 2 claim, Plaintiffs must demonstrate that, under the totality of circumstances, the political process is not "'equally open' to minority and non-minority groups alike." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2337 (2021). "[T]he most relevant definition of the term 'open,' as used in [Section 2] is 'without restrictions as to who may participate,' or 'requiring no special status, identification, or permit for entry or participation.'" *Id.* (citations omitted). In evaluating the totality of the circumstances, courts may analyze "any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity.' *Id.* at 2338.

   b. **Fourteenth Amendment Equal Protection Clause**

The Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person within its jurisdiction the equal protection of the laws."

U.S. Const. amend. XIV, § 1. The Equal Protection Clause guarantees "the rights of citizenship of the native born and of the naturalized person are of the same dignity and are coextensive." *Schneider v. Rusk*, 377 U.S. 163, 165 (1964).

In assessing whether a voting practice or procedure unconstitutionally burdens the right to vote, courts apply the *Anderson-Burdick* test to "weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule, taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). Thus, "the rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

When an election practice or procedure imposes only "reasonable, *nondiscriminatory* restrictions" on the right to vote, "the state's important regulatory interests are generally sufficient to justify" restrictions. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (emphasis added). A higher level of scrutiny applies when the burden on the right is more substantial. *Democratic Exec. Comm. of Fla.*, 915 F.3d

1312, 1319 (11th Cir. 2019) ("The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law.").[4]

### c. First and Fourteenth Amendments Fundamental Right to Vote

The First and Fourteenth Amendments of the Unites States Constitution protect the right to vote as a fundamental right. The First Amendment's guarantees of freedom of speech and association protect the right to vote and to participate in the political process. The right to vote is a fundamental constitutional right also protected by both the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *See, e.g.*, *Bush v. Gore*, 531 U.S. 98, 104-105 (2000); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Anderson v. Celebrezze*, 460 U.S. 780, 786-87 (1983). In assessing constitutional right to vote claims, courts apply the *Anderson-Burdick* test described above in Sub-section (b).

### d. Section 8 of the National Voter Registration Act (NVRA), 52 U.S.C. § 20507

Section 8 of the NVRA requires each state to "*ensure* that any eligible applicant is registered to vote in an election" 52 U.S.C. § 20507(a)(1) (emphasis added), thereby "affirmatively requir[ing] states to register eligible voters." *Bellito*

---

[4] Plaintiffs recognize that the Court's Order denying Defendant's Motion for Summary Judgement (Doc. 160) held that the *Anderson-Burdick* framework controls Plaintiffs' Equal Protection claim. Plaintiffs preserve the argument that strict scrutiny is the proper standard for Equal Protection claims concerning discrimination on the basis of national origin or naturalized citizenship, including in cases dealing with the right to vote.

*v. Snipes*, 935 F.3d 1192, 1201 (11th Cir. 2019). An individual is considered registered to vote to satisfy Section 8 only when they are "actually able to go to the polls and cast a regular ballot." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 383 (6th Cir. 2008). Congress' purpose in passing the NVRA was to "increase the number of eligible citizens who register to vote" and "enhance[] the participation of eligible citizens as voters." 52 U.S.C. § 20501(b). "These provisions show that the NVRA was 'designed to ensure that eligible applicants in fact are registered and that ineligible registrants are removed from the States' official voter lists.'" *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1340 (N.D. Ga. 2016) (quoting *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 721 (S.D. Miss. 2014)).

Section 8 of the NVRA also provides that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . shall be uniform, nondiscriminatory, and in compliance with the [VRA]." 52 U.S.C. § 20507(b)(l). *See United States v. Fla.*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012) ("The Secretary's methodology made it likely that the properly registered citizens who would be required to respond and provide documentation would be primarily newly naturalized citizens. The program was likely to have a discriminatory impact on these new citizens. . . . A state cannot properly impose burdensome demands in a discriminatory manner.").